**2023-2163, 2023-2164**

In The

# United States Court of Appeals
## for the Federal Circuit

GUIZHOU TYRE CO., LTD. CO., LTD., GUIZHOU TYRE
IMPORT AND EXPORT CO., LTD., AEOLUS TYRE CO., LTD.,

Plaintiffs-Appellants,

QINGDAO FREE TRADE ZONE FULL-WORLD INTERNATIONAL
TRADING CO., LTD., XUZHOU XUGONG TYRES CO., LTD., TRELLEBORG
WHEEL SYSTEMS (XINGTAI) CO., LTD., QINGDAO QIHANG TYRE CO.,
LTD., WEIHAI ZHONGWEI RUBBER CO., LTD.,

Plaintiffs,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of International Trade in
Case No. 17-cv-00100, Senior Judge Timothy C. Stanceu

**NONCONFIDENTIAL OPENING BRIEF FOR PLAINTIFF-APPELLANTS
GUIZHOU TYRE CO., LTD. AND
GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.**

Ned H. Marshak*
Jordan C. Kahn
Dharmendra N. Choudhary

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

*599 Lexington Ave., 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel to Plaintiff-Appellants*
*Guizhou Tyre Co., Ltd. and Guizhou*
*Tyre Import and Export Co., Ltd.*

Dated:  October 27, 2023

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 23-2163 (consolidated with 23-2164)

**Short Case Caption** Guizhou Tyre Co., Ltd. v. US

**Filing Party/Entity** Guizhou Tyre Co., Ltd., Guizhou Tyre Import and Export Co., Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: October 27, 2023

Signature: /s/ Jordan C. Kahn

Name: Jordan C. Kahn

FORM 9. Certificate of Interest

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Guizhou Tyre Co., Ltd. | | |
| Guizhou Tyre Import and Export Co., Ltd. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable               ☐     Additional pages attached

| | | |
|---|---|---|
| Brandon M. Petelin | Elaine F. Wang | Andrew T. Schutz |
| Mark E. Pardo | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)     ☐  No     ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable               ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ..................................................ix

JURISDICTION.................................................................................1

INTRODUCTION .............................................................................1

ISSUES PRESENTED FOR REVIEW ............................................2

STATEMENT OF THE CASE...........................................................3

STATEMENT OF FACTS .................................................................3

    A.    Background ..........................................................................3

    B.    GTC Reported That It Was Not Controlled by the Government ..........4

        1.    Information evidencing independence from government control ................................................................4

        2.    GTC's 2012 and 2015 Meetings.................................9

        3.    Legal constraints governing GTC operations ...........12

    C.    Preliminary Results through CIT Appeal...........................16

    D.    CIT Rulings and Commerce Remands................................17

SUMMARY OF ARGUMENT ..........................................................18

ARGUMENT .....................................................................................21

    I.    STANDARD OF REVIEW ..................................................21

    II.    COMMERCE IMPROPERLY EMPLOYED THE SEPARATE RATE ANALYSIS FOR MAJORITY SOE-OWNED RESPONDENTS..................................................22

        A.    Commerce's Traditional Methodology Holistically Requires Actual Control Over Export Activities .....................................23

        B.    This Court Has Affirmed Commerce's Truncated Separate Rate Methodology For Majority SOE-Owned Respondents ............26

**TABLE OF CONTENTS - Continued**

C.    Precedent Recognizing Different Analyses Depending on Majority- or Minority-SOE Ownership ....................................28

D.    Commerce Improperly Denied GTC's Separate Rate By Applying the Analysis for Majority SOE-Owned Respondents ...................................................................................................32

III.    GTC REBUTTED THE PRESUMPTION OF STATE CONTROL ............37

IV.    COMMERCE RELIED ON EVIDENCE INSUFFICIENT TO DENY GTC'S SEPARATE RATE ..........................................................................45

A.    The 2012 and 2015 Meetings Do Not Evidence State Control ...................................................................................................46

B.    Commerce Failed to Establish Government Control Over Export Activities ......................................................................53

V.    COMMERCE ARBITRARILY REVERSED ITSELF BETWEEN AR5 AND AR7 ...................................................................................................58

CONCLUSION ....................................................................................................60

**CONFIDENTIAL MATERIAL DELETED**

The confidential material deleted from pages 47 and 52 consists of business proprietary information submitted to, or released by, the U.S. Department of Commerce under administrative protective order, Appxi-iv, the disclosure of which is protected by statute, 19 U.S.C. § 1677f.

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States,*
284 F.Supp.3d 1350 (CIT 2018) ................................................................*passim*

*Advanced Technology & Materials v. United States,*
36 CIT 1576 (2012) ..............................................................................26

*Advanced Technology & Materials v. United States,*
37 CIT 1487 (2013) ..............................................................................26

*Advanced Technology & Materials v. United States,*
581 Fed. Appx. 900 (Fed. Cir. 2014)....................................................27

*Aukerman Co. v. R.L. Chaides Constr. Co.,*
960 F.2d 1020 (Fed. Cir. 1992) .....................................................*passim*

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962)..............................................................................21

*China Mfgrs. Alliance, LLC. v. United States,*
1 F.4th 1028 (Fed. Cir. 2021) ..............................................................27

*China Mfgrs. Alliance, LLC v. United States,*
639 F.Supp.3d 1260 (CIT 2023) ....................................................4, 27

*Diamond Sawblades Mgrs. Coal. v. United States,*
866 F.3d 1304 (Fed. Cir. 2017) .....................................26, 27, 54, 58

*Downhole Pipe & Equip., L.P. v. United States,*
776 F.3d 1369 (Fed. Cir. 2015) ..........................................................21

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009)........................................................................22, 59

*Gallant Ocean (Thailand) Co. v. United States,*
602 F.3d 1319 (Fed. Cir. 2010) .....................................................21, 46

## TABLE OF AUTHORITIES - Continued

*Guizhou Tyre Co. v. United States*,
    389 F.Supp.3d 1350 (CIT 2019) ....................................................3, 17

*Guizhou Tyre Co. v. United States*,
    519 F.Supp.3d 1248 (CIT 2021) ..............................................3, 17, 36

*Guizhou Tyre Co. v. United States*,
    641 F. Supp.3d 1371 (CIT 2023) ...............................................*passim*

*Hyundai Elecs. Indus. Co. v. United States*,
    899 F.2d 1204 (Fed. Cir. 1990) ....................................................22, 58

*I.D.I. International Development and Investment Corp. v. United States*,
    2021 WL 3082807 (CIT July 6, 2021) ........................................35, 36

*INS v. Cardoza–Fonseca*,
    480 U.S. 421 (1987)........................................................................22, 60

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
    121 F.Supp.3d 1263 (CIT 2015) ..........................................................28

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
    28 F.Supp.3d 1317 (CIT 2014) ..................................................*passim*

*Jilin Forest Industry Jinqiao Flooring Group Co. v. United States*,
    617 F.Supp.3d 1343 (CIT 2023) ................................................19, 38

*NLRB v. Columbian Enameling & Stamping Co.*,
    306 U.S. 292 (1939)....................................................................21, 47

*Save Domestic Oil, Inc. v. United States*,
    357 F.3d 1278 (Fed. Cir. 2004) .........................................................21

*Signa Corp. v. United States*,
    117 F.3d 1401 (Fed. Cir. 1997) .........................................................26

*SKF USA, Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011) ............................................21, 59, 60

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951)...................................................................21, 47

iv

## TABLE OF AUTHORITIES - Continued

*WelCom Prods., Inc. v. United States,*
  865 F.Supp.2d 1340 (CIT 2012) ...................................................22, 59

*Zhejiang Machinery Import & Export Corp. v. United States,*
  65 F.4th 1364 (Fed. Cir. 2023) .......................................................27, 28

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States,*
  350 F.Supp.3d 1308 (CIT 2018) ...........................................30, 31, 33

**Statutes**

5 U.S.C. § 706 ...............................................................................................22

19 U.S.C. § 1516a ......................................................................1, 3, 21, 46

28 U.S.C. § 1295 ..............................................................................................1

28 U.S.C. § 1581 ........................................................................................1, 3

28 U.S.C. § 2645 ..............................................................................................1

**Regulations**

19 C.F.R. § 351.303 .......................................................................................57

**Federal Register Publications**

*Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,629
  (Sept. 14, 2006) (final results) ...................................................25, 56

*New Pneumatic Off-the-Road-Tires from China*, 82 Fed. Reg. 18,733
  (Apr. 21, 2017) (final results) .........................................................3, 16

*New Pneumatic Off-the-Road-Tires from China*, 73 Fed. Reg. 40,485
  (July 15, 2008) (final determination)..........................................4, 60

*New Pneumatic Off-the-Road-Tires from China*, 80 Fed. Reg. 20,197
  (Apr. 15, 2015) (final results) ....................................................*passim*

*New Pneumatic Off-the-Road-Tires from China*, 76 Fed. Reg. 23,272
  (Apr. 20, 2016) (final results) .............................................................58

**TABLE OF AUTHORITIES - Continued**

*Silicon Carbide from China*, 59 Fed. Reg. 22,585 (May 2, 1994)
(final determination) .........................................................................23, 24, 40, 53

*Sparklers from China*, 56 Fed. Reg. 20,588 (May 6, 1991)
(final deterination) ............................................................................23, 24, 40, 53

*Structural Steel Beams from China*, 66 Fed. Reg. 67,197
(Dec. 28, 2001) (preliminary determination)......................................................24

## <u>STATEMENT OF RELATED CASES</u>

No appeal in or from the same proceeding in the lower court was previously before this or any other appellate court. The cases known to counsel that could directly affect or be directly affected by this Court's decision in this appeal are:

- *Guizhou Tyre Co., Ltd. v. US*, Fed Cir. Case No. 23-2165 (companion case) – same Appellant, an exporter with minority state ownership, challenging its separate rate denial in the less-than-fair-value investigation of truck and bus tires from the People's Republic of China based on specific record evidence;

- *China Manufacturers Alliance, LLC v. US,* Fed. Cir. Case No. 23-2391 (companion case) – Appellant, an exporter with majority state ownership, challenging its separate rate denial in the fifth administrative review of the antidumping duty order on certain pneumatic off-the-road tires from the People's Republic of China based on specific record evidence;

- *Pirelli Tyre Co., Ltd. v. US*, Fed. Cir. Case No. 23-2266 – Appellant, an exporter with minority state ownership, challenging its separate rate denial in the third administrative review of the antidumping duty order on passenger vehicle and light truck tires from the People's Republic of China based on specific record evidence; and

- *Jilin Forest Industry Jinqiao Flooring Group Co. v. US*, Fed. Cir. Case No. 23-2245 – Appellant United States challenging the U.S. Court of International Trade's invalidation of the presumption of state control in case where Appellee, an exporter with majority state ownership, was under protest granted a separate rate in the fifth administrative review of the antidumping duty order on multilayered wood flooring from the People's Republic of China.

## JURISDICTION

Plaintiffs-Appellants Guizhou Tyre Co., Ltd. ("GTC") and Guizhou Tyre Import and Export Co., Ltd. ("GTCIE") (collectively, "Guizhou")[1] appeal from a May 18, 2022, final judgment of the U.S. Court of International Trade ("CIT"). Appx1-2. The CIT had jurisdiction per 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c). Appx7. This Court has jurisdiction per 28 U.S.C. § 1295(a)(5). Guizhou filed a notice of appeal on July 24, 2023. Appx229; 28 U.S.C. § 2645(c).

## INTRODUCTION

Guizhou contests the denial of GTC's "separate rate" in the seventh administrative review ("AR7") of the antidumping duty ("ADD") order on new pneumatic off-the-road-tires ("OTR") from the People's Republic of China ("China" or "PRC"), a nonmarket economy ("NME") country, in which the U.S. Department of Commerce ("Commerce" or "Department") assigned GTC the 105.31% PRC-wide rate after finding that the presumption of state control was not rebutted. The AR7 period of review ("POR") spanned September 1, 2014—August 31, 2015. GTC's separate rate denial was neither supported by substantial evidence nor in accordance with law.

---

[1] GTC produced the subject merchandise exported to the United States by its wholly-owned affiliate GTCIE, and both participated in the administrative proceeding resulting in GTC's separate rate denial.

## ISSUES PRESENTED FOR REVIEW

1.  Whether Commerce unlawfully denied a separate rate for GTC—which is minority owned by a state-owned enterprise ("SOE")—using a truncated potential control analysis approved by this Court for respondents with majority SOE-ownership, instead of the longstanding, holistic analysis requiring actual control over export functions?

2.  Whether GTC rebutted the presumption of state control, which vanishes upon contrary evidence and is not entitled to deference, by submitting substantial evidence establishing its independence from the Chinese government?

3.  Whether Commerce unlawfully denied GTC's separate rate based on meetings where its SOE shareholder voted on resolutions, notwithstanding the fact that such votes did not constitute: (a) actual state control over export functions; (b) additional indicia beyond what is required in the majority SOE-ownership context; or (c) substantial evidence to find GTC state-controlled?

4.  Whether Commerce arbitrarily reversed its separate rate decision between consecutive reviews of GTC, when AR7 reflected significantly less SOE ownership and substantially more evidence of independence than in the fifth administrative review ("AR5") when Commerce granted GTC's separate rate?

## STATEMENT OF THE CASE

Guizhou appeals Commerce's denial of GTC's separate rate in AR7 of the ADD order on OTR from China in *OTR from China*, 82 Fed. Reg. 18,733 (Apr. 21, 2017), Appx89-92 ("*Final Results*"); Issues and Decision Memorandum ("IDM") (Apr. 12, 2017), at 12-15, Appx58-61. Guizhou appealed the *Final Results* per 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), as CIT No. 17-00100.

This appeal comes after the CIT affirmed Commerce's third explanation for denying GTC's separate rate. The CIT in May 2019 ordered Commerce to reconsider the separate rate denial in its *Final Results*. *GTC v. United States*, 389 F.Supp.3d 1350 (CIT 2019), Appx3-20 ("*GTC I*"). Commerce provided additional explanation. Final Redetermination (Sept. 23, 2019), Appx96-138 ("1st Remand"). The CIT in May 2021 again ordered Commerce to reconsider the separate rate denial. *GTC. v. United States*, 519 F.Supp.3d 1248 (CIT 2021), Appx21-32 ("*GTC II*"). Commerce again provided additional explanation. Final Redetermination (Sept. 24, 2021), Appx139-202 ("2nd Remand"). The CIT in May 2023 affirmed Commerce's 2nd Remand. *GTC v. United States*, 641 F. Supp.3d 1371 (CIT 2023), Appx34-45 ("*GTC III*").

## STATEMENT OF FACTS

### A.    Background

In the less than fair value ("LTFV") investigation of OTR from China leading to the ADD order, Commerce granted GTC a rate separate from the PRC-

wide entity by finding an absence of control by the Chinese government. *OTR from China*, 73 Fed. Reg. 40,485, 40,487 (July 15, 2008) ("*LTFV Final*") ("the evidence placed on the record . . . demonstrate{s} both a *de jure* and *de facto* absence of government control, . . . and, thus {GTC is} eligible for separate rate status.").

Commerce next reviewed GTC in AR5, and a separate rate was granted despite GTC's 33.84% SOE-ownership. *OTR from China*, 80 Fed. Reg. 20,197, 20,198-99 (Apr. 15, 2015) ("*AR5 Final Results*"). In contrast, Commerce denied separate rate status for the other individually examined AR5 respondent, Double Coin Holdings Ltd., that was 65.66% SOE-owned. *Id*. at 20,198, IDM ("AR5 IDM") at 5-20; *China Mfgrs. Alliance, LLC v. United States*, 639 F.Supp.3d 1260, 1264 (CIT 2023). GTC's separate rate status was next reviewed in AR7, when it again fully cooperated with Commerce's individual examination.

### B.    GTC Reported That It Was Not State-Controlled

Guizhou throughout AR7 submitted information detailing: (1) its independence from government control; (2) shareholder meetings in 2012 and 2015; and (3) the legal constraints under which it operated.

#### 1.    Information evidencing independence from government control

Guizhou in January 2016 reported that:

- "GTC is a public company listed in the Shenzen Stock Exchange";

- "GTC is publicly traded and therefore controlled by its shareholders"; and

- AR7 sales of subject OTR produced by GTC were made by its wholly-owned affiliated exporter GTCIE, either directly to unaffiliated U.S. customers or through its U.S. affiliate.

Guizhou Section A Questionnaire Response (Jan. 20, 2016) ("AQR"), at 1-2, Exhibits A-2A–B, Appx810-811, Appx837-840.

Guizhou reported that one of its shareholders, Guiyang Industry Investment (Group) Co., Ltd. ("GIIC" or "GIIG") "is a state owned investment company under the supervision of the Guiyang {State-owned Assets Supervision and Administration Commission ('SASAC')}."[2] Appx812. GIIC held **25.20% of the shares in GTC at the end of 2014**. *Id*. Exhibit A-8, Appx933. Guizhou throughout AR7 submitted extensive evidence demonstrating that—despite this minority interest—GTC was not controlled by the government.

Guizhou submitted GTC's business license and explained that subject OTR "does not appear on any government list regarding export provisions or export licensing." *Id*. at 9, Exhibit A-4, Appx818, Appx911-915. GTC reported that it "sets its prices taking into consideration its production costs and expenses as well as prevailing market conditions. **These prices are not subject to review or guidance from any governmental organization**." *Id*. at 10, Exhibit A-5, Appx819 (emphasis modified), App921-24 (correspondence of price discussions with an unaffiliated customer). Guizhou advised that neither GTC "nor any

---

[2] Throughout AR7, Guizhou used "GIIC" and Commerce used "GIIG."

manager of the Company is expected to achieve foreign exchange targets set by any governmental authority." *Id*. at 11, Appx820.

Guizhou demonstrated that GTC retains the proceeds of export sales and make independent decisions regarding disposition of profits or financing of losses: "The export price less the cost of goods sold and applicable sales expenses results in export profits. The Company can dispose these profits as it needs for its business operations." *Id*. at 12, Appx821. Guizhou's financial statements showed that Guizhou retains the proceeds of export sales. *Id*. Exhibits A-13–14, Appx1023-1665. Guizhou explained its management selection process:

> As a public company, the board of directors of GTC is selected by its shareholders at a shareholders' meeting, and its senior management is selected by its board of directors.

> As the single shareholder of GTCIE, GTC selects GTCIE's management.

> Neither GTC nor GTCIE is required to notify any governmental authorities of who the managers are.

*Id*. at 11, Appx820.

To rebut Petitioner's claim "that Guiyang SASAC conducts an annual performance review of GTC's senior management," GTC in February 2016 submitted the "Notice by Guiyang SASAC regarding Stopping Performance Review of Persons in Charge of State-owned Listed Enterprises." Guizhou Rebuttal Factual Information (Feb 23, 2016) ("RFI"), Exhibit 1, Appx1750-1753. It stated that "**Guiyang SASAC stopped performance review of** state-owned

listed enterprises including **GTC from January 1, 2015** (including performance reviews for the year of 2014)." *Id*. at 2, Appx1740 (emphases added).

Guizhou further established that "the performance review of senior management of GTC will be carried out by the Remuneration and Appraisal Committee of the Board of Directors of the Company itself, not by outsiders." *Id*. at 2, Exhibit 2, Appx1740, Appx1754-1757. "Guiyang SASAC did **not** conduct any performance reviews of GTC's senior management during any part of this review period." *Id*. at 2, Appx1740 (emphasis in original). SASAC's ownership in GTC during AR7 was 25.2%—8.64% less than when GTC received a separate rate in AR5. *Id*. at 6, Appx1744. *AR5 Final Results*, 80 Fed. Reg. at 20,198-99.

The Guiyang SASAC formally clarified its relationship with GTC in the "Reply of Guiyang Municipal {SASAC} to {GTC} regarding 'Request to Clarify and Explain and Administration Authority of Guiyang Municipal {SASAC} on {GTC}.'" Guizhou Supplemental AQR (May 25, 2016) ("SAQR"), at 6, Exhibit 10, Appx1888, Appx2763-2770 ("Guiyang SASAC Clarification").

> GTC is in a special position because it is a publicly traded company. Thus, while Guiyang SASAC has an interest in GTC's activities, **Guiyang SASAC has confirmed that it does not have the authority to make decisions for GTC**. Instead, Guiyang SASAC confirms that "GTC must follow the national laws and regulations for operation and decision making by public companies." . . .
>
> **Guiyang SASAC which has an interest in your company, does not have the right to make a decision on appointment or dismissal of board directors or management of your company**.

> **Decisions on selection of board members, appointment of management** and general business operation decisions **shall be made** by your company **in accordance with relevant laws, regulations and your company's articles of association {"AoA"} without approval from Guiyang SASAC**.
>
> . . . Guiyang SASAC can express its opinion regarding relevant significant matters, based on relevant law, regulation and the articles of association of the company. **The final decision shall be made by the shareholders' meeting and the board of directors of the company pursuant to law, regulation and the {AoA} of the company**.

*Id*. at 6 (emphases added), Appx1888.

Guizhou confirmed that the SOE "can only participate through the shareholders' meeting to voice its opinion." Guizhou Second SAQR (Aug. 8, 2016) ("2SAQR") at 3, Exhibit 3A Art. 2, Appx2935, Appx3340. Responding to Commerce's request for SASAC supervision records, Guizhou stated: "There were no such inspections of GTC or GTCIE by SASAC and therefore there were no reports . . . . **SASAC is not involved in the daily operation of management of GTC**." *Id*. at 6 (emphasis added), Appx2938. GTC provided correspondence in which Guiyang SAAC confirmed that it "did not conduct on-site supervision or inspection of GTC or {its} subsidiaries in 2014 or 2015." *Id*. Exhibit 4, Appx3368.

Guizhou submitted GTC/GTCIE financial statements. SAQR Exhibits 3-5, Appx2003-2641. GTC's 2015 Annual Report demonstrated independence over profit distribution and management selection; its "{p}rofit distribution plan for

year 2014 was passed" in July 2015, which resulted in a dividend being issued to

all shareholders. *Id*. Exhibit 3 at 19, Appx2178. In distributing the dividend, GTC

confirmed that "**the minority shareholders have the opportunity to fully express**

**their opinions and claims; check whether or not their legitimate rights and**

**interests are fully protected**." *Id*. (emphasis added). The Annual Report

articulated that its independence included compliance with the PRC Code of

Corporate Governance for Listed Companies ("PRC Code"):

> **The Company strictly abides by relevant provisions** of the {PRC Code . . . } **and completely separates from the controlling shareholder {GIIC}** in personnel, assets and finance, etc., with independent organization and independent business. **The controlling shareholder strictly abides by the provisions of laws and regulations** and exercise shareholders' rights pursuant to laws. . . . .

> The performance review of senior management of the Company will be carried out by the Remuneration and Appraisal Committee of the Board of Directors based on the Company's business performance during the reporting period . . . .

*Id*. Exhibit 3 at 46 (emphases added), 49, Appx2205, Appx2208.

### 2. GTC's 2012 and 2015 Meetings

GTC submitted resolutions from multiple shareholder meetings, including:

- <u>Third Interim Shareholders' Meeting</u> ("2012 Meeting"), when GTC's 6th Board was elected, which was substantially similar to the AR7 POR board, and this board selected the chairman;

- <u>2014 Annual General Meeting</u> ("May 2015 Meeting"), when proposals to appoint two directors and preliminarily distribute profits failed; and

- <u>2015 3rd Interim Shareholders' General Meeting</u> ("July 2015 Meeting"), when proposals to appoint two directors and preliminarily distribute profits passed.

SAQR at 3-4, Exhibit 7, Appx1885-1886, Appx2682-2725.

GTC submitted information detailing these meetings. At the 2012 Meeting, "the 6th session of board of directors of GTC were nominated by the Nomination Committee under the Board of Directors of GTC; **GIIC did not have any involvement in the nomination stage of election of GTC's 6th session** of the board of directors." 2SAQR at 9, Appx2941 (emphasis added). "{S}hareholders other than GIIC attended and voted on proposals at other shareholders' meetings, such as the May 2015 Meeting." *Id*.

> {D}uring the {May 2015 Meeting}, **due to dissenting votes from shareholders other than GIIC**, the following proposals were not passed at the shareholders' meeting:
> Proposal 4: 2014 Profit Distribution Preliminary Plan
>
> Proposal 7: Election of Independent Directors for the 6th session of board of directors of GTC
>
> **Although GIIC voted in favor of both of these proposals through its proxy . . . these proposals did not pass due to objections by other shareholders.**

*Id*. (emphases added). For these meetings, Guizhou provided voting books, online voting results, and resolutions to demonstrate that management selection and profit distribution were determined by GTC's shareholders, including minority shareholders—without any involvement of Guiyang SASAC or other government entities. *Id*. Exhibit 7C, Appx3446-3490.

- 10 -

Case: 23-2163    Document: 21    Page: 23    Filed: 10/27/2023

Guizhou submitted detailed information for its meetings, wherein
shareholders may cumulate votes and vote via internet, conducted "in full
compliance with the PRC Company Law and {AoA} of GTC." SAQR at 4,
Exhibits 6-7, 11-12, Appx1886, Appx2642-2725, Appx2771-2775. Guizhou
informed Commerce that the "current non-employee directors of GTC were
nominated by its board of directors," and "the employee director is nominated by
employee representatives of GTC." *Id.* at 4, Exhibit 8, Appx1886, Appx2726-
2743. Guizhou reported that GTC's: (1) Board of Directors are elected by its
shareholders; (2) board chairman and vice chairman are elected by board members;
and (3) senior management are selected by board members. *Id.* at 4-6, Exhibits 6,
11, Appx1886-1888, Appx2642-2681, Appx2771-2773.

Guizhou provided information for GTC's "nomination committee"
established pursuant to PRC Code Article 52. Guizhou Third Supplemental AQR
(Sept. 13, 2016) ("3SAQR"), at 1-2, Exhibits 1-3, Appx3552-3553, Appx3560-
3619. GTC shareholder meetings before and throughout the POR were well-
documented, including the voting shares of GIIC at each. *Id.* at 3-4, Exhibits 4-8,
Appx3554-3555, Appx3620-3758. Guizhou provided the employment status for
each GTC board member who was not a member of GTC's senior management,
and information regarding GTC board members who served as directors of other
companies. It reported that GTCIE "board members and senior managers did not

sit on the boards of other companies or government entities during the POR or

three previous years." *Id*. at 3, Exhibits 9-10, Appx3554, Appx3755-3758.

Guizhou confirmed that GTC's "board members and senior managers did not work

in any government entities during the POR or three previous years" and that GTC's

chairman "did not hold any management position at GTC or any other company

during the period 9/1/2011-8/31/15." *Id*. at 4, Exhibit 9, Appx3555, Appx3756.

### 3.  Legal constraints governing GTC

GTC's 2014 Annual Report confirmed that "**the Company strictly abides**

**by relevant provisions of laws, statutes and rules and regulations**." SAQR

Exhibit 3 at 46, Appx2205 (emphasis added). GTC's submitted its AoA, with

mandating transparent and democratic procedures, as well as protections against its

SOE shareholder, GIIC, that included:

- <u>32</u>: **The Shareholders of the Company shall be entitled** . . .

  (2) To request, convene, preside, attend . . . the Shareholders' General Meetings, and to **exercise relevant voting rights** . . . ;

  (3) To **supervise the operations of the Company** . . . .

- <u>39</u>: **A controlling shareholder** . . . **shall not take advantage of its relationship** to harm the interests of the Company. . . . **A controlling shareholder** . . . **shall have a fiduciary duty** to the Company and its public shareholders. **A controlling shareholder shall strictly exercise its rights as an investor** and shall not use ways of profits distribution . . . to harm the legal interests and rights of the Company and the public shareholders, nor shall they make use of their controlling positions to harm the interests of the Company or the public shareholders.

- <u>57</u>: Where matters on the voting of the directors and supervisors to be discussed at the shareholders' general meeting, the notice for the shareholders' general meeting **shall fully reveal** the detailed information . . . includ{ing} . . .
  **whether have affiliation with** . . . **controlling shareholders**. . . .

- <u>83</u>: The candidates for non-independent directors shall be nominated by the Board of Directors or the shareholders individually or jointly holding more than{10%} of the shares . . . . Every shareholder individually or jointly can nominate candidates for directors **for no more than one fifth of all directors**.

- <u>88</u>: . . . . **Where the shareholder{} has a stake** in the matters deliberated, **the shareholder{}** . . . **shall not engage in counting** and supervising the vote.

- <u>110</u>: The **Board of Directors of the Company shall** . . . :

  {} **decide on the business operations** and investment plans . . . ;

  {} **formulate plans for the distribution of profits** . . . .

- <u>117</u>: The Board of Directors shall have one **chairman**, and one to two vice chairman. . . . {They} **shall be elected and dismissed by the** affirmative votes of more than half of all **directors**.

- <u>130</u>: The Company shall have a Manager, who shall be hired and dismissed by the Board . . . .

- <u>132</u>: Persons who assume positions other than directors at the controlling shareholders or the actual controllers of the Company **shall not assume position of senior management of the Company**.

- <u>134</u>: The Manager shall . . .
  decid{e} on the hiring or dismissal of the persons-in-charge other than those who shall be decided by the Board . . . .

*Id*. Exhibit 1, Appx1954-1997 (emphases added).

GTC submitted the PRC Company Law establishing GTC's independent operations, subject to decision-making by all shareholders, its board, and management—with protections against GIIG dominating business decisions:

- 5: The **legitimate rights and interests of a company shall be protected** by law . . . .

- 37: The **shareholders' meeting of a company** shall . . . :

  (1)  Mak{e} **decisions on the company's operation** guidelines and investment plans;

  (2)  **Elect{} and replac{e} the directors and supervisors** who are . . . making decisions on the matters concerning the remunerations of the directors and supervisors; . . .

  (6)  **Approv{e} the profit distribution plans** . . . . .

AQR Exhibit A-3A, Appx843-857 (emphases added).

GTC also submitted the PRC Code affording protections to "listed" companies such as GTC, with the following Articles ensuring that GTC operates independently and separate from GIIC:

- 2: The corporate governance structure . . . shall ensure **fair treatment toward all shareholders, especially minority shareholders. All shareholders are to enjoy equal rights** . . . .

- 19: The **controlling shareholders owe a duty of good faith toward the listed company and other shareholders. The controlling shareholders of a listed company shall strictly comply with laws and regulations** . . . shall be prevented from damaging the . . . other shareholders' legal rights and interests, through . . . taking advantage of their privileged position . . . .

- 20: The controlling shareholders shall nominate the candidates for directors . . . in strict compliance with the terms and procedures

provided for by laws . . . . **{R}esolutions made through the shareholders' meetings electing personnel or the board of directors' resolutions appointing personnel shall not be subject to approval procedures by the controlling shareholders. The controlling shareholders are forbidden to appoint senior management personnel by circumventing the shareholders' meetings or the board of directors.**

- <u>21</u>: The important decisions of a listed company shall be made through a shareholders' meeting . . .  in accordance with law. **The controlling shareholders shall not directly or indirectly interfere with the company's decisions or business activities** conducted in accordance with laws; nor shall they impair . . . other shareholders' rights and interests.

- <u>22</u>: A **listed company shall be separated from its controlling shareholders** in such aspects as personnel, assets and financial affairs shall be independent in institution and business, shall practice independent business accounting . . . .

- <u>23</u>: **The personnel of a listed company shall be independent from the controlling shareholders.** The management, financial officers, sales officers and secretary . . . shall not take posts other than as a director in a controlling shareholder's entities.

- <u>24</u>: **The assets invested by a controlling shareholder in a listed company shall be independent** . . . . The **controlling shareholders shall not misappropriate or control such assets or interfere with the listed company's management** of such assets.

- <u>25</u>: **Controlling shareholders shall respect the financial independence of the company and shall not interfere** with the financial and accounting activities . . . .

- <u>26</u>: **The board of directors** . . . **shall operate in an independent manner**. . . . .

- <u>27</u>: **A listed company's business shall be completely independent from that of its controlling shareholders.** Controlling shareholders .

. . shall not engage in the same or similar business as that of the listed
company. Controlling shareholders shall adopt efficient measures to
avoid competition with the listed company.

SAQR Exhibit 9, Appx2746-2751 (emphases added).

### C.    Preliminary Results through CIT Appeal

Guizhou requested that GTC be granted a separate rate, relying on the

evidence summarized above. Guizhou Pre-Preliminary Comments (Sept. 15,

2016), at 1-9, Appx3773-3781. Commerce disagreed:

> {T}he Department will assign a separate rate in NME proceedings if a
> respondent can demonstrate the absence of both *de jure* and *de facto*
> **government control over its export activities**. . . .
>
> Based on these facts, **we find that, despite the 25.20 percent
> ownership, Guiyang SASAC has demonstrated an ability to
> exercise *de facto* control over GTC and GTCIE** . . . . {W}e find . . .
> control over GTCIE's selection of management through GIIG and
> GTC and GTCIE's profit distribution.

Commerce Memorandum (Oct. 5, 2016) ("Separate Rate Memo") at 2-3 (emphases

added) (footnotes omitted), Appx3825-3826. "These facts" referred to GTC's 2012

and 2015 Meetings. Section IV.A, *infra*.

Guizhou urged Commerce to reverse the preliminary denial. Case Brief

(Dec. 14, 2016), at 3-35, Appx3869-3901. Commerce refused. Commerce in April

2017 finalized the denial, treating GTC as "part of the PRC-wide rate entity." IDM

at 12-15, Appx58-61; *Final Results*, 82 Fed. Reg. at 18,735, Appx91. Commerce

supported this action by finding that, at the July 2015 Meeting, GTC "elected

members of its board of directors through shareholders' meetings **not available to all shareholders**." *Id.* at 14, Appx60 (emphasis added). Guizhou subsequently appealed to the CIT, Appx217.

### D.    CIT Rulings and Commerce Remands

The CIT in 2019 granted Commerce's request for voluntary remand, acknowledging that the July 2015 Meeting was open to all shareholders. *GTC I*, 389 F.Supp.3d at 1359-60, Appx9-10. Nevertheless, Commerce continued to deny GTC's separate rate. 1st Remand at 16-20, Appx111-115. The CIT in 2021 again remanded because Commerce—despite purporting to examine all four "*de facto*" separate rate criteria—did not make findings with respect to the export pricing and contracting criteria, instead analyzing only the management selection and profit distribution criteria. *GTC II*, 519 F.Supp.3d at 1256, Appx28. Commerce thereafter clarified that it could not find GTC's export activities were government-controlled, but nonetheless denied GTC's separate rate based solely on the latter criteria. 2nd Remand at 14-15, Appx152-153.

The CIT in 2023 affirmed Commerce's 2nd Remand. *GTC III*, 641 F.Supp.3d at 1384-85, Appx44. Guizhou subsequently appealed to this Court. Appx229. The central question in this appeal is whether Commerce, given its separate rate practice as well as the record evidencing GTC's minority-SOE ownership and independence, lawfully denied GTC's separate rate based solely on

- 17 -

its findings: (1) "that GIIG had the ability to control the election of board members and influence the distribution of the company's profits." *Id*. at 1385, Appx44; and (2) the SOE "shareholder{} . . . controlled the selection of board members and . . . the board controlled the selection of senior management." *Id*. at 1379, Appx40.

## SUMMARY OF ARGUMENT

To determine whether companies are "*de facto*" government-controlled, Commerce traditionally employed a holistic analysis that considers four criteria, through which separate rates were only denied based on evidence of actual control over export activities. Recently, Commerce, for majority SOE-owned respondents, has instead relied on a truncated analysis to deny separate rates based on potential control over export activities through control of management selection (the third criterion); an analysis affirmed by this Court. At the same time, the CIT repeatedly—based on Commerce's own practice—has found this truncated analysis inapplicable to minority SOE-ownership, since such respondents are not necessarily government-controlled. Here, Commerce erroneously denied a separate rate for the minority SOE-owned GTC using the "necessarily controlled" analysis for majority SOE-ownership. Instead, Commerce should have followed CIT precedent by considering all four factors and approving GTC's separate rate in the absence of substantial evidence of actual control over export activities.

Moreover, Guizhou rebutted the presumption of state control, which

vanishes upon minimal contradictory evidence. The AR7 record contains substantial evidence establishing GTC's independence from state control, including information detailing the separation between GIIG/SASAC and Guizhou, and the absence of state control over GTC's export pricing, contracting, management selection, and profit distribution. Guizhou also established extensive legal constraints governing GTC's operations that protect against domination by any one shareholder. This rebuttal evidence obligated Commerce to affirmatively establish, with substantial evidence, actual state control of GTC. Commerce should not have deference in construing the presumption, which is not based on statute or regulation—and was therefore invalidated by the CIT in *Jilin Forest Industrial Jinqiao Flooring Group. v. United States*, a case appealed to this Court.

Commerce relied on evidence insufficient to deny GTC's separate rate. With the presumption rebutted, Commerce was obligated to demonstrate actual state control. Given GTC's minority SOE-ownership, Commerce needed additional indicia of state control that could reasonably support denying GTC's separate rate; indicia which are not needed with majority SOE-ownership. Commerce did not meet this standard, relying only on 2012 and 2015 meetings that show the ordinary and democratic operations of a publicly-listed company. That GIIG voted to elect the board in 2012 that remained substantially the same in AR7 does not constitute state control, particular since shareholders do not select management.

Significantly, GIIG was unable to pass its preferred proposals to appoint directors and distribute profits in May 2015—proving that GTC is not always ultimately beholden to the government. That these proposals passed in July 2015 establishes only that GIIC may participate in GTC's decision-making through the normal courses available to all shareholders. There is no evidence of control by GIIC. Indeed, Commerce concedes the absence of actual control over GTC's export activities—the traditional focus of Commerce's inquiry necessary to deny separate rates.

Finally, Commerce arbitrarily reversed its longstanding grant of a separate rate for GTC. GTC's SOE ownership declined from 33.84% to 25.20% and SASAC ceased conducting performance reviews between AR7 and AR5, when Commerce granted GTC's application for separate rate status. In AR7, Guizhou submitted extensive information evidencing its independence. Given these facts, Commerce was required to provide a heightened justification for its change of practice from AR5. Instead, Commerce feigned adherence to its practice while reaching a diametrically opposite result.

For all of these reasons, Commerce's decision should be reversed.

# ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews CIT decisions *de novo*, applying the same legal standard. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1373 (Fed. Cir. 2015). This Court invalidates final ADD determinations that are "unsupported by substantial evidence." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). It "must do more than create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

This Court "reviews the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence." *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010). Commerce must provide a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

"Despite Commerce's statutory discretion, . . . if Commerce had a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004). "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF*

*USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). "If the

Department provides no reasonable explanation for changing a practice that it has

consistently followed, such a change is an unacceptable agency practice." *WelCom*

*Prods., Inc. v. United States,* 865 F.Supp.2d 1340, 1344 (CIT 2012). An "agency

must show . . . a more detailed justification . . . when . . . its new policy rests upon

factual findings that contradict those which underlay its prior policy." *FCC v. Fox*

*Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *INS v. Cardoza–Fonseca,* 480

U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which

conflicts with the agency's earlier interpretation is 'entitled to considerably less

deference' than a consistently held agency view").

This Court must further "hold unlawful and set aside agency action,

findings, and conclusions found to be arbitrary." 5 U.S.C. § 706(2)(A). Agency

actions are arbitrary if there has been "a clear error in judgment." *Hyundai Elecs.*

*Indus. Co. v. United States*, 899 F.2d 1204, 1209 (Fed. Cir. 1990).

## II.    COMMERCE IMPROPERLY EMPLOYED THE SEPARATE RATE ANALYSIS FOR MAJORITY SOE-OWNED RESPONDENTS

Commerce's traditional separate rate analysis considers the totality of

circumstances for four *de facto* criteria, which all focus on actual control over

export activities. For decades, Commerce relied on this methodology to grant

separate rates to respondents having extensive or even 100% SOE ownership.

Recently, Commerce modified this practice **for majority SOE-owned**

**respondents**, considering only potential control over management selection (the third criterion)—a truncated methodology affirmed by this Court.

In evaluating separate rate denials for minority SOE-owned respondents, the CIT has repeatedly required—per Commerce practice—additional indicia of state control. This is because in the majority SOE-ownership context, control over management selection is sufficient to find government control since the company is ultimately beholden to the government in all respects. This is not so without majority SOE-ownership. Commerce improperly extended the truncated majority SOE-ownership analysis to GTC; it instead should have evaluated GTC using the longstanding inquiry that considers all criteria (the totality of the circumstances) and requires actual control over export activities.

### A.     Commerce's Traditional Methodology Holistically Requires Actual Control Over Export Activities

For more than three decades, Commerce "determined that exporters in NME countries are entitled to separate, company specific margins when they can demonstrate an absence of central government control, both in law and in fact, **with respect to exports**." *Sparklers from China*, 56 Fed. Reg. 20,588 (May 6, 1991) (final determination) ("*Sparklers*"), IDM Comment 1 (emphasis added); *Silicon Carbide from China*, 59 Fed. Reg. 22,585, 22,587 (May 2, 1994) (final determination) ("*Silicon Carbide*") (granting separate rates where "the record . . . demonstrates a *de jure* and *de facto* absence of government control **over the**

**export functions**") (emphasis added). As formalized in April 2005, Commerce

considers multiple *de jure* and *de facto* factors in deciding to grant separate rates:

> {T}he Department assigns separate rate status in NME cases only **if an exporter can demonstrate the absence of both *de jure* and *de facto* governmental control over its export activities**. . . . {T}o request and qualify for separate rate status . . . a company . . . must provide information responsive to the following considerations: . . . .
>
>> Typically, the Department considers four factors in evaluating whether each respondent is subject to *de facto* government control of its **export functions**:
>>
>> 1)   whether the **export prices** are set by, or subject to approval of, a government authority;
>> 2)   whether the respondent has authority to negotiate and sign contracts and other agreements;
>> 3)   whether the respondent has autonomy from the government regarding the selection of its management; and
>> 4)   whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

Commerce Policy Bulletin 05.1 (Apr. 5, 2005), Appx232 (emphases added).

The purpose of Commerce's separate rate analysis has been to determine

whether a respondent can demonstrate the absence of governmental control **over

its export activities**. *Sparklers*, 56 Fed. Reg. 20,588; *Silicon Carbide*, 59 Fed.

Reg. at 22,587; *Structural Steel Beams from China*, 66 Fed. Reg. 67,197, 67,199

(Dec. 28, 2001) (preliminary determination) ("the Department assigns separate

rates in NME cases only if the NME respondents can demonstrate the absence of

both de jure and de facto governmental control over export activities."). Commerce

claimed to follow this practice in AR7: "According to this separate rate test, the Department will assign a separate rate in NME proceedings if a respondent can demonstrate the absence of both *de jure* and *de facto* **government control over its export activities**." Separate Rate Memo at 1, Appx3824 (emphasis added).

Commerce's separate rate inquiry historically required actual state control, not mere potential; the *de facto* analysis does not hinge on the "*possibility* that . . . government officials *could have* influenced these companies' export sales." *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F.Supp.3d 1317, 1350 (CIT 2014) ("*Jiasheng I*") (emphases in original). Indeed, Commerce granted separate rates based on evidence of "**only potential control by SASAC** . . . , **rather than any actual control** of the PRC government over the numerous individual export decisions." *Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,629 (Sept. 14, 2006) (final results) ("*HFHT*"), IDM Comment 3 (emphases added). Commerce's separate rate analysis has traditionally been a holistic inquiry:

> Commerce's essential inquiry . . . focuses on whether, "**considering the totality of circumstances**," the respondents . . . "had sufficient independence in their export pricing decisions from government control to qualify for separate rates." . . . . *{D}e facto* **autonomy "can be established by evidence that {the} exporter sets its prices independently of the government and of other exporters, and that {the} exporter keeps the proceeds of its sales."**

*Jiansheng I*, 28 F.Supp.3d at 1339 n.160 (emphasis added) (quotation omitted).

**B.    This Court Has Affirmed Commerce's Truncated Separate Rate Methodology For Majority SOE-Owned Respondents**

This Court has long recognized that Commerce employs a "presumption of government control" to evaluate separate rates. *Signa Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997). In recent years, this Court has affirmed Commerce's separate rate denials for the majority SOE-ownership through a truncated analysis that does not require finding actual government control over export activities, but instead only potential control over operations through management selection. The first such case featured Advanced Technology & Materials ("ATM") in the ADD order on diamond sawblades from China:

> Commerce found {SASAC}, a Chinese government agency, owned 100 percent of the China Iron & Steel Research Institute ("CISRI") . . . , and CISRI held a **majority share** in AT&M . . . . CISRI placed four of its senior officials on AT&M's board, and the other five board members were all nominated by CISRI. . . . Because the AT&M board was active in selecting the company's management, Commerce concluded that AT&M did not choose its own management autonomously, rendering ATM part of the PRC-wide entity.

*Diamond Sawblades Mgrs. Coal. v. United States*, 866 F.3d 1304, 1307 (Fed. Cir. 2017) ("*DSMC*") (emphasis added).

Commerce initially granted ATM's separate rate using its traditional holistic analysis requiring actual control over export activities. *Id*. at 1308; Section II.A, *supra*. Then, responding to a CIT ruling, Commerce changed course and denied ATM's separate rare due to majority SOE-ownership. *ATM v. United States*, 36

CIT 1576, 1584-86 (2012); *ATM v. United States*, 37 CIT 1487, 1498, 1493-96 (2013). This Court affirmed ATM's separate rate denials. *ATM v. United States*, 581 Fed. Appx. 900 (Fed. Cir. 2014); *DSMC*, 866 F.3d at 1315.

In 2021, this Court in AR5 again affirmed Commerce's authority to deny separate rate status to a company majority owned by an SOE. *China Mfgrs. Alliance, LLC. v. United States*, 1 F.4th 1028 (Fed. Cir. 2021). While granting GTC a separate rate despite 33.84% SOE-ownership, Commerce denied it for the 65.66% SOE-owned respondent upon finding "evidence that the 100{%} SASAC–owned majority owner of Double Coin exerts considerable influence over the board of directors (and, thus, the management and operations of the company), and that the factual record does not provide sufficient information to rebut the presumption of government control." AR5 IDM at 18. This Court found that Commerce followed *DSMC*: "Double Coin sought, but failed, to rebut the presumption of government control." *China Mfgrs.*, 1 F.4th at 1039-40.[3]

In April 2023, this Court affirmed Commerce's denial of a separate rate for Zhejiang Machinery Import & Export Corp. ("ZMC"), an exporter "wholly owned by Zhejiang Sunny I/E corporation ('Sunny')" which, in turn, was majority-owned

---

[3] Despite Commerce asserting that this Court affirmed Double Coin's separate rate denial, the CIT allowed and denied an as-applied claim—appealed as a companion case with AR7. *China Mfgrs.*, 639 F.Supp.3d at 1263-68; *China Mfgrs.*, Case No. 23-2391.

by a Chinese government entity. *ZMC v. United States*, 65 F.4th 1364, 1368 (Fed. Cir. 2023). This Court agreed with Commerce that ZMC had not rebutted the presumption of government control because "the shareholders, including the labor union, have the power to select managers and keep the profit distribution—factors that Commerce has considered in establishing the presumption of de facto control." *Id*. at 1372. Given the judicial coalescence affirming DOC's truncated analysis for majority-SOE owned respondents applying for separate rates, the CIT has repeatedly recognized an irrebuttable presumption for such respondents. *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F.Supp.3d 1350, 1362 (CIT 2018) ("*An Giang II*"); *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121 F.Supp.3d 1263, 1267 (CIT 2015) (emphasis added) ("*Jiasheng II*").

### C.     Precedent Recognizing Different Analyses For Majority Versus Minority SOE-Ownership

Prior to the instant appeal, Commerce and the CIT recognized that the separate rate analysis for majority SOE-owned respondents should not apply to minority SOE-owned companies. In 2015, the CIT affirmed Commerce's grant of a separate rate despite minority-SOE ownership—despite petitioner SolarWorld arguing that "the wholly state-owned enterprise holding the **twenty percent share** was involved in the selection of {the respondent's} high-level management personal." *Jiasheng II*, 121 F.Supp.3d at 1266 (emphasis added). The CIT found that Commerce could not deny separate rates in the minority-SOE context based

"**solely**" on "**the *possibility* for governmental control over export activities**."

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F.Supp.3d 1317,

1348 (CIT 2014) ("*Jiasheng I*") (emphases modified).

> . . . **{I}n an NME country, there will usually be state involvement and *authority* to intervene in commercial affairs. But this fact alone does not necessarily lead to the conclusion that all NME producers and exporters should be categorically treated as in fact setting their prices** according to some centralized strategy. . . .
>
> The agency's conclusion was that, despite the systemic cross-contamination of personnel between the government and the commercial sector within the PRC, **these companies exhibited sufficient localized control over their own export activities** . . . . .
>
> **SolarWorld has not pointed to any specific evidence that, in influencing the companies' operations pursuant to their duties as *company* officials** (including through the selection of management and preparation of profit distribution plans), **these persons were directing the companies' export pricing decisions based on the will of the PRC government**.

*Id*. at 1348-50 (emphasis modified).

   In 2018, the CIT in *An Giang II* traced agency practice and bound

Commerce to its actual control standard for minority SOE-ownership:

> . . . Commerce explains that, following {*DSMC*}, the agency "concluded that **where a government entity holds a majority ownership share**, either directly or indirectly, in the respondent exporter, **the majority ownership** holding in and of itself **means that the government** exercises, or **has the potential to exercise, control over the company's operations** generally." . . . **Commerce explained that a majority government shareholder will not be able to rebut the presumption of government control because it is reasonable to assume that, notwithstanding a lack of evidence of actual control, the majority shareholder is constantly in possession of the ability to exercise actual control**. . . .

> **Commerce has required additional indicia of control prior** to
> concluding that a respondent company could not rebut the
> presumption . . . **where the government owns**, either directly or
> indirectly, **only a minority of shares** . . . .
>
> {B}ecause of **this prior practice of requiring more indicia of
> control in minority situations**, Commerce cannot focus solely on
> potentiality here, without more. **Without more, "potential control"
> suggests the potential to influence management rather than the
> potential to actually control management.**

*An Giang II*, 284 F.Supp.3d at 1357-60 (emphases added) (footnotes & citations

omitted).[4]

Also in 2018, in *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United

States*, a second CIT Judge traced precedent to distinguish the separate rate

analyses applicable for majority and minority SOE-ownership:

> Commerce has viewed evidence **of majority government ownership
> as "mean{ing} that the government exercises or has the potential
> to exercise control over the company's operations generally**, which
> may include control over, for example, the selection of management .
> . . ." . . . . Accordingly, **Commerce now "consider{s} the level of
> government ownership where necessary."** . . . .
>
> *An Giang II* . . . explained that, in the context of majority government
> ownership, "**potential control . . . . is, for all intents and purposes,
> actual control**" because "**the majority shareholder can typically
> control the operations** . . . without actually removing directors or
> management since it is clear that directors or management *could be*
> removed." . . . . . In contrast, **when . . . there is minority government
> ownership, the phrase "potential control" may not suggest "actual
> control."** . . . Under those circumstances, "Commerce has required
> **additional indicia of control prior** to concluding that a respondent

---

[4] The CIT found distinguishing "facts underlying" *Jiasheng* and *An Giang*, but
cannot avoid their recognizing different analyses based on majority- or minority-
SOE ownership. *GTC III*, 641 F.Supp.3d at 1382-83, Appx42-43.

company could not rebut the presumption" . . . .

> **Commerce views government ownership differently depending on whether the government is a majority or minority owner.** Evidence of legal separation between an exporter . . . and its parent company (and its parent's state-owned parent company) . . . *may* rebut the presumption of *de facto* control over management selection when the government holds a *minority* stake. . . . In contrast, **when** . . . **the government owns a *majority* stake, legal separation between the exporter and its direct and indirect parent companies *does not* rebut the presumption because of the ever-present potential for the government to exert *de facto* control over the exporter's operations and management selection, and the expectation that it would do so**. . . . In the latter instance, absent contrary evidence, **Commerce reasonably infers that the government exerts *de facto* control by exercising its legal rights as a majority shareholder** of the exporter's parent company, rendering each link in the chain of ownership **ultimately beholden** to the government.

350 F.Supp.3d 1308, 1317-18 (CIT 2018) (emphases added).

Commerce's disparate practice for majority- and minority-SOE owned respondents is also evidenced by its OTR AR5 decisions to grant a separate rate to the 33.84% SASAC-owned GTC, but not to the 65.66% SASAC-owned Double Coin. Statement of Facts §§ A, B.1, *supra*. Commerce's rationale for this dichotomy is that since the majority SOE-owned respondents' management remains "ultimate beholden to the government," the SOE has "**the potential to exercise control over the company's operations generally**"; thus, the SOE effectively controls export functions. By contrast, for minority SOE-ownership, this theory does not hold and Commerce requires "additional indica" to evidence actual SOE-control over the respondent's export functions. *Zhejiang Quzhou*, 350

F.Supp.3d at 1317-18. While "**it is reasonable to assume that, notwithstanding a lack of evidence of actual control, the majority shareholder is constantly in possession of the ability to exercise actual control**," it is **<u>not</u>** reasonable to do so for minority SOE-ownership. *An Giang II*, 284 F.Supp.3d at 1357 (emphasis added).

### D.    Commerce Improperly Denied GTC's Separate Rate By Applying the Analysis for Majority SOE-Owned Respondents

In AR7, Commerce abandoned its judicially-approved, holistic actual control test to determine separate rate eligibility for respondents with minority SOE-ownership. It denied GTC's separate rate through the truncated analysis used for majority-owned SOEs that exclusively considers potential control through management selection:

> Commerce's determination to deny the separate rate request for . . . GTC focused predominantly on the finding that record information . . . reflected a **measure of control on behalf of relevant SOE shareholders in the selection of the board of directors and management** . . . . Commerce, thus, concluded that {GTC} had not adequately substantiated autonomy in the selection of directors and management (the third factor). Failure to establish this prong of the criteria meant that {GTC} failed to rebut the presumption of government control and, thus, Commerce reasonably determined that **record evidence indicated a measure of control, or potential for control, of relevant Chinese-government entities** over the operations of the companies as a whole, including their export activities.

2nd Remand at 15-16, Appx153-154 (emphasis added). Commerce should have instead used its traditional analysis by considering all four *de facto* criteria to

determine whether a government entity had actual control over GTC's export activities. Section II.A, *supra*.

Commerce's redetermination disavowed any obligation to modify its analysis because GTC was not majority SOE-owned. According to Commerce, "majority ownership by a government entity is **a consideration only in the sense that such a fact pattern establishes control** of a respondent by a government entity **to preclude any further analysis** of the *de facto* criteria." *Id*. at 16-17, Appx154-155 (emphases added). Commerce thus understood that majority SOE-ownership makes it easier to deny separate rates—as such respondents "cannot demonstrate that they operate autonomously from the government." *Id*. at 37, Appx175. Yet Commerce ignored the fact that, conversely, additional evidence is required to deny separate rates for minority SOE-ownership.

Commerce conflated precedent for majority and minority SOE-ownership, claiming that the administrative practice and judicial precedent discussed above lack "any mention of a threshold for government ownership in applying this relevant analytical framework." 2nd Remand at 16, Appx154. This claim is wrong. As discussed above, the CIT has repeatedly recognized that "**Commerce views government ownership differently depending on whether the government is a majority or minority owner**." *Zhejiang Quzhou*, 350 F.Supp.3d at 1318 (emphasis added). The CIT cautioned against Commerce denying separate rates

based on "potential for control by a minority shareholder," which constitutes "a

deviation from its past practice of looking for actual control." *An Giang II*, 284

F.Supp.3d at 1360-61.

Commerce nonetheless denied GTC's separate rate based only on potential

control:

- "control of the board and appointment of management equates to **potential control** of the company's operations;"

- "government shareholders maintain the **potential** to control the export operations;"

- "**we would expect** any controlling shareholder, including a government, to **have the ability to control, and an interest in controlling**, the operations of the company;"

- "GTC's status as the only individual shareholder with enough shares to convene interim meetings provided additional **evidence of the potential for GIIG to control GTC's board**;" and

- "Commerce's practice to examine **whether the government might be able to exercise, or have the potential to exercise, control** of a company's general operations."

2nd Remand at 18-19, 50, 59, 62 (emphases added), Appx156-157, Appx188,

Appx197, Appx200.

Separate rate denials may be based on potential control for majority SOE-

ownership—but not for minority SOE-ownership, where "**Commerce has**

**required additional indicia of control**." *An Giang II*, 284 F.Supp.3d at 1359-60

(emphasis added). Commerce claims such indicia from "relevant documents,

meeting notes, by-laws, {AoA}, **and voting actions suggestive of potential for control**, generally, as well as information regarding the influence of the SOE-appointed board in GTC's decisions regarding the disposition of profits." 2nd Remand at 21, Appx159 (emphasis added). In so stating, Commerce recognizes that its denial for GTC was based on "potential" control through the latter *de facto* criteria. *Id*. Yet in the minority SOE-ownership context, the default traditional holistic analysis **requires consideration of all four *de facto* factors**. Section II.A, *supra*. Commerce erred by considering only selective criteria—the antithesis of "totality of the circumstances"—to deny GTC's separate rate based only on the "*possibility* that . . . government officials *could have* influenced these companies' export sales." *Jiasheng I*, 28 F.Supp.3d at 1339 n.160, 1350.

Commerce improperly relies on the 2021 CIT affirmation of the separate rate denial for I.D.I. International Development and Investment Corp. ("IDI"). 2nd Remand at 17-21, 38-39, Appx155-159, Appx176-177. According to Commerce, "the underlying facts of the *IDI* . . . case mirrored those of the instant litigation, where the largest minority shareholder of the respondent in question was a SOE, and the respondent's separate rate was denied based on a failure to rebut the presumption with respect to autonomy of management selection." 2nd Remand at 21 n.70, Appx159. Commerce is wrong. IDI's separate rate denial was based on multiple, additional factual findings; "Commerce found that a government official

and Communist Party member—referred to as Mr. X—represented the Vietnamese government on the boards of both IDI and its corporate parent, Company Y." *IDI v. United States*, 2021 WL 3082807 *2 (CIT July 6, 2021).

There is no evidence that Chinese government officials or Communist party members served on the GTC/GTCIE boards. To the contrary: "**None of the board members or management at GTC or GTCIE has any relationship with Guiyang SASAC or any of GTC's other ultimate or intermediate shareholders**, including holding any position as shareholder." SAQR at 5 (emphases added), Appx1887. *IDI* is therefore inapposite.

In short, Commerce erroneously applied the standard for evaluating majority SOE-owned respondents to GTC in AR7. On appeal, the CIT initially remanded Commerce's denial because the rationale was based on "**an ownership structure in which government entities owned a majority share during the POR**." *GTC II*, 519 F.Supp.3d at 1256, Appx28 (emphases added). However, the CIT subsequently affirmed Commerce's redetermination without reference to the majority/minority distinction—despite this issue being raised. *Compare* Plaintiff's Comments on 2nd Remand (Nov. 24, 2021), at 5-10, Appx4278-4283 *with GTC III*, 641 F.Supp.3d at 1371-86, Appx34-45.

In sum, this Court should reject Commerce's denial of GTC's separate rate because Commerce's decision applied the wrong analytical framework. In so

doing, this Court should follow CIT precedent— which affirmed Commerce's own practice—requiring additional indicia of actual control to deny separate rates for minority-SOE respondents. Section II.C, *supra*.

## III.    GTC REBUTTED THE PRESUMPTION OF STATE CONTROL

The presumption of state control operates in the manner recognized by this Court decades ago:

> . . . {A} presumption is not merely rebuttable but **completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact**. . . . {T}he evidence must be sufficient to put the existence of a presumed fact into genuine dispute. **The presumption compels the production of this minimum quantum of evidence from the party against whom it operates, nothing more**.

*Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992) (emphases added) (citations omitted).

Commerce should not be afforded deference in applying this presumption, which is not grounded in statute or regulation. The CIT recently invalidated the presumption on this basis, which led to Commerce—under protest—granting a separate rate for a majority SOE-owned respondent in AR5 of the ADD order on multilayered wood flooring from China:

> {A}lthough Commerce has used the NME presumption for years, it has never identified the source in law authorizing the presumption or even given a real reason for the NME presumption's use. . . .
>
> Because Commerce makes no claim to *Chevron* deference and . . . identif{ies} no statutory source for the NME presumption, the court

finds that **the Department has conceded that there is no statutory source for the presumption**. . . .

**Commerce's explanation for using its NME presumption . . . is not from statute, nor from any regulation, but is merely a practice bolstered by Federal Circuit dicta** . . . .

. . . **Commerce's unexplained NME presumption was entitled to no deference**.

*Jilin Forest Industry Jinqiao Flooring Group Co. v. United States*, 617 F.Supp.3d 1343, 1354-68 (CIT 2023) (emphases added), *appeal docketed*, No. 23-2245 (Fed. Cir. Aug. 7, 2023).[5]

GTC in AR7 submitted substantial evidence supporting its separate rate eligibility, far surpassing the "minimum quantum of evidence" to rebut the presumption and "sufficient to put the existence of the presumed fact"—*i.e.*, government control—into genuine dispute. *Id*. Most compelling is the Guiyang SASAC Clarification in which the SOE "**confirmed that it does not have the authority to make decisions for GTC**. . . . **Guiyang SASAC, which has an interest in {GTC}, does not have the right to make a decision on appointment or dismissal of board directors or management of {GTC}**." SAQR Exhibit 10 (emphases added), Appx2769. Similarly, GTC's 2015 Annual Report provided:

The Company . . . **completely separates from the controlling shareholder {GIIC} in personnel, assets and finance**, etc., with

---

[5] As for deference afforded to Commerce in AR7, this Court should consider the Supreme Court's anticipated pronouncement on deference to administrative decisions—expected by June 2024.

- 38 -

independent organization and independent business. **The controlling shareholder strictly abides by the provisions of laws** and regulations and exercise shareholders' rights pursuant to laws.

*Id*. Exhibit 3 at 46 (emphases added), Appx2205. Its financial statements showed

that Guizhou retains the proceeds of export sales. AQR Exhibits A-13–14,

Appx1023-1665.

These documents disprove the lynchpin of Commerce's separate rate denial,

that GIIG controlled GTC's management selection and profit distribution. 2nd

Remand at 4, Appx142. Further support for GTC's independence for these *de facto*

factors—as well as the factors demonstrating independence over export pricing and

contracting—was provided in the following AQR responses certified as "accurate

and complete", Appx805-806:

- its "**prices are not subject to review or guidance from any governmental organization**;"

- neither GTC "nor any manager of the Company is expected to achieve foreign exchange targets set by any governmental authority;"

- "The export price less the cost of goods sold and applicable sales expenses results in export profits. The Company can dispose these profits as it needs for its business operations;"

- As a public company, the board of directors of GTC is selected by its shareholders at a shareholders' meeting, and its senior management are selected by its board of directors.

  As the single shareholder of GTCIE, GTC selects GTCIE's management.

  Neither GTC nor GTCIE is required to notify any governmental authorities as to who are their managers.

- 39 -

*Id*. at 10-11 (emphasis added), Exhibit A-5, Appx819-820, App921-924.

Guizhou further submitted evidence establishing that:

- "**Guiyang SASAC stopped performance review of** state-owned listed enterprises including **GTC from January 1, 2015** (including performance reviews for the year of 2014);"

- "Guiyang SASAC did **<u>not</u>** conduct any performance reviews of GTC's senior management during any part of this review period;" and

- since GTC obtained a separate rate in AR5, "the level of SASAC investment in GTC has actually been **reduced** from 33.84% to 25.2%."

RFI at 2, 6, Exhibits 1-2, Appx1740, Appx1744-1757.

Moreover, there was no overlapping management with the SOE: "**None of the board members or management at GTC or GTCIE has any relationship with Guiyang SASAC or any of GTC's other ultimate or intermediate shareholders**." SAQR at 5, Appx1887 (emphasis added).

This evidence overwhelmingly refuted "**governmental control over . . . export activities**"—the longstanding focus of Commerce's separate rate analysis, which Commerce claims to have followed in AR7. *Sparklers*, 56 Fed. Reg. 20,588; *Silicon Carbide*, 59 Fed. Reg. at 22,587; Separate Rate Memo at 1, Appx3824 (emphasis added). Indeed, Commerce concedes that "there is **no evidence that the SOE owners directly exercised their control on the respondents' export activities**" because "GTC provided sufficient evidence to demonstrate that company officials set export prices, and there is no indication of explicit

- 40 -

involvement or approval authority in this process by any government entities, and no party provided information on the record to contradict this finding." 2nd Remand at 19, 23, Appx157, Appx161 (emphasis added). Commerce thus correctly "acknowledge{s} that there is **no explicit evidence that the Chinese government 'actually did control' export pricing**." *Id*. at 4, Appx142 (emphasis added).

GTC also provided substantial evidence that, as a publicly listed company, there existed significant legal restrictions on all shareholders—including GIIC—to ensure that they abide by the procedures applicable to all investors. *See* PRC Company Law, Appx842-891; PRC Code, Appx2745-2762; GTC AoA, Appx1896-1900. Such "evidence show{s} that the only way in which GIIC may participate in GTC's decision-making is through normal courses available to all shareholders." Case Brief at 20, Appx3886. These ample legal requirements and safeguards include:

- GTC AoA 40 with PRC Company Law Articles 3 and 99 provide strict election procedures, through which GTC board members were elected democratically and transparently by shareholders, and its chairman was elected by the board;

- PRC Code Articles 20–21 limit controlling shareholders, prohibiting GIIC from either circumventing the shareholders' meetings or the board of directors in selecting management or interfering with GTC or other shareholders;

- GTC AoA 83 limits GIIC from nominating more than one third of GTC's directors; in fact, the 6th Board was nominated in 2012 by the previous board—without GIIC/Guiyang SASAC involvement;

- GTC AoA 57, 83, and 88 provide for strict voting procedures, allowing cumulative voting to prevent GIIC from controlling GTC elections and internet voting to maximize participation; and

- GTC AoA 124, 130, 132, and 134 provide strict election procedures for senior management, through which board members selected GTC's management.

PRC Company Law, Appx843-857; PRC Code, Appx2750; GTC AoA, Appx1956-1978; Case Brief at 21-25, Appx3887-3891.

Based on the foregoing "**evidence sufficient to support a finding of the nonexistence of the presumed fact**," the presumption that GTC was controlled by the Chinese government "**completely vanishe{d}**." *Aukerman*, 960 F.2d at 1037 (emphases added). As the evidence surpassed the "**minimum quantum of evidence**," Commerce was required to affirmatively establish state control, based on substantial evidence, before denying GTC's separate rate. *Id*. (emphasis added). Commerce incorrectly based its decision on GTC's failure to conclusively establish the absence of state control:

> Commerce's practice is to deny a request for a separate rate if an applicant **fails to demonstrate separation from the government** . . . .
>
> **Failure to establish this prong of the criteria meant that the respondents failed to rebut the presumption of government control** and, thus, Commerce reasonably determined that record evidence indicated **a measure of control, or potential for control**, of relevant Chinese-government entities over the operations of the companies as a whole, including their export activities. . . .

- 42 -

Commerce found that record evidence indicating a lack of autonomy in management selection **did not satisfy the third prong** of the *de facto* analysis and, thus, that GTC . . . {was} **unable to rebut the presumption** . . . .

{A} respondent **must satisfy all four factors to rebut the presumption** of government control that applies in NME country proceedings. . . .

{B}ecause **failure to establish autonomy with respect to one prong of the analysis means that a respondent has not met its burden to rebut the presumption** . . . , our findings related to the first factor do not otherwise overcome Commerce's findings that . . . GTC **failed to establish autonomy from government control** in making decisions regarding the selection of management . . . .

{F}ailure to **establish independence from the government in any such factor is sufficient to demonstrate failure to rebut the presumption**. . . .

GTC . . . **did not establish that they operated autonomously** from the government in selecting management. The respondents have therefore **not met their burden in rebutting the presumption** . . . , *i.e.*, that **they must demonstrate autonomy from the government** under each of the four *de facto* factors in the separate rate analysis.

2nd Remand at 15-18, 21-24, Appx153-156, Appx159-162 (emphases added).

Contrary to Commerce's claim, GTC was not required to "establish," "demonstrate," or "satisfy" the presumed fact (*i.e.*, prove separation from government control) for each criteria. *Id*. Commerce's rationale is directly contrary to the manner in which presumptions operate. *Aukerman*, 960 F.2d at 1037.

Commerce's redetermination lays bare its misconstruction:

Commerce does not affirmatively establish in each instance the government is actually controlling the respondent's export activities, including pricing decisions. Rather, it is **the *burden of the respondent***

- 43 -

*to rebut the presumption* **by providing sufficient evidence to establish that it operates autonomously from the government** . . . .

{R}ecord information . . . reflects **a measure of control** on behalf of relevant SOE shareholders in the selection of the board of directors and management . . . and, thus, **does not adequately substantiate autonomy** of each firm in the selection of directors and management during the POR . . . .

2nd Remand at 18-19, 24, Appx156-67, Appx162 (emphases modified).

Commerce improperly conflates "sufficient evidence" to rebut the presumption—*i.e.*, the "minimum quantum"—with evidence to conclusively "establish" the presumed fact—*i.e.*, that GTC "operates autonomously from the government." *Id*. at 19, Appx157; *Aukerman*, 960 F.2d at 1037. To deny GTC's separate rate, Commerce was required to affirmatively demonstrate state control; an amorphous "measure of control" is insufficient because, with the presumption rebutted, Commerce had to "adequately substantiate" state control. 2nd Remand at 18, 24, Appx156, Appx162. The flawed lynchpin of the 2nd Remand is that "GTC **failed to establish autonomy from government control** in making decisions regarding the selection of management." 2nd Remand at 23 (emphasis added), Appx161. As discussed above, GTC was under no such obligation.

GIIG's voting "solely" raised "the *possibility* for governmental control over export activities," which is inapposite for minority SOE-owned respondents. *Jiasheng I*, 28 F.Supp.3d at 1348.The record confirms that GTC: (1) independently set export prices; (2) had negotiating authority; (3) selected its own management;

and (4) retained export sale proceeds/making independent decisions regarding profit. AQR at 10-12, 18, Exhibits A-11, A-13–14, Appx819-21, Appx827, Appx981-1004, Appx1023-1665; SAQR Exhibits 3-5, 16, Appx2003-2641, Appx-2813-2841. Commerce "**has not pointed to any specific evidence that, in influencing the companies' operations pursuant to their duties as *company officials* (including through the selection of management and preparation of profit distribution plans), these persons were directing the companies' export pricing decisions based on the will of the PRC government**." *Jiasheng I*, 28 F.Supp.3d at 1348-50 (emphases added).

Thus, Commerce's decision was contrary to law and should be reversed.

## IV.    COMMERCE RELIED ON EVIDENCE INSUFFICIENT TO DENY GTC'S SEPARATE RATE

Commerce denied GTC's separate rate based on "record evidence, that GIIG **has the ability to control** the election of board members and influence the distribution." *GTC III*, 641 F.Supp.3d at 1385, Appx44 (emphasis added). As addressed below, this decision was not supported by substantial evidence because: (a) the 2012 and 2015 Meetings did not constitute substantial evidence that GTC was state-controlled; and (b) Commerce did not rely on any evidence demonstrating government control over GTC export activities.

### A.      The 2012 and 2015 Meetings Do Not Evidence State Control

Commerce had three distinct evidentiary burdens to deny a separate rate for

GTC—a minority SOE-owned respondent that submitted substantial evidence

confirming its independence from government control. Section III.A, *supra*. Before

such denial, Commerce was required to:

1. affirmatively demonstrate state control because the evidence provided by
   GTC surpassed the "**minimum quantum of evidence**" required to rebut the
   presumption of control. *Aukerman*, 960 F.2d at 1037 (emphasis added),
   Section III, *supra*; **and**

2. provide "**additional indicia of control**" beyond that found sufficient to deny
   majority-SOE owned respondent's separate rate. *An Giang II*, 284 F.Supp.3d
   at 1359-60 (emphases added); Section II.C, *supra*; **and**

3. support its determination with "substantial evidence on the record." 19
   U.S.C. § 1516a(b)(1)(B)(I).

Commerce met none of these standards. The overarching substantial

evidence standard was not met because—by disregarding the plethora of evidence,

Section III.A, *supra*—Commerce failed to consider "the record as a whole,

including any evidence that fairly detracts from the substantiality of the evidence."

*Gallant Ocean*, 602 F.3d at 1323. For minority SOE-ownership, mere potential

control over operations through management selection is insufficient to deny

separate rates. Section II.C, *supra*. As shown below, Commerce's separate rate

denial was based only on potential control, which was supported only by GTC's

(1) 2012 Meeting; and (2) 2015 Meetings. This evidence is insufficient for "a

**BUSINESS PROPRIETARY INFORMATION DELETED**

reasonable mind . . . to support a conclusion" that GTC was state-controlled; it

merely "create{d} a suspicion of the existence of the fact to be established."

*Universal Camera*, 340 U.S. at 477; *Columbian Enameling*, 306 U.S. at 300.

### 1.    The 2012 Meeting Does Not Evidence Government Control

To support its state-control finding, Commerce relies on GTC's 2012

Meeting, when GTC's 6th Board was elected, reasoning that the 2012 Board was

substantially similar to the Board during the AR7 POR. 2nd Remand at 45-47,

Appx183-185; 1st Remand at 17-18, Appx112-113. Commerce concedes that

"GIIG had no direct role in the nomination process" for the 2012 board members.

2nd Remand at 45, Appx183; 1st Remand at 27, Appx122. Rather, Commerce

recognizes that "the 6th session of board of **directors of GTC were nominated by**

the Nomination Committee under **the Board of Directors of GTC**; **GIIC did not**

**have any involvement in the nomination stage of election of GTC's 6th session**

of the board of directors." 2SAQR at 9, Appx2941 (emphases added).

Commerce overlooks the lack of GIIG involvement in the nomination

process by justifying its decision on the facts "that the board [    **action**    ] and

was then elected at a meeting where GIIG comprised [    **amount of votes**    ]."

2nd Remand at 46, Appx184. This justification fails. Whether other shareholders

participated at the 2012 Meeting does not change the facts that: (1) shareholders

were not involved in the nomination process; and (2) the 2012 Meeting election

complied with all legal requirements proscribed by GTC's AoA, the PRC Law, and Code—including protections against domination by any one shareholder.

Rather than constitute evidence of government control, the 2012 Meeting reveals that GTC acted as an ordinary publicly listed company operating transparently and democratically through normal procedures, subject to legal restrictions. A critical legal protection rebutting Commerce's theory that GIIG controls GTC is found in PRC Code Article 26:

> **The board of directors** . . . **shall operate in an independent manner. There shall be no subordination relationship between, on the one hand, a listed company** . . . **and, on the other hand, the company's controlling shareholders** . . . nor shall the latter interfere with the **independent operation** of the former in any other manner.

SAQR Exhibit 9, Appx2751 (emphases added).

Commerce acknowledges the legality of the 2012 Meeting but then wrongly claims that the meeting supports a finding of state control because "an SOE exerted state control over board selection and, by extension, the selection of management." 2nd Remand at 48, Appx186. However, that GIIG comprised the majority of shareholders participating in the 2012 Meeting does not mean that it selected board members at that meeting, particularly since shareholders do not select management. The elected board members "do not have any position in GIIG or SASAC or any other government agency"—they act on behalf of GTC. Case Brief at 20, Appx3886; 3SAQR Exhibit 10, Appx3758; SAQR Exhibit 6, Appx2643.

Moreover, GTC management, and not its board members, conduct the day-to-day operation of GTC. While managers are selected by the board, they are required by law to work for the best interests of GTC; board members and management owe fiduciary duties to GTC and **all** shareholders. GTC AoA Arts. 98-99, Appx1970-1971. That in 2012 SOE shareholders voted for board members who served during the POR does not make GTC management "beholden" to the Chinese government, as Commerce claims. 1st Remand at 29, Appx124. Assuming *arguendo* that "GIIG effectively selected GTC's board," 2nd Remand at 46, Appx184, GTC's 6th Board and management operated the company independently from its shareholders, including GIIG.

Commerce's reliance on the 2012 Meeting presumes perpetual government control over GTC by virtue of a GIIG vote years before the POR—an unreasonable fiction that defies Commerce's own findings. Commerce conferred separate rate status on GTC in AR5 for the period September 1, 2012–August 31, 2013, *AR5 Final*, 80 Fed. Reg. at 20,197-200. Thus, it is disingenuous for Commerce to deny GTC separate rate status in AR7—particularly since GIIC's investment in GTC since AR5 **was reduced** from 33.36% to 25.2% and Guiyang's SASAC no longer conducted GTC performance reviews. RFI at 2, 6, Exhibit 1, Appx1740, Appx1744-1753. Commerce initially in AR7 recognized that events such as the 2012 Meeting, which "pre-date the POR . . . are thus not pertinent to this review."

IDM at 15, Appx61. While Commerce now claims that this pre-POR election is necessarily "relevant" and that its separate rate analysis has "evolve{ed}" since AR5. 1st Remand at 41, Appx136; 2nd Remand at 47, Appx185. Commerce's 180-degree about-face on the 2012 Meeting invalidates GTC's separate rate denial.

### 2.    The 2015 Meetings Do Not Evidence Government Control

GTC's May 2015 Meeting disproves GIIG control during the POR, as the managerial candidates advocated by GIIG were **not** elected "**due to dissenting votes from shareholders other than GIIC**." 2SAQR at 9  (emphasis in original), Exhibit 7C, Appx2941, Appx3446-3490; *see* SAQR Exhibit 7, Appx2682-2725. Indeed, **this May 2015 vote constitutes substantial evidence that GTC is not ultimately beholden to GIIG**. This is an additional reason why Commerce's application of its truncated analysis for majority SOE-owned respondents to a minority-owned respondent, such as GTC, is contrary to law. Section II.C, *supra*.

Commerce denied GTC's separate rate by relying on its speculative conclusion that GIIG "force{d} an interim meeting to re-vote on its favored proposal." 2nd Remand at 49, Appx187. Yet despite Commerce's initial factual error, which led to a voluntary remand, the July 2015 Meeting was conducted transparently in compliance with all legal requirements, including the AoA which Commerce recognizes "**appears on its face to place safeguards against undue**

**influence by large shareholders in the selection of GTC's senior managers**."
*Id*. at 19 (emphasis added), Appx114.

That GIIG subsequently achieved in July 2015 what it had not achieved in
May 2015—through a democratic and legal process—demonstrates "**that GIIC
may only participate in GTC's decision making through the normal courses
available to all shareholders. There is absolutely no record evidence of any
instance of 'control' by GIIC**." 2SAQR at 10 (emphasis added), Appx2942. The
CIT improperly discounted this fact by misstating the applicable standard: "That a
publicly-held company is governed by transparent and democratic procedures,
including procedures for electing board members open to all shareholders, **does
not suffice to demonstrate autonomy from government control** of decisions on
the selection of management." *GTC III*, 641 F.Supp.3d at 1383, Appx43 (emphasis
added). Once more, GTC was not required to demonstrate such autonomy, since it
had rebutted the presumption. Section III, *supra*. Instead, Commerce was required
to provide additional indicia of control due to GTC's minority SOE-ownership—
but failed to do so. Section II.C, *supra*.

In May 2015, when GIIC's proposals were rejected, participating
shareholders accounted for 58.4416% of total voting shares. SAQR Exhibit 7,
Appx2699. This vote establishes that **all GTC shareholders** are on an equal
footing with respect to voting, and that GTC's 75% ownership by non-GIIC

**BUSINESS PROPRIETARY INFORMATION DELETED**

shareholders can readily overturn a GIIC proposal. That GIIC proposals were

accepted at the July 2015 meeting is irrelevant; the point is that all decisions as to

GTC board members are made at shareholders' meetings, which are open to all

shareholders—including shareholders comprising the 75% of GTC not held by

GIIG. The May 2015 Meeting establishes that GIIG has no ability to control GTC.

GIIG's success in July 2015 does not mean it controls selection of the GTC

board of directors; other shareholders can, and during the POR did, reject

proposals favored by GIIG. Moreover, GIIG is **not** the only shareholder authorized

to convene shareholders meetings. Commerce itself recognized that: (1) "Article

49 of GTC's AoA allows: '[

### Articles of Association provision

];'" and (2) "the second-largest shareholder

owned 9.87 percent of shares and the third largest owned 7.74 percent of GTC

shares." 1st Remand at 28, 30, Appx123 (quoting SAQR Exhibit 1, Appx1959),

Appx125 (citing AQR Exhibit A-8, Appx933).

Commerce unpersuasively maintains that GTC's second and third largest

shareholders also are SOEs, in an attempt to discount their ability to jointly

convene a shareholders meeting. 2nd Remand at 50-51, Appx188-189. Commerce

is again wrong. These individual fund shareholders—not fund managers having

custodial functions, RFI at 3-4, Exhibits 3-6, Appx1741-1742, Appx1758-1838—

and other minority shareholders, are not SOEs. Moreover, they have all rights afforded by GTC's AoA, the PRC Law, and PRC Code. Commerce thus wrongly denied GTC's separate rate, since its conclusion that GIIG had the "sole ability to convene interim shareholders meetings" was not supported by substantial evidence. 1st Remand at 28, Appx123.

### B.    Commerce Failed to Establish Government Control Over Export Activities

The longstanding analysis, which Commerce claimed to follow in AR7, is that eligibility for a separate rate is based on whether there is "governmental control over" a respondent's "export activities." *Sparklers*, 56 Fed. Reg. 20,588; *Silicon Carbide*, 59 Fed. Reg. at 22,587; Separate Rate Memo at 1, Appx3824. Yet in this case, Commerce concedes that "there is **no evidence that the SOE owners directly exercised their control on the respondents' export activities**" because "GTC provided sufficient evidence to demonstrate that company officials set export prices, and there is no indication of explicit involvement or approval authority in this process by any government entities, and no party provided information on the record to contradict this finding." 2nd Remand at 19 (emphasis added), 23, Appx157, Appx161.Commerce thereby correctly and candidly "acknowledge{s} that there is **no explicit evidence that the Chinese government 'actually did control' export pricing**." *Id*. at 4 (emphasis added), Appx142.

Commerce was required to have tethered GTC's separate rate denial to

"government control over its export functions"—the overarching *de facto*

requirement. Commerce Policy Bulletin, Appx232. The CIT excused this nexus by

finding that potential control through management control satisfied this

requirement:

> {T}he court cannot conclude that it necessarily was unreasonable for
> Commerce to infer control of "export functions," broadly defined,
> from record facts showing that a governmental agency **had control
> over the selection of company management and thus, indirectly,
> over business activity in general**, which includes activity related to
> the exportation of merchandise.

*GTC III*, 641 F.Supp.3d at 1381 (emphasis added), Appx41. The CIT's theory that

mere potential control of a minority-SOE owned respondent through management

selection constitutes control over export activities should be reversed.

The CIT erred by conflating the distinct analyses for majority- and minority-

SOE owned respondents. For the former, this Court recognizes that Commerce

may "implement its *de facto* test for government control based principally on the

third prong of that test." *Id*. However, this Court has not made any such finding in

the minority-SOE context, and for good reason; such respondents are not beholden

to the Chinese government—a conclusion that the CIT has repeatedly recognized

in prior cases. Section II.C, *supra*. The CIT accordingly misplaced reliance on this

Court's rulings in AR5 and *DSMC*. *GTC III*, 641 F.Supp.3d at 1381, Appx41.

While potential control over management selection may be sufficient for majority

- 54 -

SOE-ownership, Section II.C, *supra*, it does not support GTC's separate rate denial. Because the minority SOE-owned GTC rebutted the presumption of state control, Section III, *supra*, Commerce could only deny GTC's separate rate by affirmatively establishing, through substantial evidence, that there was state control over export activities.

Commerce faults the requirement for "evidence of direct government involvement in price setting" as "ignor{ing} other aspects of export activities where the government may exert control." 2nd Remand at 23, Appx161. Yet Commerce proffers no evidence of state control "such as influence over export quantities/quotas, terms of sale, financing, customer relationships, contract negotiation, transportation, customs requirements, management directives, selection of export markets, export-related investment, *etc*." *Id*. at 23-24, Appx161-62. Commerce improperly avoids relying on substantial evidence to support state control by merely listing possible ways that such control could be exercised.

Commerce only identifies "voting actions **suggestive of potential for control**" and other "evidence indicative of **potential for control**." *Id*. at 23-25 (emphases added), Appx161-63. Tellingly, Commerce claims:

> {F}inding that . . . GTC {lacks} autonomy in the selection of management allows for **the reasonable inference**, in light of the presumption of government control in NME proceedings, **that their respective government shareholders maintain the potential to control the export operations** of each company because the

> management of a firm controls its operations – including its export functions.

*Id*. at 19 (emphases added), Appx157. Such finding of potential control cannot be reconciled with judicial precedent and administrative practice holding **that in the absence of majority SOE-control, separate rate denials must be based on actual government control as opposed to mere potential**. *Jiasheng I*, 28 F.Supp.3d at 1350; *HFHT*, 71 Fed. Reg. 54,629, IDM Comment 3.

Commerce unpersuasively complains of difficulties finding evidence of state control over exports: "A standard requiring evidence of direct government involvement in price-setting before finding government control would be almost impossible to meet, requiring that a 'smoking gun' document exist on the record showing direct involvement on behalf of as government authority in price-setting for an individual firm." 2nd Remand at 24, Appx162. Commerce again is wrong. With the presumption rebutted, Commerce had to affirmatively establish state control; smoking gun evidence is not required. Section III, *supra*. As GTC provided substantial evidence to rebut its being state-controlled, requiring that "Commerce would need to rely on direct evidence unambiguously demonstrating government involvement in price-setting" is an accurate summary of controlling law—not "an unreasonable threshold." 2nd Remand at 40, Appx178.

Commerce's complaint about supposed difficulties obtaining the requisite evidence to deny separate rates is both incorrect and irrelevant. Commerce claims

that, even "where the government involvement is price-setting is direct and unambiguous, actual affirmative documentation is unlikely to exist, and the ability of Commerce to compel that any such information to be provided to the record extremely limited." 2nd Remand at 24, Appx162. Commerce is wrong. It can readily solicit information regarding price in response to questionnaires—in the form of narrative responses, if documentation does not exist. Indeed, Commerce acknowledges its "authority to solicit such information and gather evidence." *Id*. at 40, Appx178. As respondents must certify the accuracy of information submitted to Commerce, those falsely reporting that they could set prices free of government interference or control are subject to severe penalties. 19 C.F.R. § 351.303(g).

GTC certified to the accuracy of its representations regrading price setting and other indicia of state control when submitting substantial evidence to rebut the presumption. Appx805-806, Appx1878-1879, Appx2928-2929, Appx3547-3548. That contrary evidence may be difficult to obtain does not relieve Commerce from its obligation to affirmatively demonstrate state control before denying separate rates for GTC. This is especially important, since GTC: (1) is not majority SOE-owned; (2) fully cooperated with Commerce; and (3) satisfied its burden by submitting substantial evidence confirming the absence of state control.

## V.    COMMERCE ARBITRARILY REVERSED ITSELF BETWEEN AR5 AND AR7

GTC's SOE ownership declined from 33.84% to 25.2% and Guiyang's SASAC ceased conducting GTC performance reviews between AR5, when it was granted a separate rate, and AR7, when its separate rate was denied. RFI at 2, 6, Exhibit 1, Appx1740, Appx1744-1753; *AR5 Final Results*, 80 Fed. Reg. at 20,198-99. AR5 and AR7 were effectively consecutive proceedings, as Guizhou was not reviewed in between. *OTR from China*, 76 Fed. Reg. 23,272, 23,272 n.2 (Apr. 20, 2016) (final results). Beyond the significant reduction in SOE- ownership, GTC in AR7 provided ample evidence of its independence that was not submitted in AR5, including the Guiyang SASAC Clarification and 2015 Annual Report. Section III, *supra*. The *AR5 Final Results* published in April 2015, during the AR7 POR. 80 Fed. Reg. at 20,198-99. This Court designated the AR5 and AR7 appeals as companion cases, presumably for involving the same product, parties, and issues.

Commerce in AR7 irrationally reversed its grant of GTC's separate rate from AR5. With superior evidence supporting a separate rate in AR7, Commerce's denial constitutes "a clear error in judgment." *Hyundai*, 899 F.2d at 1209. Moreover, Commerce has not justified this reversal. It strains credulity to accept that "Commerce has not changed its separate rate practice, but rather examined the level of government ownership more closely in light of {*DSMC*}." 1st Remand at 40, Appx135. That *DSMC* affirmed Commerce's separate rate denial for a

respondent with 100% SASAC ownership and overlapping management with the

SOE does support separate rate denial based on mere 25.2% SOE ownership.

Commerce incorrectly claims that the denial "reflect{s} the reasonable evolution

of Commerce's analysis in response to court decisions" involving majority SOE-

ownership. 2nd Remand at 63, Appx201. Transposing this standard for the

minority-SOE ownership is neither reasonable nor an evolution—but instead an

unlawful and unexplained departure from a longstanding practice, which has been

affirmed by the courts Section II.B-D, *supra*.

Commerce's denial of GTC's separate rate in AR7 through myopic fixation

on potential control through management selection based on SOE-ownership is

anathema to its longstanding separate rate practice that considers the totality of the

record and focuses on export activities—as implemented in AR5. Section II.A,

*supra*. Commerce failed to provide the requisite "adequate explanation for the

change." *SKF*, 630 F.3d at 1373. In AR7 where "the Department provides no

reasonable explanation for changing a practice that it has consistently followed,

**such a change in an unacceptable agency practice**." *WelCom*, 865 F.Supp.2d at

1344 (emphasis added). Indeed, agencies must show "a **more detailed

justification** . . . when, for example, its **new policy rests upon factual findings

that contradict those which underlay its prior policy**." *Fox*, 556 U.S. at 515

(emphasis added).

GTC's separate rate denial rests on findings that contradict those made by Commerce pursuant to *Sparklers* and *Silicon Carbide*, including Commerce granting GTC's separate rate in 2015 with greater GIIG ownership. RFI at 6, Appx1744; *AR5 Final*, 80 Fed. Reg. at 20,198-99. Commerce also contradicted its extensive investigation findings detailing verified separate rate propriety, despite 33.84% GIIG ownership. *LTFV Final* IDM Comment 25. By feigning adherence to Department practice while reaching diametrically opposite results, *see* 2nd Remand at 61-63, Appx199-201, Commerce in AR7 arbitrarily "offer{ed} insufficient reasons for treating similar situations differently." *SKF v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). Commerce's 180-degree about-face on GTC's separate rate further deprives it of the deference afforded when defending a longstanding, consistent position. *Cardoza–Fonseca,* 480 U.S. at 446 n.30.

## CONCLUSION

Based on the foregoing, Guizhou respectfully requests that the CIT's judgment be reversed and remanded for further consideration consistent with this Court's opinion.

  Respectfully submitted,

*/s/ Jordan C. Kahn*
Ned H. Marshak*
Jordan C. Kahn
Dharmendra N. Choudhary

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW Suite 650
Washington, DC 20005
 (202) 783-6881

*599 Lexington Ave., 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel to Plaintiffs-Appellants Guizhou
Tyre Co., Ltd. and Guizhou Tyre Import and
Export Co., Ltd.*

Dated: October 27, 2023

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains less than 14,000 words. This brief contains 13,942 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.


Dated: October 27, 2023                          */s/ Jordan C. Kahn*

# **Addendum**

UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>
GUIZHOU TYRE CO., LTD. AND<br>
GUIZHOU TYRE IMPORT AND<br>
EXPORT CO., LTD., et al.,<br><br>
              Plaintiffs,<br><br>
      v.<br><br>
UNITED STATES,<br><br>
              Defendant.
</td><td>
Before: Timothy C. Stanceu, Judge<br><br>
Consol. Court No. 17-00100
</td></tr>
</table>

JUDGMENT

Upon consideration of the "Second Remand Redetermination" issued by the International Trade Administration, U.S. Department of Commerce ("Commerce"), *Final Results of Redetermination Pursuant to Ct. Remand* (Sept. 24, 2021), ECF Nos. 109 (Conf.), 110 (Public), issued in response to the court's Opinion and Order in *Guizhou Tyre Co. v. United States*, 45 CIT __, 519 F. Supp. 3d 1248 (2021) (*Guizhou II*"), the "First Remand Redetermination," *Final Results of Redetermination Pursuant to Ct. Remand* (Oct. 10, 2019), ECF Nos. 74 (Conf.), 81 (Public), issued by Commerce in response to the court's opinion and order in *Guizhou Tyre Co. v. United States*, 43 CIT __, 389 F. Supp. 3d 1350 (2019) (*Guizhou I*") and all other filings and proceedings had herein, in conformity with the court's Order and with the court's Opinion, both issued this day, and upon due deliberation, it is hereby

**Consol. Court No. 17-00100**                                        **Page 2**

    **ORDERED** that the Second Remand Redetermination be, and hereby is, sustained; it is further

    **ORDERED** that, in conformity with the court's Opinion and Order in *Guizhou I* and the First Remand Redetermination, the assignment of a redetermined weighted average dumping margin of 16.78% to Xuzhou Xugong Tyres Co., Ltd., Xuzhou Armour Rubber Co. Ltd., and Xuzhou Hanbang Tyre Co., Ltd. (collectively, "Xugong"), and the assignment of 16.78% rates to Qingdao Qihang Tyre Co., Ltd., Qingdao Free Trade Zone Full-World International Trading Co., Ltd., Trelleborg Wheel Systems (Xingtai) China, Co. Ltd., and Weihai Zhongwei Rubber Co., Ltd. be, and hereby are, sustained; and it is further

    **ORDERED** that the entries of merchandise that are at issue in this litigation shall be liquidated in accordance with the final and conclusive court decision in this action.

                                       /s/ Timothy C. Stanceu
                                       Timothy C. Stanceu, Judge

Dated: May 18, 2023
      New York, New York

Guizhou Tyre Co., Ltd. v. United States, 389 F.Supp.3d 1350 (2019)

KeyCite Blue Flag – Appeal Notification
Appeal Filed by GUIZHOU TYRE CO., LTD. v. US, Fed.Cir., July 24, 2023

389 F.Supp.3d 1350
United States Court of International Trade.

GUIZHOU TYRE CO., LTD. and Guizhou Tyre
Import and Export Co., Ltd., et al., Plaintiffs,
v.
UNITED STATES, Defendant.

Slip Op. No. 19-64
|
Consol. Court No. 17-00100
|
May 24, 2019

**Synopsis**
**Background:** Foreign producers filed suit challenging final results by Department of Commerce in seventh administrative review of antidumping duty order on off-the-road (OTR) tires from the People's Republic of China (PRC). Producers moved for judgment on the agency record.

**Holdings:** The Court of International Trade, Stanceu, Chief Judge, held that:

[1] Commerce's failure to consider report submitted by producer warranted remand;

[2] granting voluntary remand was warranted; and

[3] Commerce's reduction of starting prices used to determine export price and constructed export price to account for irrecoverable value-added tax (VAT) was unlawful.

Ordered accordingly.

**Procedural Posture(s):** Review of Administrative Decision; Motion for Judgment on Administrative Record.

West Headnotes (7)

**[1]    Customs Duties**—Proceedings

Substantial evidence, as required to support an antidumping duty determination by the Department of Commerce, refers to such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**[2]    Customs Duties**—Determination, Judgment, and Relief;  Summary Judgment

Department of Commerce's failure to consider report submitted by foreign producer warranted remand for Commerce to reconsider its determination that producer did not rebut presumption of de facto control by government of the People's Republic of China (PRC), and, thus, was subject to PRC-wide dumping margin, in seventh administrative review of antidumping duty order on off-the-road tires from the PRC; report was originally submitted by producer's board of directors to Chinese regulatory entity as part of a proceeding unrelated to Commerce's administrative review and was dated prior to subject period of review (POR), producer argued that report summarized corrections it had already made in response to prior control issues, and Commerce did not refer to report at all. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

1 Case that cites this headnote

**[3]    Customs Duties**—Determination, Judgment, and Relief;  Summary Judgment

Department of Commerce's concern that it had misunderstood record evidence concerning foreign producer's shareholder meetings was substantial and legitimate, warranting voluntary remand to Commerce for it to reconsider

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.     1

whether producer rebutted presumption of de
facto control by government of the People's
Republic of China (PRC), in determining
whether producer was subject to PRC-wide
dumping margin in seventh administrative
review of antidumping duty order on
off-the-road tires from the PRC, since
Commerce originally relied on its finding that
producer elected members of its board of
directors through shareholder meetings not
available to all shareholders, at least one
meeting was publicly noticed and available to
all shareholders, and such determination was
significant to outcome.

1 Case that cites this headnote

**[4]**    **Customs Duties**🔑Determination, Judgment,
and Relief; Summary Judgment

The Court of International Trade exercises its
discretion in considering a request by the
Department of Commerce for a voluntary
remand in an antidumping proceeding.

**[5]**    **Customs Duties**🔑Determination, Judgment,
and Relief; Summary Judgment

If the Department of Commerce's concern in
connection with a request for a voluntary
remand in an antidumping proceeding is
substantial and legitimate, a remand is usually
appropriate.

**[6]**    **Customs Duties**🔑Foreign market value, fair
value, and adjustment

Department of Commerce's reduction of starting
prices used to determine export price and
constructed export price of subject merchandise
to account for irrecoverable value-added tax

(VAT) imposed by the People's Republic of
China (PRC) on foreign producer's inputs was
unlawful, in calculating dumping margin in
seventh administrative review of antidumping
duty order on off-the-road tires from the PRC;
VAT, whether or not recoverable on export, was
not export tax, duty, or other charge within
meaning of antidumping duty statute governing
export tax adjustments, rather it was type of
home market tax. Tariff Act of 1930 §§ 516A,
772, 773, 🚩19 U.S.C.A. §§ 1516a(b)(1)(B)(i),
1677a(c)(2)(B), 🚩1677b(a)(6)(B)(iii).

2 Cases that cite this headnote

**[7]**    **Customs Duties**🔑Foreign market value, fair
value, and adjustment

The antidumping duty statute governing export
tax adjustments is expressly confined to export
taxes, duties, and other charges on the
exportation of the subject merchandise to the
United States, and the provision cannot
permissibly be construed to apply to a domestic
home market tax such as a value-added tax
(VAT), whether or not recoverable due to
export. Tariff Act of 1930 § 772, 🚩19
U.S.C.A. § 1677a(c)(2)(B).

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*1352** Douglas J. Heffner, Drinker Biddle & Reath, LLP,
of Washington, D.C., for plaintiff Xuzhou Xugong Tyres
Co., Ltd. With him on the brief was Richard P. Ferrin.

Richard P. Ferrin, Drinker Biddle & Reath, LLP, of
Washington, D.C., for plaintiff Trelleborg Wheel Systems
(Xingtai) Co., Ltd. With him on the brief was Douglas J.
Heffner.

Ned H. Marshak, Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP, of New York, NY, argued for plaintiffs
Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and
Export Co., Ltd. With him on the brief were Jordan C.

Kahn, Elaine F. Wang, and Brandon M. Petelin.

Brandon M. Petelin, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for plaintiff Qingdao Qihang Tyre Co., Ltd. With him on the brief were Ned H. Marshak, Elaine F. Wang, and Jordan C. Kahn.

Brandon M. Petelin, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for plaintiff Qingdao Free Trade Zone Full-World International Trading Co., Ltd. With him on the brief were Ned H. Marshak, Elaine F. Wang, and Jordan C. Kahn.

Ned H. Marshak, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, for plaintiff Aeolus Tyre Co., Ltd. With him on the brief were Brandon M. Petelin, Elaine F. Wang, and Jordan C. Kahn.

Robert K. Williams and Lara A. Austrins, Clark Hill PLC, of Chicago, IL, for plaintiff Weihai Zhongwei Rubber Co., Ltd.

John J. Todor, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With him on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Paul K. Keith, Attorney, Office of the Chief Counsel For Trade Enforcement & Compliance, U.S. Department of Commerce.

**OPINION AND ORDER**

Stanceu, Chief Judge:

In this consolidated action, eight plaintiffs contest an administrative determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department"), issued to conclude a periodic review of an antidumping duty order on off-the-road ("OTR") tires from the People's Republic of China ("China" or the "PRC").[1] Ruling that the determination is contrary to law in certain respects, the court remands the **1353** determination to Commerce for appropriate corrective action.

**I. BACKGROUND**

**A. The Contested Determination**

The determination contested in this litigation (the "Final Results") is *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733 (Int'l Trade Admin. Apr. 21, 2017) ("*Final Results*"). *See also Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 27,224 (Int'l Trade Admin. June 14, 2017) ("*Amended Final Results*"). Incorporated by reference in the Final Results and the Amended Final Results is a final "Issues and Decision Memorandum" containing explanatory discussion. *Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2014-2015* (Int'l Trade Admin. Apr. 12, 2017) (P.R. Doc. 308), *available at* https://enforcement.trade.gov/frn/summary/prc/2017-0801 1-1.pdf (last visited May 21, 2019) ("*Issues and Decision Mem.*").

**B. Proceedings Conducted by Commerce**

Commerce issued an antidumping duty order (the "Order") on certain OTR tires from China (the "subject merchandise") in 2008. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Int'l Trade Admin. Sept. 4, 2008). Commerce initiated the review at issue in this litigation, which was the seventh periodic administrative review of the Order, on November 9, 2015. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 80 Fed. Reg. 69,193 (Int'l Trade Admin. Nov. 9, 2015). The seventh review pertained to entries of subject merchandise made during the period of review ("POR") of September 1, 2014 through August 31, 2015. *Id.*, 80 Fed. Reg. at 69,196.

Commerce published the preliminary results of the review on October 14, 2016. *Certain New Pneumatic*

*Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 71,068 (Int'l Trade Admin. Oct. 14, 2016) ("*Prelim. Results*"). Commerce incorporated by reference a "Decision Memorandum for Preliminary Results." *Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2014-2015* (Int'l Trade Admin. Oct. 5, 2016), *available at* https://enforcement.trade.gov/frn/summary/prc/2016-2482 1-1.pdf (last visited May 21, 2019) ("*Prelim. Decision Mem.*").

In the Final Results, Commerce selected two "mandatory" respondents for individual examination: (1) Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Co. Ltd., and Xuzhou Hanbang Tyre Co., Ltd. (collectively, "Xugong"), which Commerce treated as a single entity ("collapsed") for purposes of the review; and (2) Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively, "GTC"), which Commerce also treated as a single entity. *Final Results*, 82 Fed. Reg. at 18,733-34 & nn.3-4.

Commerce concluded that Xugong, but not GTC, established independence from the government of China and therefore, under its practice, qualified for what Commerce terms a "separate rate," i.e., an **\*1354** antidumping duty rate other than the rate Commerce assigns to exporters and producers it considers to be part of the "PRC-wide entity." *Id.*, 82 Fed. Reg. at 18,734.[2] In the Final Results, Commerce assigned a weighted-average dumping margin of 33.08% to Xugong and assigned to GTC the PRC-wide rate, which in the seventh review was 105.31%. *Id.*, 82 Fed. Reg. at 18,735.[3]

Because Xugong was the only individually-examined respondent that Commerce determined to be qualified for a separate rate, Commerce assigned to all other separate rate respondents a rate of 33.08%, equivalent to the margin it calculated for Xugong. *Id.* Commerce found that two respondents in addition to GTC failed to qualify for a separate rate and therefore treated these two respondents as part of the PRC-wide entity, assigning them the rate of 105.31%: Aeolus Tyre Co., Ltd. ("Aeolus") and Tianjin Leviathan International Trade Co., Ltd. ("Leviathan"). *Id.*

On June 14, 2017, Commerce issued the Amended Final Results to correct a ministerial error. *Amended Final Results*, 82 Fed. Reg. 27,224. Specifically, the Amended Final Results explained that Xugong correctly identified an error Commerce made in its calculation of Xugong's margin for the Final Results by inadvertently using the

incorrect sales figures as a denominator to devise the indirect sales expense ratio. *Id.* In response to the ministerial error allegation, Commerce determined that the weighted-average dumping margin applicable to Xugong was 33.14% rather than 33.08%. *Id.*, 82 Fed. Reg. at 27,225. Commerce applied this margin to the other "separate rate" respondents. *Id.* The 105.31% rate applied to respondents Commerce found to be part of the PRC-wide entity in the Final Results was unchanged by the Amended Final Results. *Id.*

## C. The Parties to this Consolidated Case

The eight plaintiffs in this litigation include the two mandatory respondents, Xugong (to which Commerce assigned a rate of 33.14%) and GTC (consisting of **\*1355** Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd., to which Commerce assigned the 105.31% PRC-wide rate). The other five plaintiffs are Aeolus (to which Commerce also assigned the PRC-wide rate) and four separate rate respondents, to each of which Commerce assigned the 33.14% rate determined for Xugong in the Amended Final Results: Qingdao Free Trade Zone Full-World International Trading Co., Ltd. ("Full World"); Qingdao Qihang Tyre Co., Ltd. ("Qingdao Qihang"); Trelleborg Wheel Systems (Xingtai) China, Co. Ltd. ("Trelleborg"); and Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei"). Defendant is the United States.[4]

## D. Proceedings before the Court

The consolidated cases each were commenced between May 4, 2017 and May 19, 2017. Before the court are the motions of seven plaintiffs for judgment on the agency record brought under USCIT Rule 56.2, all of which are opposed by defendant United States.[5] *See* Xugong's Mem. in Support of Mot. for J. on the Agency R. 1-2 (Jan. 30, 2018), ECF Nos. 48 (conf.), 49 (public) ("Xugong's Br."); Guizhou Tyre Co., Ltd.'s and Guizhou Tyre Import and Export Co., Ltd.'s Mem. in Support of Mot. for J. on the Agency R. 1-2 (Jan. 30, 2018), ECF Nos. 51 (conf.), 52 (public) ("GTC's Br."); Aeolus's Mem. in Support of Mot. for J. on the Agency R. 1-2 (Jan. 30, 2018), ECF Nos. 55 (conf.), 56 (public) ("Aeolus's Br."); Trelleborg's Mem. in Support of Mot. for J. on the Agency R. 1-2 (Jan. 30, 2018), ECF No. 50; Qingdao Qihang's Mem. in Support of Mot. for J. on the Agency R. 1-2 (Jan. 30, 2018), ECF No. 53; Full World's Mem. in Support of

Mot. for J. on the Agency R. 1-2 (Jan. 30, 2018), ECF No. 54; Def.'s Resp. to Mots. for J. on the Agency R. 1-2 (June 1, 2018), ECF No. 58 ("Def.'s Br.").

The court held oral argument on December 6, 2018. Oral Argument (Dec. 6, 2018), ECF No. 67.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

[1]The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c) (2012), pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended* ⚑ 19 U.S.C. § 1516a (2012), including an action contesting a final determination that Commerce issues to conclude an administrative review of an antidumping duty order.⁶ In reviewing a final determination, the court "shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." ⚑ 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ⚑ **\*1356** *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) ("*SKF I*") (quoting ⚑ *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

### B. Summary of the Parties' Claims and the Court's Disposition of those Claims

Aeolus claims that Commerce erred in determining that Aeolus failed to rebut the Department's presumption of *de facto* control by the government of the PRC. Because the court cannot conclude that Commerce considered certain record evidence relevant to its determination, the court orders Commerce to reconsider its decision that Aeolus does not qualify for a separate rate.

GTC claims that Commerce erred in determining that GTC failed to rebut the presumption of *de facto* control. As discussed below, defendant advocates that the court allow Commerce to reconsider one aspect of the issue of

whether GTC should be granted separate rate status. *See* Def.'s Br. 1-2. While allowing Commerce to reconsider the aspect of the determination as to GTC's separate rate status that defendant identifies, the court's Order directs Commerce to reconsider that determination in the entirety.

Xugong claims that Commerce erred in making deductions from the prices used to determine export price ("EP") and constructed export price ("CEP") of Xugong's subject merchandise to account for the PRC's value-added tax ("VAT"). Concluding that the antidumping duty statute does not permit the deductions Commerce made for VAT, the court orders Commerce to redetermine Xugong's margin upon eliminating these deductions.

Full World, Qingdao Qihang, Trelleborg, and Zhongwei each claim entitlement to a new antidumping duty rate that is adjusted for any change made to the rate to be assigned to separate rate respondents. The court awards this remedy to these plaintiffs.

### C. The Department's Decision to Deny Aeolus a Separate Rate

In the Issues and Decision Memorandum, Commerce stated that "[f]or the final results and based on record evidence, we continue to find that Aeolus is not eligible for a separate rate." *Issues and Decision Mem.* at 10. Aeolus claims that this determination was not supported by substantial evidence. *See* Aeolus's Br. 16-34.

#### 1. The Department's Test for Separate Rate Status in Proceedings Involving Nonmarket Economy Countries

In antidumping duty proceedings involving nonmarket economy countries, including China, Commerce applies a rebuttable presumption that all companies within the nonmarket economy country are controlled by the government of that country. *See* ⚑ *AMS Assocs. v. United States*, 719 F.3d 1376, 1379 (Fed. Cir. 2013). An exporter may overcome this presumption by convincing Commerce that it is subject neither to *de jure* nor to *de facto* government control over its export activities. ⚑ *Id.* *De jure* independence, which is not at issue in this case, may be shown by legislation and other governmental measures in the nonmarket economy country

demonstrating legal independence. *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997). To establish the absence of *de facto* control, Commerce requires an exporter to demonstrate that it (i) sets its prices independently of the government and other exporters, (ii) negotiates its own contracts, (iii) keeps the proceeds of its sales (apart from taxation), and (iv) selects its management autonomously. *AMS Assocs.*, 719 F.3d at 1379; *see also* **\*1357** *Advanced Tech. & Materials Co. v. United States*, 37 CIT ——, ——, 938 F.Supp.2d 1342, 1348-49 (2013); *Advanced Tech. & Materials Co. v. United States*, 36 C.I.T. 1576, 1576–78, 885 F.Supp.2d 1343, 1346-47 (2012); *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide From the People's Republic of China*, 59 Fed. Reg. 22,585, 22,587 (Int'l Trade Admin. May 2, 1994); *Final Determination of Sales at Less Than Fair Value: Sparklers From the People's Republic of China*, 56 Fed. Reg. 20,588, 20,589 (Int'l Trade Admin. May 6, 1991).

### 2. The Department's Conclusion that Aeolus Did Not Rebut the Presumption of Government Control Resulted from an Incomplete Analysis of the Record

[2]Commerce determined, and Aeolus does not dispute, that Aeolus: (1) is 42.58% owned by China National Tire & Rubber Co., Ltd. ("China National Tire"), a 100%-owned subsidiary of China National Chemical Corporation ("ChinaChem"), a state-owned enterprise ("SOE") supervised by China's State-Owned Assets Supervision and Administration Commission ("SASAC"), and (2) is 6.48% owned by other SOEs supervised by "local SASACs," making Aeolus's total SOE ownership 49.06%. *Issues and Decision Mem.* at 10. Aeolus claims that record information shows that the SOE shareholders cannot exercise control over Aeolus's business decisions despite the high level of SOE ownership. Aeolus's Br. 27-29.

When conducting a separate rate analysis for a company with less than a majority of SOE ownership, Commerce has considered whether the record contains "additional indicia of control" sufficient to demonstrate that the company lacks independence and therefore should receive a PRC-wide rate. *See, e.g.*, *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 42 CIT ——, ——, 284 F.Supp.3d 1350, 1359 (2018). In the seventh review, Commerce found government control of Aeolus based on (1) a statement on Aeolus's website indicating that it is a state-owned enterprise and (2) the company's corporate policies governing how certain shareholders can select

members of management. *See Issues and Decision Mem.* at 10-12 (citing *Letter From Stewart & Stewart for Sec'y Commerce* Attach. 3 (Dec. 30, 2015) (C.R. Doc. 38) (P.R. Doc. 75) (stating that Aeolus is "[a] model state-owned enterprise")). Commerce found that Aeolus's SOE shareholders exercised control over the selection of the company's board, which in turn selected management, despite the various shareholder protections present in PRC law and Aeolus's Articles of Association ("AoA"). *See id.* at 10-11.

Aeolus argues that Commerce failed to consider important contrary record evidence: a "Rectification Report" it placed on the record, which, it argues, demonstrates Aeolus's independence. Aeolus's Br. 12-13 (citing *Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt to U.S. Department of Commerce* Ex. 1A (Jan. 8, 2016) (C.R. Doc. 39) (P.R. Doc. 79) **\*1358** ("*Rectification Report Letter*")). The court notes that the Issues and Decision Memorandum makes no mention of the Rectification Report.

The Rectification Report originally was submitted by the Aeolus board of directors to the Henan Security Regulatory Commission in China as part of a proceeding unrelated to the seventh review and is dated January 13, 2014, i.e., before the commencement of the POR on September 1, 2014. *See Rectification Report Letter* 2-4, Ex. 1A. On December 30, 2015, petitioners placed on the record an English-language translation of the Rectification Report in support of their argument that Aeolus was not independent of the government of China. *Id.* at 2 (citing petitioners' submission). According to petitioners, the Rectification Report indicated that the SOE ChinaChem: (1) maintained direct control over Aeolus's operations, (2) could access Aeolus's financial information at any time through software it shared with Aeolus, and (3) required Aeolus to submit "investment, key projects, and tender process" for ChinaChem's approval. *See id.* In its rebuttal submission dated January 8, 2016, Aeolus placed on the record its own translation of the Rectification Report, which it claimed was more accurate than petitioners' translation, and argued that the properly-translated Rectification Report actually supported Aeolus's independence. *Id.* at 2-4, Ex. 1A. Specifically, Aeolus claimed the Rectification Report demonstrates that, as of the commencement of the POR, the government control issues identified in the Rectification Report showed a "Rectification Status" of "[c]ompleted," i.e., that "the Rectification Report does not address current issues, but, instead, describes *past issues* that have been identified as improper connections between Aeolus and ChinaChem and that have now been rectified." *Id.* at 2, Ex. 1A. Aeolus argues that, as of the

**WESTLAW**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    6

publication of the Rectification Report (i.e., before the POR), Aeolus's SOE shareholders could not access the company's financial information and that review and approval of key projects did not depend on the company's SOE shareholders but only on Aeolus's board of directors.[9]

Because the Issues and Decision Memorandum does not refer to the Rectification Report, the court cannot conclude that Commerce considered the report or the evidence therein when determining that Aeolus was not independent of government control. Commerce is tasked with weighing the record evidence, but it nonetheless must address significant contrary evidence when making determinations. *See* 🔖 *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." (internal quotation marks and citation omitted)). It did not do **\*1359** so in the administrative determination being challenged before the court. Accordingly, the court is ordering Commerce to reconsider its separate rate determination as to Aeolus in light of all evidence on the record, including the evidence in the Rectification Report. The court does not address Aeolus's remaining arguments at this time.

### D. The Department's Decision to Deny GTC a Separate Rate

Commerce stated that "[f]or the final results, we continue to find, based on record evidence, that GTC is not eligible for a separate rate." *Issues and Decision Mem.* at 13. Before the court, GTC contests this determination, arguing that it was not supported by substantial evidence. *See* GTC's Br. 20-43.

### 1. The Department's Analysis

As it did with Aeolus, Commerce found *de jure* independence but concluded that GTC failed to demonstrate independence under its four-factor *de facto* test. *Issues and Decision Mem.* at 6-9, 13-15. Commerce found that the absence of government control had not been demonstrated as to Guizhou Tyre Co., Ltd.'s selection of management and as to its ability to distribute profits. *Id.* at 14-15. Commerce also found that, because Guizhou Tyre Import and Export Co., Ltd. was a wholly-owned subsidiary of Guizhou Tyre Co., Ltd., it

too was subject to government control. *Id.* at 13-14. On that basis, Commerce considered the combined entity, i.e., GTC, subject to government control and assigned it the PRC-wide rate.

Commerce found that Guizhou Tyre Co., Ltd.'s largest shareholder, Guiyang Industry Investment (Group) Co., Ltd. ("GIIG"), was an SOE that was 100% owned and supervised by the "Guiyang SASAC" (i.e., the local SASAC in Guiyang, China). *Issues and Decision Mem.* at 13. Commerce further found that GIIG owned 25.20% of Guizhou Tire Co., Ltd. during the POR and concluded that the Guiyang SASAC therefore was in a position to control the activities of Guizhou Tyre Co., Ltd. as well as those of the wholly-owned subsidiary Guizhou Tyre Import and Export Co., Ltd. (which Commerce collapsed with Guizhou Tyre Co., Ltd. for the purposes of the review). *Id.* at 13-14.

According to Commerce, record evidence showed that Guizhou Tyre Co., Ltd. "elected members of its board of directors through shareholders' meetings not available to all shareholders" and made decisions affecting the distributions of profits at these meetings. *Id.* at 14. Commerce found that "[b]ecause GIIG circumvented a more inclusive board election process, it was able to elect specific board members of its preference and preferred profit distribution schemes [*sic*]." *Id.* Commerce concluded that "[b]ased on these findings, we do not find any practical difference between holding shareholder elections to select board members, or the Guiyang SASAC, through GIIG, directly appointing board members by direct decree" notwithstanding certain shareholder protections in Guizhou Tyre Co., Ltd.'s Articles of Association. *Id.* Commerce found it unavailing that shareholders with 10% ownership could nominate director candidates of their choosing, noting that GIIG was the only shareholder with sufficient ownership to meet that threshold. *Id.* Commerce also addressed the contention that shareholder voting protections in Guizhou Tyre Co., Ltd.'s AoA, such as cumulative voting and online voting, prevented GIIG from exercising *de facto* control over the election of directors and selection of management. Commerce characterized the protections as "unsuccessful," finding that "GIIG was ultimately able to dominate GTC's decision-making process, despite such safeguards, and appoint its preferred members **\*1360** to GTC's board, as well as control profit distribution." *Id.* at 15 (footnote omitted).

### 2. The Court Remands the Department's Determination of Government Control as to GTC

[3]Defendant has requested a remand to reconsider its separate rate determination as to GTC. *See* Def.'s Br. 2, 20-21. Rather than respond substantively to GTC's arguments, defendant "respectfully request[s] a voluntary remand, without confessing error, for Commerce to reconsider and explain its determination with respect to assigning a separate rate to GTC." *Id.* at 20. Defendant explains that "[o]ne factor that Commerce relied on in [its] analysis was its finding that, 'GTC [i.e., Guizhou Tyre Co., Ltd.] elected members of its board of directors through shareholders' meetings not available to all shareholders.[']" *Id.* at 21 (quoting *Issues and Decision Mem.* at 14). Defendant called that factual finding into question by explaining that "[i]n its brief, however, GTC has identified that a particular shareholders' meeting [of Guizhou Tyre Co., Ltd.] that Commerce found was not available to all shareholders was, in fact, publicly noticed and available to all shareholders." *Id.* (citing GTC's Br. 27-28). Defendant concludes that because "Commerce's understanding of such record evidence has the potential to impact the analysis concerning whether to grant GTC a separate rate in the underlying review," the Department's concern is "substantial and legitimate," justifying a remand in this case. *Id.* (citations omitted). GTC does not oppose defendant's request but maintains its challenge to the Department's separate rate decision in the entirety. *See* Reply of Pls. GTC 2 (July 16, 2018), ECF No. 61.

[4] [5]The court exercises its discretion in considering a request for a remand. "[I]f the agency's concern is substantial and legitimate, a remand is usually appropriate." *SKF USA, Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) ("*SKF II*"). The court agrees that the Department's concern in this case is "substantial and legitimate" and will order a remand for Commerce to reconsider and explain its separate rate analysis with respect to the collapsed GTC entity. Because the factual finding defendant identifies was significant to the outcome, Commerce upon remand must reconsider its separate rate determination as to GTC in the entirety, i.e., in light of all record evidence. The court does not reach any conclusions at this time regarding the other arguments GTC directs to that determination.

E. Adjustment to Prices Used to Determine Export Price and Constructed Export Price for Irrecoverable Value-Added Tax

Under section 731 of the Tariff Act, 19 U.S.C. § 1673, an antidumping duty is imposed "in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673. The amount by which the normal value exceeds the export price or constructed export price of the subject merchandise is referred to as the "dumping margin." *Id.* § 1677(35)(A). The prices in some of Xugong's U.S. sales of subject merchandise during the seventh review were determined on the basis of export price; others were determined on the basis of constructed export price. *See Issues and Decision Mem.* at 37.

Section 772 of the Tariff Act, 19 U.S.C. § 1677a, directs Commerce to make various adjustments (upward and downward) to "[t]he price used to establish export price and constructed export price." 19 U.S.C. § 1677a(c). In its regulations, Commerce refers to this unadjusted price for **\*1361** determining EP and CEP as the "starting price."[10] *See* 19 C.F.R. § 351.402(a). Because the export price or the constructed export price (both of which are sometimes identified as "U.S. price") is compared to normal value, an upward adjustment to the starting price will reduce a dumping margin, and a downward adjustment will increase one.

[6]Xugong's claim pertaining to Chinese value-added tax turns on the meaning of a provision in the Tariff Act that effectuates the "export tax" adjustment. This provision, in section 772(c)(2)(B) of the Tariff Act (19 U.S.C. § 1677a(c)(2)(B)), reduces the starting price for determining EP or CEP by "the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title."[11] 19 U.S.C. § 1677a(c)(2)(B). The question before the court is whether the export tax adjustment applies to Chinese value-added taxes present in the prices of the materials Xugong used to produce the OTR tires it exported to the United States and not refunded (i.e., "recovered") due to exportation. For the reasons discussed below, the court holds that it does not.

With respect to both EP and CEP sales, Commerce "reduce[d] Xugong's U.S. sales prices by eight percent, which is the percentage of irrecoverable VAT." *Issues and Decision Mem.* at 37 (footnote omitted). Commerce considered "irrecoverable VAT" to be value-added tax that is incurred on inputs used to produce subject merchandise and that is not avoided or recovered by reason of exportation of the finished good. *Id.* at 37-38 ("Irrecoverable VAT, as defined in PRC law, is a net VAT burden that arises solely from, and is specific to, exports. It is VAT paid on inputs and raw materials used

in the production of exports that is non-refundable and, therefore, a cost." (footnotes omitted)).

Xugong contests the downward, margin-increasing adjustments Commerce made to Xugong's EP and CEP starting prices on two grounds. It argues that Chinese value-added tax is not an "export tax, duty, or other charge" within the meaning of 🚩 19 U.S.C. § 1677a(c)(2)(B). *See* Xugong's Br. 6-8. In the alternative, it argues that even were Commerce entitled to treat irrecoverable VAT as an "export tax" subject to the provision, Xugong did not incur irrecoverable VAT in the amount of eight percent of its U.S. prices. *See id.* at 9-14. Because Xugong is correct that the export tax adjustment does not apply to Chinese value-added tax present in the prices of materials Xugong used to produce subject merchandise (whether or not recoverable upon **\*1362** export), the court does not reach Xugong's alternative argument.

The export tax provision is one of several tax-related provisions in the Tariff Act that potentially affect a dumping margin. While the export tax adjustment potentially increases a dumping margin, two other tax-related adjustment provisions—a provision addressing import duties in the exporting country and the "home market tax" adjustment provision—may reduce a dumping margin. These other tax-related provisions lend context to the intended meaning of the export tax provision.

The three tax-related provisions stem from international trade commitments under which a "fair comparison" must be made between U.S. price and normal value and under which "due allowance" must be made for differences in taxation.[12] The provision on import duties, set forth in section 772(c)(1)(B) of the Tariff Act, makes an upward adjustment to the EP or CEP starting price to account for import duties imposed by the exporting country that are refunded or avoided by reason of exportation. *See* 🚩 19 U.S.C. § 1677a(c)(1)(B) (adding to the starting price "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States"). Such import duties would include, for example, duties on materials used in producing the subject merchandise in the exporting country that are refunded as drawback or avoided by use of a similar program.

The import duty adjustment provision implicitly presumes that import duties imposed by the government of the exporting country would be present in the U.S. price of the subject merchandise unless rebated or avoided due to

the exportation of the good to the United States. If rebated or avoided due to exportation, the import duties are added to U.S. price, thereby adjusting for a difference in taxation for purposes of the comparison with normal value and reducing the dumping margin accordingly. If the import duties are "irrecoverable," i.e., if they are not rebated or avoided by reason of the exportation, the duties presumably are included in the U.S. price and also in the price of the foreign **\*1363** like product when sold for consumption in the home market (or other, i.e., third-country, comparison market), and, therefore, no upward adjustment (or, of course, downward adjustment) in the EP or CEP starting price is made under this provision. The export tax provision is, in effect, the reverse: taxes the exporting government imposes on the exportation of the good are, by definition, taxes that would not be imposed on the good if sold for consumption in the domestic market. If present in U.S. price (whether EP or CEP), and if not levied to offset a countervailable subsidy, they are removed from the starting price in the EP or CEP determination.

The provision allowing for the "home market tax" adjustment, in 🚩 19 U.S.C. § 1677b(a)(6)(B)(iii), is similar in operation, and in purpose, to the import duty adjustment. If the home market tax is present in the price of the foreign like product and rebated or avoided on the subject merchandise, the provision adjusts the price comparison for the difference in taxation, thereby lowering the dumping margin. The home market tax adjustment provision reduces normal value by:

> the amount of any taxes imposed directly upon the foreign like product or components thereof which have been rebated, or which have not been collected, on the subject merchandise, but only to the extent that such taxes are added to or included in the price of the foreign like product.

🚩 19 U.S.C. § 1677b(a)(6)(B)(iii). This provision applies when normal value is determined from the price at which the foreign like product is sold in the comparison market (the home market or, where applicable, the third-country market). An analogous provision in 🚩 19 U.S.C. § 1677b(e) accomplishes the same purpose when normal value is determined by the constructed value method.

The home market tax adjustment has been understood to apply to value-added taxes imposed by the exporting country. *See generally* 🚩 *Federal-Mogul Corp. v. United States*, 63 F.3d 1572 (Fed. Cir. 1995). The history of the home market tax adjustment is, therefore, instructive on the treatment of value-added taxes under the antidumping duty statute. Prior to the amendment of the Tariff Act by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) (the "URAA"), the home market tax adjustment was effectuated as an addition to U.S. price rather than as a reduction to normal value. In the pre-URAA version of the statute (as codified by the Trade Agreements Act of 1979 ("TAA")), the home market tax adjustment provision stood alongside the import duty provision and the export tax provision in the same section, as follows:

The purchase price [equivalent to today's "export price"] and the exporter's sales price [equivalent to today's "constructed export price"] shall be adjusted by being—

(1) increased by—

* * *

(B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States;

(C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation;

**\*1364**

* * *

and

(2) reduced by—

* * *

(B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the country of exportation on the exportation of the merchandise to the United States other than an export tax, duty, or other charge described in 🚩 section 1677(6)(C) of this title.

🚩 19 U.S.C. § 1677a(d) (1982). The opinion of the Court of Appeals for the Federal Circuit ("Court of Appeals") in 🚩 *Federal-Mogul*, which referred to the home market tax provision as the "adjustment for Home Market (HM) taxes," 63 F.3d at 1574, discussed the provision in the context of a recoverable value-added tax. The case, which arose under the TAA version of the Tariff Act, 🚩 19 U.S.C. § 1677a(d) (1982), involved a value-added tax that was imposed by the government of the home market country, Japan, on antifriction bearings that were manufactured and sold in Japan but not on these products when exported to the United States. 🚩 *Federal-Mogul*, 63 F.3d at 1575.

Under the TAA version of the statute, it would have been unreasonable to interpret the export tax adjustment to apply to value-added taxes imposed by the exporting country. Having effectuated an adjustment to U.S. price for value-added taxes in the home market tax provision, Congress could not also have intended to adjust for them again, in the opposite way, in the export tax provision. The former, like the import duty provision, potentially reduced a dumping margin (to the extent the tax was avoided or recovered upon export), and the latter potentially increased one (to the extent the export tax was present in the U.S. price and not levied to offset a countervailable subsidy). The statute used language to describe the home market taxes ("taxes imposed *in* the country of exportation *directly upon* the exported merchandise or components thereof") and the import duties ("any *import* duties imposed by the country of exportation") that differed from the language it used to describe the export taxes ("any *export* tax, duty, or other charge imposed by the country of exportation *on the exportation* of the merchandise"). 🚩 19 U.S.C. § 1677a(d) (1982) (emphasis added). In short, the statute treated export taxes quite differently than it treated import duties and home market taxes such as value-added taxes. Having clearly distinguished export taxes from home market taxes (as well as from import duties), Congress could not have intended to place home market taxes such as value-added taxes within the scope of the export tax provision.

The next question to be answered is whether the URAA, which placed the relevant provisions of the Tariff Act into current form, brought value-added taxes within the ambit of the export tax adjustment. The court concludes that it did not. The wording of the URAA version of the export tax adjustment essentially was identical to the previous version, indicating a lack of intent to broaden or otherwise alter the scope.[13] Congress made no change in the provision for the import duty adjustment, except to add

the word "subject" before the word "merchandise," and also retained the home market tax adjustment, albeit in modified form. But the modification the URAA effected in the home market **\*1365** tax adjustment does not demonstrate a congressional intent to address internal taxes such as value-added taxes in the export tax provision as opposed to the home market tax provision. Specifically, as discussed above, the URAA converted the § 1677a(d)(1)(C) (1982) upward adjustment to United States price to a downward adjustment to normal value, where it also potentially reduces a dumping margin for recoverable value-added taxes. The URAA did not alter substantively the TAA's treatment of recoverable home market taxes in the determination of constructed value, retaining the exclusion of such taxes from the valuation of materials.[14] The legislative history of the URAA is a further indication that Congress intended to leave the scope of the export tax adjustment unchanged.[15]

[7]In summary, Congress expressly confined the export tax provision to export taxes, duties, and other charges on the exportation of the subject merchandise to the United States. The provision cannot permissibly be construed to apply to a domestic home market tax such as a value-added tax, whether or not recoverable due to export. The Department's deductions **\*1366** from Xugongs' EP and CEP starting prices for Chinese value-added taxes were, therefore, unlawful.

*Qingdao Qihang Tyre Co., v. United States*, 42 CIT ——, 308 F. Supp. 3d 1329 (2018) (" *Qingdao Qihang*") held, as the court does here, that the Department's applying the export tax adjustment provision to home market value-added taxes is incorrect and, contrary to the government's argument in that case, cannot be sustained as reasonable under the principle of deference established by *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[16] Below, the court explains why the reasoning Commerce included in the Issues and Decision Memorandum for the review at issue in this case to support its interpretation of 19 U.S.C. § 1677c(c)(2)(B) does not alter the court's conclusion.

Commerce began its analysis by citing a 2012 Federal Register notice ("Methodological Change") in which it announced a change in its interpretation of the export tax provision. *Issues and Decision Mem.* at 37 (citing *Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, in Certain Non-Market Economy Antidumping Proceedings*, 77 Fed. Reg. 36,481 (Int'l Trade Admin. June 19, 2012) ("*Methodological Change*")). Commerce explained that

"[i]n this announcement, the Department stated that, when a NME [nonmarket economy] government has imposed an export tax, duty, or other charge on subject merchandise or on inputs used to produce subject merchandise from which the respondent was not exempted, the Department will reduce the respondent's EP or CEP, accordingly, by the amount of the tax, duty or charge paid, but not rebated." *Issues and Decision Mem.* at 37 (footnote omitted). This explanation presents two immediate problems.

First, while the export tax provision, in some circumstances, will reduce the EP or CEP starting price for "an export tax, duty, or other charge," 19 U.S.C. § 1677c(c)(2)(B), it is not precisely correct to say, as the Issues and Decisions Memorandum does, that it may apply to any such tax, duty, or charge "on subject merchandise." *Issues and Decision Mem.* at 37. Instead, the export tax adjustment applies only to a tax, duty, or other charge "on the *exportation* of the subject merchandise." 19 U.S.C. § 1677a(c)(2)(B) (emphasis added). Commerce does not demonstrate (from record evidence or otherwise) that China actually imposed a tax on the exportation of OTR tires, or anything resembling one. Nor does the export tax adjustment apply to a tax, duty, or other **\*1367** charge on "inputs used to produce subject merchandise." *Issues and Decision Mem.* at 37. A tax applied to materials used in the domestic production of a good subsequently exported, whether or not rebated or avoided, is by definition not a tax on the exportation of the finished merchandise. The Department's formulation, which imposes the export tax provision "on subject merchandise or on inputs used to produce subject merchandise," *id.*, tracks the language of the home market tax provision (as originally enacted and as amended by the URAA) rather than the export tax provision. *See* 19 U.S.C. § 1677a(d)(1)(C) (1982) (applying the home market tax adjustment for "the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof"); 19 U.S.C. § 1677b(a)(6)(B)(iii) (applying the home market tax adjustment for "the amount of any taxes imposed directly upon the foreign like product or components thereof").

Second, nothing in 19 U.S.C. § 1677a distinguishes between market economy and nonmarket economy countries. While nonmarket economy countries are treated differently than are market economy countries in the determination of normal value, *see* 19 U.S.C. § 1677b(c), they are not treated differently in the determination of export price and constructed export

*Guizhou Tyre Co., Ltd. v. United States*, 389 F.Supp.3d 1350 (2019)

price, *see id.* 🚩 § 1677a. Nevertheless, Methodological Change is directed solely to nonmarket economy countries. Were the statute to treat irrecoverable VAT as subject to the export tax adjustment (which it does not), Commerce would be required to adjust U.S. price for irrecoverable VAT in all antidumping duty proceedings in which it occurred, whether involving merchandise from market economy or from nonmarket economy countries. Methodological Change does not indicate that Commerce intends to adopt such a practice.

The reasoning in the Issues and Decisions Memorandum is flawed in other respects as well. Commerce opined as follows:

> In a typical VAT system, companies do not incur any VAT expense for exports. Rather, upon export, they receive a full rebate of the VAT paid on inputs used in the production of exports ("input VAT"), and, in the case of domestic sales, the company can credit the VAT they paid on input purchases for those sales against the VAT they collect from customers. That stands in contrast to the PRC's VAT regime, where some portion of the input VAT that a company pays on inputs used in production of exports is not refunded. This unrefunded amount differs from the amount refunded on domestic sales, and thus amount[s] to a tax, duty, or other charge imposed on exports that is not imposed on domestic sales.

*Issues and Decision Mem.* at 37 (footnotes omitted). The statement that input VAT not refunded by reason of exportation (to which Commerce referred as "irrecoverable VAT") "amount[s] to a tax, duty or other charge imposed on exports *that is not imposed on domestic sales*," *id.* (emphasis added), can be read to suggest that domestic sales of OTR tires in China do not incur VAT. But Commerce did not actually reach a finding that these sales do not incur VAT, and had it done so, it would have been contradicted by record evidence. *See Xuzhou Xugong Tyres Co., Ltd.,* ("Xugong") Section C Questionnaire Response for the *Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of China* 55, Ex. C-20(1) to C-20(3) (Feb. 4, 2016) (C.R. Docs. 74-88) (P.R. Docs. 110-111). As the court discussed above, a tax, duty, or other charge that actually is subject to the export tax provision, which applies only to a tax, duty, or other charge imposed on the **\*1368** *exportation* of a good, is one that, by definition, is not imposed on a domestic sale of the same good.[17]

Similarly, the Department's opining that the "unrefunded amount" of input VAT "differs from the amount refunded on domestic sales" is not accompanied by an actual finding that under the PRC VAT regime *any* amount of input VAT is refunded on domestic sales. Rather, if the PRC VAT regime operates domestically as does any normal VAT regime (and there is nothing in the record or in the Department's explanation indicating it does not), the domestic producer credits the amount of input VAT incurred in the prices of materials used in production of its goods against any amount of VAT payable to government on the sales of the finished goods (i.e., the "output" VAT).[18] In this way, the domestic producer would incur a value-added tax on the value added by that producer. Even though Commerce did not find that irrecoverable VAT does not occur on domestic sales in China, Commerce nevertheless reasoned, paradoxically, that "[i]rrecoverable VAT, as defined in PRC law, is a net VAT burden that arises solely from, and is specific to, exports." *Issues and Decision Mem.* at 38 (footnote omitted).

Commerce reasoned, further, that because irrecoverable VAT "is VAT paid on inputs and raw materials used in the production of exports that is non-refundable and, therefore, a cost," *id.* (footnote omitted), irrecoverable VAT is "an 'export tax, duty or other charge imposed' on exports of the subject merchandise to the United States."[19] Continuing on this line of reasoning, Commerce stated that "[t]he statute does not define the terms 'export tax, duty, or other charge imposed' on the exportation of subject merchandise" and that "[w]e find it reasonable to interpret these **\*1369** terms as encompassing irrecoverable VAT because the irrecoverable VAT is a cost that arises as a result of export sales." *Id.*

The Department's rationale is, essentially, that the statute treats irrecoverable value-added tax as an export tax subject to the export tax adjustment because it is irrecoverable. That is directly contrary to the treatment the statute accords to home market taxes. As the court has explained, Congress, having addressed value-added taxes in the home market tax provision and export taxes in the export tax provision, could not have intended for value-added taxes (whether or not recoverable) to fall within both provisions. Moreover, by identifying only

Appx14

recoverable home market taxes as qualifying for the home market tax adjustment, Congress indicated its awareness of the existence of irrecoverable home market taxes. Nowhere in the statute did it designate them as taxes subject to the export tax adjustment.

Nor does the statutory formulation "export tax, duty, *or other charge*," 🚩19 U.S.C. § 1677a(c)(2)(B) (emphasis added), lend anything to the Department's analysis. Commerce itself regards Chinese value-added tax as a "tax" that is imposed on materials used domestically to produce OTR tires, some portion of which, according to Commerce, may be avoided or rebated by reason of subsequent exportation of the finished good. But whether or not recovered by reason of exportation, the value-added tax imposed by the PRC, as Commerce itself describes it, cannot lawfully be deemed a tax "on the exportation of the subject merchandise" within the intended meaning of 🚩19 U.S.C. § 1677a(c)(2)(B).

The Department further stated that its "adjustment for irrecoverable VAT achieves what is called for under section 772(c)(2)(B) of the Act [ 🚩19 U.S.C. § 1677a(c)(2)(B)], as it reduces the gross U.S. price charged to the customer to a net price received. This deduction is consistent with our longstanding policy, which is consistent with the intent of the statute, *i.e.*, that dumping margin calculations be tax neutral." *Issues and Decision Mem.* at 38 (citing, inter alia, *Methodological Change*, 77 Fed. Reg. at 36,483). This "tax-neutral" justification for the Department's deduction is unavailing. The statute itself specifies the tax-related adjustments that Commerce is directed to make to adjust for differences in taxation, for purposes of the comparison of EP or CEP to normal value. The statute provides for a margin-reducing adjustment for recoverable value-added tax (not applicable here, in this nonmarket economy country proceeding, because normal value was not determined based on home market price or other comparison market price). It does not authorize Commerce to make a margin-*increasing* adjustment for value-added tax that is not recoverable, whether or not the good is exported from a nonmarket economy country. Commerce may not rewrite the statute in a misguided attempt to adjust U.S. price downward for home market taxes that it considers to be present in that price. Nor is it free to bring about what it considers a "tax-neutral" result by any means it sees fit. The statute confines the export tax adjustment to taxes, duties, and other charges imposed on the exportation of the good and does not apply it to home market taxes on the good or the materials incorporated therein. It is no more permissible for Commerce to adjust U.S. price downward for irrecoverable value-added tax than it would be for Commerce to adjust U.S. price downward for

irrecoverable import duty that also may be present in the U.S. price. In each case, the statute speaks directly to the adjustment that is to be made.

**\*1370** In summary, Commerce has made downward adjustments in calculating the EP and CEP for subject merchandise exported by Xugong based on an impermissible construction of the export tax provision of 🚩19 U.S.C. § 1677a(c)(2)(B). Therefore, Commerce must correct this error in responding to the court's Opinion and Order in this proceeding.

F. The All-Others Rate as Applied to Separate Rate Respondents

Trelleborg, Qingdao Qihang, Full World, and Zhongwei are parties to this litigation and were assigned the all-others rate of 33.14% in the seventh administrative review. Both in its briefings and at oral argument, defendant indicated that Commerce does not oppose this claim, should it be determined judicially that revision in the rates of the examined respondents is required. Def.'s Br. 28; Oral Argument (Dec. 6, 2018), ECF No. 67. Because Trelleborg, Qingdao Qihang, Full World, and Zhongwei contested the Final Results as plaintiffs, they will qualify for relief that ultimately results from any recalculation of the individually-determined rate applicable to Xugong or to an individually-determined rate for GTC, should one be forthcoming. Should Aeolus be determined to qualify for a separate rate, it also will qualify for relief.

### III. CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court remands to Commerce the decision published as *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733 (Int'l Trade Admin. Apr. 21, 2017) ("*Final Results*") and amended as *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 27,224 (Int'l Trade Admin. June 14, 2017) ("*Amended Final Results*") for reconsideration according to the decisions the court reaches in this Opinion and Order. Therefore, upon consideration of all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that Commerce shall submit a new determination upon remand ("Remand Redetermination") in which it reconsiders its decisions not to assign separate rates to GTC and Aeolus and redetermines the dumping margins for those respondents as required by its reconsideration of those decisions; it is further

**ORDERED** that Commerce, in the Remand Redetermination, shall recalculate export price and constructed export price for Xugong without making deductions for Chinese value-added tax; it is further

**ORDERED** that Commerce will redetermine the weighted average dumping margin for Xugong and also the rates to be assigned to all other qualifying separate rate respondents that are plaintiffs in this action; it is further

**ORDERED** that Commerce will submit its Remand Redetermination within 90 days of the date of this Opinion and Order; it is further

**ORDERED** that comments of plaintiffs on the Remand Redetermination must be filed with the court no later than 30 days after the filing of the Remand Redetermination; and it is further

**ORDERED** that the response of defendant to the aforementioned comments must be filed no later than 15 days from the date on which the last comment is filed.

**All Citations**

389 F.Supp.3d 1350

**Footnotes**

[1]   Consolidated under the lead case, *Guizhou Tyre Co. and Guizhou Tyre Import and Export Co. v. United States*, Court No. 17-00100, are *Aeolus Tyre Co. v. United States*, Court No. 17-00102; *Qingdao Free Trade Zone Full-World International Trading Co. v. United States*, Court No. 17-00103; *Xuzhou Xugong Tyres Co. v. United States*, Court No. 17-00104; *Trelleborg Wheel Systems (Xingtai) Co. v. United States*, Court No. 17-00111; *Qingdao Qihang Tyre Co. v. United States*, Court No. 17-00113; and *Weihai Zhongwei Rubber Co. v. United States*, Court No. 17-00123. Order Granting Motion to Consolidate (June 16, 2017), ECF No. 24.

[2]   In addition to the mandatory respondent Xugong, Commerce determined that nine other Chinese companies or groups of companies qualified for a "separate rate": Qingdao Qihang Tyre Co., Ltd. ("Qingdao Qihang"); Qingdao Free Trade Zone Full-World International Trading Co., Ltd. ("Full World"); Trelleborg Wheel Systems (Xingtai) China, Co. Ltd. ("Trelleborg"); Shiyan Desizheng Industry & Trade Co., Ltd.; Qingdao Jinhaoyang International Co., Ltd.; Sailun Jinyu Group Co., Ltd.; Weifang Jintongda Tyre Co., Ltd.; Zhongce Rubber Group Company Limited; and Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei"). These nine exporter/producers were not individually examined in the seventh review and therefore did not receive an individually determined rate. *Final Results*, 82 Fed. Reg. at 18,735.

[3]   The PRC-wide rate was carried over from the Department's determination in the fifth administrative review. *See Final Results*, 82 Fed. Reg. at 18,735 n.16. This PRC-wide rate was determined by calculating the average of the PRC-wide rate prior to the fifth review (determined in the investigation) and the individually-determined rate Commerce calculated for a respondent in the fifth review, Double Coin Holdings, Ltd. ("Double Coin"), which is not a party to this case. *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013* (Int'l Trade Admin. Apr. 15, 2015), 80 Fed. Reg. 20,197, 20,199. The 105.31% rate is based in part on the application of facts otherwise available and an adverse inference. Double Coin challenged the Department's assigning it the 105.31% rate in the fifth administrative review. *See China Mfrs. Alliance, LLC v. United States*, 43 CIT ——, ——, 357 F.Supp.3d 1364, 1367 (2019). In this case, no party challenges the basis for the PRC-wide rate, but GTC and Aeolus each challenge the Department's

determination of failure to establish independence from government control.

4    Titan Tire Corporation ("Titan") and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW") were defendant-intervenors in this case and the cases consolidated under it, *see* Order (May 30, 2017), ECF No. 20, and were also plaintiffs, *see* Order (June 16, 2017), ECF No. 24. They were severed as plaintiffs on June 26, 2017, Order (June 26, 2017), ECF No. 30, and withdrew as defendant-intervenors from this consolidated case on September 29, 2017, Order (Sept. 29, 2017), ECF No. 43.

5    Plaintiff Zhongwei did not submit briefing in this case.

6    All citations to the United States Code herein are to the 2012 edition and all citations to the Code of Federal Regulations herein are to the 2016 edition, except where otherwise indicated.

7    Record evidence indicates that state-owned enterprises in China may be supervised either by the central State-Owned Assets Supervision and Administration Commission ("SASAC") of China's State Council or a local body representing the central SASAC in a particular region or city in China. *See* Aeolus Separate Rate Application 12-13, *appended to Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt to U.S. Department of Commerce re: Separate Rate Application* (Dec. 11, 2015) (C.R. Docs. 28-33) (P.R. Docs. 53-55).

8    The court provides citations to both the public and the confidential versions of record documents. This Opinion and Order discloses only the information included in the public versions and information subsequently made public in the Issues and Decision Memorandum or public versions of the parties' filings.

9    Aeolus's translation of the Rectification Report states that "ChinaChem fully respects the independence of a listed company and has never inquired about financial information of the Company [i.e., Aeolus]" and that:

> Regarding the Company's investment, key projects, and tender process being reviewed and approved by ChinaChem. ChinaChem and China National Tire & Rubber Corp. will strictly comply with the provisions of the *Company Law, Code of Corporate Governance for Listed Companies* and other relevant law and regulations, exert their investors' rights, fully respect the independence of a listed company, and let the Company's shareholders' meeting, board of directors and the management team perform their internal approvals on investments, key projects, and tender process based on their respective obligations, authority and rules of procedure.

> *Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt to U.S. Department of Commerce* Ex. 1A (Jan. 8, 2016) (C.R. Doc. 39) (P.R. Doc. 79) ("*Rectification Report Letter*").

10   The starting price for determining export price is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the

United States." 🚩 19 U.S.C. § 1677a(a). The starting price for determining constructed export price is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter." 🚩 *Id.* § 1677a(b).

[11]   The "export taxes, duties, or other charges" described in section 1677(6)(C) are those which are "levied on the export of merchandise to the United States [and] specifically intended to offset the countervailable subsidy received." 🚩 19 U.S.C. § 1677(6)(C). The countervailable subsidy offset exception is not at issue in this case.

[12]   The taxation-related provisions of the Tariff Act implement Article VI of the General Agreement on Tariffs and Trade ("GATT"). Article 2.4 of the Agreement on the Implementation of Article VI of the General Agreement on Tariffs and Trade, in the form in which it was effectuated by the Uruguay Round Agreements ("GATT 1994"), provides that:

> A fair comparison shall be made between the export price and the normal value. This comparison shall be made at the same level of trade, normally at the ex-factory level, and in respect of sales made at as nearly as possible the same time. Due allowance shall be made in each case, on its merits, for differences which affect price comparability, including *differences in* conditions and terms of sale, *taxation*, levels of trade, quantities, physical characteristics, and any other differences which are also demonstrated to affect price comparability.

Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, art. 2.4, 1868 U.N.T.S. 201 (emphasis added) (footnote omitted). In its original form, Article VI of the GATT ("Antidumping and Countervailing Duties") provided that "[d]ue allowance shall be made in each case for differences in conditions and terms of sale, for *differences in taxation*, and for other differences affecting price comparability." General Agreement on Tariffs and Trade, art. VI(1), Oct. 30, 1947, 61 Stat. A-11, 55 U.N.T.S. 194 (emphasis added). The "fair comparison" language is reflected in 🚩 19 U.S.C. § 1677b(a) ("In determining under this subtitle whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value.").

[13]   The URAA revised "imposed by the country of exportation" to "imposed by the exporting country," added the word "subject" before the word "merchandise," and added a comma following "United States." *Compare* 🚩 19 U.S.C. § 1677a(d)(2)(B) (1982) *with* 🚩 19 U.S.C. § 1677a(c)(2)(B).

[14]   *Compare* 🚩 19 U.S.C. § 1677b(e) ("For purposes of paragraph (1), the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition that is remitted or refunded upon exportation of the subject merchandise produced from such materials.") *with* 🚩 19 U.S.C. § 1677b(e)(1) (1982) ("For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of—(A) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) ....").

15    The Statement of Administrative Action accompanying the Uruguay Round Agreements Act explained that:

> New section 772 retains the distinction in existing law between "purchase price" (now called the "export price") and "exporter[']s sales price" (now called "constructed export price").
>
> \* \* \*
>
> Under new section 772(c)(1), Commerce will calculate export price and constructed export price by adding to the starting prices: (1) packing costs for shipment to the United States, if not included in the price; (2) import duties that are rebated or not collected due to the exportation of the merchandise (duty drawback); and (3) countervailing duties attributable to export subsidies. Section 772(c)(2) requires that Commerce reduce export price to account for: (1) transportation and other expenses, including warehousing expenses, incurred in bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States; and (2) if included in the price, export taxes or other charges imposed by the exporting country. *These adjustments have not changed from current law.*

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103–316, Vol. 1 at 822-23 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163 (emphasis added). The Statement of Administrative Action described the change to the home market tax provision (which, as discussed herein, converted the upward adjustment to U.S. price to a downward adjustment to normal value) as follows:

> The deduction from normal value for indirect taxes constitutes a change from the existing statute. The change is intended to ensure that the dumping margins will be tax-neutral. The requirement that the home-market consumption taxes in question be "added to or included in the price" of the foreign like product is intended to insure that such taxes actually have been charged and paid on the home market sales used to calculate normal value, rather than charged on sales of such merchandise in the home market generally. It would be inappropriate to reduce a foreign price by the amount of the tax, unless a tax liability had actually been incurred on that sale.

*Id.* at 827-28, *reprinted in* 1994 U.S.C.C.A.N. at 4166.

16    In holding that the Department's interpretation of the export tax provision was an unreasonable statutory construction, *Qingdao Qihang Tyre Co. v. United States*, 42 CIT ——, 308 F. Supp. 3d 1329 (2018) ("*Qingdao Qihang*") reached a result opposite to those of certain prior decisions of this Court, which accorded deference to the Department's interpretation applying 19 U.S.C. § 1677a(c)(2)(B) to irrecoverable input VAT. *See Qingdao Qihang*, 42 CIT at ——, 308 F. Supp. 3d at 1346. The prior decisions cited therein are *Diamond Sawblades Mfrs.' Coal. v. United States*, 42 CIT ——, ——, 301 F. Supp. 3d 1326, 1331-35 (2018); *Aristocraft of Am., LLC v. United States*, 41 CIT ——, ——, 269 F. Supp. 3d 1316, 1321-26 (2017); *Jacobi Carbons AB v. United States*, 41 CIT ——, ——, 222 F. Supp. 3d 1159, 1186-88 (2017); *Juancheng Kangtai Chem. Co. v. United States*, 41 CIT ——, ——, 2017 WL 218910, at \*10-14 (Jan. 19, 2017); *Fushun Jinly Petrochemical Carbon Co. v. United States*, 40 CIT ——, ——, 2016 WL 1170876, at \*8-11 (Mar. 23, 2016). *See also Aristocraft of Am., LLC v. United States*, 43 CIT ——, ——, 2019 WL 1945553, at \*2-3 (Apr. 17, 2019). Commerce cited *Fushun Jinly Petrochemical Carbon Co.* in the Issues and Decision Memorandum in support of its interpretation of the export tax provision. *Issues and Decision Mem.* at 40.

17    In *Jiangsu Senmao Bamboo and Wood Indus. Co. v. United States*, 42 CIT ——, 322 F. Supp. 3d 1308 (2018) ("*Senmao*"), this Court considered specifically the question of whether record evidence supported the finding of

Commerce in that review that Chinese irrecoverable VAT "amounts to a tax, duty or other charge imposed on exports that is not imposed on domestic sales." *Senmao*, 42 CIT at ——, 322 F. Supp. 3d at 1342. *Senmao* concluded that this finding, which was critical to the Department's rationale, was directly contradicted by the evidence on the administrative record of the review at issue in that case.

18    In *Senmao*, there was record evidence that a Chinese producer could credit input VAT on all materials (whether in production for domestic consumption or export) against total output VAT (on both classes of sales). *Senmao, 42 CIT at ——, 322 F. Supp. 3d at 1342-45*. In this case, Xugong argues that the record evidence shows that the output VAT rate on exported OTR tires is zero. Xugong's Mem. in Support of Mot. for J. on the Agency R. 7-8 (Jan. 30, 2018), ECF Nos. 48 (conf.), 49 (public) ("Xugong's Br."). Regardless, there is no evidence that the PRC imposes an export tax, duty, or other charge on the *exportation* of OTR tires.

19    Recently, Commerce adopted an entirely different method and rationale for applying the export tax provision to a good exported from China. Rather than applying § 1677a(c)(2)(B) to what it considered to be irrecoverable *input* VAT, as it did in this case, Commerce applied the provision to *output* VAT and did so without regard to the credit for input VAT that the producer incurred on the purchase of materials used in the production of the exported merchandise. *See Jacobi Carbons v. United States, 43 CIT ——, 365 F.Supp.3d 1323 (2019) ("Jacobi I"); Jacobi Carbons v. United States, 43 CIT ——, 365 F.Supp.3d 1344 (2019) ("Jacobi II")*. In reasoning that is at variance with the holding and reasoning in *Qingdao Qihang*, *Jacobi I* and *Jacobi II* upheld the Department's new construction as reasonable according to the deference principle of *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Jacobi I, 43 CIT at ——, 365 F.Supp.3d at 1334–44; Jacobi II, 43 CIT at ——, 365 F.Supp.3d at 1353–63*.

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Blue Flag – Appeal Notification
Appeal Filed by GUIZHOU TYRE CO., LTD. v. US, Fed.Cir., July 24, 2023

519 F.Supp.3d 1248
United States Court of International Trade.

GUIZHOU TYRE CO., LTD. and Guizhou Tyre
Import and Export Co., Ltd., et al., Plaintiffs,
v.
UNITED STATES, Defendant.

Slip Op. No. 21-60
|
Consol. Court No. 17-00100
|
May 14, 2021

**Synopsis**
**Background:** Foreign producers filed suit challenging final results by Department of Commerce in seventh administrative review of antidumping duty order on off-the-road (OTR) tires from People's Republic of China. Producers moved for judgment on the agency record. The Court of International Trade, Timothy C. Stanceu, Chief Judge, 389 F.Supp.3d 1350, remanded. On remand, the Department of Commerce issued final results of remand redetermination.

**Holdings:** The Court of International Trade, Stanceu, Chief Judge, held that:

[1] reduction of producer's dumping margin was supported by substantial evidence;

[2] application of reduced margin for unexamined separate rate producers was supported by substantial evidence; but

[3] denial of separate-rate status to two foreign producers was not supported by substantial evidence.

Sustained in part and remanded in part.

**Procedural Posture(s):** Review of Administrative Decision; Motion for Judgment on Administrative Record.

West Headnotes (12)

**[1]    Customs Duties**⚖️Scope of inquiry or review

"Substantial evidence," as required to uphold an antidumping determination, refers to such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**[2]    Customs Duties**⚖️Foreign market value, fair value, and adjustment

Department of Commerce's remand redetermination, in seventh administrative review of antidumping duty order on off-the-road (OTR) tires from China, reducing foreign producer's individually-determined weighted-average dumping margin upon recalculating export price and constructed export price to remove deductions made from United States price for Chinese value-added tax (VAT), was supported by substantial evidence including that Department's elimination of VAT deduction conformed to remand order, was based on correct interpretation of antidumping statute, and was not subject to any objection by producer.

**[3]    Customs Duties**⚖️Foreign market value, fair value, and adjustment

Department of Commerce's remand redetermination, in seventh administrative review of antidumping duty order on off-the-road (OTR) tires from China, applying foreign producer's reduced individually-determined weighted-average dumping margin to four unexamined separate rate producers upon recalculating export price and constructed export price to remove

deductions made from United States price for Chinese value-added tax (VAT), was supported by substantial evidence including that Department's elimination of VAT deduction conformed to remand order, and producers either concurred or did not object to redetermination.

**[4]    Customs Duties⚑—Proceedings**

Department of Commerce's remand redetermination, in administrative review of antidumping duty order on off-the-road (OTR) tires from China, denying separate-rate status to two foreign producers that Commerce determined had not rebutted presumption of Chinese government control, was not supported by substantial evidence; Commerce presumed, without evidentiary support, that lack of autonomy in producers' selection of management was equivalent to finding Chinese government controlled their export activities, instead of examining factors for evaluating whether they were subject to government control, and Commerce failed to inquire whether producers' export prices were set by or subject to government approval so did not reasonably infer that producers did not control their export activities. Tariff Act of 1930 § 773, ⚑ 19 U.S.C.A. § 1677b(c)(1).

**[5]    Customs Duties⚑—Proceedings**

Under the presumption in antidumping duty proceedings involving countries designated as nonmarket economy (NME) countries, such as China, that all companies within the country are government controlled, exporters in an NME receive the country-wide antidumping duty rate, unless the exporter can rebut this presumption by affirmatively demonstrating its entitlement to a separate, company-specific margin by showing an absence of government control, both in law and fact, with respect to its export activities.

**[6]    Customs Duties⚑—Countervailing or Dumping Duties**

Typically, Department of Commerce considers four factors in evaluating whether each respondent to an administrative review of an antidumping duty order is subject to de facto foreign government control of its export functions: (1) whether the export prices are set by or are subject to the approval of a government authority, (2) whether the respondent has authority to negotiate and sign contracts and other agreements, (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management, and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

**[7]    Customs Duties⚑—Scope of inquiry or review**

Under the substantial evidence standard of review in an antidumping proceeding, Court of International Trade may not sustain a factual finding that ignores record evidence and relies upon speculation. Tariff Act of 1930 § 516A, ⚑ 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**[8]    Customs Duties⚑—Proceedings
Customs Duties⚑—Liquidation and Reliquidation**

Under the administrative review procedure, the Tariff Act employs a retrospective method of antidumping duty assessment; thus, duties are assessed following the finality of the results of the review, upon liquidation of the entries of merchandise that are subject to it. Tariff Act of

1930 § 751, 19 U.S.C.A. § 1675(a).

**[9]    Customs Duties**⚖️Proceedings

The purpose of the administrative review of an antidumping order is to determine, retrospectively, whether and at what rate entries are to be assessed antidumping duties as a remedial measure for price discrimination, that is, the sale of the subject merchandise in the United States at less than normal value. Tariff Act of 1930 § 751, 19 U.S.C.A. § 1675(a)(2)(A).

**[10]    Customs Duties**⚖️Foreign market value, fair value, and adjustment

Under the retrospective method of antidumping duty assessment, the entries subject to the review already have occurred by the time Department of Commerce conducts its review, during which Commerce, under its typical practice, determines a weighted average dumping margin for the exporter by examining the data on the exporter's prior sales that occurred during the period of review (POR), particularly, the prices at which the exported subject merchandise was sold into the United States market. Tariff Act of 1930 § 751, 19 U.S.C.A. § 1675(a)(2)(A).

**[11]    Customs Duties**⚖️Foreign market value, fair value, and adjustment

In an administrative review of an antidumping duty order involving subject merchandise from a country that Department of Commerce determines to be a nonmarket economy (NME) country, such as China, Commerce ordinarily determines normal value according to special

procedures by valuing factors of production according to surrogate values obtained from market economy countries; that leaves the United States price of the exported subject merchandise, in other words, the export price or, alternatively, constructed export price, as the only determinant of a dumping margin that is dependent on prices grounded in economic activity in China. Tariff Act of 1930 §§ 771, 773, 19 U.S.C.A. §§ 1677(18), 1677b(c)(1).

**[12]    Customs Duties**⚖️Scope of inquiry or review

Because Department of Commerce has identified a respondent's export functions or activities as the subject of its separate rate inquiry in an administrative review of an antidumping duty order covering merchandise imported from a nonmarket economy (NME), such as China, Court of International Trade in reviewing a decision placing an exporter within the China-wide entity consisting of all government-controlled exporters of the subject merchandise necessarily must review Commerce's factual identification of the price discriminator, in other words, the party that controlled the setting of the United States price of the exported subject merchandise, during the period of review (POR). Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(c)(1).

**Attorneys and Law Firms**

**\*1250** Ned H. Marshak and Brandon M. Petelin, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, argued for plaintiffs Guizhou Tyre Co., Ltd., Guizhou Tyre Import and Export Co., Ltd., Aeolus Tyre Co., Ltd., Qingdao Free Trade Zone Full-World International Trading Co., Ltd., and Qingdao Qihang Tyre Co., Ltd. With them on the brief were Jordan C. Kahn and Elaine F. Wang.

Douglas J. Heffner and Richard P. Ferrin, Drinker Biddle

& Reath, LLP, of Washington, D.C., for plaintiffs Trelleborg Wheel Systems (Xingtai) Co., Ltd. and Xuzhou Xugong Tyres Co., Ltd.

Robert K. Williams and Lara A. Austrins, Clark Hill PLC, of Chicago, IL, for plaintiff Weihai Zhongwei Rubber Co., Ltd.

John J. Todor, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With him on the brief were Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Paul K. Keith, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

## OPINION AND ORDER

STANCEU, Judge:

Before the court is a decision the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued in response to the court's opinion and order in **\*1251** *Guizhou Tyre Co., Ltd. v. United States*, 43 CIT ——, 389 F. Supp. 3d 1350 (2019) ("*Guizhou I*"). The court sustains this decision in part and remands it in part.

## I. BACKGROUND

Before the court are the *Final Results of Redetermination Pursuant to Court Remand* (Sept. 23, 2019), ECF No. 74 (conf.); (Oct. 10, 2019), ECF No. 81 (public) (the "*Remand Redetermination*"). Background on this litigation is presented in *Guizhou I*, 43 CIT at ——, 389 F. Supp. 3d at 1353–55, and summarized and supplemented below.

Following an investigation, Commerce in 2008 issued an antidumping duty order (the "Order") on certain off-the-road tires from the People's Republic of China ("China" or the "PRC") under the authority of 19 U.S.C. § 1673d(a).[1] *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Int'l Trade Admin. Sept. 4, 2008) (the "*Order*").

In 2017, Commerce, under 19 U.S.C. § 1675(a), published the final results of the seventh periodic administrative review of the Order (the "Final Results"), which is the administrative decision plaintiffs contested in commencing this litigation according to the judicial review provisions of 19 U.S.C. § 1516a. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733 (Int'l Trade Admin. Apr. 21, 2017) (P.R. Doc. 312) ("*Final Results*").[2] To correct certain ministerial errors (which are not at issue in this litigation), the Department later amended the Final Results. *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 27,224 (Int'l Trade Admin. June 14, 2017) ("*Amended Final Results*").

Commerce incorporated by reference in the Final Results a final "Issues and Decision Memorandum" ("Final I&D Memorandum") that contains explanatory discussion. *Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2014-2015* (Int'l Trade Admin. Apr. 12, 2017) (P.R. Doc. 308) ("*Final I&D Mem.*").

The seven plaintiffs in this consolidated case, all of which are respondents in the administrative proceeding below, include two "mandatory" respondents, i.e., respondents Commerce selected for individual examination in the seventh review. They were: (1) Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively, "GTC"), which Commerce treated as a single entity; and (2) Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Co. Ltd., and Xuzhou Hanbang Tyre Co., Ltd. (collectively, "Xugong"), which Commerce also treated as a single entity during the seventh review. *Final Results*, 82 Fed. Reg. at 18,733–34. In the Final Results, Commerce assigned Xugong an individual weighted-average dumping margin rate of 33.08%. *Id.* at 18,735. Commerce **\*1252** assigned GTC the rate that, under its practice, Commerce assigns to an exporter it considers to be part of an entity consisting of all exporters of the subject merchandise that it determines not to have rebutted its presumption of government control of export functions. Commerce referred to this entity in the Final

Results as the "PRC-wide entity." *Id.* For the Final Results, Commerce applied a "PRC-wide" rate of 105.31% to this entity and, thus, to GTC, *id.*, a rate Commerce carried over from prior reviews, *id.* at 18,735 n.16.

Plaintiff Aeolus Tyre Co., Ltd. ("Aeolus"), (Ct. No. 17-00102), another respondent Commerce determined not to have rebutted its presumption of government control over export functions, also was assigned the PRC-wide rate of 105.31% in the Final Results. *Id.*

Plaintiffs Qingdao Qihang Tyre Co., Ltd. ("Qingdao Qihang"), Qingdao Free Trade Zone Full-World International Trading Co., Ltd. ("Full World"), Trelleborg Wheel Systems (Xingtai) China, Co., Ltd. ("Trelleborg"), and Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei"), are entities that Commerce determined in the seventh review to have rebutted its presumption of government control and therefore to have qualified for a "separate rate," i.e., a rate separate from the rate assigned to the PRC-wide entity. *Id.* Commerce did not examine these entities individually and, therefore, did not calculate an individually-determined rate for any of them. Instead, Commerce assigned a rate of 33.08% to Qingdao Qihang, Full World, Trelleborg, and Zhongwei based on the margin it determined for mandatory respondent Xugong. *Id.*

Commerce later corrected a ministerial error and amended Xugong's separate individual weighted-average dumping margin to 33.14%. *Amended Final Results*, 82 Fed. Reg. at 27,225. Commerce then applied Xugong's revised rate to Qingdao Qihang, Full World, Trelleborg, and Zhongwei. *Id.* Commerce made no change in the 105.31% rate it applied to the companies it determined to be part of the PRC-wide entity. *Id.*

On January 30, 2018, six plaintiffs—mandatory respondents Xugong and GTC, and separate rate respondents Aeolus, Qingdao Qihang, Full World, and Trelleborg—moved for judgment on the agency record under USCIT Rule 56.2. Mots. for J. on Agency R., ECF Nos. 48–56 (conf. & public).[3] In response to GTC's motion, defendant requested a remand to allow Commerce to reconsider GTC's eligibility for separate rate status. Def.'s Resp. to Mots. for J. on the Agency R. 1-2 (June 1, 2018), ECF No. 58. Defendant opposed the motions in all other respects. *Id.*

In *Guizhou I*, the court granted defendant's request for a remand to allow Commerce to reconsider its separate rate determination as to GTC. *Guizhou I*, 43 CIT at ——, 389 F. Supp. 3d at 1360. The court concluded that

Commerce's determination that Aeolus did not qualify for a separate rate was unsupported by substantial evidence and remanded that determination to Commerce for reconsideration in light of all record evidence. *Id.* at ——, 389 F. Supp. 3d at 1359. The court noted, in particular, that Commerce did not mention a "Rectification Report" that Aeolus claimed demonstrated its independence from government control. *Id.* at ——, 389 F. Supp. 3d at 1358. Additionally, the court held that Commerce acted contrary to law in effecting reductions to Xugong's "U.S. price" (export price or constructed export price) for Chinese value-added tax ("VAT"), ***1253** *id.* at ——, 389 F. Supp. 3d at 1361, and directed Commerce to redetermine Xugong's weighted average dumping margin without making deductions for VAT, *id.* at ——, 389 F. Supp. 3d at 1370. Finally, because Full World, Qingdao, Trelleborg, and Zhongwei timely contested the Final Results as plaintiffs, the court ruled that these plaintiffs would be entitled to any relief that resulted from the recalculation of Xugong's individually-determined rate. *Id.* at ——, 389 F. Supp. 3d at 1370.

Following the court's decision in *Guizhou I*, Commerce prepared a draft remand redetermination and released it to the parties on August 9, 2019. *Remand Redetermination* 2 (citing *Draft Results of Redetermination Pursuant to Ct. Remand* (Aug. 9, 2019) ("*Draft Results*")), upon which GTC and Aeolus commented before the agency. *GTC and Aeolus' Comments on the Department's Draft Remand Redetermination* (Aug. 23, 2019) (Remand P.R. Doc. 5).

In the instant Remand Redetermination, submitted on September 23, 2019, Commerce, under protest, redetermined Xugong's margin by eliminating the Department's previous VAT deductions from U.S. price, resulting in a recalculated margin of 16.78%. *Remand Redetermination* 3–4, 43. Based on Xugong's redetermined margin, Commerce assigned rates of 16.78% to Full World, Qingdao Qihang, Trelleborg, and Zhongwei. *Id.* at 43. Commerce again determined that Aeolus failed to rebut its presumption of government control. *Id.* at 14 ("... there remains *de facto* government control over Aeolus ..."). Commerce reached the same conclusion as to GTC. *Id.* at 16 ("... we continue to find that GTC is ineligible for a separate rate in the underlying review because it is not free from *de facto* government control over its export activities.").

Six plaintiffs filed comments on the Remand Redetermination. Comments of Consol. Pl[s]. Xuzhou Xugong Tyres Co., Ltd. and Trelleborg Wheel Systems

(Xingtai) Co., Ltd. on Final Results of Redetermination Pursuant to Ct. Remand from Slip Op. 10-64 (CIT May 24, 2019) (Nov. 22, 2019), ECF No. 83 ("Xugong's & Trelleborg's Comments"); [GTC's] Comments on Final Remand Redetermination (Nov. 22, 2019), ECF Nos. 84 (conf.), 85 (public) ("GTC's Comments"); Aeolus' Comments on Final Remand Redetermination (Nov. 22, 2019), ECF Nos. 86 (conf.), 87 (public) ("Aeolus's Comments"); Comments [of Full World & Qingdao Qihang] on Final Remand Redetermination (Nov. 22, 2019), ECF No. 88 ("Qingdao's Comments"). Thereafter, defendant responded to the parties' comments. Def.'s Resp. to Comments on Remand Results (Feb. 21, 2020), ECF Nos. 97 (conf.), 98 (public) ("Def.'s Resp. to Comments").

As noted in 🚩 *Guizhou I*, in this litigation no party challenged the legal basis for the Department's assigning the 105.31% PRC-wide rate to all respondents it determined to have failed to rebut its presumption of control by the government of China. 🚩 *Guizhou I*, 43 CIT at ——— n.3, 389 F. Supp. 3d at 1354 n.3. Aeolus and GTC instead have confined their challenges to the Department's determination that each failed to rebut the presumption of *de facto* government control.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

[1]Section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c) vests the court with subject-matter jurisdiction of a civil action arising under subsections 516A(a)(2)(A)(i)(I) and 516A(a)(2)(B)(iii) of the Tariff Act of 1930 (the "Tariff Act"), *codified as amended*, 🚩 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I), 🚩 1516a(a)(2)(B)(iii), which together authorize judicial review of a final determination in an antidumping duty administrative review proceeding conducted **\*1254** under section 751(a), *codified as amended*, 19 U.S.C. § 1675(a). In reviewing a final determination, the court "shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 🚩 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 🚩 *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir.

2008) (quoting 🚩 *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

### B. Redetermined Margin for Xugong upon Elimination of the Unlawful Deduction for Chinese Value-Added Tax

[2]Commerce, under protest, redetermined Xugong's individually-determined weighted-average dumping margin upon recalculating export price and constructed export price to remove the deductions it made from U.S. price for Chinese value-added tax, reducing the margin from 33.14% to 16.78%.[1] *Remand Redetermination* 3–4, 43. Because the Department's elimination of the VAT deduction conforms to the court's remand order in 🚩 *Guizhou I* and is based on the correct interpretation of the governing statutory provisions, and because Xugong raises no objection, the court sustains the Department's decision to assign the new margin of 16.78% to Xugong.

### C. Redetermined Margins for the Unexamined Separate Rate Respondents Full World, Qingdao Qihang, Trelleborg, and Zhongwei

[3]In the Remand Redetermination, Commerce applied the margin it redetermined for Xugong (16.78%) to the unexamined separate-rate respondents, i.e., Full World, Qingdao Qihang, Trelleborg, and Zhongwei. Full World, Qingdao Qihang, and Trelleborg expressly agree with the elimination of the VAT deductions and the assignment of this redetermined rate. Xugong's & Trelleborg's Comments 1–2; Qingdao's Comments 1. Defendant advocates that the court sustain the Remand Redetermination in the entirety, Def.'s Resp. to Comments 2, and, specifically, raises no objection to the comments of the separate rate respondents advocating that the court sustain the Remand Results as to the assignment of the 16.78% margin. Because Full World, Qingdao Qihang, and Trelleborg expressly concur, because Zhongwei filed no objection, and because the Department's decision to assign the 16.78% rate to Full World, Qingdao Qihang, Trelleborg, and Zhongwei conforms to the court's previous Opinion and Order, the court sustains this decision.

It is possible that Commerce, on remand, will revise the margin it assigned to GTC, a mandatory respondent, in further proceedings required by this Opinion and Order.

Normally, Commerce would base the rate to be assigned to the separate rate respondents on the margins determined for the mandatory respondents. Nevertheless, Full World, Qingdao Qihang, and Trelleborg, having commented that they should be assigned the rate of 16.78% in accordance with the Department's Remand Redetermination, have waived any claim that their rates should be redetermined in further proceedings. Because it filed no objection, Zhongwei also has waived any such claim. By advocating that the court sustain the Remand Redetermination **1255** in the entirety and by raising no objection in its response to the comments of Full World, Qingdao Qihang, and Trelleborg advocating that the court sustain the assignment of the 16.78% rate, defendant also has waived any argument to the contrary. Accordingly, the court sustains the assignment of the 16.78% rate to the four unexamined separate-rate respondents.

### D. Decisions on Separate Rate Status for Aeolus and GTC

[4] [5] In the seventh review, Commerce followed its usual practice for antidumping duty proceedings involving countries it designates as nonmarket economy ("NME") countries, such as China, by presuming all companies within the country to be government controlled. *Remand Redetermination* 6. "Under this presumption, exporters in an NME receive the country-wide rate, unless the exporter can rebut this presumption by affirmatively demonstrating its entitlement to a separate, company-specific margin by showing an absence of government control, both in law and fact, with respect to its export activities." *Id.* (citing ⬜ *Sigma Corp. v. United States*, 117 F. 3d 1401, 1405 (Fed. Cir. 1997)).

[6] For the Final Results, Commerce found that Aeolus and GTC had demonstrated *de jure*, but not *de facto*, independence from government control over their export activities. *Final I&D Mem.* 6, 8–9. In the Remand Redetermination, Commerce again concluded that neither Aeolus nor GTC had rebutted the Department's presumption. Accordingly, Commerce assigned to both the PRC-wide rate of 105.31%, as it had in the Final Results. In explaining the reasoning behind this decision, the Remand Redetermination states that:

> Typically, Commerce considers four factors in evaluating whether each respondent is subject to *de facto* government control of its

export functions: (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

*Remand Redetermination* 7 (footnote omitted).[5] The Remand Redetermination states, further, that "Commerce's separate rate test examines all four *de facto* criteria," *id.* at 41, but also contains, in the same paragraph, the contradicting statement that "[i]f a respondent is unable to rebut one of the four *de facto* criteria, the company is ineligible for a separate rate," *id.* at 42 (citing ⬜ *Zhejiang Quzhou Lianzhou Refrigerants Co., Ltd. v. United States*, 42 CIT ——, 350 F. Supp. 3d 1308, 1313 (2018)).

Defendant argues in its response to comments that "Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria" and that "if an applicant fails to establish any one of the **1256** *de jure* or *de facto* criteria, Commerce is not required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria." Def.'s Resp. to Comments 9 (citing ⬜ *Yantai CMC Bearing Co. v. United States*, 41 CIT ——, 203 F. Supp. 3d 1317 (2017)). In addition to ⬜ *Yantai CMC Bearing Co.*, defendant relies on ⬜ *Advanced Tech. & Materials Co. v. United States*, 37 C.I.T. 1487, 938 F. Supp. 2d 1342 (2013), *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014).[6] Def.'s Resp. to Comments 9. Neither decision was based on facts analogous to those of the review at issue. In ⬜ *Advanced Tech. & Materials Co.*, the respondent attempting to rebut the Department's presumption was majority-owned by an entity that was 100% owned by a PRC government entity. ⬜ 37 C.I.T. at 1494, 938 F. Supp. 2d at 1348. Similarly, in ⬜ *Yantai CMC Bearing Co.*, the respondent at issue, Yantai CMC Bearing Co.

("Yantai CMC"), had a "chain of ownership" that "extended to the Chinese government because Yantai CMC is more than majority owned by CMC [China National Machinery Import & Export Corporation], which is, in turn, more than majority owned by Genertec, and Genertec is wholly-owned by the State-owned Assets Supervision and Administration of the State Council ('SASAC')." 41 CIT at ——, 203 F. Supp. at 1323 (citations omitted).

In contrast, neither Aeolus nor GTC had an ownership structure in which government entities owned a majority share during the POR. As to Aeolus, China Chemical Rubber Co., Ltd. ("China Chem Rubber") had a 42.58% ownership share, the largest share of any company, and this shareholder was 100% owned by a state-owned enterprise, China National Chemical Corporation ("ChinaChem"), which was under the supervision of China's national State-owned Assets Supervision & Administration Commission ("SASAC"). *Final I&D Mem.* 10, *Remand Redetermination* 7 (citations omitted). Commerce further found that during the POR three other state-owned enterprises owned an additional 6.48% of Aeolus, resulting in a total ownership by state-controlled enterprises of 49.06%. *Final I&D Mem.* 10, *Remand Redetermination* 7. As to GTC, Commerce found according to record evidence that Guiyang Industry Investment (Group) Co., Ltd. ("GIIG") owned a 25.20% interest and was GTC's largest shareholder. *Final I&D Mem.* 13, *Remand Redetermination* 17. GIIG was entirely owned by the Guiyang Municipal State-owned Assets Supervision & Administration Commission ("Guiyang SASAC"). *Remand Redetermination* 17.

[7]While explaining that failure to satisfy any one of the four stated factors is sufficient to deny a respondent separate rate status, the Remand Redetermination also states that "in cases where a respondent was not majority owned by the government, Commerce has examined the totality of the circumstances and made a reasonable inference that the respondent does not control its export activities the four *de facto* criteria, as Commerce has done here." *Id.* at 42 (citations omitted). The court cannot agree that Commerce examined the four criteria. Instead of examining the four criteria, the Remand Redetermination presumes, without evidentiary support, that the Department's finding of a lack of autonomy in the selection of management was the factual equivalent of a finding that the Chinese government controlled what Commerce termed a company's "export activities," **1257** *Remand Redetermination* 6, or "export functions," *id.* at 7, during the POR. Nor can the court agree that, on this record, Commerce made what can be described as a "reasonable inference." Under the

applicable standard of review, the court may not sustain a factual finding that ignores record evidence and relies upon speculation.[7]

[8] [9] [10]The court begins its substantial evidence review of the Department's findings that Aeolus's and GTC's export functions were government controlled by considering the method and purpose of an administrative review of an antidumping duty order under the Tariff Act. Under the administrative review procedure of 19 U.S.C. § 1675(a), the Tariff Act employs a "retrospective" method of antidumping duty assessment. Duties are assessed following the finality of the results of the review, upon liquidation of the entries of merchandise that are subject to it. Stated briefly, the purpose of the review is to determine, retrospectively, whether and at what rate those entries are to be assessed antidumping duties as a remedial measure for "price discrimination," i.e., the sale of the subject merchandise in the United States at less than normal value. *See* 19 U.S.C. § 1675(a)(2)(A) (directing Commerce to determine, in the review, "the normal value and export price (or constructed export price) of each entry of the subject merchandise, and ... the dumping margin for each such entry"). Under this retrospective method, the entries subject to the review already have occurred by the time Commerce conducts its review under 19 U.S.C. § 1675(a)(2)(A), during which Commerce, under its typical practice, determines a weighted average dumping margin for the exporter by examining the data on the exporter's prior sales that occurred during the POR, particularly, the prices at which the exported subject merchandise was sold into the U.S. market.

[11] [12]In an administrative review involving subject merchandise from a country Commerce determines according to 19 U.S.C. § 1677(18) to be an NME country, such as China, Commerce ordinarily determines normal value according to the special procedures of 19 U.S.C. § 1677b(c), as it did in this review, under which Commerce determines normal value by valuing factors of production according to "surrogate" values obtained from market economy countries. *See* 19 U.S.C. § 1677b(c)(1). That leaves the "U.S. price" of the exported subject merchandise (i.e., export price or, alternatively, constructed export price) as the only determinant of a dumping margin that is dependent on prices grounded in economic activity in China. Because Commerce has identified a respondent's "export functions" (or "activities") as the subject of its separate rate inquiry, the court, in reviewing a decision placing an exporter within the Department's "PRC-wide" entity consisting of all government-controlled exporters of the subject merchandise, necessarily must review the Department's

factual identification of the price discriminator, i.e., the party that controlled the setting of the U.S. price of the exported subject merchandise, during the POR.

In the seventh review, the Department's rationale for including Aeolus and GTC **1258** within the PRC-wide entity was that both were parts of a single entity composed of all Chinese exporters of the subject merchandise whose export functions were controlled by the PRC government, and to which Commerce assigned the single antidumping duty rate of 105.31%. *See Final I&D Mem.* 6–7. As the court has explained, by the time Commerce made its separate rate determinations for Aeolus and GTC, all sales and entries upon which the final results of the review were based already had occurred. In other words, if there was price discrimination, i.e., U.S. sales at less than normal value, to be remedied under the antidumping laws, it already had occurred by the time Commerce conducted the seventh review. In light of the retrospective method by which a review of an antidumping duty order is conducted and the purpose of the review, i.e., remedying price discrimination, the issue this case presents is whether the Department's inclusions of Aeolus and GTC within the PRC-wide entity were supported by valid factual findings that the Chinese government, rather than Aeolus or GTC, controlled the prices at which these companies' subject off-the-road tires were sold for export during the POR. Because Commerce, in the Remand Redetermination, did not apply the first of its factors—which inquires as to whether the export prices are set by or are subject to the approval of a government authority—the court has no such finding of fact to subject to judicial review under the substantial evidence standard.

The issue presented affects the two respondents differently. For GTC, a mandatory respondent, a valid finding by Commerce that the Chinese government, rather than GTC, set or controlled the prices at which GTC's subject off-the-road tires were sold for export to the United States during the POR is critical to a decision on whether GTC is to be assigned a rate other than one based on an examination of GTC's own sales. For Aeolus, which was not individually examined, the issue is whether Aeolus, by setting its prices for exported subject tires free of governmental control during the POR, qualifies for a rate Commerce determines for an unexamined separate rate respondent.

Because dumping is a comparison between normal value and export price (or constructed export price), the absence of findings of fact on the issue of whether the PRC government, as opposed to Aeolus or GTC, was the agent controlling the price of the subject exported merchandise

is a critical omission from the Department's analysis. This is all the more so because, as discussed previously, the methodology by which Commerce, in practically all cases (including this one), calculates dumping margins for Chinese exporters ensures that there is no factual relationship between prices and costs in China and the method of determining normal value. As the court also has explained, the Department's determination of normal value according to NME-country procedures relies on values obtained from market economy countries rather than prices for inputs in China, leaving U.S. price as the only determinant of a dumping margin that is dependent on prices grounded in economic activity occurring in China. Despite this, in the seventh review both Aeolus and GTC were assigned the PRC-wide rate of 105.31%, a rate that had no factual relationship to the export prices or constructed export prices of the subject merchandise that Aeolus and GTC exported to the United States or to the export prices or constructed export prices (based on Xugong's sales) that Commerce used to determine a collective rate for the separate rate respondents.

Under the separate-rate methodology Commerce applied to Aeolus and GTC in **1259** the Final Results and again in the Remand Redetermination, the sole reason export price and constructed export price became irrelevant to the antidumping duty rate applied to Aeolus and GTC was the Department's insistence that the government of China controlled the export functions of these two respondents. That conclusion rings hollow in the absence of actual findings, supported by substantial record evidence, on whether the PRC government, and not the respondents, controlled the prices of the exported merchandise subject to the review. Here, not only did both exporters place information on the record from which they argue that the Chinese government did not control their activities generally, they also introduced evidence to support their specific contentions that they maintained control over their own prices for the exported subject merchandise. *See* Aeolus's Comments 23–27, GTC's Comments 21–26. Under the Department's "rebuttable presumption" method of determining government control over export functions, the introduction of that evidence was at least sufficient to require Commerce to make retrospective determinations, based on a full consideration of the entire record, on the issue of whether the PRC government actually did control these respondents' export pricing decisions during the POR.

In challenging the Final Results, Aeolus argued that "Commerce relied exclusively on SOE [state-owned-enterprise] ownership and petitioners' website printouts to deny Aeolus' separate rate based only on the 'selection of management' *de facto* criterion"

instead of applying all four factors of its stated analysis. Mem. of Law in Supp. of Mot. for J. on the Agency R. of Consol. Pl. Aeolus Tyre Co., Ltd. 20 (Jan. 30, 2018), ECF No. 56 ("Aeolus's Br."). It argued, further, that the 49.06% level of ownership by state-owned enterprises does not establish government control over Aeolus's business decisions, let alone its export activities, and that the Department's findings to the contrary, which treated the level of ownership as "dispositive," were "mere speculation." *Id.* at 15. According to Aeolus, "[t]here is no evidence that the PRC government interfered with Aeolus' export activities—the focus of Commerce's separate rate test," *id.*, and "Commerce's finding that the PRC government controlled Aeolus' export decisions is not supported by any record evidence; rather, it is based entirely on speculation," *id.* at 24 (citation omitted). Aeolus maintained that it "submitted uncontroverted evidence that it: independently sets export prices; has negotiating authority; selects management independently; retains the proceeds of its export sales; and makes independent decisions regarding the disposition of profits." *Id.* at 27. Aeolus also challenged the Final Results on the ground that Commerce failed to provide "the requisite explanation for its new separate rate analysis," which Aeolus contends is at variance with the Department's past practice. *Id.* at 32–34.

Commerce found that "we continue to find that the Chinese government, through an SOE, exerts control over Aeolus's management selection process, through control of its board member selection process." *Remand Redetermination* 7 (citing *Final I&D Mem.* 10). Commerce followed this finding with a lengthy discussion of voting procedures for the election of directors and selection of management, a discussion of access to the company's financial information, and the Department's finding that the Rectification Report does not alter its ultimate conclusion. *Id.* at 8–14. Commerce opined that the Rectification Report "describes steps taken to ensure that Aeolus has an independent accounting system, but whether those steps are effective remains unaddressed in the Rectification Report." *Id.* at 13. Commerce concluded its analysis **\*1260** of *de facto* government control with the conclusory statements that "the only purported safeguard is ChinaChem's mere promise to not interfere with a listed company's business operations" and that "[t]herefore ... despite the Rectification Report showing specific government control issues being 'rectified,' there remains *de facto* government control over Aeolus by virtue of its board of directors and management being nominated and appointed by its SOE shareholders." *Id.* at 13–14. The critical issue of control over pricing of subject exports during the POR was left to speculation.

As to the issue of a separate rate for Aeolus, all of the Department's findings in the Remand Redetermination pertained to the issue of selection of directors and management and to government influence generally. There is no discussion of specific government control over the setting of prices of exported subject merchandise during the POR. Nor does the Remand Redetermination point to specific record evidence contradicting the evidence Aeolus put forth in its separate rate application on the issues of independence from the government in the setting of export prices, the negotiating of contracts, the retention of export sales proceeds, and the disposition of profits. *See* Aeolus's Comments at 2, 26–27. Without deciding whether Commerce permissibly reached findings under its third factor, autonomy in selection of management, the court concludes that Commerce reached an ultimate decision on Aeolus's separate rate application that was unsupported by substantial record evidence on the whole. The critical flaw was the Department's failure to conduct the review so as to determine whether the Chinese government, during the POR, controlled the prices of Aeolus's subject merchandise that was sold for export to the United States and at issue in the seventh review. If it did not, the inclusion of Aeolus within the PRC-wide entity lacked both an evidentiary basis and sound reasoning when viewed according to the Department's own formulation of its separate rate inquiry, which expressly identifies "export activities" and "export functions."

Regarding GTC, Commerce summarized its decision with the following finding: "In the instant case, we find that GTC is not free from government control in making decisions regarding the selection of its management and thus is subject to *de facto* government control of its export functions." *Remand Redetermination* 17. The Remand Redetermination explains, further, that "GTC's board is responsible for the selection of senior management, which controls the day-to-day decisions regarding the company's export activity." *Id.* at 20 (footnote omitted). As shown by the conclusory nature of both of these findings, the Department's analysis of GTC's separate rate application in the Remand Redetermination suffers from the same fatal flaws as does its analysis for Aeolus. No specific evidence is presented, or addressed, on the critical issue of whether the Chinese government controlled the prices of exports to the United States of GTC's subject merchandise during the POR. Almost all of the Department's discussion in the Remand Redetermination pertained to the factor addressing autonomy in selection of management. One finding pertained to the fourth factor ("makes independent decisions regarding disposition of profits or financing of

losses"), which was the finding that "Article 161 (IV) of GTC's AoA [Articles of Association] states, 'The Board of Director shall put forward { an} annual profit distribution proposal....' As a result, GIIG ultimately controls the selection of GTC's senior management, as well as profit distributions through its influence on GTC's board selection process." *Id.* at 19 (footnotes omitted). **\*1261** But there is no discussion addressing the question of whether the Chinese government controlled the prices of GTC's exported subject merchandise during the POR.

GTC argues that the evidence shows, at most, that the PRC central government has the potential to control, not that it actually controls, GTC's affairs. GTC's Comments 27. GTC points out that the Department's decision to treat GTC as part of the PRC-wide entity is unreasonable because Commerce granted GTC separate rate status in the fifth periodic review, when GTC's management and profit distribution structures were substantially similar to those in the instant review. *Id.* at 14–15. GTC contends that Commerce neither acknowledged nor explained the decision to employ a new *de facto* analysis, rendering the Remand Redetermination contrary to law. *Id.* at 28–32.

Without deciding whether Commerce was correct in its finding under its third factor, autonomy in selection of management (a finding GTC, like Aeolus, disputes), the court must set aside as insufficiently supported by substantial evidence on the record the presumption or inference that the Chinese government set or controlled the prices at which GTC sold subject off-the-road tires to the U.S. market during the POR. Commerce sidestepped the issue of whether the record evidence supported a finding of control of those prices during the POR by GIIG, the minority shareholder and government-controlled entity. Therefore, the standard of review requires the court to set aside, as unsupported by substantial record evidence, the denial of separate rate status to GTC as set forth in the Remand Redetermination.

As the court discussed previously, Commerce also ignored the issue of control over pricing of exported subject merchandise during the POR in denying separate rate status to Aeolus. With respect to both plaintiffs, Commerce failed to justify its application of its separate rate methodology for determining *de facto* government control according to remedial purpose of the antidumping duty statute in general and the particular remedial purpose of 19 U.S.C. § 1675(a), which calls for a retrospectively-determined remedy when sales of exported subject merchandise are found to have occurred during the POR at prices lower than normal value.

## III. CONCLUSION AND ORDER

The court sustains the following decisions in the Remand Redetermination: (1) to redetermine Xugong's individually-determined dumping margin upon recalculating export price and constructed export price to remove the deduction from U.S. price for Chinese value-added tax, (2) the resulting redetermined margin of 16.78% for Xugong, and (3) the decision to apply the rate of 16.78% to Full World, Qingdao Qihang, Trelleborg, and Zhongwei, who were unexamined separate-rate respondents.

The court remands to Commerce the Department's decisions in the Remand Redetermination to deny separate-rate status to Aeolus and GTC and orders that Commerce reach new decisions in accordance with this Opinion and Order.

Therefore, upon consideration of all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that the Remand Redetermination be, and hereby is, sustained with respect to the assignment of a redetermined weighted average dumping margin of 16.78% to mandatory respondent Xugong and the assignment of a rate of 16.78% to separate rate respondents Full World, Qingdao Qihang, Trelleborg, and Zhongwei; it is further

**\*1262 ORDERED** that Commerce submit a second determination upon remand ("Second Remand Redetermination") in which it reconsiders its decisions not to accord separate rate status to Aeolus and GTC and revises the antidumping duty rates applied to these respondents as may be required by its reconsideration of those decisions; it is further

**ORDERED** that Commerce shall submit its Second Remand Redetermination within 90 days of the date of this Opinion and Order; it is further

**ORDERED** that comments of plaintiffs on the Second Remand Redetermination must be filed with the court no later than 30 days after the filing of the Second Remand Redetermination; and it is further

**ORDERED** that the response of defendant to the aforementioned comments must be filed no later than 15 days from the date on which the last comment is filed.

**All Citations**                                              519 F.Supp.3d 1248

### Footnotes

1    Citations to the United States Code are to the 2012 edition.

2    All citations to record documents are to public versions. References cited as "P.R. Doc. ___" are to documents that
     were on the record of the proceeding at issue in 🏴 *Guizhou Tyre Co., Ltd. v. United States*, 43 CIT ——, 389 F. Supp.
     3d 1350 (2019) ("🏴*Guizhou I*"), while references cited as "Remand P.R. Doc. ___" are to documents placed on the
     agency record during the remand proceedings.

3    Plaintiff Zhongwei did not submit briefing in this case.

4    Although stating that Commerce is removing its VAT deduction under protest, the Remand Redetermination states
     no reasons why Commerce disagrees with the court's holding and reasoning on this issue, as are set forth in
     🏴*Guizhou I*.

5    In citing these factors, Commerce does not identify a statute or regulation and relies instead on two of its own prior
     decisions: *Final Determination of Sales at Less than Fair Value: Silicon Carbide from the People's Republic of China*,
     59 Fed. Reg. 22,585, 22,586–87 (Int'l Trade Admin. May 2, 1994) and *Notice of Final Determination of Sales at Less
     Than Fair Value: Furfuryl Alcohol from the People's Republic of China*, 60 Fed. Reg. 22,544, 22,545 (May 8, 1995).

6    This summary affirmance, issued according to U.S. Court of Appeals for the Federal Circuit Rule 36, is not a
     precedential decision. *See Advanced Tech. & Materials Co. v. United States*, 581 F. App'x 900 (Fed. Cir. 2014).

7    In remanding to Commerce an administrative decision denying separate rate status, this Court, questioning the
     Department's analysis, inquired as to how the Department's finding of majority equity ownership by an entity
     Commerce found to be government-controlled "translates into control of export functions." *Jilin Forest Indus.
     Jinqiao Flooring Grp. Co., Ltd. v. United States* 519 F.Supp.3d 1224, 1234 (2021).

                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Appx33

KeyCite Blue Flag – Appeal Notification
Appeal Filed by GUIZHOU TYRE CO., LTD. v. US, Fed.Cir., July 24, 2023

641 F.Supp.3d 1371
United States Court of International Trade.

GUIZHOU TYRE CO., LTD. and Guizhou Tyre
Import and Export Co., Ltd., et al., Plaintiffs,
v.
UNITED STATES, Defendant.

Slip Op. No. 23-79
|
Consol. Court No. 17-00100
|
May 18, 2023

**Synopsis**
**Background:** Respondents in antidumping proceeding, Chinese tire producers, brought actions against United States challenging determination by Department of Commerce's International Trade Administration (ITA) in seventh periodic administrative review of antidumping-duty order on certain off-the-road tires from the People's Republic of China. After actions were consolidated, the Court of International Trade, Timothy C. Stanceu, J., 389 F. Supp. 3d 1350, remanded for redetermination of certain issues, and when the remand redetermination came up for review, the Court of International Trade, Stanceu, J., 519 F. Supp. 3d 1248, remanded for a second redetermination of certain issues. The Department's second remand redetermination came up for review.

**Holdings:** The Court of International Trade, Timothy C. Stanceu, J., held that:

[1] Department permissibly determined, based principally on finding that Chinese government had effective control over selection of respondents' management, that respondents failed to establish independence from control by Chinese government of export functions;

[2] substantial evidence supported determination that one respondent failed to rebut presumption of government control by failing to demonstrate autonomy from Chinese government in making decisions about selection of management; and

[3] substantial evidence supported determination that second respondent failed to rebut presumption of government control by failing to demonstrate autonomy from Chinese government in making decisions about selection of management and distribution of profits.

Second remand redetermination sustained.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (6)

[1]     **Customs Duties**—Proceedings

"Substantial evidence," as required to support a final determination issued by the Department of Commerce to conclude an administrative review of an antidumping-duty order, refers to such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

[2]     **Customs Duties**—Proceedings

Department of Commerce permissibly determined, principally on basis that Chinese government had effective control over the selection of company management of respondents, Chinese producers of off-the-road tires, that respondents failed to establish independence from control by Chinese government of export functions, even though management control was only one factor of Department's four-factor test for government control; Department had broad discretion in selecting the methodology by which it interpreted and effectuated its rebuttable presumption of government control over export functions, and that discretion included power to implement test for government control based principally on test's third prong, autonomy in selection of

management.

**[3]    Customs Duties⌖Proceedings**

In reaching a final determination in an administrative review of an antidumping-duty order, the Department of Commerce may draw reasonable inferences from record evidence. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**[4]    Customs Duties⌖Proceedings**

Substantial evidence supported Department of Commerce's determination that respondent in antidumping proceeding, Chinese producer of off-the-road tires, failed to demonstrate autonomy from Chinese government in making decisions regarding the selection of management, and thereby failed to rebut the presumption of control by the Chinese government of its export functions, even if respondent's governance procedures were transparent and democratic, where record data on voting showed that a state-owned enterprise, through a wholly owned subsidiary, despite being a minority shareholder, had the ability to control selection of members of respondent's board of directors, and board controlled selection of respondent's senior management.

**[5]    Customs Duties⌖Proceedings**

That a publicly held company in a nonmarket economy is governed by transparent and democratic procedures, including procedures for electing board members open to all shareholders, does not suffice to demonstrate the company's autonomy from government control of decisions on the selection of management, a factor that must be shown in an antidumping proceeding to rebut the presumption of government control of the company's export functions, where a government entity is the dominant shareholder in the election of board members.

**[6]    Customs Duties⌖Proceedings**

Substantial evidence supported Department of Commerce's determination that respondent in antidumping proceeding, Chinese producer-exporter of off-the-road tires, failed to rebut the presumption of control by Chinese government of its export functions, and thus was not entitled to separate-rate status, even if respondent complied with provisions of Chinese law and in its articles of association related to control by shareholder that was a wholly owned subsidiary of a state-owned entity, where that shareholder was the only one with enough shares to convene a shareholder meeting, and record evidence showed that shareholder could control the election of respondent's board of directors, which selected senior management, and could influence the distribution of respondent's profits.

**Attorneys and Law Firms**

**\*1373** Richard P. Ferrin, Faegre Drinker Biddle & Reath, LLP, of Washington, D.C., for plaintiff Xuzhou Xugong Tyres Co., Ltd. With him on the briefs was Douglas J. Heffner.

Richard P. Ferrin, Faegre Drinker Biddle & Reath, LLP, of Washington, D.C., for plaintiff Trelleborg Wheel Systems (Xingtai) Co., Ltd. With him on the briefs was Douglas J. Heffner.

Ned H. Marshak, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, New York, argued for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. With him on the briefs were Jordan C. Kahn, Elaine F. Wang, and Brandon M. Petelin.

Brandon M. Petelin, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for plaintiff Qingdao Qihang Tyre Co., Ltd. With him on the briefs were Ned. H. Marshak, Elaine F. Wang, and Jordan C. Kahn.

Brandon M. Petelin, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for plaintiff Qingdao Free Trade Zone Full-World International Trading Co., Ltd. With him on the briefs were Ned. H. Marshak, Elaine F. Wang, and Jordan C. Kahn.

Ned H. Marshak, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, New York, for plaintiff Aeolus Tyre Co., Ltd. With him on the briefs were Brandon M. Petelin, Elaine F. Wang, and Jordan C. Kahn.

Robert K. Williams and Lara A. Austrins, Clark Hill PLC, of Chicago, Illinois, for plaintiff Weihai Zhongwei Rubber Co., Ltd.

John J. Todor, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With him on the briefs were Brian M. Boynton, Acting Assistant Attorney General, Patricia M. McCarthy, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Paul K. Keith, Attorney, Office of the Chief Counsel For Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington D.C.

OPINION

Stanceu, Judge:

The plaintiffs in this consolidated action contested an administrative determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department"), issued to conclude a periodic review of an antidumping duty order on off-the-road ("OTR") tires from the People's Republic of China ("China" or the "PRC").[1]

**\*1374** Before the court is the "Second Remand Redetermination," which Commerce submitted in response to a previous opinion and order in this litigation,

*Guizhou Tyre Co. v. United States*, 45 CIT ——, 519 F. Supp. 3d 1248 (2021) ("*Guizhou II*"). *Final Results of Redetermination Pursuant to Ct. Remand* (Sept. 24, 2021), ECF Nos. 109 (Conf.), 110 (Public), ("*Second Remand Redetermination*"). The court sustains the Second Remand Redetermination.

## I. BACKGROUND

### A. The Contested Determination

The determination contested in this litigation (the "Final Results") is *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733 (Int'l Trade Admin. Apr. 21, 2017) ("*Final Results*"). *See also Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 27,224 (Int'l Trade Admin. June 14, 2017) ("*Amended Final Results*"). Commerce incorporated by reference in the Final Results and the Amended Final Results a final "Issues and Decision Memorandum" containing explanatory discussion. *Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2014-2015* (Int'l Trade Admin. Apr. 12, 2017) (P.R. Doc. 308) ("*Final I&D Mem.*").[2]

### B. The Seventh Review of the Antidumping Duty Order

Commerce issued an antidumping duty order (the "Order") on certain OTR tires from China (the "subject merchandise") in 2008. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Int'l Trade Admin. Sept. 4, 2008). Commerce initiated the review at issue, the seventh periodic administrative review of the Order, on November 9, 2015. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 80 Fed. Reg. 69,193 (Int'l Trade Admin.). The seventh review pertained to entries of subject merchandise made during

the period of review ("POR") of September 1, 2014 through August 31, 2015. *Id.*, 80 Fed. Reg. at 69,196. Commerce published the preliminary results of the review on October 14, 2016. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 71,068 (Int'l Trade Admin.).

For the review, Commerce selected two groups of respondents as "mandatory respondents," i.e., respondents for which it intended to conduct individual examinations. The first group of respondents consisted of Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Co. Ltd., and Xuzhou Hanbang Tyre Co., Ltd. (collectively, "Xugong"), which Commerce treated as a single entity ("collapsed") for purposes of the review. The second group consisted of Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively, "GTC"), which Commerce also treated as a single entity. *Final Results*, 82 Fed. Reg. at 18,733–34 & nn.3–4.

Commerce concluded that Xugong established independence from the government of China by rebutting the Department's **\*1375** presumption of *de jure* and *de facto* government control and therefore, under its practice, qualified for a "separate rate," i.e., an antidumping duty rate other than the rate Commerce assigns to exporters and producers it considers to be part of the "PRC-wide entity," i.e., those Chinese exporters and producers of the subject merchandise that failed to rebut the Department's presumption. *Id.*, 82 Fed. Reg. at 18,734.[3] In the Final Results, Commerce assigned a weighted-average dumping margin of 33.08% to Xugong and assigned to GTC the PRC-wide rate, which in the seventh review was 105.31%. *Id.*, 82 Fed. Reg. at 18,735.[4] Commerce concluded that GTC, while demonstrating *de jure* independence from government control, had not rebutted the presumption that the government of China exercised *de facto* control over its export functions. *Final I&D Mem.* at 8–9.

Because Xugong was the only individually-examined respondent that Commerce determined to be qualified for a separate rate, Commerce assigned to all other separate rate respondents a rate of 33.08%, equivalent to the margin it calculated for Xugong. *Final Results*, 82 Fed. Reg. at 18,735. In addition to GTC, Commerce determined that Aeolus Tyre Co., Ltd. ("Aeolus") failed to qualify for a separate rate and therefore treated it as part of the PRC-wide entity, assigning it the rate of 105.31%. Commerce made the same determination as to Tianjin Leviathan International Trade Co., Ltd., which is not a party to this case. *Id.*

On June 14, 2017, Commerce issued the Amended Final Results to correct a ministerial error. *Amended Final Results*, 82 Fed. Reg. at 27,224. Commerce determined that the weighted-average dumping margin applicable to Xugong was 33.14% rather than 33.08%. *Id.*, 82 Fed. Reg. at 27,225. Commerce applied this margin to the other "separate rate" respondents. *Id.* The 105.31% rate applied to members of the PRC-wide entity in the Final Results was unchanged. *Id.*

### C. The Parties to this Consolidated Case

The plaintiffs in this litigation include the two mandatory respondents, Xugong **\*1376** (to which Commerce assigned a rate of 33.14%) and GTC (to which Commerce assigned the 105.31% PRC-wide rate). The other plaintiffs are Aeolus (to which Commerce also assigned the PRC-wide rate) and four separate rate respondents, to each of which Commerce assigned the 33.14% rate determined for Xugong in the Amended Final Results: Qingdao Free Trade Zone Full-World International Trading Co., Ltd.; Qingdao Qihang Tyre Co., Ltd.; Trelleborg Wheel Systems (Xingtai) China, Co. Ltd.; and Weihai Zhongwei Rubber Co., Ltd. Defendant is the United States.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

[1] The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended* 19 U.S.C. § 1516a, including an action contesting a final determination that Commerce issues to conclude an administrative review of an antidumping duty order.[5] In reviewing a final determination, the court "shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008)

(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

### B. The Court's Prior Opinions

The court remanded the Final Results to Commerce in its first decision, *Guizhou Tyre Co. Ltd. v. United States*, 43 CIT ——, 389 F. Supp. 3d 1350 (2019) ("*Guizhou I*"). Commerce responded in a decision (the "First Remand Redetermination") submitted on October 10, 2019. *Final Results of Redetermination Pursuant to Ct. Remand*, ECF Nos. 74 (Conf.), 81 (Public) ("*First Remand Redetermination*").

In *Guizhou I*, the court held that Commerce unlawfully made deductions from the starting prices used to determine the export price and constructed export price of Xugong's subject merchandise to adjust for Chinese value-added tax ("VAT"). *Guizhou I*, 43 CIT at ——, 389 F. Supp. 3d at 1364. In the First Remand Redetermination, Commerce, under protest, redetermined Xugong's weighted average dumping margin by removing the deductions for VAT, reducing Xugong's margin from 33.14% to 16.78%. *Guizhou II*, 45 CIT at ——, 519 F. Supp. 3d at 1254. Because Commerce used Xugong's margin to determine the rate for the other separate rate respondents, Commerce also lowered the rate for those respondents from 33.14% to 16.78%. *Id.*

The court in *Guizhou I* also remanded for reconsideration of the Department's decisions in the Final Results that GTC and Aeolus failed to rebut the Department's presumption of *de facto* government control. Defendant requested a remand to allow Commerce to reconsider its decision as to GTC. *Id.*, 45 CIT at ——, 519 F. Supp. 3d at 1252 (citing *Guizhou I*, 43 CIT at ——, 389 F. Supp. 3d. at 1360). As to Aeolus, the court's opinion and order in *Guizhou I* concluded that Commerce had failed to consider all record evidence and, in particular, had not addressed a "Rectification Report" that Aeolus claimed demonstrated its independence from government **\*1377** control. *Guizhou I*, 43 CIT at ——, 389 F. Supp. 3d. at 1357–59 (citing *Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Kleistadt to U.S. Dep't. of Commerce* at Ex. 1A (Jan. 8, 2016) (C.R. Doc. 39) (P.R. Doc. 79) ("*Rectification Report Letter*")). In the First Remand Redetermination, Commerce concluded, as it had

in the Final Results, that both Guizhou and Aeolus had failed to rebut the Department's presumption of government control. *Guizhou II*, 45 CIT at ——, 519 F. Supp. 3d at 1253. In each of those determinations, Commerce placed considerable weight on a finding that a 100% government-owned entity was the largest shareholder, albeit without majority ownership, and concluded that the government-owned shareholder had the ability to control the selection of members of the board of directors, which in turn selected senior management. *Id.*, 45 CIT at ——, 519 F. Supp. 3d. at 1256, 1259–60 (citing *First Remand Redetermination* at 7 (citing *Final I&D Mem.* at 10)).

The opinion and order in *Guizhou II* issued a second remand on the determinations by Commerce that GTC and Aeolus failed to rebut the presumption of government control. The court noted a contradiction in the Department's description of the methodology by which it made those determinations. Commerce identified four criteria for its inquiry as to *de facto* government control over export functions, as follows:

> Typically, Commerce considers four factors in evaluating whether each respondent is subject to *de facto government* control of its export functions: (1) whether the export prices are set by or are subject to the approval of a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

*First Remand Redetermination* at 7 (citation omitted). After recounting the four criteria Commerce identified, the court noted that the First Remand Redetermination stated that "Commerce's separate rate test examines all four *de facto* criteria." *Guizhou II*, 45 CIT at ——, 519 F. Supp. 3d at 1255 (quoting *First Remand*

*Redetermination* at 41). The court mentioned that the First Remand Redetermination "also states that 'in cases where a respondent was not majority owned by the government, Commerce has examined the totality of the circumstances and made a reasonable inference that the respondent does not control its export activities by examining the four *de facto* criteria, as Commerce has done here.' " *Id., 45 CIT at ——, 519 F. Supp. 3d at 1256* (quoting *First Remand Redetermination* at 42). The First Remand Redetermination also contained "the contradicting statement that '[i]f a respondent is unable to rebut one of the four *de facto* criteria, the company is ineligible for a separate rate.' " *Id., 45 CIT at ——, 519 F. Supp. 3d at 1255* (quoting *First Remand Redetermination* at 42 (citing *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 42 CIT ——, ——, 350 F. Supp. 3d 1308, 1313 (2018))).

The Department's assertions that it examined all four of its criteria for *de facto* control, when in fact it had not, required the court to remand the decisions to deny separate rate status to GTC and Aeolus. The court in *Guizhou II* found particularly significant the Department's ignoring, and failing to state findings on, the first criterion, which pertains to independence in setting **\*1378** export prices. After discussing why a finding of fact on that criterion is particularly relevant to the issue of whether an exporter or producer should be included within the PRC-wide entity, the court concluded in *Guizhou II* that Commerce had sidestepped that issue. The court stated that "[b]ecause Commerce, in the [First] Remand Redetermination, did not apply the first of its factors—which inquires as to whether the export prices are set by or are subject to the approval of a government authority—the court has no such finding of fact to subject to judicial review under the substantial evidence standard." *Id., 45 CIT at ——, 519 F. Supp. 3d at 1258.*

While pointing out the several shortcomings of the Department's self-contradictory methodology in the First Remand Redetermination, the court in *Guizhou II* did not order Commerce to reverse its decision denying GTC and Aeolus separate rate status. Instead, the court ordered Commerce to "reach new decisions in accordance with this Opinion and Order." *Id., 45 CIT at ——, 519 F. Supp. 3d at 1261.*

**C. The Department's Revised Separate Rate Analyses**

**in the Second Remand Redetermination**

In the Second Remand Redetermination, Commerce made a finding on each "prong" of its four-criteria test for *de facto* independence from government control, with respect to both Aeolus and GTC. Commerce found that both respondents satisfied the first two prongs. "Based on our review of the record, we conclude that it does not contain affirmative evidence that the Chinese government 'actually did control' the respondents' export pricing decisions (*i.e.*, the first prong)." *Second Remand Redetermination* at 3. Commerce further found:

> [T]here is no evidence to contradict statements and information in support of claims that Aeolus and GTC have authority to negotiate and sign contracts and other agreements (*i.e.*, the second prong) and, for Aeolus, no explicit evidence to contradict a finding that the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses (*i.e.*, the fourth prong).

*Id.* at 3–4. Despite these findings, Commerce determined that Aeolus and GTC failed to rebut the presumption of government control of their respective export functions, asserting that a respondent must demonstrate independence from government control as described in each of the four prongs of its test. Commerce found that "both companies failed to establish autonomy in the selection of management (*i.e.*, the third prong), and that GTC further failed to rebut the presumption of control with respect to independent decision-making regarding disposition of profits (*i.e.*, the fourth prong)." *Id.* at 4. In making its findings under the third prong, Commerce began its analysis with the ownership structure of Aeolus and GTC, reiterating findings it had made previously.

Commerce found that a parent company of Aeolus, China Chemical Rubber Co., Ltd. (also known as China National Tire & Rubber Corp.), held a 42.58% share of Aeolus during the POR. *Id.* at 5. Commerce found, further, that this parent company was 100% owned by a state-owned enterprise, China National Chemical Corporation ("ChinaChem") and supervised by a State-owned Assets Supervision & Administration

Commission ("SASAC"), a government entity. *Id.* Commerce also found that three other shareholders of Aeolus were state-owned enterprises supervised by SASACs, such that the "total SOE ownership in Aeolus" was 49.06%. *Id.* **\*1379** (citation omitted). From these and other findings, Commerce concluded that ChinaChem, a state-owned enterprise, was the "controlling shareholder" of Aeolus. *Id.*

On GTC's ownership structure, Commerce found that Guiyang Industry Investment (Group) Co., Ltd. ("GIIG"), owned 25.20% of Guizhou Tyre Co., Ltd. (of which Guizhou Tyre Import and Export Co., Ltd. was a wholly-owned subsidiary) and that GIIG was entirely owned by the Guiyang Municipal State-owned Assets Supervision & Administration Commission ("Guiyang SASAC"). *Id.* at 7; *see* ⚑ *Guizhou I*, 43 CIT at ——, 389 F. Supp. 3d at 1359. Commerce concluded that Guiyang SASAC "is GTC's single largest and *de facto* controlling shareholder." *Second Remand Redetermination* at 7.

From the record evidence on ownership structure and other record evidence, Commerce found that a government entity, as the controlling (although not majority) shareholder in Aeolus and in GTC, controlled the selection of board members and that the board controlled the selection of senior management. Specifically, Commerce found that Aeolus's Articles of Association ("AoA") "allows its majority shareholders to control the selection of its board of directors, a board which, in turn, selects Aeolus's general manager and deputy general manager." *Second Remand Redetermination* at 6. As to GTC, Commerce found that "GIIG, through its 25.20 percent ownership stake, controlled GTC's board nomination process" and that the board "is responsible for the selection of senior management." *Id.* at 9.

Aeolus and GTC oppose the Second Remand Redetermination. Consol. Pl.'s Comments on Second Remand Redetermination (Nov. 24, 2021), ECF Nos. 116 (Conf.), 117 (Public) ("Aeolus's Comments"); Pls.' Comments on Second Remand Redetermination (Nov. 24, 2021), ECF Nos. 114 (Conf.), 115 (Public) ("GTC's Comments").

The Department's revised analysis presents two issues. First, the court must decide whether requiring a respondent to satisfy all four prongs of the Department's test to obtain separate rate status is a permissible methodology. Second, if it is, then the court must decide whether substantial evidence supported the Department's findings that Aeolus and GTC failed to satisfy the third prong, which requires a demonstration of independence in

the selection of management. The court addresses these two issues below.

### 1. The Department's Methodology for Effectuating its *De Facto* Test Is Not Impermissible *Per Se*

Both Aeolus and GTC object to the Second Remand Redetermination on the ground that Commerce must base its decision on the total body of record evidence pertaining to all four of its criteria ("prongs"), i.e., the totality of the circumstances. Aeolus's Comments 14–18, 29–31; GTC's Comments 14–18, 28–31. In the Second Remand Redetermination, Commerce based its decision as to Aeolus on only the third prong, "autonomy from the government in making decisions regarding the selection of management," and based its decision as to GTC on the third and the fourth prong, which requires independence in profit distribution decisions. In effect, GTC and Aeolus challenge the Department's methodology of requiring a separate rate respondent to establish independence from government control as to each of the four criteria.

Aeolus's and GTC's challenges to the Department's application of its four-prong test view the Department's conception of "export functions" as overly broad. According to their arguments, independence in export pricing and in entering into contracts (in the case of GTC) or independence **\*1380** in export pricing, in entering into contracts, and in retaining proceeds of export sales and making independent decisions regarding disposition of profits or financing of losses (in the case of Aeolus) should suffice to rebut the presumption of government control of export functions. In that regard, the opinion and order in ⚑ *Guizhou II* questioned the Department's application of the four-prong test, noting the significance for the antidumping duty laws of independence in setting prices for exported subject merchandise. *See* ⚑ *Guizhou II*, 45 CIT at ——, 519 F. Supp. 3d at 1257–60.

Aeolus and GTC argue that in ⚑ *Guizhou II* the court *required* Commerce to base any denial of separate rate status on evidence of government influence on price-setting. Aeolus's Comments 14–18; GTC's Comments 14–18. The court disagrees. The opinion and order in ⚑ *Guizhou II* directed Commerce to reconsider its decisions as to Aeolus and GTC but did not rule the Department's application of its four-prong test impermissible *per se*.

The Second Remand Redetermination responded to the court's order by providing an expanded discussion on the

Department's reliance on the third criterion:

> Specifically, our finding that neither Aeolus nor GTC have autonomy in the selection of management allows for the reasonable inference, in light of the presumption of government control in NME [nonmarket economy] country proceedings, that their respective government shareholders maintain the potential to control the export operations of each company because the management of a firm controls its operations—including its export functions.

*Second Remand Redetermination* at 19. Commerce also explained that it considers an absence of evidence of direct government involvement in the setting of prices of the exported subject merchandise insufficient to establish a company's independence in "operations—including its export functions," *id.*, because doing so "ignores other aspects of export activities where the government may exert control, such as influence over export quantities/quotas, terms of sale, financing, customer relationships, contract negotiation, transportation, customs requirements, management directives, selection of export markets, export-related investment, *etc.*," *id.* at 23–24 (footnote omitted).

[2] To place a company within the PRC-wide entity, Commerce considers it sufficient that an entity of the Chinese government have effective control over the selection of company management, which it views as signifying the power to influence all of a company's business activities, including export functions. *Final I&D Mem.* at 13. The question presented is whether the court must reject the rationale Commerce stated in the Second Remand Redetermination and thereby conclude that this agency practice is impermissible *per se*. Based on the explanation provided in the Second Remand Redetermination, the court cannot reach that conclusion. For the reasons discussed below, the circumstances of this case do not place the court in a position to substitute its judgment for the agency's on the question of just how much governmental "control" over export functions sufficed to place an exporter or producer within the PRC-wide entity.

[3] Commerce has not grounded its regulatory scheme to

effectuate its rebuttable presumption of *de facto* government control in a specific provision of the Tariff Act or implementing regulations. *See* ⚑ *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 617 F.Supp.3d 1343, 1356 (Ct. Int'l Trade 2023). Because it exists apart from the provisions in the Tariff Act **\*1381** and regulations, there is no statutory language, legislative history, or regulatory language or preamble to guide the court in deciding whether the Department's methodology is *ultra vires* or unreasonable *per se*. In that circumstance, the court cannot conclude that it necessarily was unreasonable for Commerce to infer control of "export functions," broadly defined, from record facts showing that a governmental agency had control over the selection of company management and thus, indirectly, over business activity in general, which includes activity related to the exportation of merchandise. In addition, a court must recognize an agency's discretion to draw reasonable inferences from record evidence. *See* ⚑ *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 845 (Fed. Cir. 2020) (quoting ⚑ *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) for the principle that "substantial evidence includes 'reasonable inferences from the record' ").

The court also is guided by binding precedent of the Court of Appeals for the Federal Circuit ("Court of Appeals"), which repeatedly has affirmed the Department's authority to apply a rebuttable presumption of government control in determining which exporters and producers of a nonmarket economy ("NME") country, such as China, to include within the NME-wide entity. *China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028, 1039 (Fed. Cir. 2021) ("*CMA*"); ⚑ *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1313 (Fed. Cir. 2017) ("⚑ *Diamond Sawblades*"). In light of the breadth of the Department's discretion to craft its own antidumping duty procedures for exports from NME countries, as the Court of Appeals recognized in its holdings in *CMA* and ⚑ *Diamond Sawblades*, the court is unable to agree with Aeolus and GTC that Commerce lacked the discretion to implement its *de facto* test for government control based principally on the third prong of that test. According to the reasoning in those cases, Commerce should be allowed broad discretion not only in applying its presumption but also in setting forth the criteria by which it will effectuate it. In other words, the greater power to create an entire regulatory scheme for an NME-wide entity, which the case law establishes, implies the lesser power to effectuate it through criteria and procedures, such as those Commerce applied in this case, that define what the agency means when it uses the term "government control" of export functions.

**2. Commerce Permissibly Found that Aeolus Did Not Establish Independence from Government Control in the Selection of Company Management**

[4]Commerce identified record evidence that ChinaChem was, by far, the dominant shareholder casting votes for the election of members of Aeolus's board of directors. *Second Remand Redetermination* at 54 ("ChinaChem represented the vast majority of votes electing the board.") (citation omitted); *see also First Remand Redetermination* at 34–35 (showing the specific, proprietary percentages of votes by ChinaChem and comparing them to percentages for votes of other shareholders). Commerce also considered that the votes cast by shareholders other than ChinaChem and other than the three other SOE shareholders were a very small percentage of the votes cast during the POR. *First Remand Redetermination* at 34. Commerce considered this significant because the board controlled the selection of Aeolus's general manager and deputy general manager. *Id.* at 5; *Second Remand Redetermination* at 6.

Aeolus argues that Commerce erred in relying on the data on voting percentages *1382 because "[t]his Commerce calculation conflates the shareholder vote conducted on December 12, 2014, with the shareholder information provided as of December 31, 2014." Aeolus's Comments 24 (citation omitted). Aeolus posits that "Commerce concedes it does not know if the shareholder percentage changed in the 19 days between the vote and year-end, wrongly faulting Aeolus for Commerce's failure to have requested ownership data at the vote to support its denial." *Id.* (citing *Second Remand Redetermination* at 55). According to Aeolus, Commerce impermissibly relied upon speculation because "[w]ithout such data, Commerce improperly made assumptions 'about ChinaChem's presence at the vote.' " *Id.* at 24–25 (citing *Second Remand Redetermination* at 55). This argument is unconvincing. Commerce reasonably interpreted the shareholder voting evidence on the record, which contained no evidence that the ownership data changed during the 19-day period. Aeolus did not submit information for the record to show that it did or, if it did, that the change cast doubt on the Department's findings that ChinaChem could exert control over the selection of board members and that the non-government shareholders did not cast votes in any meaningful percentage.

Aeolus argues, further, that because its government ownership was only minority ownership, denial of separate rate status required more indicia of government

control than the record indicated and that, accordingly, Aeolus rebutted the presumption of government control. According to Aeolus, Commerce failed to base its separate rate denial on "on actual government control as opposed to mere potential to control." Aeolus's Comments 18–22. In support of this argument, Aeolus cites several decisions of this Court, 🚩 *An Giang Fisheries Import & Export Joint Stock Co. v. United States*, 42 CIT ——, ——, 284 F. Supp. 3d 1350, 1359 (2018) ("🚩 *An Giang II*"), 🚩 *An Giang Fisheries Import & Export Joint Stock Co. v. United States*, 41 CIT ——, ——, 203 F. Supp. 3d 1256, 1291–92 (2017) ("🚩 *An Giang I*"), and 🚩 *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 38 CIT ——, ——, 28 F. Supp. 3d 1317, 1348–50 (2014). Aeolus's Comments 20–21. The court rejects this argument because the facts underlying these cases are not analogous to the record facts here.

In the 🚩 *An Giang* cases, the government-controlled entity that was the largest, but still minority, shareholder did not have "the authority to appoint Directors without the approval of 65% of the General Meeting of Shareholders." 🚩 *An Giang I*, 41 CIT at ——, 203 F. Supp. 3d at 1290. Ultimately, concluding that the respondent had "not demonstrated how the protective rights available in the 2012 Articles of Association could have been exerted during the first 61 days of the POR, when the 2006 Articles of Association remained in effect," this Court held that the respondent failed to rebut the presumption of government control, concluding that "[a]s a result, Commerce's determination that there existed the potential for actual control by the minority government shareholder during the POR was reasonable."

🚩 *An Giang II*, 42 CIT at ——, 284 F. Supp. 3d at 1364.

🚩 *Jiangsu Jiasheng Photovoltaic Tech. Co.* is also inapposite, having turned on an issue not presented by this case. A domestic producer contested the Department's granting separate rate status to respondents "whose senior managers and/or board directors held membership or positions in certain state-owned enterprises or government entities." 🚩 *Jiangsu Jiasheng Photovoltaic Tech. Co.*, 38 CIT at ——, 28 F. Supp. 3d at 1348. Commerce found that the respondents had satisfied all four prongs of the Department's *de facto* test, reasoning that the "record does not show *1383 that the membership or position of senior managers or board directors ... resulted in a lack of autonomy on the part of the respondent[s] to set prices, negotiate and sign agreements, *select management*, or decide how to dispose of profits or financing of losses." 🚩 *Id.*, 38 CIT at ——, 28 F. Supp. 3d at 1349 (quoting the Department's *Issues & Decision Memorandum*)

(emphasis added). This Court sustained the Department's determinations that the respondents established *de facto* independence from government control.

[5]Aeolus argues, also, that the AoA and various provisions of Chinese law ensured "that the process was democratic" and subject to "myriad protections." Aeolus's Comments 25. Aeolus surmises that "[r]ather than indicate impropriety, the board election reveals that Aeolus is an ordinary publicly listed company operating transparently through normal procedures, subject to legal restrictions." *Id.* Aeolus adds that the AoA precludes ChinaChem's domination of the nomination of board members by providing, for example, that all board members "must be re-elected to retain their positions" and that non-independent directors may be nominated by multiple shareholders. *Id.* at 26. These arguments also fail to persuade the court. In denying separate rate status to Aeolus, Commerce did not rely upon a finding that Aeolus's governance procedures were other than transparent and democratic, or that non-government shareholders were barred from participating in those procedures, including procedures for nominating board members. The Department's conclusions instead reflected record data on shareholder voting, which supported a finding that a government-owned shareholder had the ability to control board membership through its predominance in the voting process, and the finding that the board controlled the selection of senior management. That a publicly-held company is governed by transparent and democratic procedures, including procedures for electing board members open to all shareholders, does not suffice to demonstrate autonomy from government control of decisions on the selection of management where, as here, a government entity was the dominant shareholder in the election of board members.

Aeolus argues that "[t]he Rectification Report does not prove government control." *Id.* at 27. That may be true, but the salient point is that the information concerning the Rectification Report that Aeolus placed on the record does not suffice to establish that Aeolus was independent from government control in the selection of management during the POR. In the Second Remand Redetermination, Commerce stated that it "interpreted the Rectification Report in context and concluded that the corrective actions outlined in the Rectification Report did not prevent ChinaChem's control of the board election process or establish Aeolus's independence from government control." *Second Remand Redetermination* at 56 (citing *First Remand Redetermination* at 11).

As the court noted in ⊞ *Guizhou I*, Aeolus placed on the record a translation of the Rectification Report containing

the statement, " 'ChinaChem fully respects the independence of a listed company and has never inquired about financial information of the ⊞ Company.' " *Guizhou I*, 43 CIT at ——, 389 F. Supp. 3d at 1358 n.9 (quoting *Rectification Report Letter* at Ex. 1A). The document further stated:

> Regarding the Company's investment, key projects, and tender process being reviewed and approved by ChinaChem. ChinaChem and China National Tire & Rubber Corp. will strictly comply with the provisions of the *Company Law, Code of Corporate Governance for Listed* **\*1384** *Companies* and other relevant law and regulations, exert their investors' rights, fully respect the independence of a listed company, and let the Company's shareholders' meeting, board of directors and the management team perform their internal approvals on investments, key projects, and tender process based on their respective obligations, authority and rules of procedure.

⊞*Id.* Aeolus argued that "as of the publication of the Rectification Report (i.e., before the POR), Aeolus's SOE shareholders could not access the company's financial information and that review and approval of key projects did not depend on the company's SOE shareholders but only on Aeolus's board of directors." ⊞*Id.*, 43 CIT at ——, 389 F. Supp. 3d at 1358 (citing *Rectification Report Letter* at Ex. 1A).

The Rectification Report, while constituting evidence that certain safeguards were implemented prior to the POR to ensure Aeolus's independence from government control in certain particular respects identified therein, is not evidence refuting a finding that ChinaChem, through its wholly-owned subsidiary China Chemical Rubber Co., Ltd., had the ability to control the election of directors during the POR, by which time the Rectification Report, according to Aeolus, had been implemented. While containing the general assertion that ChinaChem and China National Tire & Rubber Corp. will "fully respect the independence" of Aeolus, it is in the context of company governance by the "board of directors and the management team." *Rectification Report Letter* at 3–4, Ex. 1A. The evidence Aeolus put on the record pertaining to the Rectification Report does not demonstrate that, after implementation, ChinaChem, through China National Tire & Rubber Corp., no longer was able to exert effective control over the election of directors or that the board, as constituted following board elections, was divested of the power to select senior management.

In summary, substantial evidence supported the findings by Commerce that ChinaChem, through its 100%

ownership of China Chemical Rubber Co., Ltd., had the ability to control the selection of board members and that the board selected senior management of the company. Commerce, therefore, permissibly determined that Aeolus had not demonstrated autonomy from the government in making decisions regarding the selection of management and, under the Department's methodology, failed to rebut a presumption of government control over its export activities.

### 3. Commerce Permissibly Found that GTC Did Not Establish Independence from Government Control in the Selection of Company Management and in the Distribution of Profits

[6]The Second Remand Redetermination, like the First Remand Redetermination, concluded that GTC failed to rebut the presumption of government control because it failed to establish independence from government control with respect to the third prong, i.e., autonomy from the government in making decisions regarding the selection of management. Among the Department's principal findings was a finding that "GIIG effectively selected GTC's board," based on evidence of GIIG's percentage of the total shares present at a meeting in December 2012 that elected the board, which remained in place during the POR. *Second Remand Redetermination* at 45–46 (stating the actual percentage, for which proprietary treatment is claimed).

Commerce also found that the company's articles of association provided that shareholders holding individually or jointly ten percent of the total shares have the **\*1385** right to convene shareholder meetings and that no individual shareholder other than GIIG met that requirement, the second-and third-largest shareholders having owned 9.97 and 7.74 percent of the total shares, respectively. *Id.* at 49.

Commerce found, further, that the board selected the company's management and also, with respect to the fourth prong of the Department's test, influenced the company's decisions on the distribution of profits. Commerce found that after GIIG's preferred proposals on profit distribution and on the selection of managers failed at a shareholder meeting in May 2015, GIIG called another meeting, held in July 2015, at which GIIG's preferred proposals were adopted. *Id.* at 43, 48–49.

In its comments on the Second Remand Redetermination, GTC argued that Commerce overlooked the evidence that shareholders were not involved in the nomination of

board members and the evidence that the election of the board "complied with all legal requirements proscribed by GTC's AoA, the PRC Law, and the Code for Listed Companies—including protections against domination by any one shareholder." GTC's Comments 23–24. GTC added that "[r]ather than indicate impropriety, the 2012 Meeting reveals GTC acting as an ordinary publicly listed company operating transparently and democratically through normal procedures, subject to legal restrictions." *Id.* at 24. GTC argued that even assuming, *arguendo*, that GIIG selected GTC's Board, the "Board and management operate the company independently from shareholders including GIIG." *Id.* GTC pointed to various provisions of its articles of association that limit the control that GIIG may exert, including provisions limiting GIIG from nominating more than one-third of the board and providing for cumulative voting. *Id.* at 28.

GTC contests as unwarranted the Department's inference that a government-owned shareholder may exert control over a company's business operations where, as here, that shareholder controls the composition of the board of directors, as evidenced by its percentage of the total shares present at the meeting that elected the board, and where, as here, the board selects senior management. But as discussed above, the court must afford Commerce broad discretion to fashion the criteria by which it will determine whether a respondent has rebutted the presumption of government control over its business operations, including its export functions. Commerce based its denial of separate rate status on what it determined to be GTC's failure to demonstrate independence in the selection of management and the distribution of profits. It did so based on findings, supported by record evidence, that GIIG had the ability to control the election of board members and influence the distribution of the company's profits. Commerce did not base its determination on the company's noncompliance with the articles of association or applicable Chinese law.

In summary, the court sustains the Department's decision to deny separate rate status to GTC, based on the findings and reasoning set forth in the Second Remand Redetermination.

### III. CONCLUSION

Commerce applied a permissible methodology and reached findings supported by substantial evidence in determining that Aeolus and GTC did not qualify for separate rate status. Therefore, the court will enter judgment sustaining the Second Remand

Redetermination.                                    641 F.Supp.3d 1371

**All Citations**

### Footnotes

1    Consolidated under the lead case, *Guizhou Tyre Co. and Guizhou Tyre Import and Export Co. v. United States*, Court No. 17-00100, are *Aeolus Tyre Co. v. United States*, Court No. 17-00102; *Qingdao Free Trade Zone Full-World International Trading Co. v. United States*, Court No. 17-00103; *Xuzhou Xugong Tyres Co. v. United States*, Court No. 17-00104; *Trelleborg Wheel Systems (Xingtai) Co. v. United States*, Court No. 17-00111; *Qingdao Qihang Tyre Co. v. United States*, Court No. 17-00113; and *Weihai Zhongwei Rubber Co. v. United States*, Court No. 17-00123. Order Granting Motion to Consolidate (June 16, 2017), ECF No. 24.

2    Documents in the Joint Appendix (July 30, 2018), ECF Nos. 62 (Conf.), 63 (Public), are cited as "P.R. Doc. ___" for public documents.

3    In addition to the mandatory respondent Xugong, Commerce determined that nine other Chinese companies or groups of companies qualified for a "separate rate": Qingdao Qihang Tyre Co., Ltd.; Qingdao Free Trade Zone Full-World International Trading Co., Ltd.; Trelleborg Wheel Systems (Xingtai) China, Co. Ltd.; Shiyan Desizheng Industry & Trade Co., Ltd.; Qingdao Jinhaoyang International Co., Ltd.; Sailun Jinyu Group Co., Ltd.; Weifang Jintongda Tyre Co., Ltd.; Zhongce Rubber Group Co., Ltd.; and Weihai Zhongwei Rubber Co., Ltd. These nine exporter/producers were not individually examined in the seventh review and therefore did not receive an individually determined rate. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733, 18,735 (Int'l Trade Admin. Apr. 21, 2017) ("*Final Results*").

4    The PRC-wide rate was carried over from the Department's determination in the fifth administrative review. *See Final Results*, 82 Fed. Reg. at 18,735 n.16. This PRC-wide rate was determined by calculating the average of the PRC-wide rate prior to the fifth review (determined in the investigation) and the individually-determined rate Commerce calculated for a respondent in the fifth review, Double Coin Holdings, Ltd., which is not a party to this case. *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013* (Int'l Trade Admin. Apr. 15, 2015), 80 Fed. Reg. 20,197, 20,199. The 105.31% rate is based in part on the application of facts otherwise available and an adverse inference and permissibly was carried over from prior reviews. *See China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028 (Fed. Cir. 2021). In this case, no party challenges the basis for the PRC-wide rate.

5    All citations to the United States Code herein are to the 2012 edition.

Guizhou Tyre Co., Ltd. v. United States, 641 F.Supp.3d 1371 (2023)

End of Document                                         © 2023 Thomson Reuters. No claim to original U.S. Government Works.



Barcode:3562807-01 A-570-912 REV - Admin Review

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-912
AR: 09/01/14 - 8/31/15
**Public Document**
E&C/III: MKM, KAH

April 12, 2017

| | |
|---|---|
| **MEMORANDUM TO:** | Ronald K. Lorentzen<br>Acting Assistant Secretary<br> for Enforcement and Compliance |
| **FROM:** | Gary Taverman<br>Associate Deputy Assistant Secretary<br> for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2014-2015 |

---

## I.    SUMMARY

The Department of Commerce ("Department") analyzed the case and rebuttal briefs of interested parties in the seventh administrative review of the antidumping duty ("AD") order on certain new pneumatic off-the-road tires ("OTR Tires") from the People's Republic of China ("PRC") for the period of review ("POR") September 1, 2014, through August 30, 2015. The review covers the following exporters of subject merchandise:

1. Aeolus Tyre Co., Ltd. ("Aeolus")
2. Shiyan Desizheng Industry & Trade Co., Ltd. ("Desizheng")
3. Qingdao Jinhaoyang International Co., Ltd. ("Jinhaoyang")
4. Weifang Jintongda Tyre Co., Ltd. ("Jintongda")
5. Sailun Jinyu Group Co., Ltd. ("Sailun")
6. Guizhou Tyre Co., Ltd. ("GTC")[1]
7. Qingdao Free Trade Zone Full-World International Trading Co., Ltd. ("Qingdao FTZ")

---

[1] In the initial investigation, the Department found GTC and Guizhou Tyre Import and Export Corporation ("GTCIE") to be affiliated pursuant to section 771(33)(B), (E), (F) and (G) of the Tariff Act of 1930, as amended, and found that it was appropriate to treat these companies as a single entity pursuant to 19 CFR 351.401(f). *See Certain New Pneumatic Off-The-Road Tires From the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 FR 9278, 9283 (February 20, 2008), unchanged in *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008) ("*OTR Tires LTFV Determination*"). This decision is unchallenged in the instant review, and there is no evidence on the record of this review that calls this determination into question. Thus, the Department continues to treat GTC and GTCIE as a single entity (collectively, "GTC") pursuant to 19 CFR 351.401(f).



8.  Qingdao Qihang Tyre Co. ("Qihang")
9.  Tianjin Leviathan International Trade Co., Ltd. ("Leviathan")
10. Trelleborg Wheel Systems (Xingtai) China, Co. Ltd. ("TWS Xingtai")
11. Trelleborg Wheel Systems Hebei Co. ("TWS Hebei")
12. Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei")
13. Xuzhou Xugong Tyres Co. Ltd. ("Xugong")[2]
14. Zhongce Rubber Group Company Limited ("Zhongce").

## II.     BACKGROUND

On October 14, 2016, the Department published the *Preliminary Results* of this administrative review.[3]  The Department invited interested parties to comment on the *Preliminary Results*.[4]

On December 14, 2016, the Department received timely filed case briefs from GTC,[5] Xugong,[6] Qingdao FTZ,[7] and Aeolus,[8] as well as Titan Tire Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (collectively, "Petitioners").[9]  On December 21, 2016, the Department

---

[2] The Department previously found Xugong to be affiliated with Xuzhou Armour Rubber Company Ltd. ("Armour") and Xuzhou Hanbang Tyre Co., Ltd. ("Hanbang") pursuant to section 771(33)(E) of the Tariff Act of 1930, as amended, and found that it was appropriate to treat these companies as a single entity pursuant to 19 CFR 351.401(f).  *See Certain New Pneumatic Off-The-Road Tires From The People's Republic Of China: Preliminary Results Of Antidumping Duty Administrative Review; 2013-2014*, 80 FR 61166, 61167 (October 9, 2015), unchanged in *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 FR 23272 (April 20, 2016) ("*OTR Tires 13-14*").  This decision is unchanged in the instant review and there is no evidence on the record of this review that calls this determination into question.  Thus, the Department continues to treat Xugong, Armour, and Hanbang as a single entity (collectively, "Xugong") pursuant to 19 CFR 351.401(f).
[3] *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 71068 (October 14, 2016) ("*Preliminary Results*") and accompanying "Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2014-2015," dated October 5, 2016 ("PDM").
[4] *See Preliminary Results*, 81 FR at 71068.
[5] *See* letter from GTC, "GTC and GTCIE Direct Case Brief in the Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from the People's Republic of China," dated December 14, 2016 ("GTC's Case Brief").
[6] *See* letter from Xugong, "Xuzhou Xugong Tyres Co., Ltd., ("Xugong") Case Brief:  Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of China," dated December 14, 2016 ("Xugong's Case Brief").
[7] *See* letter from Qingdao FTZ, "Qingdao FTZ Direct Case Brief in the Seventh Administrative Review of the Antidumping Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 14, 2016 ("Qingdao FTZ's Case Brief").
[8] *See* letter from Aeolus, "Aeolus Direct Case Brief in the Seventh Administrative Review of the Antidumping Order on Certain New Pneumatic Off the-Road Tires from the People's Republic of China," dated December 14, 2016 ("Aeolus' Case Brief").
[9] *See* letter from Petitioners, "Case Brief of Titan Tire Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC," dated December 14, 2016 ("Petitioners' Case Brief").

received timely filed rebuttal briefs from Petitioners,[10] GTC,[11] Zhongce,[12] Jinhaoyang,[13] and Xugong.[14]

On December 22, 2016, in accordance with section 751(a)(3)(A) of the Tariff Act of 1930, as amended ("the Act"), the Department extended the period for issuing the final results of this review by sixty-days, to April 12, 2017.[15]  Additionally, in accordance with timely requests from parties, the Department held a public hearing on February 15, 2017.[16]

### III.    SCOPE OF THE ORDER

The products covered by the order are new pneumatic tires designed for off-the-road and off-highway use, subject to exceptions identified below.  Certain OTR tires are generally designed, manufactured and offered for sale for use on off-road or off-highway surfaces, including but not limited to, agricultural fields, forests, construction sites, factory and warehouse interiors, airport tarmacs, ports and harbors, mines, quarries, gravel yards, and steel mills.  The vehicles and equipment for which certain OTR tires are designed for use include, but are not limited to:  (1) agricultural and forestry vehicles and equipment, including agricultural tractors,[17] combine harvesters,[18] agricultural high clearance sprayers,[19] industrial tractors,[20] log-skidders,[21] agricultural implements, highway-towed implements, agricultural logging, and agricultural, industrial, skid-steers/mini-loaders;[22] (2) construction vehicles and equipment, including

---

[10] *See* letter from Petitioners, "Rebuttal Brief of Titan Tire Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC," dated December 21, 2016 ("Petitioners' Rebuttal Brief").

[11] *See* letter from GTC, "GTC and GTCIE Rebuttal Brief in the Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from the People's Republic of China," dated December 21, 2016 ("GTC's Rebuttal Brief").

[12] *See* letter from Zhongce, "Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Zhongce's Rebuttal Brief," dated December 21, 2016 ("Zhongce's Rebuttal Brief").

[13] *See* letter from Jinhaoyang, "Jinhaoyang's Reply Brief Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 21, 2016 ("Jinhaoyang's Rebuttal Brief").

[14] *See* letter from Xugong, "Xuzhou Xugong Tyres Co., Ltd., ("Xugong") Rebuttal Brief:  Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of China," dated December 21, 2016 ("Xugong's Rebuttal Brief").

[15] *See* memorandum to Christian Marsh, "Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Extension of Deadline for Final Results of Antidumping Duty Administrative Review; 2014-2015," dated December 22, 2016.

[16] *See* the Hearing Transcript, filed onto the record by Kevin Connolly Court Reporting.

[17] Agricultural tractors are dual-axle vehicles that typically are designed to pull farming equipment in the field and that may have front tires of a different size than the rear tires.

[18] Combine harvesters are used to harvest crops such as corn or wheat.

[19] Agricultural sprayers are used to irrigate agricultural fields

[20] Industrial tractors are dual-axle vehicles that typically are designed to pull industrial equipment and that may have front tires of a different size than the rear tires.

[21] A log-skidder has a grappling lift arm that is used to grasp, lift and move trees that have been cut down to a truck or trailer for transport to a mill or other destination.

[22] Skid-steer loaders are four-wheel drive vehicles with the left-side drive wheels independent of the right-side drive wheels and lift arms that lie alongside the driver with the major pivot points behind the driver's shoulders.  Skid-steer loaders are used in agricultural, construction and industrial settings.

earthmover articulated dump products, rigid frame haul trucks,[23] front end loaders,[24] dozers,[25] lift trucks, straddle carriers,[26] graders,[27] mobile cranes,[28] compactors; and (3) industrial vehicles and equipment, including smooth floor, industrial, mining, counterbalanced lift trucks, industrial and mining vehicles other than smooth floor, skid-steers/mini-loaders, and smooth floor off-the-road counterbalanced lift trucks.  The foregoing list of vehicles and equipment generally have in common that they are used for hauling, towing, lifting, and/or loading a wide variety of equipment and materials in agricultural, construction and industrial settings.  Such vehicles and equipment, and the descriptions contained in the footnotes are illustrative of the types of vehicles and equipment that use certain OTR tires, but are not necessarily all-inclusive.  While the physical characteristics of certain OTR tires will vary depending on the specific applications and conditions for which the tires are designed (*e.g.*, tread pattern and depth), all of the tires within the scope have in common that they are designed for off-road and off-highway use.  Except as discussed below, OTR tires included in the scope of the order range in size (rim diameter) generally but not exclusively from 8 inches to 54 inches.  The tires may be either tube-type[29] or tubeless, radial or non-radial, and intended for sale either to original equipment manufacturers or the replacement market.  The subject merchandise is currently classifiable under Harmonized Tariff Schedule of the United States ("HTSUS") subheadings:  4011.20.10.25, 4011.20.10.35, 4011.20.50.30, 4011.20.50.50, 4011.61.00.00, 4011.62.00.00, 4011.63.00.00, 4011.69.00.00, 4011.92.00.00, 4011.93.40.00, 4011.93.80.00, 4011.94.40.00, and 4011.94.80.00.  While HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope is dispositive.

Specifically excluded from the scope are new pneumatic tires designed, manufactured and offered for sale primarily for on-highway or on-road use, including passenger cars, race cars, station wagons, sport utility vehicles, minivans, mobile homes, motorcycles, bicycles, on-road or on-highway trailers, light trucks, and trucks and buses.  Such tires generally have in common that the symbol "DOT" must appear on the sidewall, certifying that the tire conforms to applicable motor vehicle safety standards.  Such excluded tires may also have the following designations that are used by the Tire and Rim Association:

> Prefix letter designations:
> - P - Identifies a tire intended primarily for service on passenger cars;

---

[23] Haul trucks, which may be either rigid frame or articulated (*i.e.*, able to bend in the middle) are typically used in mines, quarries and construction sites to haul soil, aggregate, mined ore, or debris.

[24] Front loaders have lift arms in front of the vehicle.  They can scrape material from one location to another, carry material in their buckets, or load material into a truck or trailer.

[25] A dozer is a large four-wheeled vehicle with a dozer blade that is used to push large quantities of soil, sand, rubble, *etc.*, typically around construction sites.  They can also be used to perform "rough grading" in road construction.

[26] A straddle carrier is a rigid frame, engine-powered machine that is used to load and offload containers from container vessels and load them onto (or off of) tractor trailers.

[27] A grader is a vehicle with a large blade used to create a flat surface.  Graders are typically used to perform "finish grading."  Graders are commonly used in maintenance of unpaved roads and road construction to prepare the base course on to which asphalt or other paving material will be laid.

[28] *I.e.,* "on-site" mobile cranes designed for off-highway use.

[29] While tube-type tires are subject to the scope of this proceeding, tubes and flaps are not subject merchandise and therefore are not covered by the scope of this proceeding, regardless of the manner in which they are sold (*e.g.,* sold with or separately from subject merchandise).

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

- LT - Identifies a tire intended primarily for service on light trucks; and,
- ST - Identifies a special tire for trailers in highway service.

Suffix letter designations:
- TR - Identifies a tire for service on trucks, buses, and other vehicles with rims having specified rim diameter of nominal plus 0.156" or plus 0.250";
- MH - Identifies tires for Mobile Homes;
- HC - Identifies a heavy duty tire designated for use on "HC" 15" tapered rims used on trucks, buses, and other vehicles.  This suffix is intended to differentiate among tires for light trucks, and other vehicles or other services, which use a similar designation.
- Example: 8R17.5 LT, 8R17.5 HC;
- LT - Identifies light truck tires for service on trucks, buses, trailers, and multipurpose passenger vehicles used in nominal highway service; and
- MC - Identifies tires and rims for motorcycles.

The following types of tires are also excluded from the scope: pneumatic tires that are not new, including recycled or retreaded tires and used tires; non-pneumatic tires, including solid rubber tires; tires of a kind designed for use on aircraft, all-terrain vehicles, and vehicles for turf, lawn and garden, golf and trailer applications.  Also excluded from the scope are radial and bias tires of a kind designed for use in mining and construction vehicles and equipment that have a rim diameter equal to or exceeding 39 inches.  Such tires may be distinguished from other tires of similar size by the number of plies that the construction and mining tires contain (minimum of 16) and the weight of such tires (minimum 1500 pounds).

## IV.     CHANGES SINCE THE PRELIMINARY RESULTS

Based on our review and analysis of the comments received from parties, we made certain changes to our margin calculations for Xugong.[30]  Specifically, we:

1. revised the surrogate value for tire valves,[31]
2. corrected a ministerial error regarding the valuation of Smoked Sheet Natural Rubber,[32]
3. calculated a U.S. sales adjustment for Xugong's warehousing expense,[33]
4. revised Xugong's indirect selling expense ratio and application thereof,[34]

---

[30] *See* memorandum to the File, "2014-2015 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Analysis of the Final Results Margin Calculation for Xuzhou Xugong Tyres Co., Ltd.," dated concurrently with this memorandum ("Xugong's Final Analysis Memo").

[31] *See below* at Comment 6; *see also* Memorandum to the File, "Final Results of the 2014-2015 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic off-The-Road Tires from the People's Republic of China:  Surrogate Value Memorandum," dated concurrently with this memorandum ("Final SV Memo").

[32] *See below* at Comment 3; *see also* Xugong's Final Analysis Memo.

[33] *See below* at Comment 7; *see also* Xugong's Final Analysis Memo.

[34] *Id*.

5

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

5. recalculated Xugong's sales adjustment for value added tax ("VAT") for its constructed export price ("CEP") sales,[35] and

6. corrected a ministerial error regarding the deduction of tubes and flaps from applicable sales.[36]

## V.    LIST OF COMMENTS

Comment 1:    Separate Rates
                    A.  Whether to Grant Aeolus a Separate Rate
                    B.  Whether to Grant GTC a Separate Rate
                    C.  Whether to Grant Jinhaoyang a Separate
                    D.  Whether to Grant Zhongce a Separate Rate
Comment 2:    Calculation of the Cost of Tube and Flap Inputs for Xugong
Comment 3:    Surrogate Value for Smoked Sheet Natural Rubber
Comment 4:    Surrogate Value for Inland Truck Freight
Comment 5:    Surrogate Value for Carbon Black
Comment 6:    Surrogate Value for Tire Valves
Comment 7:    Warehousing Expense Calculation for Xugong
Comment 8:    Whether to Adjust Xugong's U.S. Prices for Irrecoverable Value Added Tax
Comment 9:    Additional Comments Raised by GTC

## VI.    DISCUSSION OF THE ISSUES

### Comment 1: Separate Rates

In the *Preliminary Results*, we determined that Aeolus, and GTC were not eligible for a separate rate because they failed to demonstrate an absence of *de facto* government control over their export activities, and that Tianjin Leviathan International Trade Co., Ltd. ("Leviathan") was not eligible for a separate rate because it did not submit a response or certification in response to the Department's separate rate questionnaire.  In addition, we also determined that Shiyan Desizheng Industry & Trade Co., Ltd. ("Desizheng"), Sailun Jinyu Group Co., Ltd. ("Sailun"), Weifang Jintongda Tyre Co., Ltd. ("Jintongda"), Trelleborg Wheel Systems (Xingtai) China, Co. Ltd. ("TWS Xingtai"), Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei"), Qingdao Qihang Tyre Co. ("Qihang"), Qingdao Free Trade Zone Full-World International Trading Co., Ltd. ("Quingdao FTZ"), Jinhaoyang and Zhongce were eligible for a separate rate.  Interested parties only commented on the separate rate eligibility of Aeolus, GTC, Jinhaoyang, and Zhongce. Accordingly, for the final results we continue to find that Leviathan is not eligible for a separate rate and that Desizheng, Sailun, Jintongda, TWS Xingtai, Zhongwei, Qihang, and Quingdao FTZ are eligible for a separate rate.  Further, as discussed below, for the final results, and based on record evidence, we continue to find that Aeolus and GTC are not eligible for a separate rate, and that Jinhaoyang and Zhongce are eligible for a separate rate.

As we stated in the *Preliminary Results*, in proceedings involving non-market economy ("NME") countries, the Department begins with a rebuttable presumption that all companies

---

[35] *See below* at Comment 8; *see also* Xugong's Final Analysis Memo.

[36] *See below* at Comment 2; *see also id.*

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

within the NME country are subject to government control and, thus, should be assessed a single antidumping duty rate.  It is the Department's policy to assign all exporters of the merchandise subject to review in NME countries a single rate unless an exporter can affirmatively demonstrate an absence of government control, *de jure* and *de facto*, with respect to exports.  To establish whether a company is sufficiently independent to be entitled to a separate, company-specific rate, the Department analyzes each exporting entity in an NME country under the test established in *Sparklers*,[37] as further developed in *Silicon Carbide*.[38]  In accordance with this separate rate test, the Department assigns separate rates to respondents in NME proceedings if respondents demonstrate the absence of both *de jure* and *de facto* government control over their export activities.[39]

The Department considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate: (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) other formal measures by the government decentralizing control of companies.[40]

Typically, the Department considers four factors in evaluating whether each respondent is subject to de facto government control of its export functions:  (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.[41]

The Department continues to evaluate its practice with regard to the separate rates analysis in light of the *Diamond Sawblades 11-12* AD proceeding, and the Department's determinations therein.[42]  In particular, we note that in litigation involving the *Diamond Sawblades 11-12*

---

[37] *See Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588, 20589 (May 6, 1991) ("*Sparklers*").

[38] *See Final Determination of Sales at Less than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994) ("*Silicon Carbide*").

[39] *See, e.g.*, *Final Results of Antidumping Duty Administrative Review:  Petroleum Wax Candles From the People's Republic of China*, 72 FR 52355, 52356 (September 13, 2007); *Brake Rotors From the People's Republic of China; Preliminary Results and Partial Rescission of the Fourth New Shipper Review and Rescission of the Third Antidumping Duty Administrative Review*, 66 FR 1303, 1306 (January 8, 2001), unchanged in *Brake Rotors From the People's Republic of China:  Final Results and Partial Rescission of Fourth New Shipper Review and Rescission of Third Antidumping Duty Administrative Review*, 66 FR 27063 (May 16, 2001); and *Notice of Final Determination of Sales at Less Than Fair Value:  Creatine Monohydrate From the People's Republic of China*, 64 FR 71104 (December 20, 1999) ("*Creatine*").

[40] *See Sparklers*, 56 FR at 20589.

[41] *See Silicon Carbide*, 59 FR at 22586-87; *see also Notice of Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol From the People's Republic of China*, 60 FR 22544, 22545 (May 8, 1995) ("*Furfuryl Alcohol*").

[42] *See Diamond Sawblades and Parts Thereof from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 77098 (December 20, 2013), and accompanying Preliminary Decision Memo at 7, unchanged in *Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014), and accompanying Issues and Decision Memorandum ("IDM") at Comment l ("*Diamond Sawblades 11-12*").

proceeding, the CIT found the Department's existing separate rates analysis deficient in the specific circumstances of that case, which involved a government-controlled entity that maintained significant ownership in the respondent exporter.[43]  Following the Court's reasoning, as affirmed by the Court of Appeals for the Federal Circuit ("CAFC"), in recent proceedings, we concluded that where a government entity holds a majority ownership share, either directly or indirectly,[44] in the respondent exporter, the majority ownership holding in and of itself means that the government exercises, or has the potential to exercise, control over the company's operations generally.[45]  This may include control over, for example, the selection of management, a key factor in determining whether a company has sufficient independence in its export activities to merit a separate rate.  Consistent with normal business practices, we would expect any majority shareholder, including a government, to have the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company.

We found in the *Preliminary Results* that Aeolus and GTC, established their *de jure* independence from the PRC government.  However, in the *Preliminary Results*, Aeolus and GTC failed to demonstrate the absence of *de facto* control by the PRC government.  Additionally, in the *Preliminary Results*, the Department determined that Jinhaoyang and Zhongce established their independence from *de jure* and *de facto* government control over their export activities, and thus, are eligible for separate rates.

As noted above, the CAFC has held that the Department has the authority to place the burden on the exporter to establish an absence of government control.[46]  For the reasons explained below,

---

[43] *See Advanced Technology & Materials Co., Ltd., et al. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012) ("*Advanced Tech I*"), affirmed in *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013), *aff'd Advanced Technology & Materials Co., Ltd. v. United States,* Case No. 2014-1154 (CAFC 2014) ("*Advanced Tech II*") (collectively, "*Advanced Tech*") ("The court remains concerned that Commerce has failed to consider important aspects of the problem and offered explanations that run counter to the evidence before it… Further substantial evidence of record does not support the inference that SASAC's {State-owned Assets Supervision and Administration Commission} 'management' of its 'state-owned assets' is restricted to the kind of passive-investor de jure 'separation' that Commerce concludes…The point here is that 'governmental control' in the context of the separate rate test appears to be a fuzzy concept, at least to this court, since a 'degree' of it can obviously be traced from the controlling shareholder, to the board, to the general manager, and so on along the chain to 'day-to-day decisions of export operations,' including terms, financing, and inputs into finished product for export…AT&M itself identifies its 'controlling shareholder' as CISRI {owned by SASAC} in its financial statements and the power to veto nomination does not equilibrate the power of control over nomination.") (footnotes omitted)).  *Id.*, at 1351-1357.

[44] *See, e.g., Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 81 FR 4251 (January 4, 2016) and accompanying IDM at Comment 7 ("in recent proceedings, we concluded that where a government entity holds a majority ownership share, either directly or indirectly, in the respondent exporter, the majority ownership holding in and of itself means that the government exercises, or has the potential to exercise, control over the company's operations generally." (footnotes omitted)).

[45] *See Carbon and Certain Alloy Steel Wire Rod From the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value and Preliminary Affirmative Determination of Critical Circumstances, in Part*, 79 FR 53169 (September 8, 2014), and accompanying PDM at 5-9 ("*Steel Wire Rod Prelim*"), unchanged in *Carbon and Certain Alloy Steel Wire Rod From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 79 FR 68860 (November 19, 2014) ("*Steel Wire Rod Final*").

[46] *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405-06 (CAFC 1997) ("*Sigma*").

8

Appx54

the Department continues to find, based on the totality of the record evidence, that Aeolus and GTC have not demonstrated an absence of *de facto* government control, and are therefore not entitled to a separate rate. In contrast, the Department continues to find that Jinhaoyang and Zhongce rebutted the presumption of *de jure* and *de facto* government control over their export activities and are eligible for a separate rate.

### A. Whether to Grant Aeolus a Separate Rate

Aeolus' Comments

- Aeolus argues that because the Department has made no indication that it has changed its separate rate test from its longstanding practice[47] established in *Sparklers* and *Silicon Carbide*,[48] and because the Department's preliminary decision to deny Aeolus a separate rate is not supported by record evidence, for the final results, the Department should grant Aeolus a separate rate.
- The Department should reconsider the totality of the circumstances with respect to Aeolus in this case because its record evidence is easily distinguishable from those presented in *Advanced Tech I*,[49] as well as other recent decisions in light of this ruling.[50]
- The company website the Department referenced in its preliminary decision is primarily for advertisement purposes;[51] it is not an official business document objectively demonstrating "control" in the manner considered by the Department under its separate rate test.
- Aeolus argues that we did not analyze all four factors of the *de facto* test or consider the totality of the circumstances.
- Furthermore, Aeolus argues that the facts in this review are distinguishable from *Advanced Tech II*[52] as Aeolus' parent company's board is elected by its shareholders.

Petitioners' Rebuttal

- The Department properly determined that Aeolus is ineligible for a separate rate.
- Petitioners argue that there are additional shareholders that are also ultimately state owned, in addition to those recognized by Aeolus.[53] Petitioners argue that Aeolus shareholders that can

---

[47] *See* Aeolus' Case Brief, at 2 (citing to *Furfuryl Alcohol*, 60 FR at 22545).

[48] *Id.* (citing to *Sparklers*, 56 FR at 20588 and *Silicon Carbide*, 59 FR at 22585).

[49] *Id.*, at 6 (citing *Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from the People's Republic of China* (May 6, 2013); *Advanced Tech I*).

[50] *Id.* (citing to *1,1,1,2-Tetrafluroethane From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 FR 62597 (October 20, 2014), and accompanying IDM at Comment 1, and *Small Diameter Graphite Electrodes from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*; *2014-2015*, 81 FR 62474 (September 9, 2016)).

[51] *Id.*, at 7 (citing to letter from Petitioners', "Administrative Review of the Antidumping Duty Order on New Pneumatic Off- The-Road Tires from China (A–570–912): Petitioners' Rebuttal Information and Deficiency Comments on Aeolus' Separate Rate Application," dated December 30, 2015, at Attachment 3 ("Petitioners' Aeolus SRA Rebuttal") which stated that stated that China National Tire & Rubber Co., Ltd. ("CNRC"), not China National Chemical Corporation., controls Aeolus).

[52] *Id.*, at 4, 14, 16 (citing to *Advanced Tech II*, aff'd 2013 U.S. App. LEXIS 22869 (CAFC 2013) ("*Advanced Tech III*")).

[53] *See* Petitioners' Rebuttal Brief, at 37 (citing to letter from Aeolus, "Separate Rate Application in the Seventh Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off the-Road Tires from the People's Republic of China," dated December 11, 2016 ("Aeolus' SRA"), at Exhibit 7).

be clearly identified as state-owned, own a higher ownership stake in Aeolus than Aeolus reported in its SRA,[54] meaning that Aeolus is a majority state-owned company, making Aeolus ineligible for a separate rate in this review.[55]

- Furthermore, the Department should continue to follow its recent decision in *Truck and Bus Tires Preliminary*[56] to deny Aeolus a separate rate.

**Department Position:**  For the final results and based on record evidence, we continue to find that Aeolus is not eligible for a separate rate.  In the *Preliminary Results*, we determined, based on substantial record evidence, that a state-owned enterprise ("SOE"), China National Chemical Corporation, ("China Chem"), is Aeolus's largest and controlling shareholder.[57]  As noted above, we would expect any major shareholder, including a government, to have the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company.[58]  In the *Preliminary Results*, we identified additional record evidence that we found (and continue to find) supports that expectation in this review.[59]

Specifically, the record shows that Aeolus is 42.58 percent owned by its parent company (China Chemical Rubber Co., Ltd. (also known as, China National Tire & Rubber Corp.) ("China Chem Rubber")), a company which is 100-percent owned by an SOE (China Chem) and supervised by "State-owned Assets Supervision and Administration Commission(s)" ("SASAC(s)"), as reflected in Aeolus' separate rate application.[60]  Additionally, during the POR, of the top 10 shareholders, which includes China Chem Rubber, three additional shareholders (Henan Tyre Group Co., Ltd., Jiaozuo Tongliang Assets Management Co., Ltd., and Xiamen Haiyi International Trade Co., Ltd.) owned an additional 6.48 percent of Aeolus.  These three companies are also SOEs that are supervised by local SASACs.[61]  Thus, the total SOE ownership is 49.06 percent.

Further, Aeolus' Articles of Association ("AoA") describe various responsibilities based on voting rights overseen by shareholders.  The shareholders have the ability to nominate board

---

[54] *Id*.

[55] *Id*.

[56] *Id*., at 36 (citing *Truck and Bus Tires from the People's Republic of China*, 81 FR 61186 (September 6, 2016) ("*Truck and Bus Preliminary*"), and accompanying PDM at 16).

[57] *See Preliminary Results*, and accompanying PDM at 16.  *See also* the Department's memorandum to the file, "Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Preliminary Denial of Separate Rate," dated October 5, 2016, at page 2 ("Preliminary Separate Rate Memo").

[58] *See, e.g., Carbon and Certain Alloy Steel Wire Rod From the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value and Preliminary Affirmative Determination of Critical Circumstances, in Part*, 79 FR 53169 (September 8, 2014), and accompanying PDM at 5-9 ("*Steel Wire Rod Prelim*"), unchanged in *Carbon and Certain Alloy Steel Wire Rod From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 79 FR 68860 (November 19, 2014) ("*Steel Wire Rod Final*").

[59] *See Preliminary Results*, and accompanying PDM at 16.  *See also* Preliminary Separate Rate Memo.

[60] *See* Aeolus' SRA, at 13 and letter from Aeolus, "Separate Rate Application Supplemental Questionnaire Response in the: Seventh Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off the-Road Tires from the People's Republic of China," dated August 2, 2016 ("Aeolus' Supplemental Response").

[61] *See* Aeolus' SRA, at 13.

members and vote on those nominees' appointment to the board.[62]  These nominees select the chairman of the board and senior management.[63]  Because Aeolus' controlling shareholders are wholly-owned SOEs,[64] they have the ability to nominate a majority of Aeolus' board members, and in turn control decisions regarding the selection of management.  Specifically, Articles 32 and 99 of Aeolus' AoA give shareholders authority over decisions on the operations of the company.[65]  In addition, Article 40 gives shareholders the authority to elect and replace board members, and according to Article 97, the board members can also act as the general manager or other senior managers.[66]  Finally, Article 147 of Aeolus' AoA provides board members the authority to appoint or remove the general manager and deputy general manager.[67]  Therefore, we conclude that Aeolus does not satisfy the criteria demonstrating an absence of *de facto* government control over its export activities.  Consequently, we determine Aeolus is ineligible for a separate rate.

Additionally, the website printouts provided by Petitioners show that Aeolus is under the direct control of an SOE, specifically, China Chem Rubber.[68]  Despite Aeolus' arguments that the websites are not official company documents that objectively demonstrate "control," we continue to find the documents to be probative as to Aeolus' ownership structure.  We find that Aeolus did not explain how specific information in Aeolus' SRA and Aeolus' Supplemental Response directly rebuts the websites in question,[69] which state that Aeolus is under the control of SOE owners.[70]  Therefore, the information presented by Petitioners corroborates the ownership information provided by Aeolus.[71]

The Department has a long-standing practice of presuming state control in an NME country and places the burden on exporters requesting a separate rate to demonstrate an absence of *de jure* and *de facto* control.[72]  The websites at issue support the presumption of PRC government control over Aeolus and challenge the credibility of Aeolus' request for a separate rate.  Therefore, we continue to find that these websites are credible documents supporting our finding that Aeolus is subject to government control through the ownership interests of China Chem

---

[62] *Id*., at Exhibit 11.
[63] *Id*.
[64] *Id*.
[65] *Id*.
[66] *Id*.
[67] *See* Preliminary Separate Rate Memo, at 2.
[68] *See* letter from Petitioners, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912):  Petitioners' Rebuttal Information and Deficiency Comments on Aeolus' Separate Rate Application," dated December 30, 2016, at Attachment 3.
[69] *See* Aeolus' Supplemental Response.
[70] *See* Preliminary Separate Rate Memo, at 2.
[71] *See* Aeolus' SRA, at 13 and Exhibit 11.
[72] *See Sigma Corp*, 117 F.3d at 1405-06 ("We agree with the government that it was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control. The antidumping statute recognizes a close correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of resources. Moreover, because exporters have the best access to information pertinent to the 'state control' issue, Commerce is justified in placing on them the burden of showing a lack of state control.") (internal citations omitted).

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

Rubber, Henan Tyre Group, Jiaozuo Tongliang Assets Management, and Xiamen Haiyi International Trade.  Aeolus is thus not eligible for a separate rate.

## B.  Whether to Grant GTC a Separate Rate

GTC's Comments
- GTC argues that, contrary to its established policy and practice, the Department only considered two of the four *de facto* control factors.[73]  GTC argues that the Department did not analyze all four factors of the *de facto* test or consider the totality of the circumstances.[74]
- GTC argues that the Department has made no indication that it has changed its separate rate test from its longstanding practice established in *Sparklers* and *Silicon Carbide*.[75]
- GTC argues that the Department's analysis misconstrues the term "*de facto* control," resulting in a conclusion that is not supported by law.[76]
- GTC argues that Guiyang Industry Investment Group Co., Ltd. (GIIG) only has a minority stake in its shares (*i.e.*, 25 percent), and that every shareholder individually or jointly can nominate candidates for directors.[77]
- GTC argues that it has repeatedly been granted a separate rate in this proceeding, including the most recent 2012-2013 administrative review.[78]

Petitioners' Rebuttal
- Petitioners argue that we properly determined that GTC and GTCIE are ineligible for a separate rate.

---

[73] *See* GTC's Case Brief., at 3-16 (citing *Sparklers* at Comment 1; *see also Silicon Carbide*, at "Separate Rates" section; *see also Furfuryl Alcohol,* at "Separate Rates" section; *see also Structural Steel Beams*, at "Separate Rates" section; *Jiangsu Jiasheng Photovoltaic Technology Co., Ltd., v. United States*, 121 F. Supp. 3d 1263, 1339 (CIT 2015) ("*Jiangsu Jiasheng*"); *Tianjin Mach. Import & Export Corp. v. United States*, 806 F. Supp. 1008, 1014 (CAFC 1992); *AMS Assocs. v. United States*, 719 F.3d 1376, 1379 (CAFC 2013) ("*AMS*"); *Advanced Tech. I* at 1347; *Shandong Huanri (Group) General Co., et al. v. United States*, 493 F.Supp.2d 1353, 1357 (CIT 2007) ("*Shandong*")).

[74] *Id.*, at 13-32.

[75] *Id.*, at 29 (citing to *Jiangsu Jiasheng* at 1339, *Sigma Corp.* at 1405, *AMS* at 1379, *Sparklers*, and *Silicon Carbide*).

[76] *Id.*, at 18-19 (citing *United States v. Garcia-Andrade*, 2013 U.S. Dist. LEXIS 110759, *15 (S.D. CA 2013); Black's Law Dictionary 479 (9th ed. 2009); *C.f. Ludlum Corp. Pension Plan Trust v. Matty's Superservice*, 156 A.D.2d 339, 548 N.Y.S.2d 292, 293 (2d Dep't 1989)).

[77] *Id.*, at 19-32 (citing Articles 76 and 77 of Articles of Association of GTC, *see* GTC's 1st SQR, at Exhibit 1, and Article 103 of the PRC Company Law, *see* GTC's SAQR, at Exhibit A-3.  Also citing GTC's 1st SQR, at Exhibits 6, 7A, 7C, 8, 9 and 12, as well as a similar situation faced by the Department in *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils From the People's Republic of China*, 59 FR 55625 (November 8, 1994) and accompanying IDM ("*Cased Pencils*")).

[78] *Id.*, at 33-35 (citing *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 61291 (October 10, 2014), and accompanying PDM, at 10-11 ("*OTR Tires Preliminary 12-13*"), unchanged in *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*; 2012–2013, 80 FR 20197 (April 15 2015) ("*OTR Tires 12-13 Final*")).

12

- Petitioners argue that GTC is still subject to government review by Guiyang SASAC, and that, accordingly, it cannot show separation from the PRC government.[79]

**Department's Position**:  For the final results, we continue to find, based on record evidence, that GTC is not eligible for a separate rate.  In the *Preliminary Results*, we determined, and record evidence supports, that a SOE, GIIG, is GTC largest and controlling shareholder.  We would expect any major shareholder, including a government, to control the operations of the company if afforded that ability by its shareholder rights.[80]  As noted below, this opportunity is provided to the largest shareholding SOE.  In the *Preliminary Results*, we identified additional record evidence that we found and continue to find, supports this expectation with respect to GTC in this review.[81]

Specifically, we found that GTC's affiliate, GTCIE, is 100-percent owned by GTC.[82]  GTC is 25.20 percent owned by GIIG, a company which GTC reported is 100-percent owned and supervised by Guiyang SASAC.[83]  GTC reported that it is the producer of the subject merchandise and its affiliate, GTCIE, exported the subject merchandise to the United States during the POR.  The Department previously collapsed GTC and GTCIE into a single entity in the initial investigation.[84]  This decision has been unchallenged in each subsequent review, including the instant review; thus, the Department continues to treat GTC and GTCIE as a single entity in this review.  As the sole owner of GTCIE, GTC has the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company.  In addition, because the Department preliminarily found that Guiyang SASAC is in a position to control the activities of GTC through its 100-percent

---

[79] *See* Petitioners' Rebuttal Brief, at 4- 17 (citing to *Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, In Part*, 80 FR 34893 (June 18, 2015), and accompanying IDM at Comment 38-39 ("*PVLT Tires from the PRC Final*").  *See also OTR Tires Preliminary 12-13*, and accompanying PDM at 10-11; *Truck and Bus Preliminary*, and accompanying PDM at 16.  *See* letter from Petitioners, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912):  Petitioners' Rebuttal Information and Deficiency Comments regarding Guizhou's Section A Questionnaire Response," dated February 1, 2016 at Attachment 1, 5 ("Petitioners' GTC SAQR Rebuttal"), (citing memorandum from the Department, "Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China, Preliminary Separate Rate Determinations," dated January 20, 2015) at 5 citing letter from GTC submitted on PVLT Tires from the PRC Final, "Separate Rate Application Supplemental Questionnaire Response in the Antidumping Duty Investigation on Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China," dated December 17, 2014 ("GTC's PVLT SSRA"));;  GTC's Case Brief, at 25-34; GTC's 2nd SQR, at 52 and Exhibits 3B and 7; GTC's SAQR at Exhibit 3, 7, 10;  letter from Petitioners, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' Rebuttal Information and Deficiency Comments regarding Guizhou's Section A Questionnaire Response," dated June 6, 2016, at Attachment 1 ("Petitioners' 2nd SAQR Rebuttal"); GTC's SAQR, at 11-12 and Exhibit 3; *Advanced Tech. I* at 1357; *Cased Pencils*, 59 FR at 55627-28).
[80] *See, e.g.*, *Steel Wire Rod Prelim* and accompanying PDM at 5-9, unchanged in *Steel Wire Rod Final*.
[81] *See Preliminary Results*, and accompanying PDM at 16.  *See also* Preliminary Separate Rate Memo, at 2-3.
[82] *See* GTC's SAQR at 2.
[83] *See* Preliminary Separate Rate Memorandum, at 2-3; *see also* GTC's SAQR, at Exhibit A-7.  GTC is the producer, and GTCIE is its affiliate in charge of export sales.
[84] *See OTR Tires LTFV Determination*.

ownership of GTC's largest shareholder, GIIG, we find that, because GTC owns GTCIE, GTCIE is also controlled by Guiyang SASAC.[85]

Our continued denial of a separate rate to GTC in this review is further supported by events that occurred at GTC's shareholder meetings in 2012 and 2015 related to the selection of directors and profit distribution.[86]  Record evidence shows that GTC elected members of its board of directors through shareholders' meetings not available to all shareholders.[87]  Because GIIG circumvented a more inclusive board election process, it was able to elect specific board members of its preference and preferred profit distribution schemes.[88]  Based on these findings, we do not find any practical difference between holding shareholder elections to select board members, or the Guiyang SASAC, through GIIG, directly appointing board members by direct decree.  Therefore, the fact that those shareholder meetings complied with the relevant laws and the AoA, as GTC argues, is irrelevant in the instant case.[89]  Thus, the Department finds that GIIG appointed a majority of the members of GTC's board of directors as evidenced in the voting record for the shareholder meetings during the POR.[90]  Additionally, the voting records show that GIIG controlled profit distribution during the POR.[91]

GTC asserts that its AoA insulates it from government interference through its prescribed nomination process for its board of directors and senior management.  However, the Department finds that GTC's nomination and voting processes for directors and management under Articles 40, 43, 83, and 117 of the AoA allowed Guiyang SASAC, through GIIG, to influence  the board nomination process.[92]  Article 83 allows only shareholders with 10 percent or more of voting shares held individually or jointly to nominate directors.[93]  Moreover, as GIIG is the only shareholder with more than 10 percent ownership, record evidence fails to demonstrate any nominations of directors without GIIG involvement.[94]  Moreover, record evidence suggests that no other individual shareholder owns the requisite percentage to nominate members to GTC's board.[95]  As a result of its position, GIIG exercises influence over the selection of GTC's board.  Furthermore, certain articles allow GIIG to remain in a supervisory position over GTC despite its diminished ownership.  Specifically, as noted above, Article 32(3) of GTC's AoA allows certain shareholders, including GIIG, the ability to supervise the operations of the Company and put forward suggestions and raise inquiries.[96]  Thus, other than its own restraint, nothing in GTC's AoA prevents GIIG from engaging in behavior that interferes with the autonomy of GTC, and in

---

[85] *Id.*
[86] *See* GTC's 1st SQR, at 3 and Exhibits 6 and 7.  For further discussion, including the business proprietary information, *see* the Preliminary Separate Rate Memo.
[87] *See* GTC's 3rd SQR, at 3 and Exhibits 2, 4, 6, 7, and 8.
[88] *See* Preliminary Separate Rate Memo, at 2-3, where the Department detailed GIIG's control over the nomination and selection of board members in during the POR.
[89] *See* GTC's Case Brief, at 20 and 27.
[90] *See* Preliminary Separate Rate Memo for business proprietary information detailing this control.
[91] *Id.*
[92] *See* GTC's 3rd SQR, at 2 and Exhibit 2, 4, 6, 7, and 8; *see also* Preliminary Separate Rate Memo, at 2-3.
[93] *Id.*
[94] *Id.*
[95] *See* GTC's 1st SQR at Exhibit 1.
[96] *Id.*

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

turn its 100-percent owned affiliate GTCIE.[97]  Additionally, the Department notes that certain BPI record evidence suggests that GIIG exercised certain rights under AoA provisions that effectively controlled the distribution of profits, during the POR.[98]

Furthermore, GTC argues that Articles 40, 43, 83, and 117 of the AoA support its assertion of strict voting procedures, which allow voting access through cumulative voting and online voting to all shareholders, are irrelevant to the Department's finding of the GIIG's *de facto* control over the selection of management.  As noted above, the provisions cited did little to prevent GIIG from electing the board members of its preference.[99]  Neither GTC's cumulative voting nor on-line voting prevented GIIG from circumventing the election outcome by requesting a special shareholder meeting, in which it elected its preferred board members to GTC's board of directors, in turn allowing its influence to flow to GTC's 100-percent owned affiliate GTCIE.[100]

Moreover, though we acknowledge that the AoA cited by GTC on its surface appears to place safeguards against undue influence by large shareholders in the selection of GTC's senior managers, the record demonstrates that those safeguards were unsuccessful in the instant case.  GIIG was ultimately able to dominate GTC's decision-making process, despite such safeguards, and appoint its preferred members to GTC's board, as well as control profit distribution.[101]  In the instant case, the Department finds the provisions do not ensure the absence of the *de facto* control of the selection of management or profit distribution schemes by certain shareholders.  Specifically, the provisions still allow Guiyang SASAC through GIIG, the authority to make decisions for GTC, which appoints GTCIE's senior management, as well as sets GTCIE's business operations agenda.[102]  Therefore, we continue to find that GTC is not eligible for a separate rate in this review.

Furthermore, the Department rejects Petitioners' assertion that we deny GTC's separate rate because of unsubstantiated claims of Guiyang SASAC's review during the POR.  Petitioners have failed to demonstrate their claim through record evidence.  Specifically, most of the documents placed on the record supporting Petitioners' allegations of Guiyang SASAC's performance review pre-date the POR, dating back to 2013.  They are thus not pertinent to this review.  Accordingly, our decision is wholly based on our findings as discussed above.  Thus, the Department sees no need to analyze evidence pre-dating the POR.  Additionally, the Department notes, because Guiyang SASAC's October 2015 notice announcing increased annual supervision and inspection of administered enterprises fails to identify specific companies subject to annual supervision and inspection this information was not used in our determination that GTCIE is under PRC government control.[103]

---

[97] *Id.*
[98] *See* GTC's 2nd SQR at Exhibit 7.
[99] *Id.*; *see also* Preliminary Separate Rate Memo, at 3 (citing GTC's 1st SQR, at 3 and Exhibits 2, 4, 6, 7, and 8).
[100] *Id.*
[101] *See* GTC's 2nd SQR at Exhibit 7.
[102] *See* GTC's SAQR at 11-12 and Exhibit A-2.
[103] *See* Petitioners' Rebuttal Brief at 7 (citing Petitioners' Rebuttal Information and Deficiency Comments regarding Guizhou's Supplemental Section A Questionnaire Response (June 6, 2016)).

Filed By: Amanda Mallott, Filed Date: 4/13/17 12:37 PM, Submission Status: Approved

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

### C.  Whether to Grant Jinhaoyang a Separate Rate

Petitioners' Comments
- Petitioners argue that the Department erred in granting Jinhaoyang a separate rate and failed to explain why it found Jinhaoyang eligible for a separate rate in this review.[104]
- Petitioners argue that Jinhaoyang did not act as a typical exporter, *i.e.*, finding its own U.S. customers, but acted as a middle-man for a formerly reviewed respondent for which we denied a separate rate and included in the PRC-wide entity.[105]
- Petitioners argue that Jinhaoyang plays no role in setting the essential terms of its sales.[106]
- The supplier (*i.e.*, the PRC-producer of OTR tires previously denied a separate rate) was aware of the destination of Jinhaoyang's U.S. sales, and set the essential terms of the sales, acting as the price discriminator.[107]
- Petitioners argue that because the supplier is funneling subject merchandise through Jinhaoyang, we should apply the knowledge test due to the unique circumstances in this case.[108]

Jinhaoyang's Rebuttal
- Jinhaoyang argues that we correctly granted Jinhaoyang separate rate status, recognizing that the company is independent from government control, in law and in fact.[109]
- Jinhaoyang argues that Petitioners fail to present a legal argument that Jinhaoyang is not the price discriminator for its contracts with its U.S. customers.[110]

---

[104] *See* Petitioners' Case Brief at 19 (citing letter from Jinhaoyang, "Separate Rate Application of Qingdao Jinhaoyang International Co., Ltd.:  Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 7, 2015 ("Jinhaoyang's SRA"), at Exhibit II.6; and letter from Jinhaoyang, "New Pneumatic Off-the-Road Tires from the People's Republic of China (2014-2015):  Second Supplemental Questionnaire Response," dated September 27, 2016 ("Jinhaoyang's 2nd SSRA"), at 8-9).

[105] *Id.*, at 22-24 (citing *Certain Circular Welded Non-Alloy Steel Pipe From Mexico: Final Results of Antidumping Duty Administrative Review*, 76 FR 36086 (June 21, 2011), and accompanying IDM at Comment 1; *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam:  Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 77 FR 55800 (September 11, 2012), and accompanying IDM at Comment 8; *Certain Oil Country Tubular Goods from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping*, 75 FR 20335 (April 19, 2010), and accompanying IDM at Comment 31; *Freshwater Crawfish Tail Meat From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Rescission of Review in Part*, 77 FR 21529 (April 10, 2012), and accompanying IDM at Comment 1; *Wooden Bedroom Furniture From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011*, 78 FR 35249 (June 12, 2013), and accompanying IDM at Comment 3; *Wooden Bedroom Furniture From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2014*, 80 FR 77321 (December 14, 2015), and accompanying IDM at 10)).

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *See* Jinhaoyang's Rebuttal Brief, at 3-4 (citing Jinhaoyang's SRA, at Exhibit IV.B.8; Jinhaoyang's 2nd SSRA, at 6 and Exhibits SQ2-10 and Exhibit SQ2-14).

[110] *Id.*, at 5-7 (citing Petitioners' Case Brief, at 23; *Hydrofluorocarbon Blends and Components Thereof From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 42314 (June 29, 2016) and accompanying IDM at Comment 17; *Mid Continent Nail Corp. v. United States*, 949 F. Supp. 2d 1247, 1280-81 (CIT 2013)).

**Department's Position:**  For the final results, we continue to find, based on substantial record evidence, that Jinhaoyang is eligible for a separate rate.[111]  Jinhaoyang timely submitted a complete separate rate application, and based on our review, we preliminarily found that Jinhaoyang met the criteria for separate rate status and, thus, assigned Jinhaoyang a separate rate.[112]  Since the issuance of the *Preliminary Results*, we have not received any information that provides a basis for reconsideration of this determination.

We disagree with Petitioners' argument that Jinhaoyang acts as a middle-man for a producer that the Department previously denied a separate rate and included in the PRC-wide entity in a prior proceeding relevant to this *Order*.[113]  The record shows that the supplier is only one of multiple manufacturers of subject merchandise from which Jinhaoyang purchases its merchandise.[114]  Further, the record shows that Jinhaoyang has been operating under its current business model prior to the Department's denial of the supplier separate rate.[115]  In addition, an agency relationship may exist either explicitly (*e.g.*, through a contract) or implicitly (*i.e.*, *de facto*).[116]  In the instant case, there is no record evidence suggesting that an explicit agency agreement exists between Jinhaoyang and the supplier.  Moreover, based on agency principles, there is no indication of an implicit agency agreement.[117]  In the instant case, the record demonstrates that Jinhaoyang only acts on its own behalf, following its normal course of business, and does not act for the benefit of the supplier.[118]  Jinhaoyang has multiple suppliers of subject merchandise, and offers their products to U.S. customers in the same manner as it offers the supplier's products.[119]  Additionally, Jinhaoyang began doing business with its U.S. customer well before the supplier was denied a separate rate.[120]

With respect to Petitioners' argument that the Department should apply the "knowledge test," we find that although the knowledge test is a framework that is of use in identifying the first party in a transaction chain with knowledge of U.S. destination where there are multiple entities, other than the unaffiliated U.S. customer, involved in such chain prior to importation,[121] we find that this framework is not relevant to the question of whether Jinhaoyang is entitled to a separate rate.  Further, under the Department's longstanding practice, the knowledge test applies only to

---

[111] *See* PDM, at 11-15.

[112] *Id.*

[113] The identity of the producer has been designated business proprietary information; accordingly we refer to it only as the "supplier" in this document.

[114] *See* letter from Jinhaoyang, "Supplemental Questionnaire Response Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated September 6, 2016 ("Jinhaoyang 1st SSRA") and Jinhaoyang's 2nd SSRA.

[115] *See* Jinhaoyang's SRA.

[116] *See* Stainless Steel Sheet and Strip in Coils from Italy:  Final Results of Antidumping Duty Administrative Review, 67 FR 1715 (January 14, 2002) and accompanying IDM ("SSSS in Coils"), at Comment 1.

[117] *Id.*  Generally, when determining whether agency exists, we look to whether the agent's actions are on his own behalf or of that of the principal.

[118] *See* Jinhaoyang's SRA, Jinhaoyang's 1st SQR, and Jinhaoyang's 2nd SQR.

[119] *See SSSS in Coils*, at Comment 1.

[120] *See* Jinhaoyang's 1st SQR, at SQ-2; Jinhaoyang's 2nd SQR, at SQ-9.

[121] See, e.g., Certain Cut-to-Length Carbon-Quality Steel Plate Products From Italy: Final Results and Partial Rescission of Antidumping Duty Administrative Review, 71 FR 39299 (July 12, 2006), and accompanying IDM at Comment 1.

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

exporters that have dealings with entities outside of the NME country, and the Department does not apply the knowledge test to transactions between parties within the PRC.[122]

Accordingly, we continue to find Jinhaoyang eligible for a separate rate because its separate rate application shows absence of both *de jure* and *de facto* government control over its export activities and because record evidence demonstrates through cooperative agreements, sales contracts, and other communications that Jinhaoyang is the price discriminator for its sales to unaffiliated customers in the United States.[123]

### D. Whether to Grant Zhongce a Separate Rate

Petitioners' Comments
- Petitioners argue that Zhongce's largest shareholders are ultimately controlled by the PRC government.[124]
- Petitioners argue that, although Zhongce conceded that two of its largest shareholders are state-controlled,[125] the number of shareholders that are majority SASAC-controlled is higher than Zhongce reported.[126] Petitioners state that several of Zhongce's largest shareholders, *i.e.*, those with the power to nominate directors, are majority-owned by a SASAC entity.[127]
- Petitioners argue that Zhongce's management is interconnected with a SASAC entity.[128]

---

[122] *See, e.g., Hydrofluorocarbon Blends and Components Thereof From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 42314 (June 29, 2016) and accompanying Issues and Decision Memorandum at Comment 17 ("Under the Department's longstanding practice, the Department will not base export price on internal transactions between two companies located in the NME country. Moreover, a producer's knowledge of the ultimate destination is an issue restricted in its application in NME cases because the knowledge test applies only to exporters that have dealings with entities outside of the NME country."), citing *Final Determination of Sales at Less Than Fair Value: Tetrahydrofurfuryl Alcohol From the People's Republic of China*, 69 FR 34130 (June 18, 2004) and accompanying IDM at Comment 2 (stating that the knowledge test "is restricted with regard to NME cases since the Department does not base export price on internal transactions between two companies located in the NME country"); *see also Fresh Garlic from the People's Republic of China; Final Results of Antidumping Duty Administrative Review and Partial Termination of Administrative Review*, 62 FR 23758, 23759 (May 1, 1997).

[123] *See* Letter from Jinhaoyang, "Jinhaoyang's Second SRA Supplemental Questionnaire Response Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," at 2-3 and Exhibits SQ2-3, SQ2-4, SQ2-9, and SQ-10, dated September 6, 2016.

[124] *See* Petitioners' Case Brief, at 18-19 (citing to Zhongce SRA at 11-13; Petitioners' submission, "Petitioners' Rebuttal Information and Deficiency Comments on Zhongce's Separate Rate Application, at Attachment 3, dated Dec. 30, 2015 ("Petitioners' 1st Rebuttal"); letter from Petitioners, "Rebuttal Information to Zhongce's Second Supplemental Questionnaire Response," at 2-3 and Attachments 1-4, dated September 30, 2016) ("Petitioners' 2nd SQR Rebuttal")).

[125] *Id.*, at 15-16 (citing to Zhongce SRA at 11-13).

[126] *Id.*, at 18-19 (citing to Petitioners' 2nd SQR Rebuttal, at 2-3 and Attachment 1-4).

[127] *Id.*

[128] *See* Petitioners' Case Brief, at 17 (citing to letter from Zhongce, "Zhongce Rubber Group Company Limited's ("Zhongce"), Second Supplemental Questionnaire Response," dated September 27, 2016 ("Zhongce's 2nd SSRA"), at 4).

- Petitioners further argue that a majority of Zhongce's board is appointed by SASAC entities, making Zhongce ineligible for a separate rate as a matter of law.[129]

Zhongce's Rebuttal

- Zhongce argues that we should follow our recent determination in the *Truck and Bus Tires Preliminary*, as well as the *Preliminary Results* in the current review, and continue to find that Zhongce is eligible for a separate rate.[130]
- Zhongce argues that Petitioners' arguments ignore fundamental changes in Zhongce's equity structure, including changes in the process of selecting its Chairman of the Board.[131]
- Zhongce argues that Petitioners' attempts to link state-owned entities to Zhongce's other shareholders are baseless. Zhongce asserts, for example, that one of the shareholders Petitioners assert has control over its management selection process has multiple layers of ownership between it and the relevant SOEs.[132]
- Petitioners' remaining argument, regarding Zhongce's Board members being interconnected with a SASAC, provides no rationale for the Department to revisit the *Preliminary Results* to grant Zhongce a separate rate.[133]

**Department's Position:** For the final results, we continue to find, based on record evidence, that Zhongce is eligible for a separate rate.[134] Zhongce submitted a complete and timely separate rate application, and based upon our review of this application, as well as Zhongce's supplemental questionnaire responses, we preliminarily found that Zhongce met the criteria for separate rate status and, thus, assigned Zhongce a separate rate in the *Preliminary Results*.[135] Since the issuance of the *Preliminary Results*, we have not received any information that provides a basis for reconsideration of this determination.

We disagree with Petitioners' argument that the number of shareholders that are majority SASAC-controlled is higher than Zhongce reported. Petitioners do not point to any record evidence in support of their argument, nor does the record contain such information, that beyond

---

[129] *See* Petitioners' Case Brief, at 18 (citing to letter from Zhongce, "Zhongce's First Supplemental Questionnaire Response," dated August 2, 2016), (Zhongce 1st SSRA)")", at 2-3 (citing *Ammonium Sulfate From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value*, 81 FR 78776 (November 9, 2016) and accompanying PDM at 5-6; *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2014-2015*, 81 FR 62717 (September 12, 2016), and accompanying IDM at Comment 11; *OTR Tires Preliminary 12-13* and accompanying PDM at 10, unchanged in *OTR Tires 12-13 Final*).
[130] *See* Zhongce's Rebuttal Brief, at 1-2 (citing to *Truck and Bus Preliminary* and accompanying PDM at the "Separate Rates" section).
[131] *Id.*, at 2 (citing to Zhongce's SRA, at 11-13 and Zhongce 1st SSRA, at 1-3).
[132] *Id.*, at 3-5 (citing Zhongce's 1st SSRA, at 2 and Exhibit S-8; Zhongce's 2nd SSRA, at Attachment 1-3, 5-7).
[133] *Id.*, at 5-6 (citing *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 FR 76970 (December 23, 2014), and accompanying IDM at Comment 6 (the CIT rejected the same kind of arguments Petitioner make in the instate case, holding that "{b}eyond emphasizing the legal and practical possibility that the company officials who are also in some capacity government officials could have influenced these companies' export sales negotiations," {Petitioner} had "not pointed to any specific evidence that, in influencing the companies' operations pursuant to their duties as company officials)).
[134] *See* PDM, at 11-15.
[135] *Id.*

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

the entities that Zhongce acknowledges as SOEs, within its separate rate application are SASAC controlled.[136] The record shows that Zhongce does have shareholders that are SOEs, as reflected in Zhongce's separate rate application.[137] However, the record also shows that those SOEs cannot control their owners, therefore, the PRC government cannot control Zhongce through these two shareholders.[138] Based on record evidence, we find that the PRC government control of Zhongce is limited through its shareholder ownership.[139] Also, the PRC government does not have majority control of Zhongce's board through its SOE ownership because the number of SOE board members is less than the majority needed to have control over the decision making process .[140] In addition, record evidence shows that each board member has equal voting power; thus, the SASAC entities are unable to exercise control over Zhongce's business operations or its selection of management through dominance of Zhongce's board.[141] Therefore, we find that Zhongce is eligible for a separate rate.

Furthermore, Zhongce's remaining largest shareholders, which the Petitioners assert are controlled by SASACs, have multiple entities between them and Zhongce's shareholders of record.[142] Furthermore, Petitioners fail to demonstrate how these tenuous connections with the PRC government impart the PRC government with control over Zhongce's shareholders, not to mention Zhongce. Moreover, Petitioners fail to show record evidence demonstrating that the PRC government controls Zhongce by other means. Accordingly, we continue to find Zhongce eligible for a separate rate because its separate rate application shows absence of both *de jure* and *de facto* government control over its export activities.[143]

## Comment 2: Calculation of the Cost of Tube and Flap Inputs for Xugong

Petitioners' Comments
- The programming language used by the Department to calculate flap weight (*i.e.*, from the difference between the net tube and flap weight and the reported tube weight) used a variable that only incorporated tube weight for self-produced (*i.e.*, Hanbang) tubes, but which would result in a missing value if the tubes were purchased. As a result, for sales of all tires with tubes purchased from unrelated parties, the value calculated for the flap was incorrectly set to zero, which, through a function of the programming, zeroed out the total deduction as well. Petitioners provide suggested language to correct this inadvertent error.[144]
- Furthermore, though the programming language sets up the language to calculate these tube and flap costs for the stated purpose of the deduction from U.S. price, as appropriate (albeit

---

[136] *See* Zhongce's SRA dated March 25, 2016, at 13-14.
[137] *Id.*
[138] *Id.*
[139] *Id.,* at Exhibit 4.
[140] *Id.*, at Exhibit 10.
[141] *Id.*, at Exhibit 8A.
[142] *See* Zhongce's 1st SQR.
[143] *Id.*
[144] *Id.*, at 4 (citing to Memorandum from the Department, "2014-2015 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Preliminary Results Margin Calculation for Xuzhou Xugong Tyres Co., Ltd.," dated October 5, 2016 ("Xugong Preliminary Analysis Memo")).

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

with the aforementioned error), the programming language necessary to make the actual deduction of these calculated costs from U.S. price was omitted later in the calculations and, thus, no deduction was actually made.  Petitioners provide suggested language to correct for this error.[145]

No interested party provided rebuttal comment on this issue.

**Department's Position:**  In the *Preliminary Results*, for Xugong's sales of an OTR tire "set" (which includes both the subject tire and accompanying non-subject tire tubes and flaps) the Department adjusted the reported U.S. sales price to remove the cost of the tube and flap products.  Specifically, to calculate the weight for both the tube and flap, the Department subtracted the net tire weight from the gross weight of the "set," as reported.  Because tube weights were reported, the Department was then able to calculate the flap weights by subtracting the reported tube weight from the tube and flap weight (*i.e.*, "set" weight net of tire weight).  For flaps, which were all purchased from an unaffiliated supplier, the Department applied a surrogate value to derive the cost of the flap to deduct from the U.S. price.  For tubes, which were both purchased from other suppliers and produced by an affiliate, Hanbang, the Department either applied a surrogate value (if the former) or calculated the cost using Hanbang's factors of production ("FOPs") (if the latter) to deduct from U.S. price.  This methodology was consistent with that applied in prior reviews.

We have reviewed the allegation and our preliminary methodology and agree with Petitioners that we made two inadvertent errors by not subtracting the tube and flap from all of the applicable sales in our calculations and by not providing the programming language to apply the deduction as intended.  We are correcting these errors in the final margin calculation for Xugong.[146]

### Comment 3:  Surrogate Value for Smoked Sheet Natural Rubber

<u>Petitioners' Comments</u>
- In the *Preliminary Results*, the Department valued natural rubber inputs using the average of daily prices reported by the Rubber Research Institute of Thailand ("RRIT").[147]  The RRIT report publishes prices for two types of natural rubber:  ribbed smoked sheet ("RSS") at USD $1.71/kg and Technically Specified Natural Rubber ("TSR") at USD $1.50/kg.[148]
- Though the Department selected the RSS data as a surrogate, as is appropriate, it appears that the TSR value was inadvertently used.  The Department should correct this error by using the RSS value for the final determination.[149]

---

[145] *See* Petitioners' Case Brief, at 4.
[146] *See* Xugong's Final Analysis Memo, at 2-3
[147] *See* Petitioners' Case Brief, at 5 (citing to the Department's memorandum, "2014-2015 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results Surrogate Value Memorandum," dated October 5, 2016 ("Preliminary SV Memo"), at Attachment I (surrogate value for RSS3)).
[148] *Id*.
[149] *See* Petitioners' Case Brief, at 5.

Filed By: Amanda Mallott, Filed Date: 4/19/17 12:37 PM, Submission Status: Approved

No interested party provided rebuttal comment on this issue.

**Department's Position:**  Petitioners correctly note that for the *Preliminary Results*, we intended to apply the average value from the RSS price data reported by the RRIT to all natural rubber inputs, but incorrectly transposed the price for TSR into the surrogate value information.[150] Accordingly, we corrected this error for the final results by valuing the natural rubber input with the RSS data as submitted by Petitioners.[151]

## Comment 4: Surrogate Value for Inland Truck Freight

Background
- To value inland truck freight, Petitioners submitted to the record the World Bank's *Doing Business 2015: Thailand, Trading Across Borders* ("*DB 2015 Thailand*") report,[152] as used by the Department in the prior 2013-2014 review, whereas respondents provided the World Bank's *Doing Business 2016: Thailand, Trading Across Borders* ("*DB 2016 Thailand*") report.[153]  The Department used the price derived from the *DB 2016 Thailand* report to value inland truck freight for the *Preliminary Results*.[154]

Petitioners' Comments
- Though the transport data in *DB 2016 Thailand* is contemporaneous with the POR, it does not provide the most relevant data, and the Department failed to address shortcomings of the *DB 2016 Thailand* information in the *Preliminary Results*.[155]
- Whereas in *DB 2015 Thailand* the distance the goods traveled was only described as from Bangkok to the Port of Bangkok, the World Bank employed a new methodology in *DB 2016 Thailand* involving a route between Bangkok and the port of Laem Chabang, but did not specify that transportation was by truck.[156]  Specifically, *DB 2016 Thailand* provides the cost to transport a set shipment of goods over the reported route "by the most widely used mode of transport," but does not specify what mode that is and, thus, may not be specific to truck freight.[157]

---

[150] *See* Preliminary SV Memo, at Attachment I.

[151] *See* Final SV Memo, at 2-3 (citing letter from Petitioners, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' First Surrogate Value Submission," dated April 7, 2016 ("Petitioners' Initial SV Submission"), at Attachment 3).

[152] *See* Petitioners' Initial SV Submission, at Attachment 10.

[153] *See* letter from GTC titled, GTC First Surrogate Value Submission: Seventh Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off the-Road Tires from the People's Republic of China, dated April 7, 2016 ("GTC's Initial SV Submission"), at Exhibit 7B.

[154] *See* Preliminary SV Memo.

[155] *See* Petitioners' Case Brief, at 6.

[156] *Id.*, at 6-7 (citing *World Bank Doing Business, Trading Across Borders Methodology,* at 1, included in letter from Petitioners titled, Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' First Rebuttal Surrogate Value Submission, dated April 18, 2016 ("Petitioners' 1st Rebuttal SV Submission"), at Attachment 7).

[157] *Id.*

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

- o Petitioners cite to evidence on the record (CMA CGM's Thailand Import Quick Guide) which they purport indicates that the mode of freight considered in *DB 2016 Thailand* was likely train transport.[158]
- o Petitioners assert that the conclusion that *DB 2016 Thailand* incorporated rail freight is further confirmed by the transport speed of 52.9 km/hour identified in the report, which Petitioners argue could only be for rail, based on traffic conditions in Bangkok.[159]

- In contrast, according to Petitioners, *DB 2015 Thailand* used a route between Bangkok and the Port of Bangkok. Nothing on the record suggests that this route is representative of a mode of transport other than a truck route, so it is an appropriate source for truck freight.[160]

GTC's and Xugong's Rebuttal

- Respondents note that *DB 2016 Thailand* is publicly available and contemporaneous with the POR. The Department has used this report to value inland truck freight in multiple recent cases.[161]
- GTC argues that the record evidence, and the well-established parameters for calculating a truck freight surrogate value, clearly indicate that *DB 2016 Thailand* is the best available source for valuing truck freight in this proceeding. Specifically, it provides a contemporaneous, specific cost to transport a specific weight of cargo allocated over a specific distance. It also specifically identifies the port of exit as "Laem Chabang" port, essentially eliminating any ambiguity with respect to distance traveled, thus correcting for the ambiguity of *DB 2015 Thailand* with respect to the port of exit.[162]
- Respondents assert that Petitioners' allegation that the 2016 report's freight rate applies to rail freight, rather than truck freight, is nothing more than speculation. Though the World Bank stated in *DB 2016 Thailand* that the inland transportation was for a route between Bangkok and Laem Chabang port using "the most widely used mode of transport," it did not specify what mode of transport was used. Moreover, the same ambiguity applies to the mode of transport in *DB 2015 Thailand*.[163]

---

[158] *Id.*, at 7 (citing the CMA CGM, Thailand Import Quick Guide, included in Petitioners' 1st Rebuttal SV Submission, at Attachments 8-9).

[159] *Id.*, at 7-8 (citing a *Driving in Thailand* report included in Attachment 2 to Petitioners' Second Surrogate Value Submission (in support of Bangkok's traffic congestion) and excerpts from the World Bank's *Doing Business* 2016 reports for Indonesia, Lao PDR, Malaysia, and Philippines included in Attachment 1 to Petitioners' Second Surrogate Value Submission (as examples of other South Asian countries with urban traffic congestion and which reported much lower traffic speeds for inland transport reported under the same general methodology in respective *Doing Business* 2016 reports)).

[160] *Id.*, at 8.

[161] See Xugong's Rebuttal Brief, at 5-6 (citing *Steel Wire Garment Hangers From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 97435 (November 4, 2016) ("*Steel Wire Hangers 14-15 Prelim*"), at 18; *Diamond Sawblades and Parts Thereof From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 89045 (December 5, 2016) ("*Diamond Sawblades 14-15 Prelim*"), at 20; and *Large Residential Washers From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 81 FR 90776 (December 13, 2016) ("*Washers from the PRC*"). *See also* GTC's Brief, at 3, citing *Steel Wire Hangers 14-15 Prelim* and *Diamond Sawblades 14-15 Prelim*).

[162] *See* GTC's Rebuttal Brief, at 2-3.

[163] *See* GTC's Rebuttal Brief, at 4-5 and Xugong's Rebuttal Brief, at 7 (citing Petitioners' 1st Rebuttal SV Submission at Attachment 8).

- Respondents argue that the CMA CGM's Thailand Import Quick Guide cited by Petitioners has no connection or relevance to *DB 2016 Thailand*. Petitioners provide no evidence that this is a contributor or source to the report, and it has no bearing on the underlying data. Moreover, even if the report were presumed relevant, it does not support Petitioners' argument, as only 9.9 percent of Laem Chabang cargo moved by rail.[164]
- Xugong also argues that the use of rail is not confirmed by the transport speed of 52.9 km/hour, and that Bangkok's notoriously poor traffic conditions have little relevance as Laem Chabang is 129 kilometers from Bangkok, *i.e.*, much of the travel would be outside Bangkok.[165]
- Any fair comparison of the 2016 and 2015 reports based on the record evidence in this proceeding clearly demonstrates that *DB 2016 Thailand* is the best available information for valuing truck freight. The express deficiencies and ambiguities in *DB 2015 Thailand* (*i.e.*, the port of exit, non-contemporaneity, and lack of information regarding industrial zones) undoubtedly outweigh any alleged ambiguity with respect to the method of transport which might exist in *DB 2016 Thailand*.[166]

**Department's Position:** For the final results, we continue to value truck freight based on information in *DB 2016 Thailand*. As an initial matter, selection of this information is consistent with the Department's use of this source to value inland freight in recent determinations concerning the PRC where Thailand was selected as the primary surrogate country. In addition to the preliminary determinations cited by Xugong and GTC,[167] we note that several final determinations have been issued since the briefing stage of this review which have utilized *DB 2016 Thailand* to value inland truck freight. These determinations found that *DB 2016 Thailand* provided all necessary information for calculating a surrogate value.[168]

In the instant case, Petitioners, who advocate for the use of similar information from *DB 2015 Thailand* to value inland freight, assert that the "shortcomings" of *DB 2016 Thailand* which make it unusable are derived from the change in methodology between the 2015 and 2016 reports, specifically that the port of exit identified in the underlying data changed from "Port: Bangkok" to "Laem Chabang." Petitioners provide no direct support as to why a change in methodology with respect to identification of the port of exit, without any other substantive methodological change identified, constitutes a shortcoming on its own. Rather, Petitioners' concerns are based on a presumption that freight costs in *DB 2016 Thailand* are based on rail

---

[164] *See* GTC's Rebuttal Brief, at 4-5 and Xugong's Rebuttal Brief, at 7-8 (citing Petitioners' 1st Rebuttal SV Submission, at Attachment 8). The report states that "Lat Krabang ICD is the Bangkok base terminal for most shipping lines who have Transpacific and/or Europe main line vessel direct call services to Laem Chabang," and that just 10% of its "import cargoes are destined for Lat Krabang ICD, 99% of which moved by rail."

[165] *See* Xugong's Rebuttal Brief, at 7-8.

[166] *See* GTC's Rebuttal Brief, at 5-6 and Xugong's Rebuttal Brief, at 9-12.

[167] *See* Xugong Rebuttal Brief, at 6, and GTC Rebuttal Brief, at 3, citing *Steel Wire Hangers 14-15 Prelim*, at 18; *Diamond Sawblades 14-15 Prelim*, at 20; and *Washers from the PRC*. *See also* GTC's Brief, at 3.

[168] *See Truck and Bus Tires From the People's Republic of China: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 82 FR 8599 (January 27, 2017) and accompanying IDM ("*Truck and Bus Tires*"), at Comment 17. *See also Washers from the PRC* (in which the selection of the 2016 report was not challenged by parties).

freight, as opposed to truck freight, a position derived from two pieces of allegedly corroborative information from CMA CGM's Thailand Import Quick Guide.[169]

First, we find that the information referenced by Petitioners is insufficient to compel the conclusion that *DB 2016 Thailand* utilized rail freight.  With respect to the CMA CGM's Thailand Import Quick Guide, there is no evidence that the information contained in this document was used in, or representative of, the data underlying *DB 2016 Thailand*.  Indeed, the two domestic freight costs identified in *DB 2016 Thailand* are for average costs for exports of a certain product from a standardized company location in Bangkok to the port of Laem Chabang and average costs for imports of another containerized product from the port of Laem Chabang to a standardized company in Bangkok.[170]  This suggests that the *DB 2016 Thailand* report information is specific to an international freight provider's export transport costs to move a different product from a company to port and import transport costs to move one product from port to company.  On the other hand, the CMA CGM's costs that Petitioners cite to corroborate their argument represent the transport from port to container depot.  The *DB 2016 Thailand* report reflects a port to company cost, and the CMA CGM report reflects a port to middle man cost.  Therefore, the movement of containers between the port and international container depot is not precisely analogous to the information contained in the report.

Moreover, we agree with Xugong and GTC that a statement from a single freight provider indicating that most shipping lines "who have Transpacific and/or Europe main line vessel direct call services to Laem Chabang" ship imported containers by rail to the Lat Krabang base terminal in Bangkok does not stand for the proposition that inland container freight costs between Bangkok and the Laem Chabang port in *DB 2016 Thailand* must be reflective of the cost of rail transport.[171]  Not only is this statement by a single shipping company regarding the activities of "most" carriers speculative and unsupported by further documentation, but even if presumed to be accurate, it only leads to the conclusion that rail freight is the predominant mode of inland freight used for containers of import cargo from a subset of freight providers for a route to a single international container depot destination.  There is no evidence that the freight costs underlying *DB 2016 Thailand* are inclusive of such a specific subset of freight movement, let alone predominantly comprised of freight representative of movement of only import cargoes from certain providers to a single location.  Indeed, as Xugong and GTC note, the CMA CGM's Thailand Import Quick Guide itself indicates that such freight movement represents only ten percent of CMA CGM's freight movement for just import cargoes.[172]

Moreover, Petitioners' argument that the 52.9 kilometer/hour average speed of inland freight for export from a standardized company location in Bangkok to the port of Laem Chabang cited in

---

[169] Demonstrating that rail is the predominant mode of transport for one international freight supplier for containers moved between Laem Chabang port and an international container depot in Bangkok) and the average speed of the freight reported in the DB 2016 Thailand study (52.9 km/hour), and Petitioners presume this is too fast for Bangkok traffic.

[170] As the total average freight expense and total average distance was equivalent between the datasets, the average costs reported were the same regardless of whether the shipment was for export or import.

[171] *See* Petitioners' First Rebuttal Surrogate Value Submission, at Attachment 8.

[172] *Id.*, ("Currently, 10% of our import cargoes are destined for Lat Krabang ICD").

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

*DB 2016 Thailand* reflects rail transport (in light of Bangkok's traffic congestion)[173] is plainly speculative and lacks basis in the record evidence. The simple fact that Bangkok and its environs have "notorious traffic" does not compel the conclusion that the 129-kilometer roadway between Bangkok and Laem Chabang is so congested that an average speed of 52.9 Km/h (approximately 33 miles per hour) attained on this route must suggest a mode of transportation other than truck freight. Moreover, the contributors to *DB 2016 Thailand* shipped cargo from all around Bangkok to a port 129 kilometers away, calling into question the degree to which they would be impacted by urban Bangkok traffic. Therefore, *DB 2016 Thailand* represents an accurate source to value inland truck freight.[174]

Second, we disagree with Petitioners' contention that *DB 2015 Thailand* is preferable to *DB 2016 Thailand* because the 2015 data has no ambiguity regarding the mode of transport utilized. This conclusion is based on the premise that the port of exit in *DB 2015 Thailand* is listed as "Bangkok," and that it is comprised of price data for shipment of goods over the reported route "by the most widely used mode of transport," which, though ambiguous, does not explicitly specify rail freight.[175] As noted above, we find that there is insufficient record evidence to support Petitioners' assertion that *DB 2016 Thailand* utilized rail freight costs to and from the port of Laem Chabang. That the record lacks information regarding the mode of freight in the 2015 study simply reflects the fact that parties did not submit information for this purpose, but provides no insight as to the modal composition of the underlying data in relation to that of the 2016 study, particularly in consideration of the above findings with respect to the relevance of the information provided by Petitioners with respect to the 2016 study. Though the Department will not revisit the details of the issue regarding the location of the port of exit in *DB 2015 Thailand* from the prior review, we note that the Department's presumption that the port of exit identified as "Port: Bangkok" in *DB 2015 Thailand* was the Bangkok city container port, not Laem Chabang, was a presumption based on lack of specific evidentiary details on the record of that segment.[176] Nevertheless, that ambiguity existed with respect to the location of the port of exit in the *DB 2015 Thailand* report was not in dispute and that this ambiguity created a substantive issue with respect to valuation of inland freight in the prior review belies Petitioners' present contention that the ambiguous "Port: Bangkok" port of exit identified in the *DB 2015 Thailand* report somehow represents a comparative advantage over the clearly defined "Laem Chabang" port identified in the *DB 2016 Thailand* information. Therefore, the Department agrees with Xugong and GTC that the specificity provided by *DB 2016 Thailand* indeed provides the better source to value inland truck freight.

Finally, even accepting Petitioners' arguments regarding rail transit with respect to *DB 2016 Thailand*, as discussed above, Petitioners still fail to demonstrate that *DB 2015 Thailand* does not otherwise exhibit the same "shortfalls" they claim are present in *DB 2016 Thailand*. Specifically, there is ambiguity regarding the mode of transport in both reports, as neither specifically identified the mode of transportation utilized.

---

[173] Petitioners argue this is purportedly corroborated by the lower traffic speeds for freight reported in the *DB 2016* reports for other South Asian countries with similar urban traffic congestion. *See* Petitioners' Case Brief, at 8.

[174] *See* World Bank *Doing Business*, Trading Across Borders Methodology, at 6.

[175] *See* Petitioners' Case Brief, at 6-7.

[176] *See OTR Tires 13-14*, at Comment 11.

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

When selecting SVs for use in an NME proceeding, the Department's preference is to use, where possible, a range of publicly available, non-export, tax-exclusive, and product-specific prices for the POR, with each of these factors applied non-hierarchically to the case-specific facts and with preference to data from a single surrogate country.[177]  Moreover, contemporaneity with the POR is one of the criteria in our selection of SVs.[178]  *DB 2016 Thailand* is contemporaneous with the POR, whereas *DB 2015 Thailand* pre-dates the POR by more than a year.[179]  Even if we were to accept each of Petitioners' arguments, we find that the record lacks evidence that *DB 2015 Thailand* is in any way preferable to the contemporaneous and exit port-specific 2016 report, and we continue to use information from *DB 2016 Thailand* to value inland freight for these final results.[180]

### Comment 5: Surrogate Value for Carbon Black

Background
The Department used price data for Thai imports under HS code 2803.00.40090 (Carbon, Nesoi (including Carbon Black); Other) to value carbon black inputs for the *Preliminary Results*.

Petitioners' Comments
- The Department did not address why Xugong's carbon black FOPs were best valued as "other" carbon blacks under Thai HS code 2803.00.40090.
- The basket category for carbon black (Thai HS 2803.00 ("Carbon, Nesoi (Including Carbon Black))) used in prior reviews of this order, as well as in investigations of other types of tires from the PRC, covers all types of carbon black that Xugong may have consumed, and thus results in a more accurate dumping margin.[181]
  - Petitioners note that in the last review of this order, the Department explained that HS 2803.00 was the most appropriate HS category "to value all carbon black

---

[177] *See* the Department's Antidumping Duty Procedures Manual, chapter 10, at 14 (citing *Carbazole Violet Pigment from the PRC*, at Comment 3).
[178] *See Diamond Sawblades and Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013–2014*, 81 FR 38673 (June 14, 2016), and accompanying IDM, at Comment 16, in which we selected one labor data source over another based on, in part, contemporaneity.  *See also Blue Field (Sichuan) Food Indus. Co. v. United States*, 949 F. Supp. 2d 1311, 1331 (CIT 2013) ("Commerce may invoke contemporaneity as a tie-breaking factor when choosing between equally reliable datasets.").
[179] *See* GTC's Initial SV Submission, at Exhibit 7B, and Petitioners' Initial SV Submission, at Attachment 10.
[180] *See* Final SV Memo.
[181] *See* Petitioners' Case Brief. at 8-9, (citing to *OTR Tires 13-14*, in a memorandum from the Department, "Final Results of the 2013-2014 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-The-Road Tires from the People's Republic of China:  Surrogate Value Memorandum," dated April 12, 2016 ("OTR Tires 13-14 Final SV Memo"), at 2; *PVLT Tires from the PRC Final*, in the memorandum from the Department, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Surrogate Value Memorandum," dated June 11, 2015, at Attachment 1; *Truck and Bus Tires Prelim*, in the memorandum from the Department, "Truck and Bus Tires from the People's Republic of China: Surrogate Values for the Preliminary Affirmative Determination of Sales at Less Than Fair Value," dated August 26, 2016 , unchanged in *Truck and Bus Tires Final*; *OTR Tires 12-13 Final*, in the memorandum from the Department, "Final Results of the 2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Surrogate Value Memorandum," dated April 8, 2015, at Attachment 1 (using the 280300 HTS category from Indonesia in the 2012-2013 review).

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

inputs with Thai data" because "it explicitly names the input in question in its description" and so was specific to all the types of carbon black consumed.[182]

- They also state that in the investigation of this order, the Department explained that it was more appropriate to use a basket category to value carbon black than more specific data, because the basket category would "cover all imports…of all types of carbon black, {so} is more likely to encompass all types of carbon black used by {the respondent}…."[183]

- Xugong has not shown why the types of carbon black it uses are limited to those types that would be captured in the HS 2803.00.40090 for "other" carbon blacks.

Xugong's Rebuttal

- The Department relied on the Thai HS 2803.00 basket carbon black category in the preceding review because all parties agreed that it was the most specific information on the record of that review to value carbon black inputs.[184]

- The record of this review specifically describes the 11-digit figure as follows: "Other Carbon Blacks; other (other than anthracene or lamp black)," and Petitioners do not argue that any of the carbon blacks are anthracene or lamp black. They contend the record includes a specific description of each type of carbon black used by Xugong with no indication that any are anthracene or lamp blacks, which are covered under the basket category of HS 2803.00.[185]

- Moreover, the use of the six-digit category 2803.00 would necessarily include imports of acetylene black (HS 2803.00.20000), which the Department explicitly rejected as a proper base to value carbon black in the *OTR Tires 13-14 Final*.[186]

- Therefore, the Department should continue to use the Thai HS code 2803.00.40090, as this is an "other" subcategory of the 2803.00 classification which explicitly excludes several types of carbon blacks not used in the production of subject merchandise and is thus not distorted by imports of carbon black for which there is no evidence of use in the production of OTR tires and is necessarily more specific to the input in question.

**Department's Position:** For the final results, we continue to use the Thai HS code 2803.00.40090 to value the carbon black reported by Xugong. We agree with Xugong that the eleven-digit Thai HS code 2803.00.40090 provides the most specific record evidence for valuing the carbon black used in its production based on the evidence on the record. Because the remaining surrogate value criteria (*i.e.* whether contemporaneous with the POR, tax and duty exclusive, publicly available, or representative of a broad market average) do not favor one Thai HS code over the other, we find that Thai HS code 2803.00.40090 continues to provide the best available information on the record because of its superior specificity.

---

[182] Petitioners cite OTR Tires 13-14 Final SV Memo, at 12.

[183] Petitioners cite *OTR Tires LTFV Determination*, at Comment 14.

[184] *See* Xugong's Rebuttal Brief, at 1-4 (citing *OTR Tires 13-14 Final*, at 66).

[185] *See* Xugong's Rebuttal Brief, at 2 (citing the letter from Xugong, "New Pneumatic Off-the-Road Tires From the PRC: Submission of Surrogate Values of Xuzhou Xugong Tyres Co. Ltd," dated September 6, 2016 ("Xugong Initial SV Submission"), at Exhibit 2).

[186] Xugong cites *OTR Tires 13-14*, at 63.

In the final results of the prior review, the Department used the six-digit HS 2803.00 basket category for the final results, as it was the most appropriate choice from among the available record evidence provided by the respondents.[187]  In the instant review, the question at issue is whether HS 2803.00.40090 appropriately further refines the basket 2803.00 category to exclude inappropriate types of carbon black and is therefore the most suitable category on the record to value input in question.  We find that use of the six-digit category 2803.00 not only would include a number of carbon blacks not used in tire production, it would also necessarily include imports of acetylene black (HTS 2803.00.20000), which we explicitly rejected as a proper base to value carbon black in the prior review.[188]

To ensure the most accurate surrogate value for carbon black was used in this review, the Department requested information not provided in past reviews, namely that Xugong submit technical specifications, purchase orders or purchase contracts, supplier's invoices, packing lists, and quality certificates for the various carbon blacks used in their production.[189]  The information provided by Xugong corroborated that lamp and acetylene black were not specific to the inputs used in their tire production.[190]

This information, as well as Xugong's detailed descriptions of the various carbon blacks used in its tire production, demonstrates that a number of the carbon blacks (such as acetylene, lamp, and anthracene) covered by the broader six-digit Thai HS 2803.00 are not used in the production of Xugong's tires.[191]  Therefore, the Department continues to use Thai HS 2803.00.40090 as a surrogate value for Xugong's carbon black variables.

## Comment 6: Surrogate Value for Tire Valves

Background
Xugong reported consumption of tire valve inputs in the production and sale of subject merchandise and described these products as "check valves of copper/copper alloy… {which} is a specific valve for tire products, and its main function is to inflate or release air /liquids.  It is a one-way valve to keep air pressure of tire."[192]  Prior to the *Preliminary Results*, parties submitted price data for Thai imports under four subcategories of the HS 8481 classification ("Taps, cocks, valves and similar appliances, for pipes, boiler shells, tanks, vats or the like, including pressure-reducing valves and thermostatically controlled valves; parts thereof") to value tire valves:

---

[187] *See OTR Tires 13-14*, and accompanying IDM at Comment 12.  The Department inadvertently used an incorrect value in the preliminary results, and therefore selected the basket category for the final results as it was the most appropriate information on record.

[188] *See OTR Tires 13-14*, and accompanying IDM at 63; Xugong Initial SV Submission, at Exhibit 1.

[189] *See* letter from Xugong, "Xuzhou Xugong Tyres Co., Ltd., ("Xugong") Second Supplemental Section D Questionnaire Response for the Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of China," dated September 7, 2016, ("Xugong 2nd Supp Sec D").

[190] *Id.*

[191] *See* letter from Xugong, "Xuzhou Xugong Tyres Co., Ltd., ("Xugong") Section D Questionnaire Response for the Administrative Review of New Pneumatic Off-The-Road Tires from the People's republic of China," dated February 11, 2016 ("Xugong Sec D").

[192] *See* letter from Xugong entitled, Xuzhou Xugong Tyres Co., Ltd., ("Xugong") Second Supplemental Section D Questionnaire Response for the Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of China, dated September 7, 2016 ("Xugong 2nd Supp Sec D"), at 2.

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

- 8481.30 ("Check (nonreturn) valves")[193]
- 8481.80 ("Other appliances")[194]
- 8481.80.1100 ("Valves for inner tubes, of copper or copper alloys")[195] and
- 8481.80.1200 ("Valves for inner tubes, of other materials")[196]

The Department used price data for Thai imports under HS category 8481.80 to value per kilogram valve costs for the deduction of the tube and flap from U.S. price for the *Preliminary Results*.[197]

## Petitioners' Comments

- The basket Thai HS 8481.80 category used in the *Preliminary Results* includes a wide variety of valves for "other appliances" including water pipeline and ball valves with internal diameters of up to and above 40 cm (15.75 inches), and these valves differ significantly from tire valves.[198]
- Tire production does not use large plumbing valves or valves for other appliances that would also be captured in the basket category; however import information for a sub-set of this basket category exists on the record that is specific to the input in question (*i.e.*, valves for inner tubes of copper or copper alloy).  As such, the Department should use the more-specific data for Thai imports under HS 8481.80.11 to value Xugong's copper tire valves.

## Xugong's Rebuttal

- Petitioner's assertion that valves should be valued using Thai HS 8481.80.11 is incorrect because it pertains to "inner tube valves," whereas Xugong reported its input to be a check valve of copper/copper alloy.[199]
- A "check valve" is a specific valve for tire products, and its main function is to inflate or release air/liquids and is a one-way valve to keep air pressure within the tire.  Therefore, the Department should rely on HS category 8481.30, which includes check valves of copper or copper alloys.[200]

---

[193] *See* Xugong Initial SV Submission, at Exhibit 1.

[194] *Id.*  In context of the harmonized tariff definition, this six-digit category is composed of taps, cocks, valves, *etc.* for "Other Appliances" and which are not elsewhere specified or indicated ("NESOI") by a sub-heading of the 8481 category.

[195] *See* Petitioners' Initial SV Submission, at Attachment 1. *See also* letter from Petitioners, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' Second Surrogate Value Submission," dated September 16, 2016 ("Petitioners' Second SV Submission"), at Attachment 4 for the definitions of products included in 8-digit categories under the Thai tariff system (as tariff classification is harmonized only to the 6-digit level).

[196] *Id.*

[197] *See* Preliminary SV Memo.

[198] *See* Petitioners' Case Brief, at 10-11, citing the definitions of merchandise contained in various eight-digit subcategories necessarily included in import price data reported at the broader six-digit 8481.80 level as provided in Petitioners' submission of the Thai tariff schedule in the Second SV Submission, at Attachment 4.

[199] *See* Xugong's Rebuttal Case Brief, at 12-13.

[200] *Id.*, citing the letter from Xugong, "Second Supplemented Section D Questionnaire Response for the Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of China," dated September 20, 2016, at 2.

Filed By: Amanda Mallott, Filed Date: 4/19/17 12:37 PM, Submission Status: Approved

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

**Department's Position:**  As an initial matter, the Department's use of price data for Thai imports under HS 8481.80 to value tire valve inputs for the *Preliminary Results* was in error. Our intent was to use import price data for the more specific HS 8481.80.11 category, which most closely matches the relevant input used by Xugong (*i.e.*, copper valves for tire tubes), but inadvertently used the broader six-digit category instead.  As we inadvertently used the more general category in the *Preliminary Results*, we have corrected this error for the final results, and find the price data for Thai imports under HS 8481.80.11 the best available information on the record to value tire valve inputs, as discussed below.

The materials in question are the valve components reported in the factor of production buildup of tire inner tubes produced by and sourced from Xugong's affiliate Hanbang.  Xugong reported that Hanbang used copper/copper alloy valves in its production of tubes during the POR.  Thai HS 8481.80.11 covers, "Valves for inner tubes, of copper or copper alloys," which is specific to the input in question.  The price information on the record for POR Thai imports of merchandise categorized under HS 8481.80.11, sourced from GTA, represents a range of publicly available, non-export, and tax-exclusive prices, contemporaneous with the POR and from the primary surrogate country, thus constituting a robust and highly product-specific dataset which fulfills each of the Department's criteria for surrogate value selection representative of the best available information on record.[201]

Xugong, however, claims that its valves are "check valves" most appropriately valued by the HS 8481.30 category for check valves.  According to Xugong, this "check valve" category is most appropriate to value the input in question because "'Check Valve' is a specific valve for tire products, and its main function is to inflate or release air/liquids.  It is a one-way valve to keep air pressure of tire."[202]  However, we disagree with Xugong's characterization of a "check valve" as a tire-specific product most appropriate to value the tire valve in question.  First, we note that the record lacks any support to substantiate Xugong's argument that the Thai HS code 8481.30 is more specific to Xugong's valve input beyond the company's statement to that effect and, despite a specific request for further information and explanation, Xugong failed to provide any documentation in support of its definition of a tire valve and check valve as one and the same.

Indeed, the description of the check valve as a "nonreturn" valve in a broad-basket category along with information placed on the record by Petitioners, confirms that a check valve is a general term for a broad category of non-return or one-way valves defined by general mechanical properties but not specific to any particular design, size, or end-use.[203]  Thus, while the latter part

---

[201] *See* Petitioners' 2nd Rebuttal Submission, at Attachment 4.

[202] *See* letter from Xugong entitled, Xuzhou Xugong Tyres Co., Ltd., ("Xugong") Second Supplemental Section D Questionnaire Response for the Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of China, dated September 7, 2016 ("Xugong 2nd Supp Sec D"), at 2.

[203] *See* Petitioners' 2nd Rebuttal Submission, at Attachment 5 ("Check valves are mechanical valves that permit gases and liquids to flow in only one direction, preventing process flow from reversing. They are classified as oneway directional valves.  Fluid flow in the desired direction opens the valve, while backflow forces the valve closed. The mechanics of check valve operation are not complicated."  This attachment then provides examples of many different check valves of various shapes, sizes, and end uses; none of which are described as valves for tire inner tubes (though various other applications are indeed indicated), and many of which fail to exhibit similarities to a valve which could be used for a tire inner tube.).

Filed By: Amanda Mallott, Filed Date: 4/19/17 12:37 PM, Submission Status: Approved

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

of Xugong's statement may be accurate (*i.e.*, a check valve's "main function is to inflate or release air/liquids and is a one-way valve"), the record contradicts Xugong's primary proposition that a check valve "is a specific valve for tire products… a one-way valve to keep air pressure of tire."

Even presuming that the mechanical properties of a tire tube product would allow it to be defined as a type of "check valve" generally, under the broad definition of the latter term, HS 8481.30 would still not be the best available information on the record because the record contains a more product-specific dataset, *i.e.*, price data for Thai imports under HS 8481.80.11 specific to copper/alloy valves for inner tubes.[204]  Unlike 8481.80.11, the 8481.30 "check valve" category lacks any mention of tire or tube valves and there is no record evidence otherwise to support Xugong's claims that this category is the most specific to the input in question, nor does Xugong sufficiently refute Petitioners' claims as to 8481.80.11's specificity advantage.  Instead, Xugong submits the confounding claim that HS 8481.30 covers check valves made of "copper/copper alloy".  While this six-digit category may indeed include certain valves made of copper/copper alloy, it is neither specific to valves made of copper/copper alloy nor to tube valves, while HS 8481.80.11 is.

Furthermore, Xugong's contention that the 8481.80.11 category is somehow non-specific because it covers valves for inner tubes, whereas its products are agricultural tires, is similarly dubious.  That the term "valve for inner tube" refers to valves for *tire* inner tube is clear and supported by the record.  The Thai HS schedule provided by Petitioners on the record states that the product covered is "valve for inner tube."[205]  Xugong itself refers to the product as "inner tubes" in its section A response.[206]  Inner tubes are a tire specific product.  Furthermore, the Thai tariff schedule under the same subgrouping of HS numbers (8481.80) makes the fact that these are all "tire"-related valves more clear.[207]  Specifically, the English translation provided in the Thai HS schedule for 8481.80.13 and 8481.80.14 states that they are "valves for tubeless tyres (of copper/alloy and of other materials)", respectively, which mirrors the exact set-up of 8481.80.11 and 8481.80.12.[208] This corroborates that the 8481.80.11 category is specific to valves for *tire* inner tubes, which is the precise input being valued.  The value of these valves is being deducted from the U.S. price, as tubes are not subject to the *Order*.  Therefore, this Thai

---

[204] Xugong notes that a tire valve is a one-way valve keeping air pressure in a tire/tube and preventing return flow, which are the properties of a check valve, whereas Petitioners point out that the mechanism that allows for deflation means that a tire valve is not exclusively a one-way valve and thus a cannot truly be a check valve.  The present record is simply ambiguous and does not contain sufficient information on valve classification in the broad sense to resolve this question.  Regardless, the necessity of a finding on this question is both precluded by the existence of product-specific dataset on the record, but also unnecessary since this is <u>not</u> a specific argument raised for consideration by Xugong (*i.e.*, whether tire valves could be reasonably considered a type of check valve, rather Xugong's rebuttal forwards the above-refuted premise that a check valve and tire valve are one in the same).  Thus, the Department has not taken a position as to whether this would be an appropriate classification for a tire valve, generally.
[205] *Id.*
[206] *See* letter from Xugong, "Xuzhou Xugong Tyres Co., Ltd., ("Xugong") Section A Questionnaire Response for the Administrative Review of New Pneumatic Off-The Road Tires from the People's Republic of China," dated January 1, 2016 ("Xugong Sec. A"), at  Exhibit A-10(3).
[207] *Id.*
[208] *Id.*

Filed By: Amanda Mallott, Filed Date: 4/13/17 12:37 PM, Submission Status: Approved

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

HS category represents the best available information to provide a surrogate value because it is specific to the tubes, not the type of tire produced. The inputs in question are valves for tire inner tubes (specifically for an OTR tire, which includes agricultural tires) and thus the SV in question is precise to the input and Xugong's contention is incorrect.

For the foregoing reasons, we find that import information for Thai imports of merchandise categorized under HS 8481.80.11 represents the best available information on record to value tire valve inputs. Accordingly, we have corrected our inadvertent error from the *Preliminary Results* and used this information to value Xugong's relevant FOPs for the final determination.[209]

## Comment 7: Warehousing Expense Calculation for Xugong

Petitioners' Comments
- Xugong did not report the unit cost of warehousing expenses incurred in the United States for CEP sales, arguing that it was not required to because its U.S. distribution warehouse was at "the same address as the distribution facility that made the sales."[210]
- Under 19 CFR 351.401(e)(2), because Xugong's U.S. warehouse was not the original factory where Xugong's merchandise was produced, Xugong's U.S. warehousing expenses should be deducted from Xugong's CEP sales.[211]
- As Xugong declined to provide these warehousing costs, the Department should then only apply the warehousing cost deduction to retail out-of-warehouse CEP sales, as facts available. Petitioners provide two options for this facts available calculation, one based on Xugong's submissions, which they assert were incomplete for the task, and one based on GTC's experience. Both were calculated on a per-tire basis.[212]

Xugong's Rebuttal
- The Department's questionnaire instructions were entirely clear, that "the cost of warehousing reported in this field should include only expenses incurred at a warehouse not located at the distribution facility that sold the merchandise."[213] Xugong contends that the Department never asked for CEP warehousing expenses in either the initial or any supplemental questionnaire.
- Xugong included all relevant expenses in its calculation of indirect selling expenses ("ISEs"). As Petitioners note, Xugong reported costs for warehouse rent, and warehouse supplies, and Petitioners speculate that these amounts do not appear to include other warehousing related

---

[209] *See* Final SV Memo.
[210] Petitioners cite "Xuzhou Xugong Tyres Co., Ltd., ("Xugong") Section C Questionnaire Response for the Administrative Review of New Pneumatic Off-The- Road Tires from People's Republic of China," dated February 5, 2016 ("Xugong Sec C"), at 40.
[211] *See* Petitioners' Case Brief, at 12, citing *Certain Frozen Warmwater Shrimp From Thailand*, 73 FR 50933 (August 29, 2008) and accompanying IDM, ("*Frozen Warmwater Shrimp from Thailand 06-07*"), at Comment 2.
[212] *Id.*, at 12-13, citing Xugong Sec C, at 3; letter from Xugong, "Xuzhou Xugong Tyres Co., Ltd., ("Xugong") Supplemental Section C Questionnaire Response for the Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of China," dated August 29, 2016 ("Xugong Supp Sec C"), at 2.
[213] *Id.*, at 4, citing letter from the Department, "2014-2015 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Questionnaire," dated December 16, 2015 ("Initial Questionnaire"), at C-15.

costs, such as labor.  However, Petitioners ignore the fact that payroll expenses and utilities are also included in the total amount of indirect selling expenses taken directly from the profit and loss statement of Armour Tires Inc. ("ATI") (Xugong's U.S. affiliate) for the period of review.  Xugong argues there is no evidence that any expenses related to the warehousing of Xugong's tires at ATI  have not been accounted for in ATI's ISE calculation.[214]

- Even if the Department were to make any adjustment to Xugong's data, Petitioner's proposal to rely on GTC's experience is entirely inappropriate:  GTC's business practices are irrelevant to Xugong's business practices.  Xugong maintains that no "facts available" determination is appropriate, because all relevant information is on the record and accounted for.

- Finally, Petitioners' suggested calculations lead to a determination of a value on a per-tire basis, while Xugong's reporting basis, and the Department's calculation basis, are both on a per-kilogram basis.  Xugong notes that if the Department were to make any calculation for a specific "U.S. Warehousing" expense, then the Department must be sure to exclude warehousing costs from Xugong's indirect selling expense calculation, in order to ensure that such expenses are not double-counted.

**Department's Position:** In the final results, we have determined that Xugong's U.S. warehouse expenses should be separated from its indirect selling expenses and deducted from Xugong's retail (out of warehouse) CEP sales on a per-tire basis, based on the facts available in Xugong's submissions.  We agree with Petitioners that under Department practice, as defined in 19 CFR 351.401(e)(2) and clarified by *Frozen Warmwater Shrimp from Thailand 06-07*, Xugong's U.S. warehousing costs are incurred after the subject merchandise or foreign like product leaves the original place of shipment, and therefore should be deducted as movement expenses.[215]  The place of production and original shipment point for the merchandise in Xugong's CEP sales was in China; therefore all warehousing expenses after this point should be deducted from the U.S. price for Xugong's out of warehouse ("wholesale" or "retail") CEP sales (reported as "Channel 3" sales).[216]  Under section 776(a)(1) of the Act, the Department can use facts otherwise available on the record if the necessary information to make the proper determination is not available on the record.  Xugong did not report specific U.S. warehouse expenses for CEP sales to the Department, but, as described below, did provide the necessary information throughout its responses to determine this expense.  To accomplish this, we calculated a per-tire expense based on facts available in Xugong's submissions.

The record shows that Xugong included its U.S. warehousing expenses in its unit cost of its ISE ratio, which is based on total sales.[217]  Because (1) Xugong's ISE ratio calculation is based on total sales, (2) under section 772(c)(2)(A) of the Act, U.S. warehouses expenses are deducted from CEP sales as "additional… expenses… incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery {Xugong's U.S. Warehouse} in the United States," and (3)  its warehousing expenses are only incurred on "wholesale" or "retail" sales made out of the warehouse, we find the Xugong's warehouse

---

[214] *Id.*, at 4-5, citing Xugong Sec C, at Exhibit C-14.
[215] *See* Petitioners' Case Brief at 12, citing *Frozen Warmwater Shrimp from Thailand 06-07* and accompanying IDM, at Comment 2.
[216] *See* Xugong Supp Sec C, at 2.
[217] *See* Xugong Sec C, at Exhibit C-14(2).

expenses as reported as a part of the ISE ratio are understated.  To remedy this understatement, using record information, we calculated a unit cost per-tire for warehousing expenses and applied it to those sales Xugong reported as incurring a warehouse expense.  As Xugong did not provide the specific warehousing expense necessary for the calculation on the record, under section 776(a)(1) of the Act, using facts available, we identified the warehousing expenses included in Xugong's ISE ratio calculation[218] and divided these costs by the maximum number of tires that incurred U.S. warehousing expenses.[219]  We then applied this warehouse cost as a sales adjustment to Xugong's Channel 3 sales.[220]

In addition, because it is our practice[221] to exclude from a company's ISE sales adjustment any expense accounted for elsewhere in the margin program, we removed the warehousing costs used in the above calculation from the numerator in the ISE ratio calculation and applied the revised ISE ratio to Xugong's net sales price (*i.e.*, gross unit price less sales adjustments).  We then replaced Xugong's reported ISE sales adjustment with the revised ISE unit cost in the margin program for Xugong.

## Comment 8: Whether to Adjust Xugong's U.S. Prices for Irrecoverable Value Added Tax

<u>Xugong's Comments</u>
- The Department should not reduce Xugong's reported U.S. prices for un-refunded VAT because the only VAT liability Xugong incurred for its U.S. sales was for the VAT paid for purchases of material inputs, which is paid regardless of whether the transaction is a domestic or export sale.  If the Department continues to make a deduction for VAT, it should rely on Xugong's reported VAT because it represents Xugong's actual nonrefundable input VAT.
- The Department misunderstands the exact calculation methodology for determining irrecoverable VAT.  It mistakes the basis of an interim calculation for the final calculation.  The PRC VAT regulations base VAT refund on the ratio of the export VAT {refund} rate (nine percent) divided by the VAT rate paid on inputs (17 percent).
- The Department's VAT calculation (*i.e.*, input VAT of 17 percent minus the refund rate of nine percent) does not consider the nature of a value-added tax system because, in addition to the material inputs, the value-added portion of the tax also includes labor, energy, and technical expertise; thus, the resulting eight percent un-refunded portion, as calculated by the Department, overstates the actual liability incurred by Xugong on exports and is a mathematical impossibility.
- If the Department continues to calculate a VAT adjustment, for Xugong's CEP sales, the Department should use Xugong's free-on-board ("FOB") export price as the base price, not its gross unit price ("GUP"), consistent with practice.[222]  Xugong provided an alternative

---

[218] *Id.*
[219] For a complete description of the calculation and the factors used in the calculation, *see* Xugong's Final Analysis Memo.
[220] *Id.*
[221] *See* 19 CFR 351.401(b)(2).
[222] *See* Xugong's Case Brief, at 9 (citing *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014–2015,* 81 FR 62088 (September 8, 2016) and accompanying IDM, ("*Activated Carbon 14-15*"), at 9).

calculation for its VAT adjustment, which calculates an FOB export price by dividing its reported VAT by Xugong's effective VAT rate.
- The Department does not have the legal authority, nor does it have a legal basis, to make deductions to U.S. price for nonrefundable VAT[223] because it is not an export tax or charge imposed by the exporting country on the subject merchandise shipped to the United States.[224]
- PRC regulations state that, "for taxpayers that export goods the tax rate shall be zero;" thus, Xugong's exports are exempt from the payment of VAT.[225]

## Qingdao FTZ's Comments
- The Department should recalculate Xugong's reported U.S. prices without any VAT deduction to U.S. price.
- There is no support for any assumption that VAT is included in Xugong's export price because the record plainly shows that the VAT rate for PRC export sales is zero.[226] Thus, the Department had no lawful basis to make its adjustment.
- The Department's methodology for computing a VAT deduction based upon the VAT rate, rather than the VAT amount, must be reconsidered.[227]
- The Department does not have the legal authority to make deductions to U.S. price because it is not an export tax or charge imposed by the exporting country on the subject merchandise to the United States.[228]

## Petitioners' Rebuttal
- The Department has rejected the claim that it lacks the authority to adjust for irrecoverable VAT imposed by a NME government.[229]
- Additionally, the Department has established that its practice is to reject firm-wide allocations of VAT across all company sales, such as the firm-wide VAT calculation that Xugong provided in its questionnaire response.

---

[223] *Id.*, at 1-3 (citing *Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, in Certain Non-Market Economy Antidumping Proceedings*, 77 FR 36481, 36482 (June 19, 2012) ("*Methodological Change*"), *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 842 (1984), *Wind Tower Trade Coalition v. United States,* 741 F.3d 89, 97 (CAFC 2014) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 842 (1984)), and *Dorbest Ltd. v. United States,* 604 F.3d 1363, 1371 (CAFC 2010)).

[224] *Id.*, at 1 (citing section 772(c)(2)(B) of the Act).

[225] *Id.*, at 3 (citing Interim Regulations of the People's Republic of China on Value-Added Tax (Rev. 2008)).

[226] *See* Qingdao FTZ's Case Brief, at 4 (citing to Interim Regulations of the People's Republic of China on Value-Added Tax (2008), at Article 2(1)(c) "the tax rate for taxpayers exporting goods shall by 0%").

[227] *Id.*, at 10 (citing to *Fine Furniture (Shanghai), Ltd. V. United States*, 2016 CIT Slip-Op 16-85, 11-15 (CIT Sept. 9, 2016), *Federal Mogul v. United States*, 63 F.3d 1572 (Fed. Cir 1995) (supporting Commerce's use of the VAT amount paid rather than the VAT rate to preserve tax neutrality); *see E. I. DuPont De Nemours & Co. v. United States*, 20 C.I.T. 373, 381 (1996) (remanding the case so Commerce can apply a VAT adjustment based upon the amount of VAT paid rather than the applicable VAT rate)).

[228] *Id.*, at 9 (citing section 772(c)(2)(B) of the Act).

[229] *See* Petitioners' Rebuttal Brief, at 28 (citing *OTR Tires 13-14* and accompanying IDM, at Comment 3). (Whether to Adjust Xugong's U.S. Prices for Irrecoverable VAT).

Filed By: Amanda Mallott, Filed Date: 4/19/17 12:37 PM, Submission Status: Approved

- Xugong has failed to provide reliable FOB values for its CEP sales.  Thus, the Department should follow its precedent in *Carbon 14-15*[230] and apply the eight percent irrecoverable VAT rate to a calculated customs FOB value (*i.e.*, ex-factory net U.S. price plus foreign movement expense) for Xugong's CEP sales.

**Department's Position:**  For the reasons explained below, we continue to reduce Xugong's U.S. sales prices by eight percent, which is the percentage of irrecoverable VAT.[231]  In addition, for Xugong's CEP sales, we have used its entered value as the FOB value of Xugong's exported goods.  For its export price ("EP") sales, we have continued to use its reported GUP.

In 2012, we announced a change of methodology with respect to the calculation of the EP or CEP to include an adjustment of any unrefunded (irrecoverable) VAT in certain NME countries, in accordance with section 772(c)(2)(B) of the Act.[232]  In this announcement, the Department stated that, when a NME government has imposed an export tax, duty, or other charge on subject merchandise or on inputs used to produce subject merchandise from which the respondent was not exempted, the Department will reduce the respondent's EP or CEP, accordingly, by the amount of the tax, duty or charge paid, but not rebated.[233]

In a typical VAT system, companies do not incur any VAT expense for exports.  Rather, upon export, they receive a full rebate of the VAT paid on inputs used in the production of exports ("input VAT"), and, in the case of domestic sales, the company can credit the VAT they paid on input purchases for those sales against the VAT they collect from customers.[234]  That stands in contrast to the PRC's VAT regime, where some portion of the input VAT that a company pays on inputs used in the production of exports is not refunded.[235]  This unrefunded amount differs from the amount refunded on domestic sales, and thus amount to a tax, duty, or other charge imposed on exports that is not imposed on domestic sales.  Where the irrecoverable VAT is a fixed percentage of U.S. price, the Department explained that the final step in arriving at a tax-neutral dumping comparison is to reduce the U.S. price downward by this same percentage.[236]

Section 772(c)(2)(B) of the Act authorizes the Department to deduct from EP or CEP the amount, if included in the price, of any "export tax, duty, or other charge imposed by the exporting country on the exportation" of the subject merchandise.  Although Xugong argues that it pays no VAT tax upon export, it misstates what is at issue.  The issue is the *irrecoverable*

---

[230] *Id.*, at 33-35 (Citing *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 62088 (September 8, 2016) and accompanying IDM, at Comment 1 ("*Activated Carbons Review 14-15*").

[231] *See* Xugong Sec C, at 57-59.

[232] *See Methodological Change*, 77 FR 36481.

[233] *Id.*, 77 FR at 36483; *see also Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 4875 (January 30, 2014) and accompanying IDM, at Comment 5.

[234] *See, e.g.*, *Diamond Sawblades 11-12*, and accompanying IDM, at Comment 6; *Methodological Change*, 77 FR at 36483.

[235] *See* Xugong's February 4, 2016, Initial Section C Response, at 54-57 and Exhibit C-20; *see also Methodological Change*, 77 FR at 36483.

[236] *See Methodological Change*, 77 FR at 36483.

VAT.[237]  Irrecoverable VAT, as defined in PRC law, is a net VAT burden that arises solely from, and is specific to, exports.[238]  It is VAT paid on inputs and raw materials used in the production of exports that is non-refundable and, therefore, a cost.[239]  Irrecoverable VAT is, therefore, an "export tax, duty, or other charge imposed" on exports of the subject merchandise to the United States.  The statute does not define the terms "export tax, duty, or other charge imposed" on the exportation of subject merchandise.  We find it reasonable to interpret these terms as encompassing irrecoverable VAT because the irrecoverable VAT is a cost that arises as the result of export sales.  It is set forth in PRC law and, therefore, can be considered to be "imposed" by the exporting country on the exportation of subject merchandise.  Furthermore, an adjustment for irrecoverable VAT achieves what is called for under section 772(c)(2)(B) of the Act, as it reduces the gross U.S. price charged to the customer to a net price received.  This deduction is consistent with our longstanding policy, which is consistent with the intent of the statute, *i.e.*, that dumping margin calculations be tax neutral.[240]

Our methodology, as applied in this review, consists of performing two basic steps: (1) determining the irrecoverable VAT tax on subject merchandise, and (2) reducing U.S. price by the amount determined in step one.  Information placed on the record of this review indicates that, according to the PRC VAT schedule, the standard VAT levy on the subject merchandise is seventeen percent and the VAT rebate rate for the subject merchandise is nine percent.[241]  Therefore, for the final results, we removed an amount calculated based on the difference between these rates (*i.e.*, eight percent) applied to the export sales value from the calculated U.S. price, consistent with the definition of irrecoverable VAT under the PRC's tax laws and regulations.[242]

Irrecoverable VAT is (1) the free-on-board value of the exported good, applied to the difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to exported goods.[243]  The first variable, export value, is unique to each respondent and sale, while the rates in (2) and (3), as well as the formula for determining irrecoverable VAT, are each explicitly set forth in Chinese law and regulations.[244]

The PRC's VAT regime is product-specific, with VAT schedules that vary by industry and even across products within the same industry.  These are product-specific export taxes, duties, or other charges that are incurred on the exportation of subject merchandise.  Contrary to the PRC's VAT schedules, Xugong argues that we should rely on its reported VAT adjustment based on its

[237] Xugong's incurrence of irrecoverable VAT is evident from the record.  *See, e.g.*, Xugong Sec C, at 56-57 and Exhibit C-20(1).

[238] *See Small Diameter Graphite Electrodes from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 57508 (September 25, 2014) ("*SDGE from the PRC 12-13*") and accompanying IDM at Comment 7.

[239] *Id.*

[240] *See Methodological Change*, 77 FR at 36483; *see also Antidumping Duties; Countervailing Duties*, 62 FR 27296, 27369 (May 19, 1997).

[241] *See* Xugong Sec C, at 57-59.

[242] *See, e.g., Final Determination of Sales at Less Than Fair Value: Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China*, 79 FR 25572 (May 5, 2014), and accompanying IDM at Comment 1.

[243] *Id.*, at Comment 1, n. 35.

[244] *Id.*, at Comment 1, n. 36.

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

own unrefunded VAT calculation. Xugong's unrefunded VAT calculation is based on all company sales and/or across sales of different products with different VAT schedules.[245] In the *Preliminary Results*, we did not rely on Xugong's reported VAT adjustment because it is not product-specific, but rather reflects all company sales and/or sales across different products with different VAT schedules.[246] Instead, we followed our standard practice and calculated the VAT adjustment using the difference between the VAT rate paid on inputs (17 percent) and the export VAT refund rate (nine percent), consistent with PRC regulations.[247] This determination was bolstered by the fact that Xugong could not demonstrate that this methodology does not apply to its sales of subject merchandise.[248]

For the final results, we have continued to reduce Xugong's U.S. sales prices by eight percent, which is the percentage of irrecoverable VAT. The Department's regulations at 19 CFR 351.401(c) require that we rely on price adjustments (*e.g.* unrefunded VAT taxes) that are "reasonably attributable to the subject merchandise." Thus, our analysis is consistent with the regulations, our current VAT policy, and our treatment of irrecoverable VAT in recently-completed NME cases.[249]

Our initial questionnaire to Xugong instructed Xugong: (1) to explain in detail if the irrecoverable VAT amount reported is not directly derived as the difference between the VAT tax rate applicable to domestic purchases and inputs and the refund rate for export sales of subject merchandise; (2) to provide worksheets demonstrating how to calculate the irrecoverable VAT; (3) to reconcile the worksheets to the translated VAT tax returns provided and provide a detailed narrative explanation that describes the calculations shown in the worksheets; and (4) for each reconciling item reported in the worksheets, to provide documentation and a citation to the PRC laws and regulations to fully support the reason for the reconciling item.[250] However, Xugong did not provide this information, and the limited information it did provide would result in an adjustment to irrecoverable VAT based on non-product-specific data. Further, Xugong did not claim or offer any evidence that it was rebated input VAT at more than the standard nine percent on their export sales.[251] With respect to Xugong's assertion that it provided the exact type of reconciliation to its VAT tax returns that the Department requested in its VAT questionnaire, we note that our request was for parties to reconcile the amount of irrecoverable VAT reported to its VAT tax returns. Xugong only reconciled the input and output VAT to its tax returns and, as such, did not provide the reconciliation requested.[252]

---

[245] *See* Xugong Sec C, at Exhibits C-20(1) and C-20(2).

[246] *See* PDM, at 24.

[247] *See, e.g.*, *Diamond Sawblades 11-12* and accompanying IDM, at Comment 6; *see also*, *Steel Wire Garment Hangers From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2013-2014*, 80 FR 69942 (November 12, 2015) and accompanying IDM, at Comment 3.

[248] *See* Xugong Sec C, at 57-59.

[249] *Id*.; see also *Diamond Sawblades 11-12* IDM at Comment 5A.

[250] *See* the Department's letter to Xugong, "2014-2015 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Questionnaire," dated December 15, 2015, at C-33.

[251] *See* Xugong Sec C, at Exhibit C-20(1).

[252] *See* Xugong Sec C, at Exhibit C-20.

Filed By: Amanda Mallott, Filed Date: 4/19/17 12:37 PM, Submission Status: Approved

Barcode:3562807-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

Xugong's proposal to calculate a "net" or "effective" company-wide VAT position[253] significantly reduces the impact of this product-specific tax by spreading it across products with potentially different VAT schedules and across domestic sales. The Department's deduction of product-specific irrecoverable VAT from the price of the subject merchandise is a more reasonable and accurate methodology because the export tax, duty, or other charge is a product-specific expense that is directly linked with the exportation of the subject merchandise. Xugong's methodology, in contrast, effectively ignores this direct link and dilutes the product-specific tax effect as previously explained. Additionally, Xugong's proposed methodology is distorted by timing differences that occur between the VAT-in value, the VAT-out value, and the receipt of the VAT refund, as well as the varying rebate rates on subject and non-subject merchandise.[254] Therefore, employing such a methodology would introduce distortion into the dumping margin calculation and obfuscate the true "apples-to-apples" comparison of U.S. price with normal value on a product-specific, tax-exclusive basis.

We disagree with Xugong's and Qingdao FTZ's claim that we do not have the statutory authority to adjust for irrecoverable VAT, and that our methodology unlawfully interprets section 772(c)(2)(B) of the Act. As stated above, section 772(c)(2)(B) of the Act authorizes the Department to deduct from EP or CEP the amount, if included in the price, of any "export tax, duty, or other charge imposed by the exporting country on the exportation" of the subject merchandise. Moreover, in *Fushun Jinly*,[255] the Court disagreed that the primary purpose of the Act's NME methodology provisions is necessarily to disregard prices and costs incurred in the production and sale of the subject merchandise that were incurred in the NME country.[256] In addition, the Court observed that, although NMEs are specifically addressed in the Act's normal value provisions,[257] NMEs are not named in the Act's U.S. price provisions.[258] Furthermore, "with regard to U.S. price, neither the governing statute nor its legislative history defines 'export tax, duty or other charge imposed' for the purpose of adjusting U.S. price."[259] The Court continued:

> Commerce reconsidered its interpretation and concluded that "export tax, duty or other charge imposed" includes VAT that is not fully refunded upon exportation…Such a methodological update, achieved through notice and comment, compels *Chevron* deference. On this issue, the plaintiffs do not persuade that deduction of the portion of the PRC's VAT that was unrefunded or irrecoverable upon export of their subject merchandise to the United States was contrary to law and not supported by substantial evidence.[260]

---

[253] *See, e.g.*, Xugong Sec C, at 54-57 and Exhibit C-20.

[254] *Id.* Specifically, Xugong reports its VAT refunds across all merchandise sold, and does not specify what applies to subject merchandise by input or final product.

[255] *See Fushun Jinly Petrochemical Carbon Co., Ltd. v. United States*, Slip Op. 16-25, Ct. No. 14-00287 (CIT 2016) ("*Fushun Jinly*").

[256] *Id.*, at 24.

[257] *Id.*, at 25 (citing section 773(c)(1)(B) of the Act).

[258] *Id.* (citations omitted).

[259] *Id.*

[260] *Id.*

Therefore, as explained above, to the extent that the amount of VAT paid on inputs used to produce OTR tires is not refunded upon exportation of the finished product, section 772(c)(2)(B) supports our adjustment for irrecoverable VAT. Additionally, the term "imposed," as used in the Act, does not require a positive action, nor does the PRC's status as an NME preclude the Department from making irrecoverable VAT adjustments.

We disagree with Xugong's argument that the Department misunderstands the exact calculation methodology for determining irrecoverable VAT by mistaking the basis of an interim calculation for the final calculation. Without citing to any relevant PRC tax law, Xugong argues that the PRC VAT regulations base VAT refund on the ratio of the export VAT {refund} rate (nine percent) divided by the VAT rate paid on inputs (17 percent). Moreover, the record does not support Xugong's argument that a different formula or basis should be used for determining unrefunded (irrecoverable) VAT. As such, Xugong's assertion that the Department's calculations are mathematically incorrect are based on the unsupported claim that there is an interim and final calculation for determining the PRC's VAT refund amount. Therefore, the Department finds that Xugong's second alternative calculation is without merit and will not be considered for the final results. Rather, we find that the mathematical formula used (eight percent * FOB export price) is arithmetically accurate and is consistent with the PRC tax law.

Finally, we agree with Xugong that its GUP for its CEP sales does not represent an FOB export price and find that its entered value better represents this price. In the *Preliminary Results*, we used Xugong's GUP as the FOB export price for calculating its VAT adjustment. Xugong requests that the Department use the FOB price rather than GUP for its CEP sales, stating that its FOB export price was the basis for its reported VAT adjustment amount. To do so, Xugong suggests FOB export price be calculated by dividing its reported VAT amount for each transaction by its reported net VAT rate. However, the record does not show Xugong used either the reported FOB price or this proposed calculation for reporting its VAT adjustment in its U.S. sales database. Thus, it is not necessary to consider Xugong's alternate FOB price calculation in our analysis for Xugong's VAT adjustment; instead we will rely on the reported entered value. In addition, when reliable FOB prices have not been reported by respondents, it is the Department's practice to use entered values as the base when calculating irrecoverable VAT for CEP sales.[261] For this reason, we find that Xugong's reported entered value is the best base price for calculating Xugong's VAT adjustment. Accordingly, we have used Xugong's entered value to calculate the VAT adjustment for its CEP sales and we have continued to use GUP for its EP sales.

**Comment 9: Additional Comments Raised by GTC**

GTC requests that, if the Department determines GTC eligible for a separate rate and calculates a margin based on its own information submitted on the record of this review, we use the following surrogate values to value GTC's reported factors of production:

---

[261] *See Activated Carbon 14-15* and accompanying IDM, at 9.

- The price of Standard Thai Rubber ("STR") 20 grade natural rubber to value GTC's compound rubber.[262]
- Financial statements submitted from Goodyear Tires, SR Tyres, Thai Sin Rubber, Otani Tires, and Vee Rubber to calculate GTC's surrogate financial ratios.[263]
- The Chumhol price quote submitted by GTC, rather than the Thai Airlines cargo warehousing rates, to value GTC's warehousing charges.[264]
- Apply the Thai National Statistics Office ("NSO") 2012 Business and Industrial Census industry-specific code 20299 labor cost data, instead of the Thai NSO October 2014-September 2015 general manufacturing data, to value labor.[265]

**Department's Position:** As we continue to find GTC ineligible for a separate rate, we note that certain issues raised by GTC are moot, and we therefore decline to address comments with respect to the valuation of GTC's individual factors of production.

## VII.    RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the above positions. If this recommendation is accepted, we will publish the final results of the review and the final weighted-average dumping margins in the *Federal Register*.

☒                              ☐

_____          _____

Agree                         Disagree

4/12/2017

X  *Ronald K. Lorentzen*

Signed by: RONALD LORENTZEN

_____

Ronald K. Lorentzen
Acting Assistant Secretary
  for Enforcement and Compliance

---

[262] *See* GTC's Case Brief, at 35.
[263] *Id.*, at 40.
[264] *Id.*, at 45.
[265] *Id.*

Please enter through the library, located on the corner of 15th St. and Pennsylvania Ave. NW., Washington, DC 20230. Please note that pre-clearance is required in order to make a statement during the public comment portion of the meeting. Please be sure to keep all comments to five minutes or less, and submit a brief statement summarizing your comment to Craig Buerstatte (see contact information below) no later than 11:59 p.m. ET on Friday, April 28, 2017.

**Teleconference**

*May 2, 2017*

   *Via WebEx: https://doclibrary-events.webex.com/doclibrary-events/onstage/g.php?MTID=e409cca3fd5c1f89 e11872defbf0b82d3*
   *Dial-In:* +1 650 479 3207.
   *Passcode:* 395 802 029.

*May 3, 2017*

   *Via WebEx: https://doclibrary-events.webex.com/doclibrary-events/onstage/g.php?MTID=ed1e75ff9e9a7b9 bf687494cb34088f35.*
   *Dial-In:* +1 650 479 3207.
   *Passcode:* 395 621 725.

**FOR FURTHER INFORMATION CONTACT:** Craig Buerstatte, Office of Innovation and Entrepreneurship, Room 78018, 1401 Constitution Avenue NW., Washington, DC 20230; email: *nacie@ doc.gov;* telephone: +1 202 482 8001; fax: +1 202 273 4781. Please reference "NACIE May 2017 Meeting" in the subject line of your correspondence.

**SUPPLEMENTARY INFORMATION:** NACIE, established by Section 25(c) of the Stevenson-Wydler Technology Innovation Act of 1980, as amended (15 U.S.C. 3720(c)), and managed by EDA's Office of Innovation and Entrepreneurship (OIE), is a Federal Advisory Committee Act (FACA) committee that provides advice directly to the Secretary of Commerce. NACIE's advice focuses on transformational policies and programs that aim to accelerate innovation and increase the rate at which research is translated into companies and jobs, including through entrepreneurship and the development of an increasingly skilled, globally competitive workforce. Comprised of successful entrepreneurs, innovators, angel investors, venture capitalists, and leaders from the nonprofit and academic sectors, NACIE has presented to the Secretary recommendations from throughout the research-to-jobs continuum regarding topics including improving access to capital, growing and connecting entrepreneurial ecosystems, increasing small business-driven research and development, and understanding the workforce of the future. In its advisory capacity, NACIE also serves as a vehicle for ongoing dialogue with the innovation, entrepreneurship, and workforce development communities.

   The final agenda for the meeting will be posted on the NACIE Web site at *http://www.eda.gov/oie/nacie/* prior to the meeting. Any member of the public may submit pertinent questions and comments concerning the NACIE's affairs at any time before or after the meeting. Comments may be submitted to the Office of Innovation and Entrepreneurship at the contact information below. Those unable to attend the meetings in person but wishing to listen to the proceedings can do so through a conference call line accessible via +1 650 479 3207 with passcode 395 802 029 on May 2, 2017, and +1 650 479 3207 with passcode 395 621 725 on May 3, 2017. Copies of the meeting minutes will be available by request within 90 days of the meeting date.

   Dated: April 17, 2017.

**Craig Buerstatte,**
*Acting Director, Office of Innovation and Entrepreneurship.*

[FR Doc. 2017–08084 Filed 4–20–17; 8:45 am]

**BILLING CODE 3510–WH–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

[A–570–912]

### Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014–2015

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce (Commerce).

**SUMMARY:** On October 14, 2016, the Department of Commerce ("Department") published the preliminary results of the seventh administrative review of the antidumping duty order on certain new pneumatic off-the-road tires ("OTR tires") from the People's Republic of China ("PRC") and provided to interested parties an opportunity to comment on these preliminary results. Based on our analysis of the comments received, we made certain changes in the margin calculation regarding one mandatory respondent, Xuzhou Xugong Tyres Co., Ltd. ("Xugong"). We also continue to find that the other mandatory respondent, Guizhou Tyre Co., Ltd. ("GTC"), is not eligible for separate rate status and, thus, is part of the PRC-wide entity. The final dumping margins for this review are listed in the "Final Results" section of this notice, below.

**DATES:** Effective April 21, 2017.

**FOR FURTHER INFORMATION CONTACT:** Amanda Mallott or Keith Haynes, AD/CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230; telephone (202) 482–6430 and (202) 482–5139, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

   On October 14, 2016, the Department published its *Preliminary Results* of the antidumping duty administrative review of OTR tires from the PRC.[1] In accordance with 19 CFR 351.309, we invited interested parties to comment on the preliminary results. On December 22, 2016, in accordance with section 751(a)(3)(A) of the Tariff Act of 1930, as amended ("the Act"), the Department extended the period for issuing the final results of this review by sixty-days, to April 12, 2017.[2]

   We received case briefs from Titan Tire Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO–CLC ("Petitioners"), the mandatory respondents Xuzhou Xugong Tyres Co., Ltd. ("Xugong")[3] and Guizhou Tyre Co.,

---

[1] *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2014–2015,* 81 FR 71068 (October 14, 2016) ("*Preliminary Results*") and accompanying "Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2014–2015," dated October 5, 2016 ("PDM").

[2] *See* Memorandum to Christian Marsh titled, Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Extension of Deadline for Final Results of Antidumping Duty Administrative Review; 2014–2015, dated December 22, 2016.

[3] The Department previously collapsed Xugong and its affiliates Xuzhou Armour Rubber Company Ltd. ("Armour") and Xuzhou Hanbang Tyre Co., Ltd. ("Hanbang") into a single entity; *see Certain New Pneumatic Off-The-Road Tires From The People's Republic Of China: Preliminary Results Of Antidumping Duty Administrative Review; 2013–2014,* 80 FR 61166, 61167 (October 9, 2015), unchanged in *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013–2014,* 81 FR 23272 (April 20, 2016). This decision is unchallenged in the instant review; thus, the Department continues to treat Xugong, Armour, and Hanbang as a single entity (collectively, "Xugong").

Barcode:3565076-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

**18734** **Federal Register** / Vol. 82, No. 76 / Friday, April 21, 2017 / Notices

Ltd. ("GTC"),[4] and separate rate applicants Aeolus Tyre Co., Ltd. ("Aeolus") and Qingdao Free Trade Zone Full-World International Trading Co., Ltd. ("Qingdao FTZ"). We received rebuttal briefs from Petitioners, Xugong, GTC, and separate rate applicants Zhongce Rubber Group Company Limited ("Zhongce") and Qingdao Jinhaoyang International Co., Ltd. ("Jinhaoyang"). On February 15, 2017, the Department held a public hearing at the request of interested parties. For a further discussion of the events that occurred in this investigation subsequent to the *Preliminary Results, see* the Issues and Decision Memorandum.[5]

**Scope of the Order**

The merchandise covered by this order includes new pneumatic tires designed for off-the-road and off-highway use, subject to certain exceptions. The subject merchandise is currently classifiable under Harmonized Tariff Schedule of the United States ("HTSUS") subheadings: 4011.20.10.25, 4011.20.10.35, 4011.20.50.30, 4011.20.50.50, 4011.61.00.00, 4011.62.00.00, 4011.63.00.00, 4011.69.00.00, 4011.92.00.00, 4011.93.40.00, 4011.93.80.00, 4011.94.40.00, and 4011.94.80.00. The HTSUS subheadings are provided for convenience and customs purposes only; the written product description of the scope of the order is dispositive. For a complete description of the scope of the order, *see* the Issues and Decision Memorandum.

**Analysis of Comments Received**

All issues raised in the case and rebuttal briefs filed by parties in this review are addressed in the Issues and Decision Memorandum, which is hereby adopted by this notice. A list of the

issues that parties raised and to which we responded in the Issues and Decision Memorandum is attached as Appendix I to this notice. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System ("ACCESS"). ACCESS is available to registered users at *http:// access.trade.gov* and it is available to all parties in the Central Records Unit, room B8024 of the main Department of Commerce building. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly on the Internet at *http:// enforcement.trade.gov/frn/index.html.* The signed Issues and Decision Memorandum and electronic version of the Issues and Decision Memorandum are identical in content.

**Final Determination of No Shipments**

As noted in the *Preliminary Results,* we received a no-shipment certification from Trelleborg Wheel Systems Hebei Co. ("TWS Hebei").[6] Consistent with its practice, the Department asked U.S. Customs and Border Protection ("CBP") to conduct a query on potential shipments made by TWS Hebei during the POR. CBP did not provide any evidence contradicting TWS Hebei's no-shipment claim.[7] No interested party provided comments on this issue. Thus, based on TWS Hebei's certification and our analysis of information received from CBP, we determine that TWS Hebei did not have any reviewable transactions during the POR.

**Separate Rates**

In the *Preliminary Results,* we determined that Shiyan Desizheng Industry & Trade Co., Ltd. ("Desizheng"), Sailun Jinyu Group Co., Ltd. ("Sailun"), Weifang Jintongda Tyre Co., Ltd. ("Jintongda"), Trelleborg Wheel Systems (Xingtai) China, Co. Ltd. ("TWS Xingtai"), Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei"), Zhongce, Qingdao Qihang Tyre Co. ("Qihang"), Jinhaoyang, and Qingdao FTZ are eligible for separate-rate status. We also preliminarily determined that Aeolus, Tianjin Leviathan International Trade Co., Ltd. ("Leviathan"), and GTC were not eligible for a separate rate, and are thus part of the PRC-wide entity.[8] We made no changes to these determinations for the final results. For

further discussion, *see* Issues and Decision Memorandum at Comment 1.

**Rate for Non-Individually-Examined Separate Rate Companies**

The statute and the Department's regulations do not address the establishment of a rate to be assigned to respondents not selected for individual examination when the Department limits its examination of companies subject to the administrative review pursuant to section 777A(c)(2)(B) of the Act. Generally, the Department looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate for respondents not individually examined in an administrative review. Section 735(c)(5)(A) of the Act articulates a preference for not calculating an all-others rate using rates which are zero, *de minimis,* or based entirely on facts available.[9] Accordingly, the Department's usual practice has been to determine the dumping margin for companies not individually examined by averaging the weighted-average dumping margins for the individually examined respondents, excluding rates that are zero, *de minimis,* or based entirely on facts available.[10] In this review, we have calculated a weighted-average dumping margin for Xugong that is above *de minimis* and not based entirely on facts available. Therefore, consistent with the Department's practice, we have assigned to Desizheng, Jinhaoyang, Jintongda, Sailun, Qingdao FTZ, Qihang, TWS Xingtai, Zhongwei, and Zhongce the weighted-average dumping margin calculated for Xugong as the separate rate for this review.

**Changes Since the Preliminary Results**

Based on an analysis of the comments received, we made certain calculation changes and revisions to the valuation of certain factors of production since the *Preliminary Results* with respect to Xugong's margin calculation, and have updated Xugong's margin accordingly. For further details on the changes made

---

[4] In the initial investigation, the Department collapsed GTC and Guizhou Tyre Import and Export Corporation ("GTCIE") into a single entity, *see Certain New Pneumatic Off-The-Road Tires From the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 73 FR 9278, 9283 (February 20, 2008), unchanged in *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 40485 (July 15, 2008). This decision is unchallenged in the instant review; thus, the Department continues to treat GTC and GTCIE as a single entity (collectively, "GTC").

[5] *See* Memorandum to Ronald K. Lorentzen, Acting Assistant Secretary for Enforcement and Compliance, "Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2014–2015," adopted by and dated concurrently with this notice ("Issues and Decision Memorandum").

[6] *See Preliminary Results,* 81 FR at 71068.

[7] *See* CBP Message Number 6207309, dated July 25, 2016.

[8] *See Preliminary Results,* 81 FR at 71069–70, and accompanying PDM at the "Separate Rates" section.

[9] *See Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews and Rescission of Reviews in Part,* 73 FR 52823, 52824 (September 11, 2008), and accompanying Issues and Decision Memorandum at Comment 16.

[10] *See, e.g., Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances: Certain Polyester Staple Fiber from the People's Republic of China,* 71 FR 77373, 77377 (December 26, 2006), unchanged in *Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances: Certain Polyester Staple Fiber from the People's Republic of China,* 72 FR 19690 (April 19, 2007).

Filed By: Amanda Mallott, Filed Date: 4/21/17 8:51 AM, Submission Status: Approved

Barcode:3565076-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15
**Federal Register** / Vol. 82, No. 76 / Friday, April 21, 2017 / Notices     **18735**

since the *Preliminary Results, see* the Issues and Decision Memorandum.[11]

In light of changes made since the *Preliminary Results* which altered Xugong's margin, we have updated the separate rate that was preliminarily

assigned to Desizheng, Jinhaoyang, Jintongda, Sailun, Qingdao FTZ, Qihang, TWS Xingtai, Zhongwei, and Zhongce to reflect Xugong's margin for the final results.

**Final Results**

As a result of this administrative review, we determine that the following weighted-average dumping margins exist for the period September 1, 2014, through August 31, 2015:

| Exporter | Weighted-average dumping margin (percent) |
|---|---|
| Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Company Ltd., or Xuzhou Hanbang Tyre Co., Ltd | 33.08 |
| Shiyan Desizheng Industry & Trade Co., Ltd | 33.08 |
| Qingdao Jinhaoyang International Co., Ltd | 33.08 |
| Sailun Jinyu Group Co., Ltd | 33.08 |
| Weifang Jintongda Tyre Co., Ltd | 33.08 |
| Zhongce Rubber Group Company Limited | 33.08 |
| Weihai Zhongwei Rubber Co., Ltd | 33.08 |
| Qingdao Qihang Tyre Co | 33.08 |
| Qingdao Free Trade Zone Full-World International Trading Co., Ltd | 33.08 |
| Trelleborg Wheel Systems (Xingtai) China, Co. Ltd | 33.08 |

Additionally, as in the *Preliminary Results,* the Department determines that Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Corporation, Aeolus Tyre Co., Ltd., and Tianjin Leviathan International Trade Co., Ltd., are part of the PRC-wide entity.

**Disclosure**

We intend to disclose the calculations performed regarding these final results within five days of the date of publication of this notice to parties in this proceeding, in accordance with 19 CFR 351.224(b).

**Assessment Rates**

The Department shall determine, and CBP shall assess, antidumping duties on all appropriate entries covered by this review pursuant to section 751(a)(2)(C) of the Act and 19 CFR 351.212(b)(1).[12] The Department intends to issue assessment instructions directly to CBP 15 days after the date of publication of these final results of administrative review.

For Xugong, the Department will calculate importer-specific assessment rates on the basis of the ratio of the total amount of dumping calculated for the importer's examined sales to the total entered value of sales, in accordance with 19 CFR 351.212(b)(1). For customers or importers of Xugong for which we do not have entered values, we calculated importer- (or customer-) specific antidumping duty assessment

amounts based on the ratio of the total amount of dumping duties calculated for the examined sales of subject merchandise to the total sales quantity of those same sales.[13] For customers or importers of Xugong for which we received entered-value information, we have calculated importer- (or customer-) specific antidumping duty assessment rates based on importer- (or customer-) specific *ad valorem* rates.[14] Where an importer- or (customer-) specific *ad valorem* rate is greater than *de minimis,* the Department will instruct CBP to collect the appropriate duties at the time of liquidation.[15] For the non-examined separate rate companies, we will instruct CBP to liquidate all appropriate entries at 33.08 percent. For those entities that are subject to this review that the Department has determined are part of the PRC-wide entity (*i.e.,* GTC and GTCIE, Aeolus Tyre Co., Ltd., and Tianjin Leviathan International Trade Co., Ltd.), we will instruct CBP to liquidate all appropriate entries at the PRC-wide rate of 105.31 percent.[16] Pursuant to a refinement in the Department's non-market economy ("NME") practice, for entries that were not reported in the U.S. sales databases submitted by companies individually examined during this review, the Department will instruct CBP to liquidate such entries at the PRC-wide rate.[17] In addition, if the Department determines that an exporter under review had no shipments of subject

merchandise, any suspended entries that entered under that exporter's case number (*i.e.,* at that exporter's rate) will be liquidated at the PRC-wide rate.

**Cash Deposit Requirements**

The following cash deposit requirements will be effective for all shipments of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date of the final results of this administrative review, as provided by section 751(a)(2)(C) of the Act: (1) For the exporters listed above, the cash deposit rate will be equal to the weighted-average dumping margin identified in the "Final Results" section of this notice, above; (2) for previously investigated or reviewed PRC and non-PRC exporters that are not under review in this segment of the proceeding but that received a separate rate in a previous segment, the cash deposit rate will continue to be the exporter-specific rate (or exporter-producer chain rate) published for the most recently completed segment of this proceeding in which the exporter was reviewed; (3) for all PRC exporters of subject merchandise which have not been found to be entitled to a separate rate, the cash deposit rate will be the PRC-wide rate of 105.31 percent; and (4) for all non-PRC exporters of subject merchandise which have not received their own rate, the cash deposit rate will be the rate applicable to the PRC

[11] *See also* Memorandum to the File, "Final Results of the 2014–2015 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic off-The-Road Tires from the People's Republic of China: Surrogate Value Memorandum," dated concurrently with this notice; and Memorandum to the File, "2014–2015 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis

of the Final Results Margin Calculation for Xuzhou Xugong Tyres Co., Ltd.," dated concurrently with this notice.

[12] *See Antidumping Proceeding: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification,* 77 FR 8103 (February 14, 2012) ("*NME Antidumping Proceedings*").

[13] *See* 19 CFR 351.212(b)(1).

[14] *Id.*

[15] *See* 19 CFR 351.212(b)(1).

[16] The PRC-wide rate was determined in *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012–2013,* 80 FR 20197 (April 15, 2015).

[17] *See Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties,* 76 FR 65694 (October 24, 2011).

Barcode:3565076-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

**18736** **Federal Register** / Vol. 82, No. 76 / Friday, April 21, 2017 / Notices

exporter(s) that supplied that non-PRC exporter. These cash deposit requirements, when imposed, shall remain in effect until further notice.

**Notification to Importers**

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping and/or countervailing duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Secretary's presumption that reimbursement of the antidumping and/or countervailing duties occurred and the subsequent assessment of double antidumping duties.

**Administrative Protective Order**

This notice also serves as a reminder to parties subject to administrative protective order ("APO") of their responsibility concerning the return or destruction of proprietary information disclosed under the APO in accordance with 19 CFR 351.305(a)(3), which continues to govern business proprietary information in this segment of the proceeding. Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

We are issuing and publishing these final results of administrative review in accordance with sections 751(a)(1) and 777(i) of the Act.

Dated: April 12, 2017.

**Ronald K. Lorentzen,**

*Acting Assistant Secretary for Enforcement and Compliance.*

**Appendix**

Issues and Decision Memorandum

I. Summary
II. Background
III. Scope of the Order
IV. Changes since the *Preliminary Results*
V. List of Comments
VI. Discussion of the Issues
 Comment 1: Separate Rates
  A. Whether to Grant Aeolus a Separate Rate
  B. Whether to Grant GTC a Separate Rate
  C. Whether to Grant Jinhaoyang a Separate Rate
  D. Whether to Grant Zhongce a Separate Rate
 Comment 2: Calculation of the Cost of Tube and Flap Inputs for Xugong
 Comment 3: Surrogate Value for Smoked Sheet Natural Rubber
 Comment 4: Surrogate Value for Inland Truck Freight
 Comment 5: Surrogate Value for Carbon Black
 Comment 6: Surrogate Value for Tire Valves
 Comment 7: Warehousing Expense Calculation for Xugong
 Comment 8: Whether to Adjust Xugong's U.S. Prices for Irrecoverable Value Added Tax
 Comment 9: Additional Comments Raised by GTC
VII. Recommendation

[FR Doc. 2017–08011 Filed 4–20–17; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**National Institute of Standards and Technology**

**Impact of Long Term Evolution Signals on Global Positioning System Receivers**

**AGENCY:** National Institute of Standards and Technology, Department of Commerce.

**ACTION:** Notice of public meeting.

---

**SUMMARY:** The National Institute of Standards and Technology (NIST) announces that National Advanced Spectrum and Communications Test Network (NASCTN) will hold a public meeting on May 4, 2017 to inform the public about the NASCTN project "Impact of Long Term Evolution (LTE) signals on Global Positioning System (GPS) Devices". At this meeting, the public will learn about this project, as described in the report released to the public on February 15, 2017, available at: *http://nvlpubs.nist.gov/nistpubs/TechnicalNotes/NIST.TN.1952.pdf.* A summary of NASCTN's test methodology and an overview of the test results will be provided as well.

**DATES:** The meeting will be held on Thursday, May 4, 2017, from 9:00 a.m. to 12:00 p.m. Eastern Time. To attend the meeting in person you must register in advance by 5:00 p.m. Eastern Time on Tuesday, May 2, 2017. In order to access the WebEx you must register in advance by 5:00 p.m. Eastern Time on Wednesday, May 3, 2017. For instructions on how to register to participate in the meeting, please see the **SUPPLEMENTARY INFORMATION** section of this notice.

**ADDRESSES:** The meeting will be held at MITRE Campus, Building 1, 7525 Colshire Drive, McLean VA, 22102. Directions to the MITRE McLean Campus are available at: *https://www.mitre.org/sites/default/files/pdf/mclean-campus-map.pdf.* The meeting will also be accessible via WebEx.

**FOR FURTHER INFORMATION CONTACT:** For questions about this public meeting contact: Dr. Sheryl Genco,

Communications Technology Laboratory, NIST by email at *sheryl.genco@nist.gov;* telephone (303–497–3591) or fax (303–497–6665). Please direct media inquiries to the NIST Public Affairs Officer, Laura Ost by email at *laura.ost@nist.gov* or telephone (303–497–4880).

**SUPPLEMENTARY INFORMATION:** NASCTN provides a neutral forum for addressing spectrum-sharing challenges to accelerate the deployment of wireless technologies among commercial and federal users. NASCTN was created in 2015 and is a joint effort among NIST, the National Telecommunications and Information Administration, and the United States Department of Defense. NASCTN's mission is to provide robust test processes and validated measurement data necessary to develop, evaluate and deploy spectrum sharing technologies that can increase access to the spectrum by both Federal agencies and non-federal spectrum users. NASCTN conducts projects with private sector entities via Cooperative Research and Development Agreements (CRADA).[1] NASCTN has completed the "Impacts of LTE Signals on GPS Receivers" project and released the NASCTN report "LTE Impacts on GPS" on February 15, 2017. The report describes the project, the test methodology and the test results and is available at: *http://nvlpubs.nist.gov/nistpubs/TechnicalNotes/NIST.TN.1952.pdf.*

The focus of this NASCTN project, proposed by Ligado Networks in 2016 and conducted under a CRADA between NIST and Ligado Networks, was the development of a test methodology to: (1) Investigate the impact of LTE signals on GPS devices that operate in the GPS L1 frequency band; and (2) perform radiated radio-frequency measurements on a representative set of GPS devices to validate the test methodology.

At the start of the project, NASCTN convened a panel of technical experts to develop a test plan with the following objectives: Develop a test plan that is transparent, reproducible, and well-calibrated; develop sound, statistically-valid data retrieval and processing techniques; provide a clear path from measurement setup, to data collection, to processed results; and provide data to inform discussions between different interested parties on proper measurement requirements. The goal

---

[1] A CRADA is the principal mechanism used by Federal laboratories to engage in collaborative efforts with non-Federal entities and allow the exchange of resources with private industry to advance technologies that can then be commercialized for the benefit of the public and the U.S. economy.

27224

Barcode:3580968-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

# Notices

Federal Register

Vol. 82, No. 113

Wednesday, June 14, 2017

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–912]

### Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2014–2015

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Department) is amending its final results of the administrative review of the antidumping duty order on certain new pneumatic off-the road tires (OTR Tires) from the People's Republic of China (PRC) for the period of September 1, 2014, through August 31, 2015, to correct a ministerial error. The amended final weighted-average dumping margins for the reviewed firms are listed below in the section entitled, ''Amended Final Results.''

**DATES:** Effective June 14, 2017.

**FOR FURTHER INFORMATION CONTACT:** Mandy Mallott, AD/CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230; telephone 202–482–6430.

**SUPPLEMENTARY INFORMATION:**

### Background

On April 13, 2017, the Department issued the final results of the administrative review of the 2014–2015 period of review.[1] On April 14, 2017, the Department disclosed to interested parties its calculations for the final results.[2] On April 24, 2017, the Department received a timely-filed ministerial error allegation from the petitioners[3] regarding the Department's margin calculation for Xugong, one of the mandatory respondents in the review.[4] The Department also received a timely-filed ministerial error allegation from Xugong regarding the draft final liquidation instructions released with the *Final Results*.[5]

### Scope of the Order

The merchandise covered by this order includes new pneumatic tires designed for off-the-road and off-highway use, subject to certain exceptions. The subject merchandise is currently classifiable under Harmonized Tariff Schedule of the United States (HTSUS) subheadings: 4011.80.1010, 4011.20.10.25, 4011.20.10.35, 4011.20.50.30, 4011.20.50.50, 4011.61.00.00, 4011.62.00.00, 4011.63.00.00, 4011.69.00.00, 4011.70.00.10, 4011.70.00.50 4011.80.20.20, 4011.92.00.00, 4011.93.40.00, 4011.93.80.00, 4011.94.40.00, 4011.94.80.00, 8716.90.5056, 8716.90.5059, 4011.80.10.10, 4011.80.10.20, 4011.80.20.10, 4011.80.80.10, and 4011.80.80.20. The HTSUS subheadings are provided for convenience and customs purposes only; the written product description of the scope of the order is dispositive. For a complete description of the scope of the order, *see* the Issues and Decision Memorandum accompanying the *Final Results*.

### Ministerial Error

Section 751(h) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.224(f) define a ''ministerial error'' as an error ''in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any similar type of unintentional error which the Secretary considers ministerial.'' We analyzed the petitioners' ministerial error comments and determined, in accordance with section 751(h) of the Act and 19 CFR 351.224(e) and (f), that we made a ministerial error in our calculation of Xugong's margin for the *Final Results* by inadvertently using the incorrect sales figures as a denominator to devise the indirect sales expense ratio.[6] We also made an error in the draft liquidation instructsions. For a detailed discussion of the Department's ministerial error determination, *see* Ministerial Error Memorandum.

In accordance with section 751(h) of the Act and 19 CFR 351.224(e), we are correcting this error in the calculation of Xugong's weighted-average dumping margin by using the proper denominator in the calculation of indirect sales expenses,[7] and are, thus, amending the *Final Results.* The revised weighted-average dumping margin for Xugong is detailed below.

Additionally, as a result of our revision to Xugong's margin, the Department has also revised the dumping margin for companies not individually examined in the review. As we explained in the *Final Results,*[8] the Department looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate for respondents not individually examined in an administrative review. Consistent with section 735(c)(5)(A) of the Act, the Department's usual practice has been to determine the dumping margin for companies not individually examined by averaging the weighted-average dumping margins for the individually examined respondents, excluding rates

---

[1] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014–2015*, 82 FR 18733 (April 21, 2017) (*Final Results*) and accompanying Issues and Decision Memorandum.

[2] *Xuzhou Xugong Tyres Co., Ltd.* (Xugong) was the only mandatory respondent for which the Department calculated a margin. *See* the Department's memorandum, ''2014–2015 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Final Results Margin Calculation for Xuzhou Xugong Tyres Co., Ltd.,'' dated April 12, 2017 (Xugong Final Analysis Memorandum).

[3] Titan Tire Corporation (Titan) and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC (the USW) (collectively, the petitioners).

[4] *See* Petitioners' Letter, ''Petitioners' Ministerial Error Comments,'' dated April 24, 2017.

[5] *See* Xugong's letter, ''Allegation of Ministerial Error for the Final Results of Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of China,'' dated April 21, 2017 (Xugong Comments).

[6] *See* the Department's memorandum, ''2014–2015 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Ministerial Error Allegation for the Final Results,'' dated concurrently with this notice (Ministerial Error Memorandum).

[7] *See* Ministerial Error Memorandum; *see also* memorandum, ''Analysis of the Amended Final Results Margin Calculation for Xuzhou Xugong Tyres Co., Ltd.,'' dated concurrently with this notice (Xugong Amended Final Analysis Memo).

[8] *See Final Results,* 82 FR at 18734.

that are zero, de minimis, or based entirely on facts available.[9] Because Xugong's revised weighted-average dumping margin is above *de minimis* and not based entirely on facts available, consistent with the Department's practice, we have assigned to companies not individually examined the weighted-average dumping margin calculated for Xugong as the separate rate for this review. The revised weighted-average dumping margins for those companies are detailed below.

**Amended Final Results**

As a result of correcting this ministerial error, we determine that the following weighted-average dumping margins exist for the POR:

| Exporter | Weighted-average dumping margin (percent) |
| --- | --- |
| Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Company Ltd., or Xuzhou Hanbang Tyre Co., Ltd | 33.14 |
| Shiyan Desizheng Industry & Trade Co., Ltd | 33.14 |
| Qingdao Jinhaoyang International Co., Ltd | 33.14 |
| Sailun Jinyu Group Co., Ltd | 33.14 |
| Weifang Jintongda Tyre Co., Ltd | 33.14 |
| Zhongce Rubber Group Company Limite | 33.14 |
| Weihai Zhongwei Rubber Co., Ltd | 33.14 |
| Qingdao Qihang Tyre Co., Ltd.[10] | 33.14 |
| Qingdao Free Trade Zone Full-World International Trading Co., Ltd | 33.14 |
| Trelleborg Wheel Systems (Xingtai) China, Co. Ltd[11] | 33.14 |

The Department's determination in the *Final Results* that Guizhou Tyre Co.,

Ltd. (GTC) and Guizhou Tyre Import and Export Co., Ltd. (GTCIE),[12] Aeolus Tyre Co., Ltd., and Tianjin Leviathan International Trade Co., Ltd., are part of the PRC-wide entity remains unchanged.[13]

**Disclosure**

We intend to disclose the calculations performed regarding these amended final results within five days of the date of publication of this notice to parties in this proceeding, in accordance with 19 CFR 351.224(b).

**Assessment Rates**

The Department shall determine, and CBP shall assess, antidumping duties on all appropriate entries covered by this review pursuant to section 751(a)(2)(C) of the Act and 19 CFR 351.212(b)(1).[14] The Department intends to issue assessment instructions directly to CBP 15 days after the date of publication of these amended final results of administrative review.

For Xugong, the Department calculated importer-specific assessment rates on the basis of the ratio of the total amount of dumping calculated for the importer's examined sales to the total entered value of sales, in accordance with 19 CFR 351.212(b)(1). For customers or importers of Xugong for which we do not have entered values, we calculated importer- (or customer-) specific antidumping duty assessment amounts based on the ratio of the total amount of dumping duties calculated for the examined sales of subject merchandise to the total sales quantity of those same sales.[15] For customers or importers of Xugong for which we received entered-value information, we have calculated importer- (or customer-) specific antidumping duty assessment rates based on importer- (or customer-) specific *ad valorem* rates.[16] Where an importer- or (customer-) specific *ad valorem* rate is greater than *de minimis*, the Department will instruct CBP to collect the appropriate duties at the time of liquidation.[17] For the non-examined separate rate companies, we will

instruct CBP to liquidate all appropriate entries at 33.14 percent. For those entities that are subject to this review that the Department has determined are part of the PRC-wide entity (*i.e.*, GTC and GTCIE, Aeolus Tyre Co., Ltd., and Tianjin Leviathan International Trade Co., Ltd.), we will instruct CBP to liquidate all appropriate entries at the PRC-wide rate of 105.31 percent.[18] Pursuant to a refinement in the Department's non-market economy (NME) practice, for entries that were not reported in the U.S. sales databases submitted by companies individually examined during this review, the Department will instruct CBP to liquidate such entries at the PRC-wide rate.[19] In addition, if the Department determines that an exporter under review had no shipments of subject merchandise, any suspended entries that entered under that exporter's case number (*i.e.*, at that exporter's rate) will be liquidated at the PRC-wide rate.

**Cash Deposit Requirements**

The following cash deposit requirements will be effective for all shipments of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after April 21, 2017, the publication date of the *Final Results* of this administrative review, as provided by section 751(a)(2)(C) of the Act: (1) For the exporters listed above, the cash deposit rate will be equal to the weighted-average dumping margin identified in the "Amended Final Results" section of this notice, above; (2) for previously investigated or reviewed PRC and non-PRC exporters that are not under review in this segment of the proceeding but that received a separate rate in a previous segment, the cash deposit rate will continue to be the exporter-specific rate (or exporter-producer chain rate) published for the most recently completed segment of this proceeding in which the exporter was reviewed; (3) for all PRC exporters of subject merchandise which have not been found to be entitled to a separate rate, the cash deposit rate will be the PRC-wide rate of 105.31 percent;[20] and (4) for all non-PRC exporters of subject merchandise which have not received

---

[9] *See, e.g., Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances: Certain Polyester Staple Fiber from the People's Republic of China,* 71 FR 77373, 77377 (December 26, 2006), unchanged in *Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances: Certain Polyester Staple Fiber from the People's Republic of China,* 72 FR 19690 (April 19, 2007).

[10] The Department intended to grant Qingdao Qihang Tyre Co., Ltd. a separate rate in the *Final Results. See* Qihang's December 6, 2015 Separate Rate Certification. However, we incorrectly referred to this company as "Qingdao Qihang Tyre Co.," in the *Final Results* and accompanying Issues and Decision Memorandum. Accordingly, we have corrected the name of this company in these *Amended Final Results.*

[11] In the *Final Results* the Department granted Trelleborg Wheel Systems (Xingtai) China, Co. Ltd. (TWS) a separate rate. However, we note that TWS is also known as Trelleborg Wheel Systems (Xingtai) Co., Ltd. *See* TWS's November 12, 2105

Entry of Appearance and TWS's November 20, 2015 Separate Rate Certification.

[12] We incorrectly referred to the this company as "Guizhou Tyre Import and Export Corporation," and have corrected the name in these *Amended Final Results.*

[13] *See Final Results,* 82 FR at 18735.

[14] *See Antidumping Proceeding: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification,* 77 FR 8103 (February 14, 2012) ("*NME Antidumping Proceedings*").

[15] *See* 19 CFR 351.212(b)(1).

[16] *Id.*

[17] *Id.*

[18] The PRC-wide rate was determined in *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012–2013,* 80 FR 20197 (April 15, 2015).

[19] *See Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties,* 76 FR 65694 (October 24, 2011).

[20] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012–2013,* 80 FR 20197 (April 15, 2015).

Barcode:3580968-01 A-570-912 REV - Admin Review 9/1/14 - 8/31/15

their own rate, the cash deposit rate will be the rate applicable to the PRC exporter(s) that supplied that non-PRC exporter. These cash deposit requirements, when imposed, shall remain in effect until further notice.

**Notification to Importers**

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping and/or countervailing duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Secretary's presumption that reimbursement of the antidumping and/or countervailing duties occurred and the subsequent assessment of double antidumping duties.

**Administrative Protective Order**

This notice also serves as a reminder to parties subject to administrative protective order (APO) of their responsibility concerning the return or destruction of proprietary information disclosed under the APO in accordance with 19 CFR 351.305(a)(3), which continues to govern business proprietary information in this segment of the proceeding. Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

We are issuing and publishing these amended final results of administrative review in accordance with sections 751(a)(1) and 777(i) of the Act.

Dated: June 7, 2017.

**Ronald K. Lorentzen,**

*Acting Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2017–12303 Filed 6–13–17; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–570–937]**

**Citric Acid and Certain Citrate Salts From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015–2016**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) published the

*Preliminary Results* of the seventh administrative review of the antidumping duty order on citric acid and certain citrate salts (citric acid) from the People's Republic of China (PRC) on February 8, 2017. The period of review (POR) for the administrative review is May 1, 2015, through April 30, 2016. The review was initiated with respect to twenty companies. After rescinding the review with respect to RZBC Co., Ltd., RZBC Import & Export Co., Ltd., and RZBC (Juxian) Co., Ltd. (collectively, RZBC) at the *Preliminary Results,* seventeen companies remain under review. The Department finds that fifteen companies, including mandatory respondent Laiwu Taihe Biochemistry Co., Ltd. (Taihe), are part of the PRC-wide entity, and two companies had no shipments of subject merchandise during the POR. We gave interested parties an opportunity to comment on the *Preliminary Results.* No parties commented. Our final results remain unchanged from the *Preliminary Results.*

**DATES:** Effective June 14, 2017.

**FOR FURTHER INFORMATION CONTACT:** Krisha Hill, Office IV, Enforcement & Compliance, International Trade Administration, Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–4037.

**SUPPLEMENTARY INFORMATION:**

**Background**

On February 8, 2017, the Department published the *Preliminary Results.*[1] We invited interested parties to submit comments on the *Preliminary Results,* but we received no comments.

**Scope of the Order**

The products covered by the order include the hydrous and anhydrous forms of citric acid, the dihydrate and anhydrous forms of sodium citrate, otherwise known as citric acid sodium salt, and the monohydrate and monopotassium forms of potassium citrate. Sodium citrate also includes both trisodium citrate and monosodium citrate, which are also known as citric acid trisodium salt and citric acid monosodium salt, respectively. Citric acid and sodium citrate are classifiable under 2918.14.0000 and 2918.15.1000 of the Harmonized Tariff Schedule of the United States (HTSUS), respectively.

Potassium citrate and crude calcium citrate are classifiable under 2918.15.5000 and 3824.90.9290 of the HTSUS, respectively. Blends that include citric acid, sodium citrate, and potassium citrate are classifiable under 3824.90.9290 of the HTSUS. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the merchandise is dispositive.[2]

**Final Determination of No Shipments**

In the *Preliminary Results,* the Department determined Niran (Thailand) Co., Ltd. (Niran) and Niran Biochemical Limited (Niran Biochemical) had no reviewable transactions during the POR.[3] We received no comments concerning our finding of no shipments by Niran and Niran Biochemical. In these final results of review, we continue to find that Niran and Niran Biochemical had no shipments of subject merchandise during the POR.

**Separate Rates**

The Department considers fifteen companies listed in the *Initiation Notice,* including Taihe, to be part of the PRC-wide entity. Because Taihe did not respond to the Department's original questionnaire and did not provide separate rate information, Taihe has not established its eligibility for separate rate status. Furthermore, the remaining fourteen companies failed to provide separate rate applications or separate rate certifications necessary to establish their eligibility for a separate rate.[4] Therefore, the Department determines that these fifteen companies, including Taihe, are not eligible for a separate rate and are part of the PRC-wide entity. Accordingly, the Department determined a rate consistent with the Department's current practice regarding conditional review of the PRC-wide entity.[5]

---

[1] *See Citric Acid and Certain Citrate Salts from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Preliminary Partial Rescission of Antidumping Duty Administrative Review; 2015–2016,* 82 FR 9722 (February 8, 2017) (*Preliminary Results*).

[2] *See Citric Acid and Certain Citrate Salts from Canada and the People's Republic of China: Antidumping Duty Orders,* 74 FR 25703 (May 29, 2009) for a full description of the scope of the order.

[3] *See Preliminary Results,* 82 FR at 9722.

[4] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 81 FR 44260, 44265 [July 7, 2016] (*Initiation Notice*).

[5] *See Preliminary Results* and accompanying Decision Memorandum at 4. *See also Antidumping Proceedings: Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings,* 78 FR 65963, 65970 (November 4, 2013). Under this practice, the PRC-wide entity will not be under review unless a party specifically requests, or the Department self-initiates, a review of the entity. Because no party requested a review of the PRC-wide entity, the entity is not under review and the entity's rate is not subject to change.

Barcode:3893758-01 A-570-912 REM - Remand  -  Slip Op 19-64

A-570-912
Remand Slip Op. 19-64
POR: 09/01/2014-08/31/2015
**Public Version**
E&C/OIII:  KAH

### *Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co., Ltd., et al. v. United States* *Consol. Court No. 17-00100; Slip Op. 19-64 (CIT 2019)*

## FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT),

issued on May 24, 2019, in *Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co., Ltd.,*

*et al. v. United States*, Consol. Court No. 17-00100, Slip Op. 19-64 (Ct. Int'l Trade May 24,

2019) (*Guizhou Tyre*).  This final redetermination concerns the final results of the administrative

review of the antidumping duty order on off-the-road (OTR) tires from the People's Republic of

China (China), covering the period of review (POR) September 1, 2014 through August 31,

2015.[1]  Previously, Commerce issued to interested parties the draft results of redetermination

pursuant to remand.[2]

Specifically, on remand, the CIT ordered that:  (1) Commerce shall submit a new

determination upon remand in which it recalculates export price (EP) and constructed export

price (CEP) without making deductions for Chinese value-added tax (VAT) for Xuzhou Xugong

Tyres Co., Ltd., Armour Rubber Co. Ltd., and Xuzhou Hanbang Tyre Co., Ltd. (collectively,

---

[1] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2014–2015*, 82 FR 18733 (April 21, 2017) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM), *amended by Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Amended Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 27224 (June 14, 2017) (*Amended Final Results*).

[2] *See* "*Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co., Ltd., et al. v. United States*, Consol. Court No. 17-00100; slip op. 19-64 (CIT 2019):  Draft Results of Redetermination Pursuant to Court Remand," released on August 9, 2019 (Draft Results).

Xugong), and redetermine the weighted-average dumping margin for Xugong;[3] (2) Commerce shall reconsider its decisions not to assign separate rates to Aeolus Tyre Co., Ltd. (Aeolus) and Guizhou Tyre Co., Ltd., and Guizhou Tyre Import and Export Co., Ltd. (collectively, GTC);[4] and (3) Commerce will recalculate the margins for all other qualifying separate rate respondents that are plaintiffs in the action.[5]

As set forth in detail below, consistent with the CIT's remand order, we have:  (1) recalculated EP and CEP for Xugong without making deductions for Chinese VAT, and redetermined Xugong's weighted-average dumping margin; (2) reconsidered our decisions not to assign separate rates to Aeolus and GTC; and (3) recalculated the margins for all other qualifying separate rate respondents that are plaintiffs in this action (based on the weighted-average dumping margin calculated for Xugong), consistent with the CIT's instructions.

On August 9, 2019, we released the Draft Results to all interested parties, and provided all parties the opportunity to comment.[6]  On August 23, 2019, we received timely-filed comments from GTC and Aeolus.[7]  We respond to arguments raised by interested parties in their comments on the Draft Results, below.  Our redetermination analysis, materially unchanged from the analysis provided in the Draft Results, is provided immediately below in Section II, "Final Analysis"; we address comments received in Section III, "Discussion of Interested

---

[3] See *Guizhou Tyre* at 32-33.

[4] *Id.*

[5] *Id.*  Separate rate respondents that are plaintiffs in the action are:  Trelleborg Wheel Systems (Xingtai) Co., Ltd.; Qingdao Qihang Tyre Co., Ltd.; Qingdao Free Trade Zone Full-World International Trading Co., Ltd.; Weihai Zhongwei Rubber Co., Ltd. (Zhongwei); Aeolus; and GTC.

[6] See Draft Results.

[7] See GTC's and Aeolus' letter, "GTC and Aeolus' Comments on the Department's Draft Results Redetermination Remand Redetermination Pursuant to Guizhou Tyre Co. v. United States, Consol. Court No. 17-00100," dated January 23, 2017 (GTC's and Aeolus's Draft Comments).

Parties' Comments"; and the corrected weighted-average margins are listed below in Section IV,

"Final Results of Redetermination."

## II.    FINAL ANALYSIS

### 1.  Xugong's Irrecoverable VAT Deduction

*Background*

In the *Final Results* of the underlying review, we stated that, pursuant to section

772(c)(2)(B) of the Tariff Act of 1930, as amended (Act), when Commerce calculates EP or

CEP, it deducts from its calculation any "export tax, duty or other charge imposed by the

exporting country on the exportation of the subject merchandise to the United States."[8]

In its opinion, the CIT held that "Commerce has made downward adjustments in

calculating the EP and CEP for subject merchandise exported by Xugong based on an

impermissible construction of the export tax provision of {section 772(c)(2)(B) of the Act}."[9]

Specifically, the CIT recognized that "Congress expressly confined the export tax provision to

export taxes, duties, and other charges on the *exportation* of the subject merchandise to the

United States."[10]  The CIT further explained that the export tax provision could not permissibly

be construed to apply to a domestic home market tax such as a value-added tax, whether or not

recoverable due to export.  Thus, the CIT held that Commerce's deductions from Xugong's EP

and CEP starting prices for Chinese value-added taxes were, therefore, unlawful.[11]

As a result, the CIT directed Commerce to recalculate EP and CEP without a downward

adjustment for irrecoverable VAT.[12]

---

[8] *See Final Results* IDM at 37.
[9] *See Guizhou Tyre* at 15.
[10] *Id.* at 12.
[11] *Id.*
[12] *Id.* at 15.

-3-

Barcode:3893758-01 A-570-912 REM - Remand  -  Slip Op 19-64

*Analysis*

We respectfully disagree with the CIT's decision in *Guizhou Tyre*, concerning the irrecoverable VAT adjustment used in Xugong's weighted-average margin calculation. Nevertheless, following the CIT's explicit directive that Commerce recalculate EP and CEP for Xugong without making deductions for Chinese VAT, under respectful protest,[13] we have recalculated EP and CEP in the margin program for Xugong to exclude the irrecoverable VAT deduction.

### 2. Aeolus's Separate Status

In the *Final Results* of the underlying review, we determined, based on substantial record evidence, that a state-owned enterprise (SOE), China National Chemical Corporation, (ChinaChem), is Aeolus's largest and controlling shareholder.[14]  In the *Final Results*, we found that the record showed that Aeolus was 42.58 percent owned by its parent company (China Chemical Rubber Co., Ltd. (also known as, China National Tire & Rubber Corp.)), a company which is 100 percent owned by an SOE (*i.e.*, ChinaChem) and supervised by a "State-owned Assets Supervision and Administration Commission{}" (SASAC).[15]  Additionally, we found three other shareholders of Aeolus to be SOEs that are supervised by SASACs.[16]  As such, we found the total SOE ownership in Aeolus to be 49.06 percent.[17]

---

[13] *See Viraj Group, Ltd. v. United States*, 343 F. 3d 1371, 1376 (Fed. Cir. 2003).

[14] *See Final Results* IDM at 10 (citing *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 71068 (October 14, 2016), and accompanying Preliminary Decision Memorandum (PDM) at 16; and Memorandum, "Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Denial of Separate Rate," dated October 5, 2016 (Preliminary Separate Rate Memo) at 2).

[15] *Id.* (citing Aeolus's Letter, "Separate Rate Application in the Seventh Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 11, 2016 (Aeolus's SRA) at 13; and Aeolus's Letter, "Separate Rate Application Supplemental Questionnaire Response in the Seventh Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated August 2, 2016).

[16] *Id.* (citing Aeolus's SRA at 13).

[17] *Id.*

Filed By: Brendan Quinn, Filed Date: 9/25/19 12:45 PM, Submission Status: Approved

We found that, based on information contained in Aeolus's Articles of Association (AoA), the company did not demonstrate that it was free from *de facto* government control over its export activities because its AoA allows its majority shareholders to control the selection of its board of directors, a board which in turn selects Aeolus's general manager and deputy general manager.[18]  Thus, we found that Aeolus did not demonstrate an absence of government control in making decisions regarding the selection of its management.[19]

Furthermore, we found that the website printouts provided by the petitioner in which Aeolus states that it is under the control of an SOE, specifically, under the control of ChinaChem, to be reliable.[20]  Therefore, we found that the website information corroborated the ownership information provided by Aeolus in its separate rate application.[21]  Thus, we found that Aeolus was not eligible for a separate rate in the *Final Results* of the underlying review.[22]

During litigation, Aeolus argued, *inter alia*, that Commerce failed to consider important contrary record evidence in its determination not to grant Aeolus a separate rate.[23]  Notably, Aeolus argued that Commerce failed to consider a "Rectification Report" Aeolus placed on the record, which, it argues, demonstrates its independence from the Chinese government.[24]

In its opinion, the CIT held that Commerce failed to address significant contrary evidence when making its determinations in the underlying review.[25]  Specifically, the CIT held that,

---

[18] *Id.* (citing Preliminary Separate Rate Memo at 2).

[19] *Id.* at 11-12.

[20] *Id.* (citing Petitioner's Letter, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912):  Petitioners' Rebuttal Information and Deficiency Comments on Aeolus' Separate Rate Application," dated December 30, 2016, at Attachment 3).

[21] *See* Aeolus's SRA at 13 and Exhibit 11.

[22] *Id.* at 12.

[23] *See Guizhou Tyre* at 6.

[24] *Id.* (citing Aeolus's Case Brief, "Aeolus Direct Case Brief in the Seventh Administrative Review of the Antidumping Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 16, 2016 (Aeolus's Case Brief), at 12-13).

[25] *Id.* at 7 (citing Aeolus's Case Brief).

because Commerce did not refer to the Rectification Report in the *Final Results* of the underlying review, it could not conclude that Commerce considered the report or the evidence therein when determining that Aeolus was not free from government control over its export activities.[26]  As such, the CIT ordered Commerce to reconsider its separate rate determination concerning Aeolus in light of all evidence on the record, including the evidence in the Rectification Report.[27]

*Analysis*

Per the CIT's instructions, we have reconsidered our separate rate determination regarding Aeolus, in light of all evidence on the record, including the evidence in the Rectification Report, and we continue to determine that Aeolus is ineligible for a separate rate because it has not demonstrated that it operates free from *de facto* control by the Chinese government.

Under the broad authority delegated to it by Congress, Commerce employs a presumption of state control for exporters in a non-market economy (NME).[28]  Under this presumption, exporters in an NME receive the country-wide rate, unless the exporter can rebut this presumption by affirmatively demonstrating its entitlement to a separate, company-specific margin by showing an absence of government control, both in law and in fact, with respect to its export activities.[29]

Commerce considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate:  (1) an absence of restrictive stipulations associated

---

[26] *Id.*
[27] *Id.*
[28] *See Sigma Corp. v. United States*, 117 F. 3d 1401, 1405 (Fed. Cir. 1997) (*Sigma*).
[29] *Id.*

with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) other formal measures by the government decentralizing control of companies.[30]  Typically, Commerce considers four factors in evaluating whether each respondent is subject to *de facto* government control of its export functions:  (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.[31]

In the instant case, as noted by the CIT, it is "undisputed that Aeolus is 42.58 percent owned by China National Tire & Rubber Co., Ltd. (China National Tire), a 100 percent-owned subsidiary of China National Chemical Corporation (ChinaChem), an SOE supervised by China's SASAC, and . . . 6.48 percent owned by other SOEs supervised by local SASACs."[32] Further, we continue to determine that ChinaChem, an SOE, through its 100 percent-owned subsidiary China National Tire, controls Aeolus's board member selection process, including the selection of Aeolus's Chairman and Vice-Chairman.[33]  Thus, we continue to find that the Chinese government, through an SOE, exerts control over Aeolus's management selection process, through control of its board member selection process.[34]

---

[30] *See Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588, 20589 (May 6, 1991) (*Sparklers*).

[31]  *See Final Determination of Sales at Less than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22585, 22586-22587 (May 2, 1994) (*Silicon Carbide*); *see also Notice of Final Determination of Sales at Less Than Fair Value:  Furfuryl Alcohol from the People's Republic of China*, 60 FR 22544, 22545 (May 8, 1995) (*Furfuryl Alcohol*).

[32] *See Guizhou Tyre* at 5.

[33] *See* Aeolus SRA at Exhibit 11.

[34] *See Final Results* IDM at 10.

**BUSINESS PROPRIETARY INFORMATION DELETED**

Specifically, Aeolus's AoA states that the board of directors shall be composed of [



].[35]  The board of directors, board of supervisors, and shareholders [

].[36]  Aeolus's AoA

only requires that [                                              ].  The board of directors, board of

supervisors, or shareholders [

].  In this case, the record indicates that no public shareholder

has ever nominated a director to the board, despite any mechanisms that may be in place in

Aeolus's AoA [                                              ].[37]

        During the POR, [                                                      ].[38]

Additionally, we note, [              ] of Aeolus's AoA [



].[39]  Furthermore, candidates are elected if they receive [



].[40]  The board elected during the POR [

---

[35] *See* Aeolus SRA at Exhibit 11, [          ].

[36] *Id.* at Exhibit 11.

[37] *See* Aeolus's August 2, 2016 Supplemental Separate Rate Application Response at 1 (Aeolus's Supp. SRA); *see also* Aeolus's SRA at Exhibit 11.

[38] *See* Aeolus's SRA at Exhibit 13A (Exhibit 13A illustrates ChinaChem's dominance of the shareholder meetings, as its voted shares were approximately seven times higher than all other shares present at the shareholders meeting confirming its Board).

[39] *See* Aeolus's SRA at Exhibit 11.

[40] *Id.* (citing Aeolus's AoA at art. 83); *see also* Aeolus's SRA at Exhibit 13A; and Aeolus's SRA at Exhibit 6 (Exhibit 6 illustrates ChinaChem's total voting shares and Exhibit 13A illustrates ChinaChem's voted shares together the exhibits illustrate ChinaChem's voted shares were approximately [                    ]).

-8-

Appx103

**BUSINESS PROPRIETARY INFORMATION DELETED**

].[41]

In addition, the record evidence indicates that during the POR, China National Tire and Aeolus shared multiple board members, and one of the overlapping board members is Aeolus's Chairman.[42]  We note that Aeolus describes its Chairman as a representative of China National Tire, which is 100 percent owned by ChinaChem, who votes on behalf of China National Tire.[43]  Furthermore, Aeolus's AoA grants its Chairman [

].[44]  In previous proceedings, we have found such connections as described above between a controlling shareholder and a separate rate applicant warrant denying the applicant a separate rate, and the CIT has upheld such determinations.[45]

However, as stated above, in its opinion, the CIT held that Commerce failed to address significant contrary evidence concerning whether Aeolus is entitled to a separate rate, specifically the "Rectification Report" that Aeolus put on the record as evidence to support its claim that it is free from government control over its export activities.[46]  According to the petitioners, the Rectification Report indicates that the SOE ChinaChem:  (1) maintained direct control over Aeolus's operations; (2) could access Aeolus's financial information at any time through software it shared with Aeolus; and (3) required Aeolus to submit "investment, key

---

[41] *See* Aeolus's SRA at Exhibit 13A; *see also* Aeolus's SRA at Exhibit 6.

[42] *See* Preliminary Separate Rate Memo at 2; *see also* Petitioner's Letter, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912):  Petitioners' Rebuttal Information and Deficiency Comments on Aeolus' Separate Rate Application," dated December 30, 2015 (Petitioners' Aeolus SRA Rebuttal), at 6; Aeolus's SRA at Exhibit 13B.

[43] *See* Aeolus's Supp. SRA at 2.

[44] *Id.* at Exhibit 11.

[45] *See, e.g., Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1320-21 (CIT 2018) (*Zhejiang Quzhou*).

[46] *Id.* at 7 (citing Aeolus's Case Brief).

projects, and tender process" for ChinaChem's approval during the POR.[47]  In contrast, Aeolus

claims, the Rectification Report demonstrates that, as of the commencement of the POR, the

government control issues identified in the Rectification Report showed a "Rectification Status"

of "{c}ompleted," *i.e.*, that the Rectification Report did not address issues during the POR, but,

instead, described past issues that had been identified as improper connections between Aeolus

and ChinaChem that were rectified.[48]  Aeolus further explained that the Rectification Report

illustrates that "as of the publication of the Rectification Report, Aeolus's SOE shareholders

could not access the company's financial information and that review, and approval of key

projects, did not depend on the company's SOE shareholders, but only on Aeolus's board of

directors."[49]

   As stated above, Aeolus's board selects its management, a board whose confirmation

process is controlled by ChinaChem through China National Tire, its 100 percent-owned

subsidiary.[50]  As detailed above, Aeolus's board was nominated or voted in by an SOE, which in

turn selected the management of the company.[51]  Hence, despite Aeolus's contention that

Aeolus's SOE shareholders could not access the company's financial information, Aeolus's

management, which was ultimately appointed by the SOE, has control over the company's

financial management system.  Moreover, Aeolus remains on a financial system that is under the

control of ChinaChem, a known SOE that continues to have a business interest in monitoring

---

[47] *See* Petitioners' Aeolus SRA Rebuttal at 6-7 and Attachment 3.

[48] *See* Aeolus's Letter, "Aeolus Rebuttal Factual Information Submission:  Seventh Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated January 8, 2016 (Aeolus's Information Rebuttal) at 2, Exhibit 1A; *see also* Petitioners' Aeolus SRA Rebuttal at Attachment 3.  We note that regardless of the translated version, the "Rectification Report" refers to ChinaChem, an SOE, as Aeolus's largest shareholder and actual *controlling* party in both the petitioners' and Aeolus's translations of the document.

[49] *See* Aeolus's Information Rebuttal at Exhibit-1A.

[50] *See* Aeolus's SRA at 13.

[51] *Id.* at Exhibit 13A.

Aeolus's business operations.[52]  Also, that ChinaChem still maintains the ability to access

Aeolus's financial information through the software it shares with Aeolus is not contradicted by

the Rectification Report.  Rather, because ChinaChem maintains the SAP enterprise resource

planning (ERP) systems of the entities under its corporate umbrella,[53] we find that only

ChinaChem's *statement* to "fully respect the independence of a listed company . . ." may serve as

a safeguard preventing it from continuing to engage in the behaviors that the Chinese

administering authority found to be unacceptable connections.[54]  Notably, the Rectification

Report contains no details about any structural changes that would address the independence

issues identified, and relies instead on the apparently voluntary restraint promised by

ChinaChem.  Moreover, the Rectification Report contains no mention of any consequences or

enforcement mechanisms to ensure that ChinaChem acts consistently with the Rectification

Report.  Considering the record evidence, we find that the Rectification Report does not establish

Aeolus's independence, but rather represents an unenforceable promise by an SOE.

Additionally, Aeolus states that it "uses the same SAP system as ChinaChem because the

companies invested by ChinaChem usually are of the same or related industry and have a similar

business.  Therefore, for cost consideration, they adopted the SAP system."[55]  However, that cost

considerations are the reason Aeolus maintains an SAP system with an SOE is not probative.

The fact remains that Aeolus has a *shared* financial management system in the SAP ERP system

---

[52] *See* Aeolus's Information Rebuttal at Exhibit-1A; *see also* Aeolus's SRA at 13 and Exhibit 6.

[53] *See* Aeolus's Information Rebuttal at Exhibit-1A, p. 2.  Aeolus's version of the rectification report states,
"{a}lthough accounting and financial information of the Company is operated through ChinaChem's SAP system,
ChinaChem fully respects the independence of a listed company and has never inquired about financial information
of the Company."  We note that it does not say that ChinaChem is unable to access Aeolus's financial information.
[54] *See* Aeolus's Information Rebuttal at 3 and Exhibit-1A.
[55] *Id.* at 3.

maintained by ChinaChem, and ChinaChem therefore remains in a position to monitor Aeolus's financial information.[56]

Aeolus attempts to mitigate this fact by stating that different entities use the SAP system independently from each other, and the SAP system requires a different approved account and password to log in for different entities.[57]  Aeolus further submits that a sample screenshot, which shows that an Aeolus employee can log in to Aeolus's SAP system but not the system of other companies such as ChinaChem, demonstrates the separation of Aeolus's SAP system from ChinaChem.  However, a subsidiary company not having access to its parent company's financial information does not prove that the inverse is also true, *i.e.*, that ChinaChem does not have access to Aeolus's financial system.  The employee's lack of access to ChinaChem's SAP module merely illustrates that Aeolus's employee does not have access to ChinaChem's SAP module.[58]

Neither the Rectification Report nor exhibit 1B of Aeolus's Information Rebuttal establishes that ChinaChem no longer maintains the SAP system, but rather states that Aeolus uses ChinaChem's SAP system for cost reasons.  As the Rectification Report states, "{t}he controlling shareholder and actual controller will work with the Company. . . and *guarantee* the Company's independent accounting activities and financial management in the SAP ERP system . . . , and forbid any person from accessing the Company's financial information without the Company's authorization."[59]  Rather than establishing the independence of Aeolus with respect to the SAP system, we find that this statement suggests the conditions providing ChinaChem

---

[56] *Id*.
[57] *Id*.
[58] *Id.* at Exhibit 1B.
[59] *Id.* at Exhibit 1A, p. 2 (emphasis added).

-12-

access to Aeolus's information via the shared SAP system remain.  Specifically, if the conditions did not still exist there would be no reason to "*guarantee*" the independence of Aeolus's financial system or "*forbid*" parties from accessing Aeolus's financial information without the company's permission.[60]  Thus, as the entity that maintains the system, and despite the promises described in the Rectification Report, the record suggests that ChinaChem remains in a position to access Aeolus's financial information.[61]

Furthermore, as stated above, it is immaterial whether ChinaChem examines Aeolus's "investment, key projects, and tender{s} process" directly, because it has placed its preferred leadership in management positions using Aeolus's AoA's prescribed processes.[62]  Because we find ChinaChem remains in a position to select Aeolus's board of directors, we find the exhibit submitted by Aeolus showing that investment, key projects, and tender process are now reviewed and approved by the internal management of Aeolus unpersuasive.[63]  Specifically, the record evidence does not address or otherwise mitigate the issue that an SOE effectively selects its board of directors.[64]  The purpose of the Rectification Report is to describe how certain improper connections between ChinaChem and Aeolus that had been identified were addressed by Aeolus and ChinaChem.  Particularly, the companies shared an SAP system, which both companies still in fact share.  The report describes steps taken to ensure that Aeolus has an independent accounting system, but whether those steps are effective remains unaddressed in the Rectification Report.  As stated above, the only purported safeguard is ChinaChem's mere promise to not interfere with a listed company's business operations.  Therefore, we find that,

---

[60] *See* Aeolus's Information Rebuttal at Exhibit-1A, p. 2.

[61] *Id.* at Exhibit-1A, p. 2 and Exhibit-1B.

[62] The leadership includes Aeolus's board chairman who is a known representative of China National Tires.

[63] *See* Aeolus's Information Rebuttal at Exhibit 2.

[64] *Id.* at 4 and Exhibit 2.

despite the Rectification Report showing specific government control issues being "rectified," there remains *de facto* government control over Aeolus by virtue of its board of directors and management being nominated and appointed by its SOE shareholders.

### 3. GTC's Separate Status

In the *Final Results* of the underlying review, we determined, based on substantial evidence, that GTC was not eligible for a separate rate. Specifically, we found that Guiyang SASAC, through its 100 percent-owned affiliate Guiyang Industry Investment Group Co., Ltd. (GIIG), an SOE who owns 25.20 percent of GTC, is GTC's single largest and *de facto* controlling shareholder.[65]  Furthermore, we found that even with less than a majority number of shares in GTC, Guiyang SASAC, through its 100 percent-owned affiliate GIIG, remained in a position to control the export activities of Guizhou Tyre Import and Export Corporation (GTCIE) through its control of GTC.[66]

In the underlying review, we found that record evidence showed that GTC "elected members of its board of directors through shareholders' meetings *not available* to all shareholders" and made decisions affecting the distributions of profits at these meetings.[67] Specifically, we found that the AoA allowed GTC to circumvent a more inclusive board election

---

[65] *See Final Results* IDM at 13.

[66] *Id.* at 13-14; *see also Certain New Pneumatic Off-The-Road Tires From the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 FR 9278, 9283 (February 20, 2008), *unchanged in Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008). Commerce previously collapsed GTC and GTCIE into a single entity in the initial investigation. This decision has been unchallenged in each subsequent review, including the instant review; thus, Commerce continues to treat GTC and GTCIE as a single entity in this review.

[67] *See Final Results* IDM at 14 (emphasis added).

process; GTC was able to elect specific board members of its preference and its preferred profit distribution scheme.[68]

Also, we found that GTC's AoA failed to insulate GTC from government interference through its prescribed nomination processes for the selection of GTC's board of directors and senior management.  Specifically, we found that GTC's nomination and voting processes for directors and management under Articles 40, 43, 83, and 117 of the AoA allowed Guiyang SASAC, through GIIG, to influence the board nomination process even with a less than majority number of voting shares.[69]  Thus, we found that GTC was not eligible for a separate rate in the *Final Results*.[70]

However, during litigation, GTC explained that the particular shareholders' meeting of GTC referenced in the IDM, which we found was not available to all shareholders, was publicly announced and open to all shareholders.[71]  Because this finding of fact calls into question our understanding of the record evidence and has the potential to impact the analysis concerning whether to grant GTC a separate rate in the underlying review, we requested a voluntary remand to reconsider and explain our determination concerning whether to grant a separate rate to GTC.

The CIT granted our request for a remand.  Specifically, the CIT opined that "{Commerce's} concern, in this case, is 'substantial and legitimate' and will order a remand for Commerce to reconsider and explain its separate rate analysis with respect to the collapsed GTC entity."[72]  As such, the CIT ordered Commerce to "reconsider its separate rate determination as

---

[68] *Id.* (citing Preliminary Separate Rate Memo at 2-3; and GTC's September 13, 2016 Supplemental Section A Questionnaire Response (GTC's 3rd SAQR)).
[69] *Id.* (citing GTC's 3rd SAQR at 2, Exhibits 2, 4, and 6-8; and Preliminary Separate Rate Memo at 2-3).
[70] *Id.* at 15.
[71] *See Guizhou Tyre* at 15.
[72] *Id.* at 8.

-15-

to GTC in the entirety, *i.e.*, in light of all record evidence."[73]  The CIT did not reach any conclusions regarding the other arguments GTC made concerning the underlying results of the review.[74]

*Analysis*

In the underlying review, we stated, "{r}ecord evidence shows that GTC elected members of its board of directors through shareholders' meetings *not available* to all shareholders.  Because GIIG circumvented a *more inclusive* board election process, it was able to elect specific board members of its preference and preferred profit distribution schemes."[75]  In our attempt to clarify our view concerning the significance of the July 16, 2015 interim shareholders meeting, we inadvertently stated that the meeting was *not available* to *all shareholders*.[76]  However, we now understand our phrasing was inaccurate.

Thus, per the CIT's order, we reconsidered our separate rate determination regarding GTC in the entirety, *i.e.*, in light of all record evidence, including the evidence related to the July 16, 2015, interim shareholders' general meeting.[77]  After reconsidering all of the evidence on the record, we continue to find that GTC is ineligible for a separate rate in the underlying review because it is not free from *de facto* government control over its export activities.

As stated above, under the broad authority delegated to it by Congress, Commerce employs a presumption of state control for exporters in an NME.[78]  Under this presumption, as outlined above, exporters in an NME-country receive the country-wide rate, unless the exporter

---

[73] *Id.*
[74] *Id.*
[75] *See Final Results* IDM at 14 (citing GTC's 3rd SAQR at 3, and Exhibits 2, 4, and 6-8).
[76] *Id.* at 14.
[77] *See Guizhou Tyre* at 8.
[78] *See Sigma* at 1405.

**BUSINESS PROPRIETARY INFORMATION DELETED**

can rebut this presumption by affirmatively demonstrating its entitlement to a separate, company-specific margin by showing an absence of government control, both in law and in fact, with respect to its export activities.[79]

In the instant case, we find that GTC is not free from government control in making decisions regarding the selection of its management and thus is subject to *de facto* government control of its export functions.[80]

Notably, we continue to determine, and record evidence supports, that an SOE, GIIG, is GTC's single largest, and thus, controlling shareholder with 25.20 percent ownership.[81] Generally, we would expect any large shareholder, including a government entity, to control the operations of the company in which it holds the largest number of shares if its shareholder rights afford it that ability.[82]  In the instant case, GTC's single largest shareholder with the opportunity and ability to exert influence on it is GIIG, an SOE.  Specifically, GIIG is 100 percent owned and supervised by Guiyang SASAC, and through its large ownership stake, GIIG can control, and has an interest in controlling, the operations of GTC, including the selection of management and the profitability of the company.[83]  In this case, the record evidence indicates that GIIG has exercised this ability to control the operations of GTC using its status as GTC's single largest, and *de facto* controlling, shareholder.[84]  Notably, [

---

[79] *Id.*

[80] *See Yantai CMC Bearing Co. Ltd. v. United States*, 203 F. Supp. 3d 1317, 1326 (CIT 2017) (recognizing that "Commerce requires that exporters satisfy all four factors of the *de facto* control test in order to qualify for separate rate status" and sustaining Commerce's decision not continue with the separate rate analysis where one of the factors is not met).

[81] *See* GTC's January 20, 2016 Section A Questionnaire Response at 16 and Exhibit A-7 (GTC's AQR).

[82] *See, e.g., Carbon and Certain Alloy Steel Wire Rod from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 79 FR 68860 (November 19, 2014), and accompanying IDM (*Steel Wire Rod*).

[83] *See* Preliminary Separate Rate Memorandum at 2-3; *see also* GTC's AQR at Exhibit A-7.  GTC is the producer, and GTCIE is its affiliate in charge of export sales.

[84] *See* GTC's 3rd SAQR at Exhibit 6.

**BUSINESS PROPRIETARY INFORMATION DELETED**

], a board of directors that remained in effect for the majority of the POR.[85]

Specifically, we continue to find that Chinese law and GTC's AoA shareholders' safeguards in place during the POR were ineffective at preventing influence by an SOE that is a controlling shareholder.  GTC's nomination and voting processes for directors and management under Articles 40, 43, 83, and 117 of its AoA allowed the Guiyang SASAC, through GIIG, to influence the board nomination process during the POR.[86]  Specifically, Article 83 only allows shareholders with ten percent or more of voting shares held individually or jointly to nominate "*non-independent*" directors, and GIIG is the only *individual* shareholder with more than ten percent of voting shares for the majority of the POR.  Further, record evidence fails to demonstrate any nominations of directors without GIIG involvement.[87]  Moreover, record evidence suggests that no other individual shareholder owns the requisite percentage to nominate "non-independent" directors to GTC's board.[88]  Furthermore, certain articles in GTC's AoA allow GIIG to remain in a supervisory position over GTC despite its number of ownership shares.  Specifically, as noted above, Article 32(3) of GTC's AoA allows individual shareholders, including GIIG, the ability to supervise the operations of the Company and put forward suggestions and raise inquiries.[89]  In addition, Article 49 of GTC's AoA allows

---

[85] *Id.*

[86] *See* GTC's May 25, 2016 Supplemental Section A Questionnaire Response at Exhibit 1 (GTC's 1st SAQR).

[87] *Id.*

[88] *Id.* at Exhibit 1.  Although, we note that Article 83 also allows candidates for "independent director" to be nominated by the Board of Directors, Board of Supervisors or ***shareholders individually or jointly holding more than one percent*** of the shares of the Company.  However, despite the one percent threshold required to nominate independent directors, GTC failed to demonstrate through record evidence of a nomination of an independent director by any individual shareholder or shareholders acting in concert.

[89] *See* GTC's 3rd SAQR at Exhibit 6.

-18-

"shareholders individually or jointly holding ten percent of the shares of the company . . . to propose to the Board of Directors to convene an interim shareholders' meeting."  In the instant case, only GIIG individually has the requisite number of shares to convene a shareholders meeting.[90]  Thus, other than GIIG's own restraint, nothing in GTC's AoA prevents GIIG from engaging in behavior that interferes with the autonomy of GTC.[91]

Moreover, though we acknowledge that the AoA cited by GTC appears on its face to place safeguards against undue influence by large shareholders in the selection of GTC's senior managers, the record demonstrates that those safeguards were unsuccessful in the instant case.[92]  GIIG was ultimately able to dominate GTC's decision-making process, despite such safeguards, and appoint its preferred members to GTC's board.[93]  In addition, because Article 130 of GTC's AoA explicitly states that the board of directors shall appoint or remove GTC's general manager and four deputy general managers, we find that GTC does not have autonomy from the government in making decisions regarding the selection of management because GIIG controls the board selection process.  In addition, Article 161 (IV) of GTC's AoA states, "The Board of Director shall put forward {an} annual profit distribution proposal. . . ."  As a result, GIIG ultimately controls the selection of GTC's senior management, as well as profit distributions through its influence on GTC's board selection process.[94],[95]

We further continue to find that GTC's Chairman's relationship with GIIG is indicative of government control over GTC.  Specifically, GTC's Chairperson, who is also [

---

[90] *See* GTC's AQR at Exhibit A-8.
[91] *Id.*
[92] *Id.*
[93] *See* GTC's 3rd SAQR at Exhibits 6 and Exhibit 8 (the exhibits illustrate that GIIG's voting shares determined the outcomes regarding almost all proposals during the POR).
[94] *See* GTC's 2nd SAQR at Exhibit 7.
[95] *See* GTC's AQR at 11-12 and Exhibit A-2.

].[96]  The record describes GTC's Chairman as the former secretary of the party committee.[97]  The record therefore indicates close ties to the Chinese government, as the Chairman was voted [                          ], which is 100 percent owned and supervised by the Guiyang SASAC.[98]  Additionally, Article 118 of GTC's AoA allows the Chairperson to conduct unilateral company decisions.[99]

Thus, we continue to find that GIIG, through its 25.20 percent ownership stake, controls GTC's board nomination process.  As noted above, GTC's board is responsible for the selection of senior management, which controls the day-to-day decisions regarding the company's export activity.[100]  Hence, we continue to find that Chinese law and GTC's AoA shareholders' safeguards in place during the POR were ineffective at preventing influence by an SOE that is a controlling shareholder, *i.e.*, GIIG.[101]

## III.    DISCUSSION OF INTERESTED PARTIES' COMMENTS

As discussed above, on August 9, 2019, Commerce released the Draft Results to interested parties for comment.[102]  On August 23, 2019, GTC and Aeolus submitted comments on the separate rate findings in the Draft Results.  No interested party submitted comment regarding the recalculation of Xugong's EP and CEP without making deductions for Chinese VAT.

**Issue 1:  GTC's Separate Status**

---

[96] *See* GTC's 2nd SAQR at Exhibit 7C.
[97] *See* GTC's 1st SAQR at Exhibit 3 (Guizhou Tyre Co., Ltd. Annual Report of 2015, p. 41).
[98] *See* GTC's 1st SAQR at Exhibit 1.
[99] *Id.* (citing GTC's AoA at art. 118).
[100] *See* GTC's 1st SAQR at Exhibit 1 (citing GTC's AoA at art. 134).
[101] *See* GTC's 3rd SAQR at Exhibit 6.
[102] *See, generally*, Draft Results.

*GTC's Comments:*

- Extensive legal requirements and safeguards prevent GIIG from dominating GTC management decisions, which include not only GTC's AoA but also relevant Chinese company laws and codes.[103]

- GTC has successfully provided the *minimum quantum* of evidence and successfully shifted the burden to Commerce to provide affirmative evidence of government control.[104]  Thus, Commerce's denial of GTC's separate rate is unlawful.

- Commerce misplaces its reliance on GIIG having accounted for most of the votes electing the 6th Board of GTC, almost 2 years prior to the POR.[105]  As Commerce itself recognized, such occurrences that "predate the POR . . . are thus not pertinent to this review."[106]  Moreover, these board members were nominated by the Nomination Committee, and GIIG had no involvement with said nomination.[107]

- In the prior review of this order, Commerce reviewed GTC as a mandatory respondent, conducted onsite verification, and found no discrepancies with GTCs qualification for a separate rate where the exact same board constitution was in place as in this review.

- Since prior reviews granting GTC a separate rate, GIIG has *decreased* its investments in GTC between AR5 and AR 7, *i.e.*, GIIG's investment reduced from 33.36 percent to 25.20 percent and the Guiyang SASAC ceased conducting performance reviews during that period of time.

- The Draft Results improperly fixate on a July 2015 shareholder meeting to find control by GIIG, while ignoring the May 2015 shareholder meeting that disproves GIIG's control.[108]  At the May 15, 2015 meeting, two managerial candidates advocated by GIIG were voted upon but not elected due to dissenting votes from shareholders other than GIIG.[109]  If GIIG controlled GTC, it would have been able at that time to appoint its preferred members to GTC's board.[110]  Although, two months later, GIIG was able to elect its preferred members to GTC's board, the record only demonstrates that GIIG did so within the bounds of GTC's decision-making processes through the normal courses granted to all shareholders.[111]  Thus, there is no record evidence of any instance of control by GIIG.

- GIIG does not have any rights not granted to every shareholder individually or jointly and is limited in its ability to nominate director candidates to no more than one-fifth of all directors.[112]

- The Draft Results misplaces reliance on GTC's Chairman in a strained attempt to manufacture government control emphasizing that he *serves as the proxy representing GIIG*

---

[103] *See* GTC's and Aeolus's Draft Comments at 9.

[104] *Id.* at 10.

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] *Id.* at 13.

[109] *Id.*

[110] *Id.*

[111] *Id.* at 12.

[112] *Id.* at 12-13.

-21-

*at GTC's shareholders' meetings.* GTC's board chairman may have served as GIIG's proxy, but he did not work for GIIG or any other governmental entity.[113]

- Commerce did not and cannot find overlapping management between GTC and GIIG, having been advised that GTC's board members and senior managers did not work in any government entities during the POR or three previous years.[114] Further, during the POR, the second-largest shareholder owned 9.87 percent of shares and the third-largest owned 7.74 percent.[115] Being under the 10 percent threshold, the shareholders could have joined together or with other shareholders to nominate non-independent directors.[116]

**Commerce's Position:** The separate rate analysis has been subject to litigation in multiple cases before the CIT and the Court of Appeals for the Federal Circuit (CAFC), and Commerce's current practice is in accordance with the holdings of those Court decisions. For example, in *Sigma*, the CAFC affirmed that it is within Commerce's authority to employ a presumption for state control in an NME country and place the burden on the exporters to demonstrate an absence of central government control.[117] The CAFC held that sections 771(18)(B)(iv)-(v) of the Act recognize a close correlation between an NME economy and government control of prices, output decisions, and allocation of resources, and therefore, Commerce's presumption of government control is reasonable.[118] Likewise, in *Jiangsu 2015*, the CIT ruled that Commerce could "make reasonable inferences from the record evidence" when examining the totality of the circumstances in determining whether a respondent had demonstrated *de jure* and *de facto*

---

[113] *Id.* at 15.

[114] *Id.* (citing GTC's 3rd SQR at 4).

[115] *Id.* at 17 (citing GTC's AQR at Exhibit A-8).

[116] *Id.*

[117] *See Sigma* at 1405-06 ("We agree with the government that it was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control. The antidumping statute recognizes a close correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of resources. Moreover, because exporters have the best access to information pertinent to the 'state control' issue, Commerce is justified in placing on them the burden of showing a lack of state control.") (internal citations omitted).

[118] *Id.*; *see also Coalition for the Preservation of American Brake Drum and Rotor Aftermarket Manufacturers v. United States*, 44 F. Supp. 2d 229, 243 (CIT 1999) (quoting *Sigma*, 117 F. 3d at 1405 ("Under the broad authority delegated to it from Congress, Commerce has employed 'a presumption of state control for exporters in a non-market economy.'... Under this presumption, all exporters receive one non-market economy country (NME) rate, or country-wide rate, unless an exporter can 'affirmatively demonstrate' its entitlement to a separate, company-specific margin by showing 'an absence of central government control, both in law and in fact, with respect to exports.'")).

-22-

control of its export activities.[119]  Furthermore, in *Advanced Technology*, the CIT ruled that

majority ownership by a government entity, either directly or indirectly, rules out a respondent's

ability to demonstrate an absence of *de facto* control.[120]

In *Wire Rod*, Commerce explained why evidence of indirect or direct government

ownership is a sufficient evidentiary basis on which to conclude that an NME government has

the ability to exercise control over a company such that the company is ineligible for a separate

rate:

> the majority ownership holding in and of itself means that the government exercises or
> has the potential to exercise control over the company's operations generally, which may
> include control over, for example, the selection of management, a key factor in
> determining whether a company has sufficient independence in its export activities to
> merit a separate rate.  Consistent with normal business practices, we would expect any
> majority shareholder, including a government, to have the ability to control, and an
> interest in controlling, the operations of the company, including the selection of
> management and the profitability of the company.[121]

Although in *Advanced Tech* the respondent was majority owned by a government

entity,[122] in other cases, consistent with the facts in *Jiangsu 2015*, Commerce has examined the

totality of the circumstances where a respondent is not majority owned by a government entity

---

[119] *See Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121 F. Supp. 3d 1263, 1266 (CIT 2015) (*Jiangsu 2015*), citing *Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1339 (CIT 2014) (*Jiangsu 2014*) ((quoting *Certain Cut-to-Length Carbon Steel Plate from Ukraine*, 62 FR 61754, 61759 (November 19, 1997) and *Sigma* at 1405 (citation omitted), respectively; and citing *Daewoo Elecs. Co. v. United States*, 6 F. 3d 1511, 1520 (Fed. Cir. 1993) (explaining that substantial evidence may include "reasonable inferences from the record") (quotation marks and citation omitted)).

[120] *See Jiangsu 2015*, 121 F. Supp. 3d at 1266 (citing *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012) (*Advanced Tech I*), remand *aff'd* in *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013) (*Advanced Tech II*), *aff'd* in *Advanced Technology & Materials Co., Ltd. v. United States*, Case No. 2014-1154 (Fed. Cir. Oct. 24, 2014) (*Advanced Tech III*) (collectively, *Advanced Tech*) ("Specifically, as a result of litigation challenging Commerce's separate rate determinations in the diamond sawblades proceedings, Commerce has clarified its practice with regard to evaluating NME companies' *de facto* independence from government control.  This revised practice, which was sustained by this Court and subsequently affirmed by the Court of Appeals, holds that 'where a government entity holds a majority ownership share, either directly or indirectly, in the respondent exporter {or producer},' such majority ownership holding 'in and of itself' precludes a finding of *de facto* autonomy.")).

[121] *See, e.g., Steel Wire Rod*.

[122] *See Advanced Tech I*, 885 F. Supp. 2d 1343.

and made a reasonable inference that the respondent does not control its export activities.  For

example, in *Containers*, we found that a respondent was indirectly controlled by an SOE, despite

owning a minority of shares, and denied that company a separate rate.[123]  In that case, two

minority shareholders owned a combined 48.2 percent of the respondent but, in turn, were 100-

percent owned by a Chinese SASAC.[124]  We examined the totality of the circumstances in

*Containers* and concluded that a Chinese SASAC, though the minority shareholders it owned,

had the ability to exercise control over important management organizations, such as the board

of directors, which had the authority to appoint managers that controlled the operations of the

respondent.[125]

Therefore, following these cases, in evaluating whether a respondent has rebutted the

presumption of government control, it is Commerce's practice to examine whether the

government might be able to exercise, or have the potential to exercise, control of a company's

general operations through *minority* government ownership under certain factual scenarios.[126]

---

[123] *See 53-Foot Domestic Dry Containers from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value; Final Negative Determination of Critical Circumstances*, 80 FR 21203 (April 17, 2015) (*Containers*), and accompanying IDM at Comment 10.

[124] *Id*.

[125] *Id*.

[126] *See Truck and Bus Tires From the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination, in Part*, 82 FR 8606 (January 27, 2017) (*Truck & Bus Tires*), and accompanying IDM at Comment 1; *see also 1,1,1,2 Tetrafluoroethane (R-134a) from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, in Part*, 82 FR 12192 (March 1, 2017) (*Tetra*), and accompanying IDM at Comment 1 ("The Department continues to evaluate its practice with regard to the separate rates analysis in light of the Diamond Sawblades 2014 AD proceeding, and the Department's determinations therein.  In particular, we note that in litigation involving the Diamond Sawblades 2014 proceeding, the CIT found the Department's existing separate rates analysis deficient in the specific circumstances of that case, in which a government-controlled entity had significant ownership in the respondent exporter.  Following the Court's reasoning, as affirmed by the Court of Appeals for the Federal Circuit ("CAFC"), in recent proceedings, we concluded that where a government entity holds a majority ownership share, either directly or indirectly, in the respondent exporter, the majority ownership holding in and of itself means that the government exercises, or has the potential to exercise, control over the company's operations generally.  This may include control over, for example, the selection of management, a key factor in determining whether a company has sufficient independence in its export activities to merit a separate rate.  Consistent with normal business practices, we would expect any majority shareholder, including a government, to have the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company.").

Specifically, the Court has upheld Commerce's practice of finding that a respondent company could not rebut the presumption of *de facto* government control where the government owns, either directly or indirectly, only a minority of shares in the respondent company, and where the record contains requisite "additional indicia" of control.[127]  Consistent with normal business practices, we would expect any controlling shareholder, including a government, to have the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company.[128]  In addition, in other cases, after an examination of the facts of the case, we have examined whether the government may be able to exercise, or have the potential to exercise, control of a company's general operations through minority government ownership.[129]

GTC asserts that the Draft Results are devoid of any indication with respect to government control over GTC, let alone the requisite "additional indicia."  We disagree.  Our analysis above demonstrates that we have considered the factual record with respect to the potential to exercise government control and identifies the evidence that is the basis for our finding that GTC is not eligible for a separate rate.  We also disagree with GTC's claim that the burden of proof shifted to Commerce to provide such direct evidence of government control based on a minimum quantum of information provided by GTC which purports to establish the non-existence of such control.  Commerce's separate rate practice requires respondents to rebut the presumption of government control if it wishes to demonstrate its eligibility for a separate rate.  GTC cites to the various provisions in the AoAs and Chinese company law that ostensibly provide safeguards to minority shareholders, which it purports to represent specific evidence

---

[127] *See An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1350, 1359 (CIT 2018), *appeal dismissed*, No. 18-1713, 2018 WL 4562795 (CAFC August 22, 2018) (*An Giang II*).
[128] *Id*.
[129] *See, e.g.*, *Truck & Bus Tires* IDM at Comment 1.

-25-

**BUSINESS PROPRIETARY INFORMATION DELETED**
Barcode:3893758-01 A-570-912 REM - Remand  -  Slip Op 19-64

demonstrating *de facto* independence from the government.[130]  However, GTC ignores the other

evidence on the record identified by Commerce, particularly the shareholder voting record that,

in contrast to the above evidence which pertains to *de jure* independence, illustrates which

shareholders *in fact* elected GTC's board of directors, that belies the effect that those safeguards

were intended to have.[131]

Additionally, GTC cites to the Draft Results at 18, which it asserts is {Commerce's}

"own 'acknowledge{ment}' these safeguards rebut the presumption that GTC is government

controlled."  However, GTC's reliance on our statement on page 18 of the Draft Results is

misplaced.  In our Draft Results we stated:

> {T}hough we acknowledge that the AoA cited by GTC appears *on its face* to place
> safeguards against undue influence by large shareholders in the selection of GTC's senior
> managers, the record demonstrates that *those safeguards were unsuccessful in the instant
> case*. (emphasis added)

As such, GTC's argument relies only on the first part of this statement, without recognizing that

Commerce found, based on other record evidence, that those safeguards were unsuccessful in

this case – and thus that such safeguards were insufficient to constitute the minimum quantum

necessary to rebut the presumption of *de facto* government control.

GTC contends that Commerce misplaces reliance on the 2012 shareholder vote (which

elected the Board of Directors of the company that was in place during the majority of the POR

in question), because occurrences pre-dating the POR are not pertinent to the review.  Further,

because the board nominations were made by the Nomination Committee and not the directors

themselves, GTC argues that GIIG was not involved in the nomination stage as Commerce

suggests.  This argument wholly ignores that the board members elected in 2012 [

---

[130] *See* GTC's 1st SAQR at Exhibit 6.
[131] *Id.*

**BUSINESS PROPRIETARY INFORMATION DELETED**

], including the [

], and thus [                    ].[132]  Thus, the record

establishes that while the extant board members [                    ] and GIIG had no direct role

in the nomination process, those directors were then elected to the board in a shareholder vote

where [                                        ] in the shareholder meeting.  As such,

the nomination process notwithstanding, GIIG's votes effectively selected the board.  Thus,

GIIG's votes effectively selected the board in existence for the majority of the POR.

GTC argues that the extent to which other shareholders did or did not participate in the

pre-POR election of the Board of Directors is irrelevant because, as Commerce recognized in the

underlying review, such occurrences that "pre-date the POR . . . are thus not pertinent to this

review."[133]  However, the statement cited by GTC concerned a performance review of GTC

performed by the Guiyang SASAC which pre-dated the POR and was thus deemed not pertinent

to this review.[134]   In contrast, and we find that evidence of a shareholder vote installing a Board

of Directors whose composition remained the same during the majority of the instant POR is,

indeed, *specifically pertinent* to the issue at hand, regardless of when such a vote was held.

GTC then asserts that the Draft Remand improperly fixates on the July 2015 Meeting to

find GIIG control, while ignoring the May 2015 Meeting that disproves GIIG control.  However,

GTC focuses on the results of the May 2015 meeting, without consideration of the results of the

May and July 2015 shareholder votes taken together and the reasonable conclusion that may be

drawn from these votes.  GTC emphasizes that the May annual shareholder meeting and vote

---

[132] *See* GTC's 1st SAQR at Exhibit 11.

[133] *See* GTC's and Aeolus's Draft Comments at 10 (citing *Final Results* IDM at 15).

[134] *See Final Results* IDM at 15 ("the Department rejects Petitioners' assertion that we deny GTC's separate rate because of unsubstantiated claims of Guiyang SASAC's review during the POR.  Petitioners have failed to demonstrate their claim through record evidence").

-27-

**BUSINESS PROPRIETARY INFORMATION DELETED**
Barcode:3893758-01 A-570-912 REM - Remand  - Slip Op 19-64

demonstrate that GIIG does not and cannot control the board selection process.  GTC claims that GIIG's election of its preferred candidates two months later does not demonstrate control, but rather, participation in GTC's decision-making in the normal course available to all shareholders.[135]  Regardless of whether the July 2015 meeting was convened in accordance with all relevant Articles of Association and relevant law we find that the re-vote evinces the limitations of such protections.  The July 2015 shareholder vote demonstrates that the largest, albeit minority, SOE shareholder, GIIG, exerts influence over GTC.  Prior to 2015, there is no record evidence that any proposal which went before the shareholders for a vote did not pass and, indeed, [                                                    ].[136]  Thus, the independent director and profit-sharing votes in May 2015 represent the first instance on the record where the largest shareholder and SOE supported proposals did not pass a shareholder vote.  The record thus demonstrates that, upon this first instance of a GIIG-supported proposal failing to secure majority shareholder support, an interim shareholder vote was immediately called, and the prior failed proposals were submitted for re-vote.  Article 49 of GTC's AoA allows "[

                                                      ]."[137]  Thus, only GIIG individually has the requisite number of shares to convene an interim shareholders meeting.[138]  As such, GIIG's sole ability to convene interim shareholders meetings means GIIG can effectively hold re-votes on GIIG's favored proposals until such a time where such proposals would prevail, which they did in the July 2015 re-vote, where GIIG dominated the vote and its

---

[135] *Id.* at 13 (citing GTC's 2nd SAQR at 10).

[136] *See* GTC's 1st SAQR at Exhibit 7; GTC's 2nd SAQR at Exhibit 7; and GTC's 3rd SAQR at Exhibits 4-8.

[137] *See* GTC's 1st SAQR at Exhibit 1.

[138] *See* GTC's AQR at Exhibit A-8.

Filed By: Brendan Quinn, Filed Date: 9/25/19 12:45 PM, Submission Status: Approved

**BUSINESS PROPRIETARY INFORMATION DELETED**

Barcode:3893758-01 A-570-912 REM - Remand  -  Slip Op 19-64

preferred proposals prevailed.[139]  We continue to conclude that this fact pattern demonstrates an

additional indicium of the potential for GIIG to control the board, and thus the day-to-day

operations, of GTC, regardless of any minority shareholder protections included in the company

AoAs or otherwise.

      GTC also contends that the Draft Remand misplaces reliance on GTC's Chairman by

emphasizing that he [                                                                                                    ].

GTC asserts that the board chairman, Ma Shichun, may have served as GIIG's proxy, but he did

not work for GIIG or any other governmental entity and was merely instructed by GIIG to vote a

certain way.[140]  While we do not solely rely on Mr. Shichun's status as the GIIG proxy as

evidence of control, we disagree that our reliance on the relationship between Mr. Shichun and

the SOE in question is misplaced.  In particular, Commerce uses this fact to illustrate that GTC's

Chairperson does, in fact, communicate with and receives suggestions regarding nominations

and profit distribution from a government entity, to which he is beholden for his position at GTC,

as GIIG's shares determined the selection of GTC's board.

      GTC further asserts that the fact that all shareholders have the ability to nominate

directors shows GIIG does not control the board selection process; that the fact that directors

have to date only been nominated by the board does not prevent shareholders from doing so in

the future; and that Commerce improperly conflates actions of the GTC board with actions of

GIIG.  Similarly, GTC argues that Commerce ignores that provisions of the AoAs allow [

---

[139] *See* GTC's 1st SAQR at Exhibit A-7.
[140] *See* GTC's and Aeolus's Draft Comments at 16 (citing GTC's 2nd SAQR at Exhibit 7A).

Filed By: Brendan Quinn, Filed Date: 9/25/19 12:45 PM, Submission Status: Approved

**BUSINESS PROPRIETARY INFORMATION DELETED**

], and, thus, that a constituency of two or more of GTC's non-majority shareholders could indeed undertake such actions represents evidence of the lack of GIIG control of the company.  While such actions may, indeed, be sufficient to rebut a presumption of control with respect to the largest shareholder, absent evidence on the record that such actions were actually undertaken, the mere potential for such actions remains insufficient to rebut evidence of GIIG's exercise of control during the POR, as discussed above.

Furthermore, GTC is correct in its assertion that the second-largest shareholder owned 9.87 percent of shares and the third largest owned 7.74 percent of GTC shares.[141]  However, GTC fails to consider that these are funds managed by government entities (*i.e.*, ICBC Credit Suisse Fund-Industrial and Commercial Bank of China-ICBC Credit Suisse Asset Management Co., Ltd., Tianhong Fund-China Everbright Bank-Minmetals International Trust -Jin Niu No 6, Private Placement, Aggregate Asset Trust Plan).[142]  Commerce has long considered Chinese financial institutions to be arms of the Chinese government.[143]  Moreover, when reviewing separate rate applications, Commerce considers whether an SOE takes an active or a passive role in the business activity of the company under consideration.[144]  As the record did not indicate that the funds exercised their shareholder rights, Commerce did not consider the funds in its SOE ownership analysis; however, GTC's hypothetical argument would make the funds not merely passive investors and would only serve to increase the potential for government control over

---

[141] *See* GTC's AQR at Exhibit 3.

[142] *See* Petitioner's Letter, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912):  Petitioners' Rebuttal Information and Deficiency Comments on Aeolus' Separate Rate Application," dated December 30, 2015 at Attachment 6 and  Attachment 9 (the petitioners' AQR Comments).

[143] *See Coated Paper* IDM at Comment 17.

[144] *See Notice of Final Determination of Sales at Less Than Fair Value:  Certain Cased Pencils from the People's Republic of China*, 59 FR 55625, 55628 (November 8, 1994).

GTC's management selection and profit distribution, not decrease the potential for government

control over the selection of its board of directors and profit distribution.[145]

## Issue 2:  Aeolus's Separate Status

*Aeolus's Comments:*
- The Draft Results improperly continues to deny separate rate status for Aeolus, despite its being 49.06-percent SOE-owned.[146]  Extensive legal requirements and safeguards prevent any one shareholder from dominating Aeolus, including relevant provisions of Aeolus's AoAs and relevant Chinese company law.[147]
- Commerce conflates actions by the board with actions of the SOE shareholder.[148]  Though Commerce concludes that the board confirmation and management selection processes are controlled by ChinaChem, the shareholders democratically select Aeolus's board in a meeting open to all shareholders.[149]
- There is no record support for these assertions that [

] at the time of the POR.[150]  Thus, the Draft Results improperly denied Aeolus a separate rate based on unsupported assertions concerning ChinaChem's voted shares.[151]
- The Draft Results also misconstrue record evidence concerning Aeolus's Chairman.[152]  Specifically, there is no record support for Aeolus describing its Chairman as a representative of China National Tire.  Also, government control is not evidenced merely because Aeolus's AoA grants its Chairman broad authorities, including [

].[153]
- The Draft Results incorrectly discount the Rectification Report, which constitutes compelling evidence of cessation of intertwined operations between ChinaChem and Aeolus before the POR of the seventh administrative review.[154]  The Draft Results mischaracterized the Rectification Report as a voluntary restraint promised by ChinaChem and an unenforceable promise by an SOE.[155]  Commerce ignores the explanation in the Rectification Report that it is being entered into as a means of compliance with a decision rendered by the Henan Security Regulatory Commission (Henan SRC), as the Henan SRC is analogous to the

---

[145] *See* GTC's and Aeolus's Draft Comments at 17 (citing GTC's AQR at Exhibit A-8).

[146] *See* GTC's and Aeolus's Draft Comments at 22.

[147] *Id.*  Aeolus cites to PRC Company Law Articles 37 and 99; Articles 20 and 21 of the Chinese Code for Listed Companies; and Articles [                    ] of its AoAs.

[148] *Id.* at 23.

[149] *Id.* (citing Aeolus's SRA 13-14).

[150] *Id.* at 24.

[151] *Id.* at 25.

[152] *Id.*

[153] *Id.*

[154] *Id.* at 26.

[155] *Id.*

Securities and Exchange Commission (SEC).[156]  The Draft Results interpret the terms of the Rectification Report contrary to their plain meaning.[157]  The Rectification Report evidence established that the steps taken to ensure that Aeolus has an independent accounting system are effective.

- The Draft Results thus rest only on speculative statements that ChinaChem could control Aeolus, whereas Aeolus has presented the *minimum quantum* of evidence necessary to shift the burden of proof to Commerce to affirmatively show *de facto* government control.[158]

**Commerce's Position:**  Aeolus makes arguments similar to GTC's with respect to Commerce's separate rate practice, generally.  In response, we refer to our discussion of our separate rate practice, generally, in Comment 1, *supra*, and the change to our practice in Comment 3, *infra*.  Regarding its claim that it has identified sufficient evidence that rebuts the presumption of government control, we disagree.  We address comments with respect to Commerce's specific findings concerning Aeolus in the Draft Results and support for the additional indicia of SOE control herein.

Aeolus first asserts that the Draft Results misconstrue the evidence of its board of directors being nominated and appointed by its shareholders, emphasizing that it is the board of directors, not the shareholders, who nominate directors, whereas shareholders then vote for the selections (thus, no shareholder, ChinaChem or otherwise *nominates* candidates for board positions).  We inadvertently conflated the board nomination and selection process in our discussion, whereas the intent of the analysis was to focus on the latter.  Nevertheless, because each board member was approved in ChinaChem-dominated shareholder votes, the fact that board members, not shareholders, nominate other potential board members does not undermine our finding that ChinaChem exercises control over the board selection process.  Aeolus would prefer that Commerce focus on the provisions of the AoAs and relevant company law that

---

[156] *Id.*
[157] *Id.* at 26.
[158] *Id.* at 27-28.

**BUSINESS PROPRIETARY INFORMATION DELETED**

hypothetically allow for public shareholders to approve board members; however, Commerce based its findings on record evidence that belies the effectiveness of such provisions, *e.g.*, the actual shareholder voting record demonstrating ChinaChem's dominance of the board selection process.[159]

Furthermore, Aeolus misplaces its reliance on the Chinese company law, Aeolus's AoA, and the Code for Listed Companies, as evidence of *de facto* independence from the government. Crucially, the shareholder voting record illustrates which shareholders *in fact* elected Aeolus's board of directors.  ChinaChem, a known SOE, dominated the vote concerning the election of Aeolus's board of directors through its 100 percent owned subsidiary China National Tire & Rubber.  The record indicates that ChinaChem through its 100 percent owned subsidiary, in fact, elected the directors of ChinaChem's choosing during the POR.[160]

Aeolus next contends that the Draft Results incorrectly stated that the AoA allows [


] whereas [


].[161]  We thus clarify the statement as follows:  non-independent director candidates *may* remain in their position in perpetuity so long as they are re-elected.[162] While our statement in the Draft Results may have been imprecise, our critical finding remains unchanged:  non-independent directors may remain in their position in perpetuity if first re-nominated by Aeolus's nomination committee and re-elected.[163]  As Aeolus asserts, to maintain their positions as board members, the "non-independent" board members must be voted in by the

---

[159] *See* Draft Results at 8 (citing Aeolus's SRA at Exhibit 11).
[160] ChinaChem's votes presents were [
                                            ], thus electing the board members of its choosing.
[161] *See* GTC's and Aeolus's Draft Comments at 24 (citing Aeolus's SRA at Exhibit 11 (emphasis added)).
[162] *Id.*
[163] *See* Aeolus's SRA at Exhibit 11, Exhibit 13A.

-33-

**BUSINESS PROPRIETARY INFORMATION DELETED**

shareholders present at the particular shareholders meeting electing the board officials.[164]  In the instant case, the AoA still allows directors to remain in perpetuity, as long as they are re-elected by the *shareholders*, whose votes are dominated by an SOE.  As such, the board of directors is beholden to its SOE shareholders, one of which the Henan SRC has referred to as Aeolus's actual controlling shareholder, *i.e.*, ChinaChem.[165]

Aeolus contends that Commerce erred in finding that ChinaChem represented an [

].[166]  Aeolus contends that that the exhibit cited by Commerce does not provide the voting information recited in the Draft Remand.[167]  Although Commerce cited only to Aeolus's SRA at Exhibit 13A (demonstrating the shareholder vote), Exhibit 6 of Aeolus's SRA demonstrates Aeolus's ownership (and thus, the proportion of the voting shares held by the shareholders).[168]  To be clear, contrary to Aeolus's assertions, the record indeed indicates that SOEs made up [

] of all shares voted to elect Aeolus's Board during the POR, with ChinaChem itself making up [          ] of all shares voted to choose Aeolus's Board.[169]  Specifically, Exhibit 6 of Aeolus's SRA shows that ChinaChem owns 159,642,148 of Aeolus's shares.  Exhibit 13A illustrates there were [        ] shares ([            ] percent of total voting shares) present at the vote which elected Aeolus's board during the POR, with a total of [          ] of the shares held by [                    ].[170]  No constituency of [            ] could

---

[164] *See* Aeolus's SRA at Exhibit 6 and Exhibit 13A.

[165] *See* Aeolus's SRA at Exhibit 6 and Exhibit 13A; *see also* Aeolus's Information Rebuttal at Exhibit-1A ([
    ]).

[166] *See* Aeolus's Draft Comments at 24-25.

[167]*Id.*

[168] *See* Aeolus's SRA at Exhibit 6 and Exhibit 13A ([

                                                                    ]).

[169] *Id.*

[170] *Id.*

**BUSINESS PROPRIETARY INFORMATION DELETED**

otherwise account for the [          ] shares in attendance without ChinaChem; thus,

ChinaChem was necessarily a party to that vote.[171]  As stated above, ChinaChem owns

159,642,148 of the shares voting at the meeting which equates to [

].[172]

Aeolus contends that the record does not support Commerce's finding that Aeolus'

Chairman is a representative of China National Tire, which is 100 percent owned by

ChinaChem, who votes on behalf of China National Tire.  However, our finding is based on

Aeolus' response to a question regarding Wang Feng's responsibilities and duties at both

entities:  "China National Tire & Rubber Corp. is a shareholder of Aeolus.  A representative of

China National Tire & Rubber Corp. attends the Shareholder's Meeting of Aeolus and votes at

the meeting."[173]  Thus, the record is vague as to whether the China National Tire representative

and Mr. Wang are one and the same.  However, even if the representative and Mr. Wang are

distinct, the record still reflects an Aeolus Board of Directors which includes Chairman Wang

Feng, who is also a board member of China National Tire, a [          ] owned subsidiary of

ChinaChem.  Moreover Mr. Wang sits on the nomination committee for Aeolus, and also holds

the position of [

---

[171] *Id.*

[172] *Id.*  Commerce notes that its [

].

[173] *See* Aeolus's Supp. SRA at 2.

-35-

**BUSINESS PROPRIETARY INFORMATION DELETED**

].[174]  Thus, Mr. Wang, a fiduciary of China National Tire, votes at Aeolus's board meetings.[175]

As such, Aeolus's assertion does not undermine Commerce's finding that the record provides substantive indicia of ChinaChem's control of Aeolus by way of Mr. Wang's position as chairman of Aeolus's board of directors and as a board member of a wholly-owned SOE subsidiary, China National Tire.[176]  Furthermore, as a fiduciary of both China National Tire and Aeolus, he has a responsibility to maximize profits for both entities, meaning that if it is in the best interest of China National Tire, an SOE subsidiary, [                    ], and it does not explicitly violate provisions of the AoA or China corporate law, he must do so.  As China National Tire is 100 percent owned by an SOE, he, in essence, has a fiduciary responsibility to an SOE; thus, he is beholden to an SOE.[177]  Moreover, we have found such connections between a controlling shareholder and a separate rate applicant warrant denying the applicant a separate rate, and the CIT has upheld such determinations.[178]

Further, Aeolus argues that the Draft Results incorrectly discount the Rectification Report and maintains that the document constitutes compelling evidence of a cessation of intertwined operations between ChinaChem and Aeolus before the AR7 POR.[179]  Commerce has fully analyzed the Rectification Report and has interpreted the Rectification Report in light of the

---

[174] *See* Aeolus's SRA at Exhibit 10A (Aeolus Tyre Co., Ltd. 2014 Annual Report at p. 24); *see also* Petitioners' Letter, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off- The-Road Tires from China (A–570–912): Petitioners' Rebuttal Information and Deficiency Comments on Aeolus' Separate Rate Application," December 30, 2015, at Attachment 4 (citing Aeolus Tyre Co., Ltd. 2014 Annual Report at 24) (Petitioners' SRA Comments).

[175] *Id.*

[176] *Id.*

[177] *See* Aeolus's SRA at Exhibit 11, [      ]; Aeolus's Supp. SRA at 2; and Petitioners' SRA Comments at Attachment 4.

[178] *See, e.g.*, *Zhejiang Quzhou*, 350 F. Supp. 3d at 1320-21.

[179] *See* Aeolus's Information Rebuttal at Exhibit-1A.

plain language of the report, which lists ChinaChem as actual controlling party of Aeolus, as well as the party maintaining the ERP system.[180]  In addition, Commerce lists further concerns regarding the enforceability of the report (*i.e.*, that it fails to list any reviewable steps that the Henan SRC took to monitor and ensure compliance, or any penalty or threat of penalty for continued non-compliance before the POR).[181]  Aeolus may characterize these concerns as speculative but, nevertheless, it fails to rebut our finding that the report itself lists ChinaChem as the actual controlling party of Aeolus and a custodian of the ERP system.[182]

**Issue 3:  New Separate Rate Analysis Contradicts Findings in Prior Segments**

*GTC and Aeolus's Comments*:

- Commerce's denial of separate rates for GTC and Aeolus contradicts Commerce's longstanding separate rate analysis.  Specifically, Commerce focuses on management selection, instead of examining the "totality of the circumstances."  Under the holistic approach, both respondents indisputably set their export prices without government approval and have independent authority to negotiate and sign contracts demonstrating their eligibility for a separate rate.  Commerce's new approach does not examine whether the government controls the companies' export activities, and instead focuses on management selection. Commerce did not even bother to analyze the respondents' export activities before denying their separate rates.[183]

- Commerce treated government ownership as dispositive, using a truncated analysis that relied upon SOE ownership percentages to deny separate rate status.  Decades ago Commerce determined that ownership 'by all the people' in and of itself cannot be considered dispositive in establishing whether a company can receive a separate rate.[184]

- Commerce relied solely upon the government's potential to nominate a manager or a board member, deviating from its practice of requiring that the government either actually appoint management or be directly or indirectly involved in the management of the company.[185]

---

[180] *Id.* at Exhibit 1.

[181] *Id.*

[182] *Id.*

[183] *See* GTC's and Aeolus's Draft Comments at 29-30 (citing *Jiasheng I* (quoting *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate From Ukraine*, 62 FR 61754, 61759 (November 19, 1997); *Jiasheng II*; Policy Bulletin 05.1; *Sparklers*, 56 FR at 20588; *Silicon Carbide*, 59 FR at 22587; *Furfuryl Alcohol*, 60 FR at 22545; and *Structural Steel Beams from China*, 66 FR at 67199).

[184] *Id.* at 30 (citing *Silicon Carbide*, 59 FR at 22586; and *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results and Partial Termination of Antidumping Duty Administrative Review*, 62 FR 6173, 6174 (February 11, 1997).

[185] *Id.* at 31 (citing *Notice of Amended Final Results of Antidumping Duty Administrative Reviews: Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China*, 71 FR 10009 (February 28, 2006), and accompanying IDM at Comment 3; *An Giang I*, 203 F. Supp. 2d at 1292; and *Jiangsu 2015*, 121 F. Supp. 3d at 1269).

- Commerce has thus established a new separate rate analysis inconsistent with separate rate findings in the LTFV investigation and prior reviews and lacking reasonable explanation of the change in practice.[186]

**Commerce's Position:**  First, we disagree with GTC and Aeolus that denying GTC and Aeolus a separate rate contradicts Commerce's long-standing separate rate analysis.  In NME proceedings, there is a rebuttable presumption that companies are subject to government control and, thus, should be assessed a single antidumping duty rate.[187]  It is Commerce's policy to assign exporters of the subject merchandise from an NME country a single rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to its export activities.  To establish whether a company is sufficiently independent to be entitled to a separate, company-specific rate, Commerce analyzes each exporting entity in an NME country under the test established in *Sparklers*,[188] as amplified by *Silicon Carbide*.[189]

Under the separate rates test, Commerce considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate:  (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) legislative enactments decentralizing control over export activities of the companies; and (3)

---

[186] *Id.* at 31-32 (citing *Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272, 1276 (2008); *SKF USA, Inc. v. United States*, 630 F. 3d 1365, 1373 (CAFC 2011); *WelCom Prods., Inc. v. United States*, 865 F. Supp. 2d 1340, 1344 (CIT 2012); and *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)).

[187] *See Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part:  Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079, 53082 (September 8, 2006); *see also Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances:  Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303, 29307 (May 22, 2006).

[188] *See Sparklers*, 56 FR at 20589.

[189] *See Silicon Carbide*, 59 FR at 22586-89.

other formal measures by the government decentralizing control over export activities of
companies.[190]

    Further, Commerce typically considers four factors in evaluating whether a respondent is
subject to *de facto* government control of its export functions:  (1) whether the export prices are
set by, or are subject to the approval of, a government agency; (2) whether the respondent has
authority to negotiate and sign contracts and other agreements; (3) whether the respondent has
autonomy from the government in making decisions regarding the selection of management; and,
(4) whether the respondent retains the proceeds of its export sales and makes independent
decisions regarding the disposition of profits or financing of losses.[191]

    Commerce continues to evaluate its practice with regard to the separate rates analysis in
light of the *Diamond Sawblades from China* AD proceeding, and Commerce's determinations
therein.[192]  In particular, we note that in litigation involving the *Diamond Sawblades* proceeding,
the CIT found Commerce's existing separate rates analysis deficient in the circumstances of that
proceeding, in which a government-controlled entity had significant ownership in the respondent
exporter.[193]  We have concluded that, where a government entity holds a majority ownership

---

[190] *See Sparklers*, 56 FR at 20589.

[191] *See Silicon Carbide*, 59 FR at 22586-89; *see also Furfuryl Alcohol*, 60 FR at 22545.

[192] *See* Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from
the People's Republic of China, (May 6, 2013), in *Advanced Technology & Materials Co., Ltd. v. United States*, 885
F. Supp. 2d 1343 (CIT 2012) (*Advanced Technology*), affirmed in *Advanced Technology & Materials Co., Ltd. v.
United States*, 938 F. Supp. 2d 1342 (CIT 2013).  This remand redetermination is available on the Enforcement and
Compliance website at http://enforcement.trade.gov/remands/12-147.pdf; *see also Diamond Sawblades and Parts
Thereof from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review;
2011-2012*, 78 FR 77098 (December 20, 2013), and accompanying PDM at 7, unchanged in *Diamond Sawblades
and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review;
2011-2012*, 79 FR 35723 (June 24, 2014), and accompanying IDM at Comment 1.

[193] *See, e.g., Advanced Technology*, 885 F. Supp. 2d at 1349 ("The court remains concerned that Commerce has
failed to consider important aspects of the problem and offered explanations that run counter to the evidence before
it."); *see also id.* at 1351 ("Further substantial evidence of record does not support the inference that SASAC's
{state-owned assets supervision and administration commission} 'management' of its 'state-owned assets' is
restricted to the kind of passive-investor de jure 'separation' that Commerce concludes.") (footnotes omitted); *id.* at
1355 ("The point here is that 'governmental control' in the context of the separate rate test appears to be a fuzzy
concept, at least to this court, since a 'degree' of it can obviously be traced from the controlling shareholder, to the

Filed By: Brendan Quinn, Filed Date: 9/25/19 12:45 PM, Submission Status: Approved

share in an exporter, either directly or indirectly, the majority ownership holding in and of itself means that the government exercises (or has the potential to exercise) control over the company's operations generally.  This may include control over, for example, the selection of management, a key factor in determining whether a company has sufficient independence in its export activities to merit a separate rate.  Consistent with normal business practices, we would expect that a majority shareholder, including a government, to have the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company.  Accordingly, we have considered the level of government ownership, where necessary.

Thus, Commerce has not changed its separate rate practice, but rather examined the level of government ownership more closely in light of the *Diamond Sawblades* proceedings.  The less than fair value investigation of this proceeding occurred prior to *Advanced Tech*, and the 2012-2013 review where Commerce previously granted GTC a separate rate took place when Commerce began to evaluate its separate rates practice in light of *Advanced Tech*.  Since then, Commerce has employed this refined practice in several NME proceedings.

Next, GTC and Aeolus take issue with Commerce focusing on management selection, instead of examining the "totality of the circumstances."  We disagree and find that GTC and Aeolus misconstrue Commerce's separate rate analysis.  Commerce has a rebuttable presumption that companies within an NME are under government control.[194]  A respondent may rebut this presumption, unless record evidence demonstrates that the majority shareholder is controlled by

---

board, to the general manager, and so on along the chain to 'day-to-day decisions of export operations,' including terms, financing, and inputs into finished product for export."); and *id*. at 1357 ("AT&M itself identifies its 'controlling shareholder' as CISRI {owned by SASAC} in its financial statements and the power to veto nomination does not equilibrate the power of control over nomination.") (footnotes omitted).
[194] *See* Policy Bulletin 05.1 at 1.

the government.[195]  The CIT has confirmed that a respondent must rebut all four *de facto* criteria in order to qualify for a separate rate:

> The absence of *de facto* government control can be shown by evidence that the exporter sets its prices independently of the government and of other exporters, negotiates its own contracts, keeps the proceeds of its sales (taxation aside), *and* selects its management autonomously.  The test is conjunctive; thus, "Commerce requires that exporters satisfy all four factors of the *de facto* control test in order to qualify for separate rate status."  Because Plaintiffs failed to satisfy one *de facto* criterion, "Commerce had no further obligation to continue with the analysis."[196]

Here, as detailed extensively above, both GTC and Aeolus were unable to show absence of *de facto* control over their management selection.  GTC and Aeolus argue that Commerce disregards the nexus to export activities by focusing on management selection, without finding government control over the export activities of the companies.  However, Commerce's separate rate test examines all four *de facto* criteria:  (1) whether the export prices are set by, or are subject to the approval of, a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and, (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses in determining whether a respondent is

---

[195] *See Jiangsu 2015*, 121 F. Supp. 3d at 1266 (reiterating Commerce's revised practice as to precluding companies that have majority government shareholders from rebutting the presumption of de facto control); *see also Tetra* IDM at 8; *Steel Wire Rod* at 6-7 (explaining Commerce's practice).  The burden of rebutting the presumption of control is on the respondent company.

[196] *See Zhejiang Quzhou*, 350 F. Supp. 3d at 1313 (citations omitted); *see also Yantai CMC Bearing Co. Ltd. v. United States*, 203 F. Supp. 3d 1317, 1325-26 (CIT 2017) (*Yantai*) (affirming Commerce's determination that the respondent company was ineligible for a separate rate based on its failure to satisfy the third criterion in establishing an absence of *de facto* government control *i.e.,* autonomy from government control in making decisions in the selection of management); *id.*, 203 F. Supp at 1326 ("{a}s an exporter in an NME country that is indirectly majority-owned by the government, Yantai CMC has the burden to show that it has such autonomy…Yantai CMC failed to meet the third factor of the test. *Given that all four factors must be satisfied, Commerce had no further obligation to continue with the analysis.*" (emphasis added)).

subject to *de facto* government control of its export functions.[197]  If a respondent is unable to rebut one of the four *de facto* criteria, the company is ineligible for a separate rate.[198]

Additionally, GTC and Aeolus argue that Commerce treated government ownership as dispositive, relying on SOE ownership to deny separate rate status, when in the past, Commerce granted separate rates to companies "owned by all the people."  Again, Commerce's practice has evolved in light of the *Diamond Sawblades* proceeding, where the CIT found Commerce's existing separate rates analysis deficient in the circumstances of that proceeding, in which a government-controlled entity had significant ownership in the respondent exporter.  Also, as detailed above, in cases where a respondent was not majority owned by the government,[199] Commerce has examined the totality of the circumstances and made a reasonable inference that the respondent does not control its export activities by examining the four *de facto* criteria, as Commerce has done here.

Finally, GTC and Aeolus argue that Commerce relied solely on the government's potential to nominate a manager or a board member with control over day-to-day company operations, deviating from its practice of requiring that the government either actually appoint management or be directly or indirectly involved in the management of the company.  However, the respondents' characterization of Commerce's practice is incorrect.  As this Court has observed, in majority ownership situations the ability to exert control *is* control, whether or not that ability is exercised.[200]  The Court observed that, because of Commerce's practice of requiring additional indicia of control in minority ownership situations, Commerce cannot rely

---

[197] *See AMS Assocs. v. United States*, 719 F. 3d 1376, 1376 (CAFC 2013).

[198] *See Zhejiang Quzhou*, 350 F. Supp. 3d at 1313 (citations omitted); *see also Yantai*, 203 F. Supp. 3d at 1326.

[199] *See*, *e.g.*, *Containers* IDM at Comment 10; *see also An Giang II*, 284 F. Supp. 3d 1350.

[200] *See An Giang II*, 284 F. Supp. 3d at 1359.

solely on potentiality because "without more, 'potential control' suggests the potential to influence management rather than the potential to actually control management."[201]  Here, Commerce has not relied on mere potentiality, without more, but rather identified additional indicia of control as explained in Issues 1 and 2, above.

## IV.    FINAL RESULTS OF REDETERMINATION

These final results of redetermination have resulted in a dumping margin of 16.78 percent for Xugong.[202]  Furthermore, because this remand redetermination has resulted in changes to the weighted-average dumping margin for Xugong, the respondent for which we based the margin for the separate respondents,[203] we have assigned this rate to the following separate rate respondents:  (1) Qingdao Qihang Tyre Co., Ltd.; (2) Qingdao Free Trade Zone Full-World International Trading Co., Ltd.; (3) Trelleborg Wheel Systems (Xingtai) Co., Ltd.; and (4) Weihai Zhongwei Rubber Co., Ltd.

9/23/2019

X _____  [signature]

Signed by:  JEFFREY KESSLER

_____
Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

---

[201] *Id.* at 1360.

[202] *See* Memorandum, "Draft Results of Redetermination Pursuant to Court Remand in the 2013-14 Antidumping Duty Administrative Review of Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Draft Results Analysis Memorandum for Xuzhou Xugong Tyres Co.," dated August 9, 2019.

[203] *See Final Results*, 82 FR at 18734.

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

A-570-912
Remand: Slip Op. 21-60
POR: 9/1/2014-8/31/2015
**Public Version**
E&C/OIII: BQ

*Guizhou Tyre Co., Ltd., et al. v. United States*
**Consol. Court No. 17-00100; Slip Op. 21-60 (CIT 2021)**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final results of

redetermination in accordance with the May 14, 2021, remand order of the U.S. Court of

International Trade (the Court), in *Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co.,*

*Ltd., et al. v. United States*, Consol. Court No. 17-00100, Slip Op. 21-60 (CIT May 14, 2021)

(*Remand Order*).  These final results concern the final results of the administrative review of the

antidumping duty order on off-the-road (OTR) tires from the People's Republic of China

(China), covering the period of review (POR) September 1, 2014, through August 31, 2015.[1]

Previously, Commerce issued to interested parties the draft results of redetermination pursuant to

court remand.[2]

The *Remand Order* follows the Court's prior remand of the underlying review in *Guizhou*

*Tyre I* and our first remand redetermination.[3]  The Court sustained, in part, Commerce's

determination, explained in the *First Remand Redetermination*, to recalculate export price (EP)

---

[1] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of
Antidumping Duty Administrative Review; 2014–2015*, 82 FR 18733 (April 21, 2017) (*Final Results*), and
accompanying Issues and Decision Memorandum (IDM), amended by *Certain New Pneumatic Off-the-Road Tires
from the People's Republic of China:  Amended Final Results of Antidumping Duty Administrative Review; 2014-
2015*, 82 FR 27224 (June 14, 2017).
[2] *See Guizhou Tyre Co., Ltd., et al. v. United States, Consol. Court No. 17-00100; Slip Op. 21-60*:  Draft Results of
Redetermination Pursuant to Court Remand, released on August 23, 2021 (Draft Results).
[3] *See Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co., Ltd., et al. v. United States*, 389 F. Supp. 3d
1350 (CIT 2019) (*Guizhou Tyre I*); *see also Final Results of Redetermination Pursuant to Remand*, Court No. 17-
00100, Slip Op. 19-64 (CIT May 24, 2019) (*First Remand Redetermination*).

Case: 23-2163    Document: 21    Page: 215    Filed: 10/27/2023

Case 1:17-cv-00100-TCS    Document 110-1    Filed 09/24/21    Page 2 of 64
Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

and constructed export price (CEP) for Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Co.
Ltd., and Xuzhou Hanbang Tyre Co., Ltd. (collectively, Xugong) without making deductions for
Chinese value-added taxes (VAT), and resulting redetermination of the weighted-average
dumping margins for Xugong and for all other qualifying separate rate respondents that are
plaintiffs in the action.[4]  However, the Court remands to Commerce the decisions in the *First
Remand Redetermination* to continue to deny separate-rate status to Aeolus Tyre Co., Ltd.
(Aeolus) and Guizhou Tyre Co., Ltd., and Guizhou Tyre Import and Export Co., Ltd.
(collectively, GTC) and orders that Commerce reach new decisions in accordance with the
*Remand Order*.[5]

        Upon review, the Court noted that Commerce had not examined the four *de facto* criteria
for freedom of government control, and held that Commerce had improperly relied on its finding
that Aeolus and GTC lacked autonomy in the selection of management as the basis for the
finding that the respondents did not operate free of government control.[6]  According to the Court,
in light of the retrospective manner by which a review is conducted and the purpose of a review,
the issue before it was whether Commerce's findings that Aeolus and GTC were not eligible for
a separate rate were supported by valid factual findings that the Chinese government, rather than
the respondents, controlled the prices at which these companies sold OTR tires during the POR.[7]
The Court held that the presumption or inference that the Chinese government set or controlled
the prices at which GTC sold subject OTR tires to the U.S. market during the POR was
insufficiently supported by record evidence, specifically regarding whether the record evidence
supported a finding of control of those prices during the POR by Guiyang Industry Investment

---

[4] *See Remand Order* at 10, 12.
[5] *Id.* at 27-29.
[6] *Id.* at 16.
[7] *Id.* at 19, 28.

2

(Group) Co., Ltd. (GIIG), the relevant State-owned Assets Supervision & Administration Commission (SASAC).[8]  The *Remand Order* also concluded that Commerce ignored the issue of control over pricing of exported subject merchandise during the POR in denying separate rate status to Aeolus.[9]  Therefore, the Court held that Commerce failed to justify its application of its separate rate methodology for determining *de facto* government control with respect to both plaintiffs.[10]  The Court, thus, ordered that Commerce submit a second determination upon remand in which it reconsiders its decisions not to accord separate rate status to Aeolus and GTC and revise the antidumping duty rates applied to these respondents as may be required by its reconsideration of those decisions.[11]

As explained below, pursuant to the Court's *Remand Order*, we have reconsidered the record evidence with respect to each prong of the enumerated *de facto* separate rate criteria,[12] including the first prong which concerns whether the Chinese government, during the POR, controlled the prices of subject merchandise that was sold for export to the United States by Aeolus and GTC.  Based on our review of the record, we conclude that it does not contain affirmative evidence that the Chinese government "actually did control" the respondents' export pricing decisions (*i.e.*, the first prong).  Further, we find that there is no evidence to contradict statements and information in support of claims that Aeolus and GTC have authority to negotiate

---

[8] *Id*. at 27.

[9] *Id.*

[10] *Id.* at 27-28.

[11] *Id.* at 29.

[12] Typically, Commerce considers four factors in evaluating whether each respondent is subject to *de facto* government control of its export functions:  (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.  *See Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588, 20589 (May 6, 1991) (*Sparklers*); *see also Final Determination of Sales at Less than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22585, 22586-22587 (May 2, 1994) (*Silicon Carbide*).

3

and sign contracts and other agreements (*i.e.*, the second prong) and, for Aeolus, no explicit

evidence to contradict a finding that the respondent retains the proceeds of its export sales and

makes independent decisions regarding disposition of profits or financing of losses (*i.e.*, the

fourth prong).  Commerce has, thus, revised its prior determination to make an explicit finding

on each of the four prongs of the standard analysis with respect to *de facto* government control,

in accordance with the *Remand Order*, acknowledging that there is no explicit evidence that the

Chinese government "actually did control" export pricing.  However, we continue to find that

both companies failed to establish autonomy in their selection of management (*i.e.*, the third

prong), and that GTC further failed to rebut the presumption of control with respect to

independent decision-making regarding disposition of its profits (*i.e.*, the fourth prong).  As

Commerce's long-standing practice holds that if a respondent is unable to rebut one of the four

*de facto* criteria, the company is ineligible for a separate rate, we, thus, continue to deny Aeolus

and GTC a separate rate in this redetermination.

On August 23, 2021, we released the *Draft Results* to interested parties.[13]  On September

3, 2021, we received timely-filed comments from Aeolus and GTC (collectively, respondents).[14]

We provide our final redetermination analysis, materially unchanged from the analysis released

in the Draft Results, in Section II.  We address the arguments raised by Aeolus and GTC in the

respondents' comments on the Draft Results in Section III.  As a result of our analysis and our

consideration of the respondents' arguments, we have made no changes to the rate assigned to

Aeolus and GTC.

---

[13] *See* Draft Results.
[14] *See* Aeolus and GTC's Letter, "GTC and Aeolus' Comments on the Department's Draft Remand Redetermination – Remand Redetermination Pursuant to Guizhou Tyre Co. v. United States, Consol. Court No. 17-00100," dated September 3, 2021 (Respondents' Comments).

4

Case: 23-2163    Document: 21    Page: 218    Filed: 10/27/2023

Case 1:17-cv-00100-TCS   Document 110-1   Filed 09/24/21   Page 5 of 64
Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

## II.    FINAL ANALYSIS

1. <u>Background</u>

   A) *Aeolus Case and Litigation History*

     In the *Final Results* of the underlying review, we determined, based on substantial record evidence, that a state-owned enterprise (SOE), China National Chemical Corporation, (ChinaChem), is Aeolus's largest and controlling shareholder.[15]  In the *Final Results*, we found that the record showed that Aeolus was 42.58 percent owned by its parent company (China Chemical Rubber Co., Ltd. (also known as, China National Tire & Rubber Corp.)), a company which is 100 percent owned by an SOE (*i.e.*, ChinaChem) and supervised by a SASAC.[16] Additionally, we found three other shareholders of Aeolus to be SOEs that are supervised by SASACs.[17]  As such, we found the total SOE ownership in Aeolus to be 49.06 percent.[18]  We found that the website printouts provided by Titan Tire Corporation ("Titan") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (the USW) (the petitioners) in which Aeolus states that it is under the control of an SOE, specifically, under the control of ChinaChem, to be

---

[15] *See Final Results* IDM at 10 (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 71068 (October 14, 2016) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 16; and Memorandum, "Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Preliminary Denial of Separate Rate," dated October 5, 2016 (Preliminary Separate Rate Memo) at 2).
[16] *Id.* (citing Aeolus's Letter, "Separate Rate Application in the Seventh Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 11, 2016 (Aeolus's SRA) at 13; and Aeolus's Letter, "Separate Rate Application Supplemental Questionnaire Response in the Seventh Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated August 2, 2016).
[17] *Id.* (citing Aeolus's SRA at 13).
[18] *Id.*

5

reliable.[19]  Thus, we found that the website information corroborated the ownership information provided by Aeolus in its separate rate application.[20]

Furthermore, we found that, based on information contained in Aeolus's Articles of Association (AoA), the company did not demonstrate that it was free from *de facto* government control over its export activities because its AoA allows its majority shareholders to control the selection of its board of directors, a board which, in turn, selects Aeolus's general manager and deputy general manager.[21]  Thus, we found that Aeolus did not demonstrate an absence of government control in making decisions regarding the selection of its management.[22]  Based on these findings, we concluded that Aeolus was not eligible for a separate rate in the *Final Results* of the underlying review.[23]

During litigation, Aeolus argued, *inter alia*, that Commerce failed to consider important contrary record evidence in its determination not to grant Aeolus a separate rate.[24]  Notably, Aeolus argued that Commerce failed to consider a "Rectification Report" Aeolus placed on the record, which, it argued, demonstrates its independence from the Chinese government.[25]

In *Guizhou Tyre I*, the Court held that Commerce failed to address significant contrary evidence when making its determinations in the underlying review.[26]  Specifically, the Court held that, because Commerce did not refer to the Rectification Report in the *Final Results* of the underlying review, it could not conclude that Commerce considered the report or the evidence

---

[19] *Id.* (citing Petitioners' Letter, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Petitioners' Rebuttal Information and Deficiency Comments on Aeolus' Separate Rate Application," dated December 30, 2016 at Attachment 3).
[20] *See* Aeolus's SRA at 13 and Exhibit 11.
[21] *Id.* (citing Preliminary Separate Rate Memo at 2).
[22] *Id.* at 11-12.
[23] *Id.* at 12.
[24] *See Guizhou Tyre I*, 389 F. Supp. 3d at 1357-58.
[25] *Id.*
[26] *Id.* at 1358-59.

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

therein when determining that Aeolus was not free from government control over its export

activities.[27]  As such, the Court ordered Commerce to reconsider its separate rate determination

concerning Aeolus in light of all evidence on the record, including the evidence in the

Rectification Report.[28]

In the *First Remand Redetermination*, we re-evaluated the determination to deny

Aeolus's separate rate in light of all evidence on the record, including the evidence in the

Rectification Report, as ordered by the Court.  Upon redetermination, we found that certain

record evidence did not address or otherwise mitigate the fact that Aeolus's SOE shareholder

effectively selected its board of directors.[29]  Further, we determined that, despite the

Rectification Report showing specific government control issues being "rectified," there

remained *de facto* government control over Aeolus by virtue of its board of directors and

management being nominated and appointed by its SOE shareholders, and we continued to deny

Aeolus a separate rate on this basis.

Aeolus challenged Commerce's finding regarding its failure to rebut the presumption of

*de facto* government control before the Court, resulting in the *Remand Order*.

B)  *GTC Case and Litigation History*

In the *Final Results*, we determined, based on substantial evidence, that GTC was not

eligible for a separate rate.  Specifically, we found that Guiyang SASAC, through its 100

percent-owned affiliate, GIIG, an SOE which owns 25.20 percent of GTC, is GTC's single

largest and *de facto* controlling shareholder.[30]  Furthermore, we found that even with less than a

majority number of shares in GTC, Guiyang SASAC, through its 100 percent-owned affiliate

---

[27] *Id*.
[28] *Id*.
[29] *See First Remand Redetermination* at 5-6.
[30] *See Final Results* IDM at 13.

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

Case: 23-2163    Document: 21    Page: 221    Filed: 10/27/2023

Case 1:17-cv-00100-TCS    Document 110-1    Filed 09/24/21    Page 8 of 64
Barcode:4163794-01 A-570-912 REM - Remand - Slip Op. 21-60

GIIG, remained in a position to control the export activities of Guizhou Tyre Import and Export

Corporation (GTCIE) through its control of GTC.[31]

In the *Final Results*, we found that record evidence showed that GTC "elected members

of its board of directors through shareholders' meetings *not available* to all shareholders" and

made decisions affecting the distributions of profits at these meetings.[32]  Specifically, we found

that the AoA allowed GTC to circumvent a more inclusive board election process; GTC was able

to elect specific board members of its preference and its preferred profit distribution scheme.[33]

Also, we found that GTC's AoA failed to insulate GTC from government interference

through its prescribed nomination processes for the selection of GTC's board of directors and

senior management.  Specifically, we found that GTC's nomination and voting processes for

directors and management under Articles 40, 43, 83, and 117 of the AoA allowed Guiyang

SASAC, through GIIG, to influence the board nomination process even with a less than majority

number of voting shares.[34]  Thus, we found that GTC was not eligible for a separate rate in the

*Final Results*.[35]

However, during litigation, GTC explained that the particular shareholders' meeting of

GTC referenced in the *Final Results*, which we found was not available to all shareholders, was

publicly announced and open to all shareholders.[36]  Because this finding of fact called into

---

[31] *Id.* at 13-14; *see also Certain New Pneumatic Off-The-Road Tires from the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 FR 9278, 9283 (February 20, 2008), unchanged in *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008).  Commerce previously collapsed GTC and GTCIE into a single entity in the initial investigation.  This decision has been unchallenged in each subsequent review, including the instant review; thus, Commerce continues to treat GTC and GTCIE as a single entity in this review.
[32] *See Final Results* IDM at 14 (emphasis added).
[33] *Id.* (citing Preliminary Separate Rate Memo at 2-3; and GTC's Letter, "Supplemental Section A Questionnaire Response, dated September 13, 2016 (GTC's 3rd SAQR)).
[34] *Id.* (citing GTC's 3rd SAQR at 2, Exhibits 2, 4, and 6-8; and Preliminary Separate Rate Memo at 2-3).
[35] *Id.* at 15.
[36] *See Guizhou Tyre I*, 389 F. Supp. 3d at 1360.

8

question our understanding of the record evidence and had the potential to impact the analysis

concerning whether to grant GTC a separate rate in the underlying review, we requested a

voluntary remand to reconsider and explain our determination concerning whether to grant a

separate rate to GTC.

The Court granted our request for a remand.  Specifically, the Court stated that

"{Commerce's} concern, in this case, is 'substantial and legitimate' and will order a remand for

Commerce to reconsider and explain its separate rate analysis with respect to the collapsed GTC

entity."[37]  As such, the Court ordered Commerce to "reconsider its separate rate determination as

to GTC in the entirety, *i.e.*, in light of all record evidence."[38]  The Court did not reach any

conclusions regarding the other arguments GTC made concerning the underlying results of the

review.[39]

In the *First Remand Redetermination*, we reconsidered our separate rate determination

regarding GTC in the entirety, *i.e.*, in light of all record evidence, including the evidence related

to the July 16, 2015, interim shareholders' general meeting.  After reconsidering all of the

evidence on the record, we continued to find that GTC was ineligible for a separate rate in the

underlying review because it was not free from *de facto* government control over its export

activities.[40]  Specifically, we continued to find that GIIG, through its 25.20 percent ownership

stake, controlled GTC's board nomination process.  As GTC's board is responsible for the

selection of senior management, we determined that it controlled the day-to-day decisions

regarding the company's export activity.[41]  Hence, we continued to find that Chinese law and

---

[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *See First Remand Redetermination* at 19-20.
[41] *Id.* (citing GTC's Letter, "Supplemental Section A Response," dated May 25, 2016 at Exhibit 1 (citing GTC's AoA at art. 134)).

9

Barcode:4163794-01 A-570-912 REM - Remand - Slip Op. 21-60

GTC's AoA shareholders' safeguards in place during the POR were ineffective at preventing influence by an SOE that is a controlling shareholder, *i.e.*, GIIG.[42]

GTC challenged Commerce's finding regarding its failure to rebut the presumption of *de facto* government control before the Court, resulting in the *Remand Order*.

C) *Remand Order*

The *Remand Order* identifies specific issues with respect to the standard of analysis applied in evaluating whether the respondents sufficiently rebutted the presumption of government control pursuant to the *de facto* separate rate criteria enumerated, the completeness of the analysis applied, and the level of support for Commerce's decision to deny the separate rate for Aeolus and GTC as laid out in the *Final Results* and the *First Remand Redetermination*. The *Remand Order* first identifies a purported contradiction between Commerce's statements in the *First Remand Redetermination* that Commerce's separate rate test examines all four *de facto* criteria, as established in *Sparklers* and modified in *Silicon Carbide*,[43] and the statement that, if a respondent is unable to rebut one of the four *de facto* criteria, a company is ineligible for a separate rate.[44]

The *Remand Order* then takes issue with Commerce's reliance on case precedent which holds that Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria and that, if an applicant fails to establish any one of the criteria, Commerce is not required to

---

[42] *Id.* (citing GTC's 3rd SAQR at Exhibit 6).
[43] *See supra* n. 11.
[44] *See Remand Order* at 13-14 (citing *First Remand Redetermination* at 41 (wherein Commerce cited *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1320-21 (CIT 2018) (*Zhejiang Quzhou*) to establish this practice)).

10

continue its analysis with respect to the remainder of the criteria.[45]  The Court concluded that neither decision was based on facts analogous to those of the instant review.  Specifically, the Court identifies that in *Advanced Tech.*, the respondent at issue was majority-owned by an entity that was 100 percent owned by a Chinese government entity and that, in *Yantai CMC*, the respondent at issue had a chain of ownership where its majority owner was wholly-owned by the SASAC; in contrast, in the instant review, neither Aeolus nor GTC had an ownership structure in which government entities owned a majority share during the POR.[46]

The Court then notes its disagreement with Commerce's statement from the *First Remand Redetermination* that it made a reasonable inference that the respondents do not control their export activities by examining the four *de facto* criteria.  Specifically, the Court explains that Commerce did not examine the four criteria and, instead, made a determination that the Chinese government controlled each respondent's export activities on the sole basis of the finding of lack of autonomy in the selection of management for each respondent.  The Court concludes, as a result, that Commerce's presumption that a lack of autonomy in management selection equated to government control of export activities was "without evidentiary support."[47]  Further, the Court does not agree that Commerce's finding was based on a reasonable inference, and notes that it cannot sustain a factual finding that ignores record evidence and relies upon speculation.[48]

---

[45] *See Remand Order* at 14 (citing Commerce's prior reliance on *Yantai CMC Bearing Co. Ltd. v. United States*, 203 F. Supp. 3d 1317, 1326 (CIT 2017) (*Yantai CMC*) (recognizing that "Commerce requires that exporters satisfy all four factors of the *de facto* control test in order to qualify for separate rate status" and sustaining Commerce's decision not continue with the separate rate analysis where one of the factors is not met); *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013) (*Advanced Tech. II*),  *aff'd* in *Advanced Technology & Materials Co., Ltd. v. United States*, Case No. 2014-1154 (Fed. Cir. Oct. 24, 2014) (*Advanced Tech III*)).
[46] *Id*. at 14-15 (citing *Advanced Tech II*, 938 F. Supp. 2d at 1348; *Yantai CMC*, 938 F. Supp. 2d at 1348).
[47] *Id.* at 16.
[48] *Id*. at 16-17.

The remainder of the *Remand Order* expands on what the Court describes as the "critical flaw" in Commerce's implementation of its *de facto* separate rate analysis; specifically the failure to conduct the review so as to determine whether the Chinese government, during the POR, controlled the prices of the respondents' subject merchandise that was sold for export to the United States in the underlying review.[49]  According to the Court, because Commerce has identified a respondent's export functions or activities as the subject of its separate rate inquiry, a review of any decision placing an exporter within the China-wide entity must necessarily take account of Commerce's identification of the price discriminator (*i.e.*, whether Commerce's inclusions of Aeolus and GTC within the China-wide entity were supported by valid factual findings that the Chinese government, rather than Aeolus or GTC, controlled the prices at which these companies' subject off-the-road tires were sold for export during the POR).[50]  The *Remand Order* thus concludes that, because the *First Remand Redetermination* did not apply the first of its factors of the *de facto* analysis – which inquires as to whether the export prices are set by, or are subject to the approval of, a government authority – the Court has no such finding of fact to subject to judicial review under the substantial evidence standard.[51]  The Court notes that both Aeolus and GTC placed information on the record in support of statements that the Chinese government did not control their activities, generally, and that they specifically maintained control over their own prices.  As a result, the Court concluded that under Commerce's "rebuttable presumption" method of determining government control over export functions, the introduction of that evidence was at least sufficient to require Commerce to make a determination (based on a full consideration of the entire record) on whether the Chinese

---

[49] *Id.* at 25-26.
[50] *Id.* at 18-19.
[51] *Id.* at 20.

government actually did control these respondents' export pricing decisions during the POR, which Commerce failed to provide.[52]

With respect to the respondent-specific findings in the *First Remand Redetermination*, the Court notes that, for Aeolus, all of Commerce's findings pertained to the issue of selection of directors and management (*i.e.*, the third factor of the *de facto* analysis) and to government influence generally.  The Court also noted that there is no discussion of specific government control over the setting of prices of exported subject merchandise during the POR, nor does Commerce identify specific record evidence contradicting the evidence Aeolus put forth in its separate rate application on the issues of independence from the government in the setting of export prices, the negotiating of contracts, the retention of export sales proceeds, and the disposition of profits (*i.e.*, evidence related to the first, second, and fourth factors).[53]  The Court held that Commerce's analysis of GTC's separate rate application in the Remand Redetermination suffers from the same "fatal flaws" as does its analysis for Aeolus:  it focuses on autonomy of selection of directors and management (the third factor) and on government influence generally, as well as a finding regarding GTC's independence in decisions regarding the disposition of profits (the fourth factor), but there is no discussion addressing the question of whether the Chinese government controlled the prices of GTC's exported subject merchandise during the POR.[54]  Thus, the Court concludes, because Commerce "sidestepped" the issue of whether the record evidence supported a finding of control of those prices during the POR by government-controlled entities and minority shareholders for each respondent, the presumption or inference that the Chinese government set or controlled the prices at which Aeolus and GTC

---

[52] *Id.* at 22.
[53] *Id.* at 24-25.
[54] *Id.* at 26.

Case: 23-2163    Document: 21    Page: 227    Filed: 10/27/2023

Case 1:17-cv-00100-TCS    Document 110-1    Filed 09/24/21    Page 14 of 64
Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

sold subject OTR tires to the U.S. market during the POR was unsupported by substantial record evidence.  As a result, the Court set aside the denial of separate rate status for Aeolus and GTC without deciding whether Commerce was correct in its finding under its third factor (autonomy in selection of management).[55]  The Court, therefore, remanded to Commerce the decisions in the *First Remand Redetermination* to deny separate-rate status to Aeolus and GTC and ordered that Commerce reconsider its decisions not to accord separate rate status to Aeolus and GTC, reach new decisions in accordance with the *Remand Order*, and revise the antidumping duty rates applied to these respondents as may be required by its reconsideration of those decisions.[56]

2.  Analysis

It is Commerce's policy to assign exporters of the subject merchandise from a non-market economy (NME) country a single rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to its export activities.  To establish whether a company is sufficiently independent to be entitled to a separate, company-specific rate, Commerce analyzes each exporting entity in an NME country under the test established in *Sparklers*,[57] as amplified by *Silicon Carbide*.[58]  Commerce typically considers four factors in evaluating whether a respondent is subject to *de facto* government control of its export functions:  (1) whether the export prices are set by, or are subject to the approval of, a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and, (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the

---

[55] *Id.* at 25 and 27.
[56] *Id.* at 28-29.
[57] *See Sparklers*, 56 FR at 20589.
[58] *See Silicon Carbide*, 59 FR at 22586-89.

14

disposition of profits or financing of losses.[59]  As established in numerous proceedings, if a respondent is unable to establish autonomy from the government under one the four *de facto* criteria, that company fails to rebut the presumption of government control and is ineligible for a separate rate.  In other words, Commerce's practice is to deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the factors (the aforementioned *de facto* factors)[60] and that if an applicant fails to establish any one of the criteria, Commerce is not required to continue its analysis with respect to the remainder of the criteria.[61]

As discussed in the *Final Results*, as modified in the *First Remand Redetermination*, and summarized in the Background section above, Commerce's determination to deny the separate rate request for Aeolus and GTC focused predominantly on the finding that record information specific to each respondent reflected a measure of control on behalf of relevant SOE shareholders in the selection of the board of directors and management for each firm. Commerce, thus, concluded that these respondents had not adequately substantiated autonomy in the selection of directors and management (the third factor).  Failure to establish this prong of the criteria meant that the respondents failed to rebut the presumption of government control and, thus, Commerce reasonably determined that record evidence indicated a measure of control, or

---

[59] *See Silicon Carbide*, 59 FR at 22586-89; *see also Furfuryl Alcohol*, 60 FR at 22545.

[60] Commerce applies the same approach with respect to its *de jure* analysis.  Commerce considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate:  (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) other formal measures by the government decentralizing control of companies.  *See Sparklers*, 56 FR at 20589.  In the underlying proceeding, Commerce found that the record supported a finding of absence of *de jure* governmental control for GTC and Aeolus based on evidence provided for each of these three factors.  *See Preliminary Results* PDM at 14-15, unchanged in *Final Results*.

[61] *See Zhejiang Quzhou* 350 F. Supp. 3d at 1320-21; *see also Yantai CMC* 203 F. Supp. 3d at 1326; and *Advanced Tech II* 938 F. Supp. 2d 1342.

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

potential for control, of relevant Chinese-government entities over the operations of the

companies as a whole, including their export activities.

The *Remand Order* first notes concerns with the relevance of the case precedent cited in

favor of the proposition that failure to establish any one prong of the analysis is a sufficient basis

to find that a respondent has not rebutted the presumption of government control, and precludes

analysis of any of the other factors (*i.e.*, the *Advanced Tech. II*, *Yantai CMC*, and *Zhejiang

Quzhou* cases).  The Court notes that in each underlying case, the SOE shareholder maintained

majority ownership of the relevant respondent, whereas in the instant case, Aeolus and GTC's

SOE shareholders own less than 50 percent of each respondent.

We note that the degree of government ownership is not a distinguishing factor in

applying the *de facto* analysis.  Nowhere in the language of the *de facto* framework (*i.e.*, the four

prongs), the *Sparklers* or *Silicon Carbide* precedent establishing the standard, nor the *Advanced

Tech. II*, *Yantai CMC, Zhejiang Quzhou*, *etc.* cases establishing that a respondent must rebut the

presumption for all factors, is there any mention of a threshold for government ownership in

applying this relevant analytical framework.  The relevance of the level of government

ownership entered into Commerce's overall separate rate analysis following the determination in

the *Advanced Tech.* litigation, where the Court held that majority ownership by a government

entity, either directly or indirectly, rules out a respondent's ability to demonstrate an absence of

*de facto* control.[62]  Accordingly, majority ownership by a government entity is a consideration

---

[62] *See Advanced Technology & Materials Co., Ltd., et al. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012)
(*Advanced Tech I*), remand *aff'd in Advanced Tech II*, *aff'd in Advanced Tech III* (collectively, *Advanced Tech*)
("Specifically, as a result of litigation challenging Commerce's separate rate determinations in the diamond
sawblades proceedings, Commerce has clarified its practice with regard to evaluating NME companies' *de facto*
independence from government control.  This revised practice, which was sustained by this Court and subsequently
affirmed by the Court of Appeals, holds that 'where a government entity holds a majority ownership share, either
directly or indirectly, in the respondent exporter {or producer},' such majority ownership holding 'in and of itself'
precludes a finding of *de facto* autonomy.")).

16

only in the sense that such a fact pattern establishes control of a respondent by a government entity to preclude any further analysis of the *de facto* criteria, and is plainly not a qualifying factor in the application thereof.  Though the cases cited involved majority government-owned entities, various other cases involving non-majority government-owned respondents have denied a separate rate based on the respondent's inability to rebut the presumption of government control with respect to only one factor of the *de facto* criteria.[63]  Indeed, in the *Silicon Carbide* decision, which established Commerce's four factor standard of analysis for *de facto* control, Commerce found certain respondents ineligible on the basis of a failure to substantiate just one of the factors and without mention of level of government ownership.[64]

The *Remand Opinion* then explains that, although Commerce claimed in the *First Remand Redetermination* that it examined the totality of the circumstances and made a reasonable inference that the respondent did not control its export activities by examining the four *de facto* criteria, the Court cannot agree that Commerce examined the four criteria. According to the Court, instead of examining the four criteria, the *First Remand Redetermination* presumes, without evidentiary support, that the finding of a lack of autonomy in the selection of management was the factual equivalent of a finding that the Chinese government controlled what Commerce termed a company's export activities or functions.  Relatedly, the Court identifies a purported contradiction between Commerce's statements in the *First Remand Redetermination*

---

[63] *See, e.g., 53-Foot Domestic Dry Containers from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value; Final Negative Determination of Critical Circumstances*, 80 FR 21203 (April 17, 2015) (*Containers*), and accompanying IDM at Comment 10; and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 23756 (April 29, 2020), and accompanying IDM at Comment 6, *aff'd I.D.I. International Development And Investment Corporation v. United States*, Court No. 20-00107, Slip Op. 21-82 (CIT July 6, 2021) (*IDI v. United States*).
[64] *See Silicon Carbide*, 59 FR 22586-22587 at Comment 2 ("Respondents Hainan and Shaanxi have failed to establish their eligibility for separate rates because, at verification, these companies failed to produce bank records necessary to prove their retention of proceeds from export sales.  Therefore, these respondents did not meet an important criterion for separate rates.").

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

that Commerce's separate rate test examines all four *de facto* criteria, as established in *Sparklers*
and modified in *Silicon Carbide*,[65] and the statement that if a respondent is unable to rebut one of
the four *de facto* criteria, a company is ineligible for a separate rate.[66]  Thus, the Court concludes
that Commerce's findings with respect to Aeolus and GTC (which the Court understood to be
that each company's failure to establish that they operate autonomously in management selection
suggested a sufficient measure of the government's control over export activity) without direct
evidence of the Chinese government's control was impermissibly speculative and, by not
examining each of the four *de facto* criteria, the Court may not sustain a finding that ignores
record evidence.

First, we clarify that Commerce did not find that a lack of autonomy in management
selection equates to a direct finding of government control of export activities.  Rather,
Commerce found that record evidence indicating a lack of autonomy in management selection
did not satisfy the third prong of the *de facto* analysis and, thus, that GTC and Aeolus were
unable to rebut the presumption of government control.  Our *de facto* criteria explicitly lay out
that it is a standard by which we evaluate whether a respondent has affirmatively rebutted the
presumption of government control or potential control of export functions/activities.  Notably,
under the presumption of government control (which has been upheld repeatedly by the courts)[67]
Commerce does not affirmatively establish in each instance that the government is actually
controlling the respondent's export activities, including pricing decisions.  Rather, it is the
*burden of the respondent to rebut the presumption* by providing sufficient evidence to establish

---

[65] *See Sparklers*, 56 FR at 20589; *see also Silicon Carbide*, 59 FR at 22586-87.
[66] *See Remand Order* at 13-14 (citing *First Remand Redetermination* at 41 (wherein Commerce cited *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1320-21 (CIT 2018) (*Zhejiang Quzhou*) to establish this practice)).
[67] *See, e.g.*, *China Manufacturers Alliance, LLC v. United States*, 1 F.4th 1028, 1030 (Fed. Cir. 2021) ("Our court has previously approved Commerce's application of a presumption of government control over exporters in NME countries{.}"); and *IDI v. United States*, Slip Op. 21-82 at 3.

18

that it operates autonomously from the government in certain key aspects (*i.e.*, those enumerated in the *de facto* criteria).  In the *Final Results* and *First Remand Redetermination*, we indeed discuss how control of the board and appointment of management equates to potential control of the company's operations (which necessarily includes export operations).  While there is no evidence that the SOE owners directly exercised their control on the respondents' export activities, we consider the *de facto* criteria as indicative of whether the government controls or has the potential to control export functions.  Specifically, our finding that neither Aeolus nor GTC have autonomy in the selection of management allows for the reasonable inference, in light of the presumption of government control in NME country proceedings, that their respective government shareholders maintain the potential to control the export operations of each company because the management of a firm controls its operations —including its export functions.  In *Jiasheng I*, the Court ruled that Commerce could "make reasonable inferences from the record evidence" when examining the totality of the circumstances in determining whether a respondent had demonstrated *de jure* and *de facto* control of its export activities.[68]  In *IDI vs. United States*, the Court ruled that Commerce's determination that an exporter is potentially controlled by the government – in the sense that the government has the ability to exercise actual control (even without exercising it) – suffices to establish that the exporter has failed to demonstrate its independence from *de facto* government control.[69]

---

[68] *See Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1339 (CIT 2014) (*Jiasheng I*) (quoting *Certain Cut-to-Length Carbon Steel Plate from Ukraine*, 62 FR 61754, 61759 (November 19, 1997), and *Sigma* at 1405 (citation omitted), respectively; and *Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (explaining that substantial evidence may include "reasonable inferences from the record") (quotation marks and citation omitted))).

[69] *See IDI v. United States*, Slip Op. 21-82 at 20 ("A puppet master is no less in control when the strings are slack.") (citing *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1350, 1359 (CIT 2018) (*An Giang II*)).

19

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

We understand the Court's concern with the apparent contradiction between statements that the underlying determination assessed the record with respect to each factor and the totality of evidence with respect to control or potential for control, and Commerce's reliance on precedent indicating that if a respondent is unable to rebut the presumption of government control under one of the four *de facto* criteria, a company is ineligible for a separate rate. Although our explanation could have been clearer, we respectfully disagree that Commerce need detail its evaluation of the record evidence with respect to all four factors in cases such as this. The analytical framework specifies four areas which may indicate *de facto* government control of export functions. Commerce examines the record, as it did in the instant case, to determine whether a respondent has provided sufficient evidence to rebut the presumption of government control that applies in non-market economy country proceedings. Crucially, a respondent must provide evidence to establish autonomy from government control with respect to all four factors in the *de facto* analysis in order to demonstrate that it operates free of government control. For this reason, Commerce's discussion in the underlying review and in the prior remand focused on the criterion where the proffered record information contradicted the respondents' assertions that they operated autonomously with respect to the third factor and, thus, our finding that the respondents were unable to rebut the presumption of government control. The Court has addressed this precise question in the recent *IDI vs. United States* ruling and upheld this approach, holding:

> {Commerce was not obligated to} review evidence pertaining to the remaining elements that were no longer material after {Commerce} concluded that IDI failed to establish the third element {of the *de facto* test}… Here, Commerce found that IDI was unable to demonstrate "that the government neither actually selects management nor directly or indirectly involves itself in the day-to-day management of the company." As the four-part test for *de facto* control requires the exporter to satisfy all four elements to demonstrate independence, Commerce was entitled to stop there: "Because Plaintiffs failed to satisfy one *de facto*

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

criterion, Commerce had no further obligation to continue with the analysis."
Contrary to IDI's argument, Commerce did not act contrary to law by declining to
consider evidence pertaining to the remaining elements that were unnecessary to
address.[70]

Though the determination for both Aeolus and GTC concentrated on record information
related to the third prong, Commerce's finding for each respondent reviewed additional indicia
of control, generally.  For example, Commerce evaluated the percentage of ownership by the
SOE as the largest individual shareholder of each respondent and relevant documents, meeting
notes, by-laws, articles of association, and voting actions suggestive of potential for control,
generally, as well as information regarding the influence of the SOE-appointed board in GTC's
decisions regarding the disposition of profits.[71]  This is precisely the totality of circumstances
referenced in the *First Remand Redetermination*.  To the extent that conclusions with respect to
the record evidence regarding specific factors were not expressly discussed in the *Final Results*
and *First Remand Redetermination*, as discussed above, this reflects Commerce's practice that a
respondent must satisfy all four factors to rebut the presumption of government control that
applies in NME country proceedings and, thus, further discussion of other factors is moot when a
respondent is unable to satisfy any single criterion.

Nevertheless, in compliance with the conclusion in the *Remand Order* that failure to
address these factors constituted a critical flaw in Commerce's analysis, we explain here that the

---

[70] *See IDI v. United States*, Slip Op. 21-82 at 17-19 (citing *Zhejiang Quzhou* 350 F. Supp. 3d at 1321; *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1348 (CIT 2017) (*Rongxin II*); and *Shandong Rongxin Imp. Exp. Co. v. United States*, 331 F. Supp. 3d 1390, 1400–3 (CIT 2018)).  Critically, the underlying facts of the *IDI v. United States* case mirrored those of the instant litigation, where the largest minority shareholder of the respondent in question was an SOE, and the respondent's separate rate was denied based on a failure to rebut the presumption with respect to autonomy of management selection.
[71] As the Court did not take up the merits of the factual findings with respect to Commerce's analysis of the third factor for each respondent, the fourth factor with respect to GTC, nor the level of relative government ownership or record information otherwise indicative of potential for control, generally, we do not further discuss these findings in this redetermination and instead incorporate the relevant discussion from the *Final Results* and *First Remand Redetermination* by reference, herein.

21

record evidence provided by Aeolus and GTC demonstrated that the general manager and the

export sales manager(s)) set export prices for each entity,[72] and there was no indication of direct

involvement or approval on behalf of any government authority regarding price-setting (the first

factor).  Moreover, both GTC and Aeolus provided sufficient evidence to demonstrate that each

company has authority to negotiate and sign contracts and other agreements on its own behalf

(the second factor).[73]  Further, the record with respect to Aeolus reflected that the respondent

retains the proceeds of its export sales and makes independent decisions regarding disposition of

profits or financing of losses (*i.e.*, the fourth factor).[74]

Finally, the *Remand Order* explains that because Commerce did not address the first of

its *de facto* factors – which inquires as to whether the export prices are set by, or are subject to,

the approval of a government authority – the Court has no such finding of fact to subject to

judicial review under the substantial evidence standard that the Chinese government, rather than

Aeolus or GTC, controlled the prices at which these companies' subject OTR tires were sold for

export during the POR.  Implicit in the Court's discussion is the apparent conclusion that the first

factor is the preeminent consideration in the *de facto* analysis, and that a lawful finding that a

respondent has failed to rebut the presumption of *de facto* government control must necessarily

rely upon evidence indicative of government influence on export pricing (and that affirmative

evidence demonstrating a firm's independence in export price setting is alone sufficient to rebut

the presumption of control).  As explained above, however, the four factors, together, relate to

the determination of whether a respondent has rebutted the presumption that the Chinese

---

[72] *See* GTC's Letter, "Section A Questionnaire Response," dated January 16. 2016 (GTC's SAQR), at 9-10 and
Exhibit A-5; *see also* Aeolus's Letter, "Separate Rate Application in the Seventh Administrative Review of the
Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China,"
dated December 11, 2016, at Exhibit 12.
[73] *See* GTC's SAQR at 9; *see also* Aeolus's SRA at 20 and Exhibit 12.
[74] *See* Aeolus's SRA at 22-23 and Exhibits 10 and 14.

government exerts control over the export functions of a firm.  An approach whereby the only relevant consideration is whether export prices are set by, or are subject to, the approval of a government entity would be inconsistent with the *de facto* analytical framework, because it would make the remaining three factors irrelevant.

As noted above, Commerce examined the totality of evidence.  To the extent that we made no explicit finding with respect to the first factor in the *Final Results* and *First Remand Redetermination*, we have clarified above that both Aeolus and GTC provided sufficient evidence to demonstrate that company officials set export prices, and there is no indication of explicit involvement or approval authority in this process by any government entities, and no party provided information on the record to contradict this finding.[75]  Nevertheless, because failure to establish autonomy with respect to one prong of the analysis means that a respondent has not met its burden to rebut the presumption of government control, our findings related to the first factor do not otherwise overcome Commerce's findings that Aeolus and GTC failed to establish autonomy from government control in making decisions regarding the selection of management, which are corroborated by the totality of evidence indicative of potential for control.

Further, limiting the examination of the *de facto* analysis primarily to the existence of evidence of direct government involvement in price-setting necessarily ignores other aspects of export activities where the government may exert control, such as influence over export quantities/quotas, terms of sale, financing, customer relationships, contract negotiation,

---

[75] Accordingly, we respectfully disagree with the Court's conclusion that our underlying determination included an insufficiently supported presumption or inference "that the Chinese government set or controlled the prices at which {Aeolus and GTC} sold subject off-the-road tires to the U.S. market during the POR was unsupported by substantial record evidence."  *See Remand Order* at 25 and 27.  We made no such presumption or inference with respect to the first factor; rather, our discussion focused on the respondents' inability to establish autonomy from government control with respect to the selection of management.

transportation, customs requirements, management directives, selection of export markets, export-related investment, *etc.*[76]  A standard requiring evidence of direct government involvement in price-setting before finding government control would be almost impossible to meet, requiring that a "smoking gun" document exist on the record showing direct involvement on behalf of a government authority in price-setting for an individual firm.  Even in a hypothetical situation where government involvement in price-setting is direct and unambiguous, actual affirmative documentation of such activity is unlikely to exist, and the ability of Commerce to compel that any such information to be provided to the record extremely limited.  It is for precisely this reason that Commerce evaluates the four factors, as well as any other information on the record that supports sustaining the presumption of government control, and may determine that failure to establish independence from the government in any one such factor is sufficient to demonstrate failure to rebut the presumption of control.

In compliance with the *Remand Order*, we have re-evaluated the record with respect to each of the four prongs of the *de facto* analysis, including the first prong with respect to independence from government influence in export price-setting.  We continue to find that record information specific to each respondent reflects a measure of control on behalf of relevant SOE shareholders in the selection of the board of directors and management for each firm and, thus, does not adequately substantiate autonomy of each firm in the selection of directors and management during the POR, as corroborated by additional indicia of control generally (such as the percentage of ownership by the SOE as the largest individual shareholder of each respondent

---

[76] *See* Policy Bulletin 05.1 at 1-2 ("{T}he test focuses on controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level."); *see also, e.g.*, *Final Determination of Sales at Less Than Fair Value:  Certain Cut-to-Length Carbon Steel Plate from Ukraine*, 62 FR 61754, 61757 (November 19, 1997); and *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 62 FR 61276, 61279 (November 17, 1997).

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

Case: 23-2163    Document: 21    Page: 238    Filed: 10/27/2023

Case 1:17-cv-00100-TCS    Document 110-1    Filed 09/24/21    Page 25 of 64
Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

and relevant documents, meeting notes, by-laws, articles of association, and voting actions

suggestive of potential for control), as well as information regarding influence of the SOE-

appointed board in GTC's decisions regarding the disposition of profits.  We determine this

evidence to be sufficient to find that neither GTC nor Aeolus rebutted the presumption of

government control or potential for control over their export functions.

### III.    DISCUSSION OF RESPONDENTS' COMMENTS

Aeolus and GTC's Comments on the Draft Results were not separated out into distinct

issues, but rather presented in five sections of substantive comment (Sections IV-VIII).

The respondents acknowledge Commerce's statement that because the Court did not take

up the merits of the factual findings underlying the separate rate analysis applied, the Draft

Results do not further discuss these findings in this redetermination, instead incorporating the

relevant discussion from the *Final Results* and First Remand Redetermination by reference.

However, the respondents note that, as the Federal Circuit requires that litigants exhaust all

arguments anew for each remand,[77] Commerce must identify the specific bases on which it is

continuing to deny the respondents' separate rates, and that lacking such specificity, it is

necessary to incorporate their own briefings on the underlying separate rate analysis (at Exhibits

1-3 of Respondents' Comments).  Moreover, the respondents assert that the "strained" findings

that the Draft Remand incorporates to justify denying a separate rate for Aeolus and GTC do not

withstand scrutiny and thus compel reiteration of the respondents' prior arguments on the instant

record in response to the Draft Remand.

Accordingly, the respondents' comments may be bifurcated into two parts:  1) Comment

directly rebutting the findings of the Draft Results (Section IV, which details the purported

---

[77] *See* Respondents' Comments at 31 and 48 (citing *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008); and *AIMCOR v. United States*, 141 F.3d 1098, 1111-12 (Fed. Cir. 1998)).

Case: 23-2163    Document: 21    Page: 239    Filed: 10/27/2023

Case 1:17-cv-00100-TCS    Document 110-1    Filed 09/24/21    Page 26 of 64
Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

inconsistency between the Draft Results and relevant precedent and the *Remand Order*, and

Section VII, which asserts that GTC and Aeolus established, and the Court held, that the

presumption of state control was sufficiently rebutted), and 2) reiteration of comments

previously submitted in the respondents' briefs challenging the *Final Results* and First Remand

Redetermination (Section V, rebutting Commerce's factual findings denying GTC's separate

rate, Section VI, rebutting Commerce's factual findings denying Aeolus's separate rate, and

Section VIII, regarding purported contradictions between the separate rate analysis applied and

prior segments).

     For the sake of clarity, in summarizing and addressing the comments, below, we have

bifurcated respondents' arguments into two sections:  A) Comments on the Distinct Findings of

the Draft Results (addressing Sections IV and Section VII of Respondents' Comments together

as a single comment), and B) Reiteration of Respondents' Comments In Response to the *Final*

*Results* and First Remand Redetermination (addressing Sections V, VI, VIII, each as separate

comments).

**A.  Respondents' Comments on the Draft Results**

**Comment 1:  The Draft Results are Inconsistent with and Cannot be Reconciled to
Applicable Precedent, Misapply the Relevant Presumption, and Misconstrue
and Fail to Address the *Remand Order***

*Respondents' Comments*
- The standard set up by Commerce's separate rates practice is to determine whether a
respondent can demonstrate the absence of *de jure* and *de facto* governmental control over its
export activities.[78]  This analysis relies upon a holistic inquiry, examining the totality of
circumstances, and Commerce has repeatedly held that government ownership alone does not
preclude eligibility.[79]  Indeed, in numerous cases, Commerce has granted separate rates to

---

[78] *See* Respondents' Comments at 5-6 (citing, *e.g.*, *Sparklers*, 56 FR at 20589; *Silicon Carbide*, 59 FR at 22586-89;
*Furfuryl Alcohol*, 60 FR at 22545; and Policy Bulletin 05.1).
[79] *Id.* at 7 (citing, *e.g.*, *Jiasheng I*, 28 F. Supp. 3d at 1339 (CIT 2014); and *Silicon Carbide*, 59 FR at 22586-89).

respondents with even 100 percent government ownership.[80]  Whereas respondents bear the burden of rebutting the presumption of government control, the Court has held that this presumption vanishes when a party produces a "minimum quantum of evidence" against it.[81]

- In numerous prior proceedings, the CIT requires separate rate denials be based on actual government control as opposed to mere potential for control.[82]  The Court confirmed this principle here in the *Remand Order*, and invalidated the denial of separate rates for GTC and Aeolus because both respondents submitted sufficient evidence to rebut the presumption of state control, and Commerce was unable to affirmatively demonstrate that the Chinese government controlled their export pricing decisions during the POR.[83]

## The Draft Results Misconstrue the Remand Order and Applicable CIT Precedent

- Accordingly, the continued denial of the separate rate for GTC and Aeolus in the *Draft Results* disregards the CIT's express directive that:  (a) Commerce must find state control over export activities to deny separate rate status; (b) the presumption of state control was rebutted, requiring Commerce to provide affirmative evidence of state control; and (c) precedent involving majority SOE-owned respondents is readily distinguished and inapposite to the facts underlying GTC and Aeolus' separate rate applications.
  - First, the Draft Results claim that the CIT erroneously interpreted Commerce's separate rate analysis in stating that "Implicit in the Court's discussion is the apparent conclusion that the first factor is the preeminent consideration in the *de facto* analysis, and that a lawful finding that a respondent has failed to rebut the presumption of *de facto* government control must necessarily rely upon evidence indicative of government influence on export pricing… An approach whereby the only relevant consideration is whether export prices are set by, or are subject to, the approval of a government entity would be inconsistent with the *de facto* analytical framework, because it would make the remaining three factors irrelevant."[84]
    - The fundamental problem with this attempt to correct the CIT is that the focus on export price-setting comes directly from Commerce's own longstanding practice:  *i.e.*, the purpose of the separate rate analysis has always been to determine whether a respondent can demonstrate the absence of *de jure* and *de facto* governmental control over its export activities.[85]
    - Critically, the *Remand Order* invalidated the separate rate denials of GTC and Aeolus "{b}ecause Commerce has identified a respondent's 'export functions'

---

[80] *Id.* at 8 (citing, *e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value:  Hot-Rolled Carbon Steel Flat Products from the People's Republic of China*, 66 FR 49632 (September 28, 2001), and accompanying IDM at Comment 1).

[81] *Id.* at 9 (citing *Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992) (*Aukerman*)).

[82] *Id.* at 9-11 (citing *Jiasheng I*, 28 F. Supp. 3d at 1339 n.160 and 1348-50 (CIT 2014); *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121 F. Supp. 3d 1263, 1269 (CIT 2015) (*Jiasheng II*); *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1291- 92 (CIT 2017) (*An Giang I*); and *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224 (April 29, 2021) (*Jilin Forest*)).

[83] *Id.* at 11-13 (citing *Remand Order* at 7-8).

[84] *Id.* at 14-15 (citing, *e.g.*, *Sparklers*, 56 FR at 20589; *Silicon Carbide*, 59 FR at 22586-89; *Furfuryl Alcohol*, 60 FR at 22545; *Jilin Forest* at 5; and *Shandong Huanri (Gr.) Gen. Co. v. United States*, 493 F. Supp. 2d 1353 at 1357 (CIT 2007) (*Shandong Huanri*)).

[85] *Id.* at 14.

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

(or 'activities') as the subject of its separate rate inquiry."[86]  The CIT did not
graft an additional analytical requirement as the Draft Results insinuate; the
CIT merely required that the separate rate denials in AR7 be tethered to the
respondents' export functions – in accordance with longstanding practice.  In
this sense, the Draft Results refuse to heed a direct judicial finding, not an
implicit one, that the denial of the separate rate for the respondents must be
"supported by valid factual findings that the Chinese government, rather than
Aeolus or GTC, controlled the prices at which these companies' subject
{OTR} were sold for export during the POR."[87]

- Rather than suggest that export pricing is the long relevant inquiry, the CIT
found that Commerce could not ignore this overarching purpose of the
separate rate analysis in denying separate rates for GTC and Aeolus.  The
Draft Results concede that "there is no evidence that the SOE owners directly
exercised their control on the respondents' export activities" because "Aeolus
and GTC provided sufficient evidence to demonstrate that company officials
set export prices, and there is no indication of explicit involvement or
approval authority in this process by any governmental entities, and no party
provided information on the record to contradict this finding."[88]  The Draft
Results thereby correctly and candidly acknowledge that there is no explicit
evidence that the Chinese government 'actually did control' export pricing.
Accordingly, the *Remand Order* leaves Commerce no room to deny separate
rates for GTC and Aeolus, yet the Draft Results do exactly that, by recasting
the CIT's mandate as "{a}n approach whereby the only relevant consideration
is whether export prices are set by, or are subject to, the approval of a
government entity."[89]

- The Draft Results err in its reading of the CIT's concern that "{b}ecause
Commerce, in the {First Remand}, did not apply the first of its factors—
which inquires as to whether the export prices are set by or are subject to the
approval of a government authority—the court has no such finding of fact to
subject to judicial review under the substantial evidence standard," as an
indication that the critical flaw was a mere failure to address these factors, and
that the remedy required on remand was to be more clear in acknowledging
and addressing these factors.[90]  It defies credulity to treat the *Remand Order*
as merely requesting confirmation that the record is devoid of any indicia of
state control with respect to export activities in order to deny the separate
rates.  Rather, the CIT was clear that such findings were a legal prerequisite to
denying the separate rates in stating the continued denials must be "supported
by valid factual findings that the Chinese government, rather than Aeolus or
GTC, controlled the prices at which these companies' subject {OTR} tires
were sold for export during the POR."[91]  The critical omission found by the

---

[86] *Id.* at 15 (citing *Remand Order* at 18).
[87] *Id.* (citing *Remand Order* at 9).
[88] *Id.* at 15-16 (citing the Draft Results at 18 and 22-23).
[89] *Id.*
[90] *Id.* at 17-18 (citing *Remand Order* at 20).
[91] *Id.* at 16-18 (citing *Remand Order* at 19).

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

CIT was not merely the absence of findings of fact on the issue but instead the absence of "valid factual findings that the Chinese government, rather than Aeolus or GTC, controlled the prices at which these companies' subject {OTR} tires were sold for export during the POR" themselves.[92]

Commerce Misconstrued the Legal Standards with Respect to the Rebuttable Presumption and Is Required, but Failed, to Present Affirmative Evidence of Control

*Respondents' Comments*

- The Draft Results err by misconstruing the analytical framework in which the presumption of control operates, including various statements which incorrectly suggest that the respondents are required to conclusively establish a lack of state control.[93]  However, the party against whom a presumption operates need not "establish," "demonstrate," or "satisfy" the presumed fact (*i.e.*, prove separation from government control), rather, once GTC and Aeolus submitted the "minimum quantum of evidence" creating "genuine dispute" as to whether they were state controlled during the POR, the presumption vanished.[94]  The respondents surpassed this minimal evidentiary threshold, proved independence with respect to price setting and sales negotiating, and sufficiently satisfied this standard with respect to management selection and profit disposition.
  - o The Draft Results improperly conflate "sufficient evidence" to rebut the presumption – *i.e.*, the "minimum quantum" – with evidence to conclusively "establish" the presumed fact – *i.e.*, that GTC and Aeolus operate autonomously from the government.[95]
  - o The Draft Results ignore the CIT, having found that GTC and Aeolus did in fact provide the requisite "sufficient evidence" to cast doubt upon their being state controlled, and Commerce thus became obligated to "affirmatively establish in each instance the government is actually controlling the respondent's export activities, including pricing decisions" before denying the separate rate.  Commerce was thus required to adequately establish state control, and the "measure of control" was insufficient.
    - ▪ Commerce's finding that Aeolus and GTC failed to establish autonomy from government control in making decisions regarding the selection of management thus:  1) misconstrues the operation of presumptions, as discussed above; 2) ignores contrary record evidence to rebut this factor, as detailed separately; and 3) disregards the CIT *Remand Order* findings that Aeolus and GTC rebutted the presumption of state control in all respects.
    - ▪ The Draft Results claim that the *Remand Order* establishes "{a} standard requiring evidence of direct government involvement in price-setting before finding government control would be almost impossible to meet, requiring that a 'smoking gun' document exist on the record showing direct involvement on behalf of as government authority in price-setting for an

---

[92] *Id.*
[93] *Id.* at 18-19 (citing Draft Results at 14-15, 21, 23, 24).
[94] *Id.* at 19-20 (citing *Aukerman*, 960 F.2d at 1037 (Fed. Cir. 1992)).
[95] *Id.* at 21.

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

individual firm."[96]  Commerce's complaint about supposed difficulties obtaining the requisite evidence to deny separate rates for GTC and Aeolus is both incorrect and irrelevant.  Governmental price-setting is expected to be documented, and Commerce can readily solicit such information in response to questionnaires – in the form of narrative responses, in the event documentation does not exist.  Even if such information were difficult to obtain, that does not relieve Commerce from its obligation to affirmatively demonstrate state control.  Commerce faults the requirement for direct evidence of government involvement in price setting as ignor{ing} other aspects of export activities where the government may exert control (such as influence over export quantities/quotas, terms of sale, financing, customer relationships, contract negotiation, transportation, customs requirements, management directives, selection of export markets, export-related investment, *etc.*), yet the Draft Results proffers no evidence of state control.  It is improper for the Draft Results to avoid the CIT's requirement for affirmative evidence of state control by listing potential ways in which state control could be exercised.[97]

  ▪ The Draft Results only identifies "voting actions suggestive of potential for control" and other "evidence indicative of potential for control."[98]  Such finding of potential control cannot be reconciled with the CIT's articulation of Commerce's practice: "Commerce's practice does not require a respondent to rebut the potential for government control, but rather actual control by the government entity."[99]  Indeed, the CIT expressly rejected this very position in the *Remand Order*, stating, "{The First} Remand Redetermination presumes, without evidentiary support, that Commerce's finding of a lack of autonomy in the selection of management was the factual equivalent of a finding that the Chinese government controlled what Commerce termed a company's "export activities".[100]  The Draft Results cannot credibly maintain the exact same reasonable inference of state control based on the exact same record which the CIT expressly found could not sustain a reasonable inference.

<u>Commerce's Denial of Separate Rates Disregards the CIT's Finding That Precedent Involving Majority SOE Ownership Precedent Is Inapposite to GTC and Aeolus</u>

  • The Draft Results contradicts established CIT precedent by improperly discounting the fact that GTC and Aeolus had minority – and not majority – SOE ownership.  The Draft Results is incorrect that SOE ownership percentage is only relevant insofar as making it easier for Commerce to deny separate rates for majority SOE respondents.  Rather, SOE ownership percentage concomitantly makes it more difficult for Commerce to deny separate rates for minority SOE respondents; the CIT has affirmed the principle that "Commerce has required additional indicia of control prior to concluding that a respondent company could not rebut

---

[96] *Id.* at 22 (citing Draft Results at 23-24).
[97] *Id.* at 22-23.
[98] *Id.* at 23 (citing Draft Results at 18-19, 20, and 23).
[99] *Id.* at 24 (citing *An Giang I*, 203 F. Supp. 3d at 1291-92 (CIT 2017)).
[100] *Id.* (citing *Remand Order* at 16).

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

Appx168

the presumption of *de facto* government control where the government owns, either directly or indirectly, only a minority of shares in the respondent company."[101]   The Draft Results improperly denied separate rates for the respondents having minority SOE ownership without evidencing any state control, let alone the "additional indicia" required.

- The CIT has repeatedly found that substantially more evidence is required to deny separate rates for respondents having minority SOE ownership,[102] and the *Remand Order* expressly found that "the degree of government ownership is . . . a distinguishing factor in applying the *de facto* analysis," in finding that Commerce cannot rely on precedent involving majority SOE ownership to deny separate rates for GTC and Aeolus, as it did in the Draft Results. Accordingly, the Draft Results flout the *Remand Order* by continuing to deny companies their separate rates through invalidated reliance on prior cases where management selection was discussed as a factor in denying the separate rate for a majority government-owned respondent,[103] and further misplaces reliance on a single CIT ruling where management selection was a factor in the denial of the separate rate for a non-majority SOE owned firm (as well as other cases which the Court has not reviewed).[104]

- Commerce is incorrect in characterizing the *IDI v. United States* case as one which mirrors the instant litigation, where the largest minority shareholder of the respondent in question was an SOE, and the respondent's separate rate was denied based on a failure to rebut the presumption with respect to autonomy of management selection.  Rather, the IDI separate rate was denied based on specific factual findings including that "Commerce found that a government official and Communist Party member— referred to as Mr. X—represented the Vietnamese government on the boards of both IDI and its corporate parent, Company Y."[105] In that litigation, the Court rejected the respondent's claim that Commerce found only the possibility of state control and, unlike in the instant case, upheld that Commerce's finding that the Vietnamese government actually controls the respondent.  Commerce has not and cannot make findings that important managerial decisions for GTC, Aeolus, and their parent companies during the AR7 POR were made by both Chinese government officials and Communist party members.  However, assuming *arguendo* that the IDI decision is not limited to cases in which multiple government and party officials make important decisions for relevant respondent corporate entities during the POR, Commerce should not apply that decision to the facts in this case, as the *Remand Order* noted that none of the decisions relied upon by Commerce to deny the AR7 separate rates have precedential effect and the only precedent governing the Draft Results is the CIT *Remand Order* itself.[106]

---

[101] *See* Respondents' Comments at 25 (citing *An Giang II*, 284 F. Supp. 3d at 1359 (CIT 2018)).

[102] *Id.* at 26 (citing *Zhejiang Quzhou*, 350 F. Supp. 3d at 1318 (CIT 2018)).

[103] *Id.* (citing *Zhejiang Quzhou*, 350 F. Supp. 3d at 1320-21 (CIT 2018); *Yantai CMC*, 203 F. Supp. 3d at 1326 (CIT 2017); and *Advanced Tech II*, 938 F. Supp. 2d 1342 (CIT 2013)).

[104] *Id.* at 27 (citing *IDI v. United States*, Slip Op. 21-82 (CIT July 6, 2021)).

[105] *Id.* at 28-29 (citing *IDI v. United States*, Slip Op. 21-82 (CIT July 6, 2021)).

[106] *Id.* at 29 (citing *D&L Supply Co. v. United States*, 22 CIT 539, 540 (CIT 1998) (*D&L Supply*); *Advanced Tech III*, 581 F. App'x 900 (Fed. Cir. 2014); and *Nakornthai Strip Mill Pub. Co. v. United States*, 587 F. Supp. 2d 1303 (CIT 2008) (*Nakornthai*)).

31

<u>GTC and Aeolus Rebutted the Presumption of Control</u>

- The CIT *Remand Order* correctly found that both GTC and Aeolus had rebutted the presumption of state control.[107] This finding – based on extensive evidence submitted by GTC and Aeolus in AR7 – was "sufficient to put the existence of the presumed fact" – *i.e.*, government control – into genuine dispute.[108] Aeolus and GTC sufficiently rebutted the presumption of state control. As discussed in the prior remand proceeding (and resubmitted to the instant record, discussed below), record evidence demonstrates that GTC and Aeolus exceeded the "minimum quantum of evidence;" thus, the presumption completely vanished, and Commerce became obligated to affirmatively demonstrate that GTC and Aeolus were in fact controlled by the Chinese government, but did not do so.
  - This CIT has affirmed that "Commerce has required additional indicia of control prior to concluding that a respondent company could not rebut the presumption of *de facto* government control where the government owns, either directly or indirectly, only a minority of shares in the respondent company."[109] Yet that is precisely what Commerce has done, by relying on select facts that, at most, establish a mere potential for government control.
  - CIT rulings in consecutive reviews of the AD order on frozen fish fillets from Vietnam demonstrates how the presumption operates in the minority SOE ownership context. The respondent in that proceeding initially failed to overcome the presumption of government control by neglecting to submit AoA covering the entire POR, and the CIT found that it had not carried its "burden to populate the record with evidence rebutting the existence of *de facto* government control" because "restrictions placed on the minority government shareholder" in the AoA may have not extended throughout the POR.[110] However, in the subsequent review where Caseamex submitted its AoA for the entire POR, the CIT invalidated Commerce's separate rate denial because "the AoA precludes the minority government shareholder from exercising any independent influence on the Board of Directors or any manager . . . . Although Caseamex has the burden of rebutting government control, it has rebutted that presumption here."[111] *CASEAMEX* is, thus, entirely on point and compels granting a separate rate in AR7 to GTC and Aeolus, who like Caseamex have minority SOE ownership. It is undisputed that GTC and Aeolus submitted their AoA encompassing the entire POR. With such shareholder protections against majority SOE owner control in effect throughout the POR, GTC and Aeolus have rebutted that presumption. Given the schism depending on whether the SOE ownership is majority or minority recognized by the CIT in the *Remand Order* and prior precedent, Commerce misplaced reliance on instances involving majority SOE ownership; such precedent is wholly inapposite with respect to minority SOE ownership, such as GTC and Aeolus.[112]

---

[107] *Id.* at 62 (citing *Remand Order* at 21-22).
[108] *Id.* at 62 (citing *Aukerman* 960 F.2d at 1037 (Fed. Cir. 1992)).
[109] *Id.* (citing *An Giang II*, 284 F. Supp. 3d at 1359 (CIT 2018)).
[110] *Id.* at 63 (citing *An Giang II*, 284 F. Supp. 3d at 1359 (CIT 2018)).
[111] *Id.* (citing *Can Tho Import-Export Joint Stock Co. v. United States*, 415 F. Supp. 3d 1187, 1195 (CIT 2019) (*CASEAMEX*)).
[112] *Id.* at 64.

<u>The Draft Results Cannot Lawfully Be Finalized</u>

- Because the Draft Results do not comply with the CIT's explicit instruction to reach new decisions in accordance with this Opinion and Order, such noncompliance would prevent the Draft Results, if finalized, from being affirmed because the CIT "reviews remand determinations for compliance with the Court's *Remand Order*."[113]  Should Commerce continue to disagree with the judicial findings in the *Remand Order*, it should grant GTC and Aeolus separate rates under protest rather than unnecessarily drag out these proceedings.  It is improper for Commerce to re-litigate before the CIT issues for which the CIT has already ruled in favor of GTC and unlawful and unfair to further drag out this appeal and make the CIT invalidate separate rate denials for a third time – especially since this proceeding involves entries from more than 2014-2015, of a product for which the AD order was revoked more than two years ago.[114]

**Commerce's Position**:  The respondents assert that Commerce incorrectly interpreted the

directive of the *Remand Order* in characterizing the Court's reasoning as effectively requiring a

standard by which the primary consideration is whether export prices are set by, or are subject to,

the approval of a government entity.  As we explain in our final analysis, such a standard would

be inconsistent with the *de facto* analytical framework because it would make the remaining

three factors irrelevant.  The respondents contend that Commerce's attempt to re-state the CIT's

directive merely serves to set up a "straw man" argument to re-cast the clear mandate from the

Court.  However, the respondents later argue that the *Remand Order* requires a finding that the

Chinese government controlled export price-setting as a legal pre-requisite to denying the

separate rate of a respondent.[115]  The respondents cannot have it both ways—faulting Commerce

for stating that the *Remand Order* implies that the preeminent consideration is whether export

prices are set by the government, while simultaneously asserting that government control of

export prices is a legal prerequisite to denying a separate rate.  Moreover, Commerce's

discussion of the implications of the Court's reasoning is not meant to create a straw man or

---

[113] *Id.* at 30 (citing *Nakornthai*, 587 F. Supp. 2d at 1303 (CIT 2008)).
[114] *Id.* at 30-31 (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of Sunset Reviews and Revocation of Antidumping Duty and Countervailing Duty Orders*, 84 FR 20616 (May 10, 2019) (*OTR Tire Revocation*)).
[115] *See* Respondents' Comments at 16-18.

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

avoid the Court's mandate, but rather to clarify how Commerce considers the four factors in its separate rate analysis.  As we have explained, the four factors all relate to whether a respondent has rebutted the presumption that the Chinese government exerts control over the export functions of a firm.  Therefore, as noted above, substantial precedent supports Commerce's view that, if a respondent is unable to establish autonomy from the government under one of the four *de facto* criteria, that company fails to rebut the presumption of government control and is ineligible for a separate rate.[116]

 Additionally, we disagree with the respondents' characterization of the *Remand Order* as unambiguous on certain conclusions or dictating a specific result.  The *Remand Order* is clear that the instant redetermination requires reconsideration of the separate rate decision and that any revisions to the AD rates are to be implemented only as may be required by such reconsideration.  Yet, the operative language of the remand does not dictate specific findings or restrict others, only specifying reconsideration in accordance with the opinion.  As part of this reconsideration, we have clarified certain aspects of our analysis and the separate rate test to address concerns raised by the Court.  Specifically, we have addressed the Court's statement that we did not apply the first factor, explaining that a respondent must submit evidence for all four factors and such evidence is considered but, because each factor must be satisfied to rebut the presumption of government control, we may not expressly discuss other factors in a decision memorandum when a respondent is unable to satisfy any single factor.  Additionally, we have addressed the Court's statement that Commerce "failed to conduct the review" so as to determine whether the Chinese government controlled the prices of subject merchandise that was sold for export by the respondents, explaining that the four factors, together, relate to the determination of whether a

---

[116] *See, e.g.*, *IDI v. United States*, Court No. 20-00107, Slip Op. 21-82 (CIT July 6, 2021); *Zhejiang Quzhou*, 350 F. Supp. 3d at 1320-21; and *Silicon Carbide*, 59 FR 22586-22587, and IDM at Comment 2.

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

respondent has rebutted the presumption that the Chinese government exerts control over the export functions of a firm.  Contrary to the respondents' assertions, these explanations are not part of an attempt to flout the CIT's findings or to refuse to comply with the *Remand Order*.

The respondents would have Commerce abandon its prior findings based on a supposition regarding the scope of the remand directive.  Specifically, Commerce made findings based on the record evidence for both GTC and Aeolus that the companies failed to establish their autonomy in the selection of management.  The *Remand Order* does not address these particular findings or rule on whether they are supported by substantial evidence.[117]  Moreover, the *Remand Order* does not expressly state that Commerce's established practice—where a company fails to rebut the presumption of government control if it fails to satisfy any one of the factors—is invalid or inconsistent with the law.  Rather, it merely concludes that the fact patterns in the cases cited by Commerce (*Advanced Tech.* and *Yantai CMC*) are distinguishable from those here.  Accordingly, we do not understand the Court to have invalidated the bases upon which Commerce found that GTC and Aeolus failed to rebut the presumption of government control.  Instead, the Court focused on the lack of specific evidence regarding Chinese government control of prices during the POR.[118]  We have responded to the Court's concerns by clarifying our practice and our findings in key respects, as detailed in the Final Analysis.

In contrast to the respondents' characterization of the Draft Results as "flouting" the order, Commerce has directly addressed the concerns identified in the *Remand Order* and explained more fully our existing practice, and thus, we believe that our redetermination here is fully compliant with the *Remand Order*.

---

[117] *See Remand Order* at 25-26.
[118] *Id.*

35

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

The respondents then argue that Commerce's decision to deny them separate rates is contrary to the manner in which the presumptions should operate.  According to the respondents, a presumption vanishes upon introduction of evidence *sufficient to support a finding of the nonexistence of the presumed fact* (emphasis added).[119]  Notwithstanding this claim, the respondents do not establish that Commerce misapplied the NME presumption in this case.  Here, the respondents ignore that the evidence submitted by GTC and Aeolus did not establish that they operated autonomously from the government in selecting management.  The respondents have therefore not met their burden in rebutting the presumption of government control, *i.e.*, that they must demonstrate autonomy from the government under each of the four *de facto* factors in the separate rate analysis.[120]

The respondents argue that Commerce erroneously applied the presumption of state control because Commerce erroneously treated GTC and Aeolus, respectively, under criteria reserved for exporters that are majority-owned by the government, whereas, in this case, state-owned entities own a minority of shares of each company.  The respondents cite to *Jiasheng I* and *An Giang II* in arguing that Commerce requires additional indicia of government control where the government owns, either directly or indirectly, only a minority of shares in the respondent company and that, where the government owns a majority of shares, Commerce finds that government ownership, in and of itself, precludes a finding of *de facto* autonomy.  We disagree with the respondents.  In this administrative review Commerce has properly applied its separate rate analysis; in minority ownership situations, Commerce evaluates evidence related to the four *de facto* factors to determine whether there are indicia of government control or whether the respondents have established that they operate autonomously from the government.

---

[119] *See* Respondents' Comments at 19-20 (citing *Aukerman*, 960 F.2d 1020, 1037 (Fed. Cir. 1992)).
[120] *See First Remand Redetermination* at 26 and 32.

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

Barcode:4163794-01 A-570-912 REM - Remand - Slip Op. 21-60

The respondents claim that the Draft Results further flout the *Remand Order* by continuing to deny their separate rates through invalidated reliance on prior cases where management selection was discussed as a factor in denying the separate rate for majority government-owned respondents, and further misplaces reliance on a single CIT ruling where management selection was a factor in the denial of the separate rate for a non-majority SOE-owned firm (as well as other cases which the Court has not reviewed).  However, as the Draft Results note, the degree of government ownership is not a distinguishing factor in applying the *de facto* analysis.  Nowhere in the language of the *de facto* framework (*i.e.*, the four prongs), the *Sparklers* or *Silicon Carbide* precedent establishing the standard, nor the *Advanced Tech.*, *Yantai CMC*, or *Zhejiang Quzhou* cases affirming Commerce's practice that a respondent must rebut the presumption for all factors, is there any mention of a threshold for government ownership in applying this relevant analytical framework.  For example, in, *Advanced Tech. II*, this Court sustained Commerce's denial of a separate rate to a respondent that failed to rebut the presumption of government control over its selection of management.[121]  Here, as in *Advanced Tech. II*, Commerce reasonably determined that Chinese-owned entities possessed the ability to appoint the companies' boards, and therefore, management.  Accordingly, *Advanced Tech. II* supports Commerce's determination that the respondents failed to rebut the presumption of government control.  Thus, majority ownership by a government entity is a consideration only in the sense that such level of ownership establishes control of a respondent by a government entity, and given that control, a respondent cannot demonstrate that they operate autonomously from the government under the four factors.  These are both crucial considerations for the Court.

---

[121] *See Advanced Tech II*, 938 F. Supp. 2d at 1350.

37

Case: 23-2163     Document: 21     Page: 251     Filed: 10/27/2023

Case 1:17-cv-00100-TCS     Document 110-1     Filed 09/24/21     Page 38 of 64
Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

Moreover, the respondents too quickly dismiss the relevance of the cases cited with respect to minority ownership, noting that most were not subject to judicial review, without acknowledging the similarities to the separate rate analysis applied in the instant case.  Indeed, as noted in the Draft Results, one such non-reviewed case was the very *Silicon Carbide* decision which established Commerce's four factor standard of analysis for *de facto* control.[122]  The respondents then attempt to dismiss *IDI v. United States* as inapposite.  We disagree.  The respondents attempt to distinguish this case based on Commerce's finding in the underlying decision that the Vietnamese government actually did control management selection, whereas in the instant case, Commerce found only the potential for control.  However, this ignores the critical preface to the CIT's holding in that case.  In addressing the plaintiff's argument that Commerce determined the Vietnamese government only had the potential to control IDI and not that it actually controlled IDI, the Court explained:

> {E}ven if IDI's characterization of Commerce's decision were correct, {Commerce}'s determination that an exporter is potentially controlled by the government—in the sense that the government has the '*ability* to exercise actual control (even without exercising it)'—suffices to establish that the exporter has failed to demonstrate its independence from *de facto* government control.  A puppet master is no less in control when the strings are slack."[123]

Although Aeolus and GTC note that board members in the *IDI* case were members of Chinese Communist Party (CCP), whereas the SASAC-appointed directors for each respondent in the instant case are not, themselves, members of the CCP, this fact goes to the sufficiency of our determination in this review that the respondents failed to demonstrate autonomy in the selection of management.  On that substantive point, the Court has yet to render a decision in this

---

[122] *See Silicon Carbide*, 59 FR 22586-22587 at Comment 2 ("Respondents Hainan and Shaanxi have failed to establish their eligibility for separate rates because, at verification, these companies failed to produce bank records necessary to prove their retention of proceeds from export sales.  Therefore, these respondents did not meet an important criterion for separate rates.").
[123] *See IDI v. United States*, Slip Op. 21-82 at 20 (citing *An Giang II*, 284 10 F. Supp. 3d 1350, 1359 (CIT 2018)).

Case: 23-2163    Document: 21    Page: 252    Filed: 10/27/2023

Case 1:17-cv-00100-TCS    Document 110-1    Filed 09/24/21    Page 39 of 64
Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

litigation.  Notably, the fact that the board members in *IDI* were party members was not a factor discussed by the Court as relevant to its decision that Commerce's separate rate analysis was lacking, nor was it relevant to the Court's statements that potential government control suffices to establish the exporter has failed to demonstrate its independence from *de facto* control. Finally, we note that in the *IDI* case, state-controlled actors held no ownership interest in the relevant respondent, whereas SOEs are the largest individual shareholders of Aeolus and GTC in the instant case.  Our characterization of the *IDI* case as "mirroring" that of the instant case was not an indication that all facts and considerations were precisely the same; no two cases are identical.  Regardless, Commerce maintains that the *IDI* case is indeed instructive in drawing reasonable inferences based on record evidence and relevant precedent when examining the totality of the circumstances.  Thus, we continue to find the precedent involving denial of separate rates (whether the firms are majority or minority owned) to be relevant to this case, and that these cases undermine the respondents' claim that Commerce erred in basing its decision on separate eligibility primarily on whether GTC and Aeolus operated autonomously from the government in making decisions regarding the selection of management.

The respondents erroneously conclude that the *Remand Order* made an explicit finding that Aeolus and GTC rebutted the presumption of state control in all respects.  We do not agree. The Court is clear that the "critical flaw" in Commerce's implementation of its *de facto* separate rate analysis regarded a failure in application of the first prong of the analysis with respect to export price-setting.  The Court was similarly clear that it did not decide on whether Commerce was correct in its finding under its third factor (autonomy in selection of management) or any other indicia.  The CIT did not reach the substantive question of whether Commerce's denial of the respondents' separate rates was supported by substantial evidence, and only held that the

39

separate rate denial could not be sustained given Commerce's presumed failure to address the first factor with respect to export price-setting.

The respondents assert that Commerce's "complaint" about supposed difficulties in obtaining the requisite evidence is both incorrect and irrelevant, as governmental price-setting is expected to be documented and Commerce can readily solicit such information in response to questionnaires – in the form of narrative responses, in the event documentation does not exist. We agree that Commerce has the authority to solicit such information and gather evidence.  Such information is solicited and scrutinized by Commerce, as it was in this case, which involved multiple rounds of questionnaires to each respondent regarding responses and documentation relevant to the separate rate analysis.  However, to require that Commerce identify record evidence that the Chinese government actually did engage in export price-setting before denying a separate rate would impose an unreasonable threshold on the *de facto* analysis and potentially result in companies improperly receiving a separate rate even when they do not operate autonomously from the government.  Under such a standard, Commerce would need to rely on direct evidence unambiguously demonstrating government involvement in price-setting as the pre-eminent consideration in whether the presumption remains.  This would result in granting a separate rate in situations, for example, where the government maintains direct and unambiguous control over a firm's export-price setting, and that control is exerted and even reflected in an extant agreement document, but not apparent in sales documentation and correspondence kept in the normal course of business (*i.e.*, the documentation Commerce requests that respondents provide with respect to this prong of the analysis).  In contrast, under Commerce's current separate rates analysis, which examines all four *de facto* factors and any additional indicia, Commerce would be able to consider all evidence probative to the government's actual control

40

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

or potential to control and deny the company a separate rate if the company failed to demonstrate autonomy from the government with respect to one or more of these factors.

The respondents suggest that Commerce is over-stating the standard that would be required, and that such affirmative evidence is only required to deny a separate rate where a firm otherwise provides sufficient information to reasonably rebut the presumption for each of the other factors, as respondents maintain they did here.  As an initial matter, given the emphasis in the *Remand Order* on the necessity of examining the first factor, Commerce's concerns are legitimate.  Additionally, even the standard outlined by the respondents is problematic, as illustrated by this case.  Specifically, Commerce found that neither GTC nor Aeolus provided sufficient evidence to rebut the presumption of government control regarding autonomy in the selection of management, and the Court specifically did not render a decision on whether these determinations by Commerce are supported by substantial evidence.  The contradiction is that Commerce is tasked with examining the first factor for affirmative evidence of actual control even though it already found that, taken as a whole, the respondents' proffered evidence is insufficient to rebut the presumption of government control and that finding that has not been specifically overturned.  Though the respondents maintain otherwise, the Court is unambiguous that it made no such conclusions on the other factors.

Similarly, the respondents maintain that because the record only includes evidence suggestive of the potential for control for one or two factors and no direct evidence of control for any one factor, whereas other evidence for those factors supported finding that the respondents had rebutted the presumption, the decision to deny the separate rates for GTC and Aeolus could not be sustained.  We do not agree.  The CIT has recognized that Commerce may examine the totality of the circumstances and make reasonable inferences from the record evidence when

41

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

determining whether a respondent had demonstrated *de jure* and *de facto* control of its export activities.[124]  We maintain that our analysis with respect to the third and fourth *de facto* factors and additional indicia establishing the potential to control is sufficient to sustain the denial of the separate rates for Aeolus and GTC in the instant case.  Because the Court did not yet decide on the merits of Commerce's analysis of the remaining factors, we find it inappropriate to presume, like the respondents do, that Commerce may not rely on such information in finding that Aeolus and GTC have not rebutted the presumption of government control.

**B.  Reiteration of Comments from the First Remand Redetermination**

**Comment 2:  The Denial of GTC's Separate Rate is Unlawful**

*Respondents' Comments*

- Commerce misplaces its reliance on GIIG having accounted for most of the votes electing the 6th Board of GTC, almost 2 years prior to the POR.  As Commerce itself recognized, such occurrences that "predate the POR . . . are thus not pertinent to this review."  Moreover, these board members were nominated by the Nomination Committee, and GIIG had no involvement with said nomination.  GTC directors, having been nominated by the board, and not shareholders, do not suggest government control.  GIIG had no role in the nomination process, and the protections against domination by any one shareholder enshrined in GTC's AoA disprove government control; it is irrelevant that the shareholders did not nominate candidates.[125]

- Commerce improperly overlooked the nomination process to equate shareholder voting with management selection, noting that, the nomination process withstanding, GIIG's votes effectively selected the board.  However, the extent to which other shareholders participated does not change the facts that:  (1) shareholders were not involved in the nomination process; and (2) the 2012 Meeting election complied with all legal requirements proscribed by GTC's AoA, the PRC Law, and Code for Listed Companies – including protections against domination by any one shareholder.  Rather than indicate impropriety, the 2012 Meeting reveals that GTC acted as an ordinary publicly listed company operating transparently and democratically through normal procedures, subject to legal restrictions.[126]

- In the prior review of this order, Commerce reviewed GTC as a mandatory respondent, conducted onsite verification, and found no discrepancies with GTC's qualification for a separate rate where the exact same board constitution was in place as in this review.  Since prior reviews granting GTC a separate rate, GIIG has *decreased* its investments in GTC between AR5 and AR 7, *i.e.*, GIIG's investment reduced from 33.36 percent to 25.20 percent, and the Guiyang SASAC ceased conducting performance reviews during that period

---

[124] *See, e.g.*, *Jiasheng I*, 28 F. Supp. 3d at 1339.
[125] *See* Respondents' Comments at 32-33.
[126] *Id*. at 33-34.

42

of time.  Just as Commerce held that events prior to the POR are relevant (*i.e.*, the 2012 shareholders meeting installing the POR board members), it follows that Commerce's decision to grant GTC a separate rate in the prior review would too be specifically pertinent.  Commerce's absolutist view confirms the unreasonableness of its attributing government control based only on the vote of a 25.2 percent SOE shareholder years before the POR.  It strains credulity to conclude that the Chinese government controlled GTC in AR7 merely because years earlier a 25 percent shareholder – which was not involved in the nomination process and acted in accordance with extensive legal safeguards – voted to elect the board.  According to Commerce, that company would remain ineligible for a separate rate for as long as that board remains install{ed}.  In other words, the Chinese government is presumed to control GTC indefinitely by virtue of a vote by GIIG years before the POR.  This unreasonable fiction defies common sense, agency practice, and Commerce's own findings in prior decisions.[127]

- The Draft Results improperly fixate on a July 2015 shareholder meeting to find control by GIIG, while ignoring the May 2015 shareholder meeting that disproves GIIG's control.  At the May 15, 2015 meeting, two managerial candidates advocated by GIIG were voted upon but not elected due to dissenting votes from shareholders other than GIIG.  If GIIG controlled GTC, it would have been able at that time to appoint its preferred members to GTC's board.  Although, two months later, GIIG was able to elect its preferred members to GTC's board, the record only demonstrates that GIIG did so within the bounds of GTC's decision-making processes through the normal courses granted to all shareholders.  Thus, there is no record evidence of any instance of control by GIIG.[128]  GIIG having its favored proposals voted down by other shareholders disproves the Department's theory that GIIG controls GTC.  The fact that between May and July 2015 GIIG garnered sufficient votes through ordinary corporate protocol to pass resolutions it favored does not mean that GIIG controlled the voting process.  Commerce further misconstrued the record in emphasizing that GIIG's sole ability to convene shareholders meetings means GIIG can effectively hold re-votes on GIIG's favored proposals until such a time where such proposals would prevail.  However, GIIG's success in July 2015 does not mean it can always have its way; other shareholders can, and during the POR, did vote down proposals favored by GIIG.  Further, GIIG is not the only shareholder authorized to convene shareholders meetings.[129]

- Commerce unpersuasively claimed that the second and third largest shareholders would have been considered SOEs had they voted collectively to convene an interim meeting.  The record demonstrates that shareholders holding lesser percentages could join together and request an interim meeting because they would collectively satisfy the ownership percentage threshold.  Moreover, GTC's second and third largest shareholders were not SOEs; these shareholders are the individual fund shareholders – not the fund managers having custodial functions.  Accordingly, Commerce properly did not consider the funds in its SOE ownership analysis.[130]

- The Draft Results misplace reliance on GTC's Chairman in a strained attempt to manufacture government control emphasizing that he serves as the proxy representing GIIG at GTC's shareholders' meetings.  GTC's board chairman may have served as GIIG's proxy, but he did

---

[127] *Id.* at 34-35.
[128] *Id.* at 35-37.
[129] *Id.* at 37-38.
[130] *Id.* at 38-39.

43

not work for GIIG or any other governmental entity.  The fact that Ma Shichun served as GIIG's proxy does not mean that he was controlled by GIIG.  GIIG explicitly instructed Ma Shichun to vote GIIG's shares a certain way.  He was selected to vote GIIG's shares in this manner because he was the "Host" for all relevant meetings.  Commerce decades ago granted a separate rate when a board chairman acted as a proxy for the SOE shareholder.[131]  Commerce did not – and could not – find overlapping management amongst GTC and GIIG, and the fact that Ma Shichun served as a proxy for GIIG does not constitute overlapping management.  Moreover, the fact that Ma Shichun was appointed as Chairperson at its 2012 Meeting – during which time Commerce recognized GTC's separate rate status – does not make him a state actor.  He personally owns shares in GTC and is not beholden to any other shareholder.  Commerce further misplaces reliance on Article 118 of GTC's AoA allowing the Chairperson to conduct unilateral company decisions.  That GTC's Chairman has the authority to temporarily act in emergencies does not indicate government control.  Commerce also wrongly found indicia of government control because Ma Shichun was the former secretary of the party committee.  This prior role, however, was the committee within GTC, not the Chinese government.[132]

- Commerce failed to consider contradictory record evidence, including extensive legal requirements and safeguards prevent GIIG from dominating GTC management decisions, which include not only GTC's AoA but also relevant Chinese company laws and codes.[133]  Commerce gave these protections short shrift, despite initially acknowledging that certain individual AoAs place safeguards against undue influence by large shareholders in the selection of GTC's senior managers.  Commerce belabored its findings based on cherry-picked facts to proclaim that those safeguards were unsuccessful in the instant case, as GIIG was ultimately able to dominate GTC's decision-making process and appoint its preferred members to GTC's board, as well as control profit distribution.  On the contrary, GIIG merely acted as an ordinary shareholder subject to legal restraints, as evidenced by its inability to pass preferred proposals at the May 2015 Meeting.  Finally, Commerce misread various other articles regarding the board of directors' ability to appoint management, issue a proposal for profit distribution, as such actions are subject to the vote of all shareholders, not just GIIG, and do not constitute affirmative evidence of GIIG control.[134]

- Commerce never identified instances in which GIIG exerted direct control over export activities over GTC.  Rather, Commerce repeatedly relied on conjecture to deny GTC's separate rate.  Separate rate denials must be based on actual government control as opposed to mere potential to control.[135]  In fact, Commerce has not pointed to any specific evidence that, in influencing the companies' operations pursuant to their duties as company officials (including through the selection of management and preparation of profit distribution plans), these persons were directing the companies' export pricing decisions based on the will of the Chinese government.[136]

---

[131] *Id.* at 40 (citing *Notice of Decision of the Court of International Trade:  Certain Cased Pencils from the People's Republic of China*, 70 FR 56889 (September 29, 2005)).

[132] *Id.* at 39-41.

[133] *Id.* at 42-43.

[134] *Id.* at 42-45.

[135] *Id.* at 46 (citing *An Giang I*, 203 F. Supp. 3d 1256, 1291- 92 (CIT 2017)).

[136] *Id.* at 45-47.

**BUSINESS PROPRIETARY INFORMATION DELETED**

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

**Commerce's Position:**  GTC challenges Commerce's finding that GTC failed to establish *de facto* independence from the Chinese government in selection of its board of directors.  GTC challenges Commerce's findings regarding the board selection process, and finding of a lack of autonomy from the government despite granting GTC a separate rate in a prior administrative review.  Further, GTC challenges Commerce's findings regarding the relationship between GTC and its SOE shareholders, and Commerce's alleged misinterpretation of record evidence.  We disagree.

First, GTC asserts that the December 2012 meeting does not demonstrate government control.  GTC states that the board selected at the 2012 meeting was nominated by the GTC board, and therefore, Commerce's conclusion that there were no nominations of directors without GIIG involvement is unsupported.  GTC's arguments, however, take Commerce's statement out of context.  Commerce was explaining that, under Article 83 of GTC's articles of association, the only shareholders who can nominate directors are those with ten percent or more of shares held individually or jointly.  GTC's argument assumes that Commerce inferred GIIG was itself involved as a shareholder in nominating directors.  To the contrary, Commerce specifically clarified that the board members elected at the December 2012 meeting [

].[137]

Thus, Commerce considered that the "board members [                    ] and GIIG had no direct role in the nomination process{.}"[138]

Nevertheless, Commerce emphasized that, once nominated, the candidates were elected by shareholder vote, with [                                        ].[139]

---

[137] *See First Remand Redetermination* at 27.
[138] *Id.*
[139] *Id.*

45

Appx183

BUSINESS PROPRIETARY INFORMATION DELETED

GTC asserts Commerce's statement that the GTC board [                         ] does not indicate GIIG involvement in nominating board members.  GTC's argument ignores that Commerce based its finding on the fact that the board [                   ] and was then elected at a meeting where GIIG comprised [                         ].[140]

GTC asserts that it is irrelevant that shareholders did not nominate candidates because GIIG had no role in the nomination process and GTC's articles of association have protections against domination by any one shareholder that disprove government control.  GTC's focus on nomination, rather than the full process of board election, ignores that [

                   ] at the meeting electing the nominated candidates.[141] GTC emphasizes that shareholders are able, pursuant to GTC's articles of association, to nominate board members, but at the same time, cites the fact that no shareholders were involved in nominating GTC's board.

GTC states that the December 2012 meeting complied with all legal requirements, and that the meeting, therefore, does not indicate impropriety.  GTC misconstrues the extent of Commerce's findings.  Commerce did not evaluate the legality of board election, nor did it find that GTC has done anything contrary to its articles of association.  Instead, Commerce found that GIIG effectively selected GTC's board.[142]  Such a finding need not be inconsistent with relevant Chinese law to demonstrate a lack of independence from the Chinese government.  GTC faults Commerce's reliance on the December 2012 meeting that elected the board in place during the period of review because the meeting itself took place prior to the current period of review. GIIG asserts that Commerce's reliance on the 2012 vote is unreasonable because it would result

---

[140] *Id.*
[141] *Id.*
[142] *Id.*

BUSINESS PROPRIETARY INFORMATION DELETED

in an indefinite presumption of control based on a vote that took place years before the period of review.  To follow GTC's logic, however, would leave Commerce unable to consider government involvement in selecting a board if that involvement pre-dated the period of investigation or review at issue, even if the board remains the same during the period at issue.  Such a result would curtail Commerce's ability to consider the level of government control in a company—even significant government involvement in the selection of a company's board could not be considered as long as that involvement took place before the period of investigation or review.  As Commerce explained, however, the election that took place before the period of review is relevant to Commerce's analysis because it relates to the level of government involvement in the selection of the board members in place during the current period of review.[143]  Commerce therefore appropriately considered the level of government involvement in the selection of that board.

Next, GTC states that it is disingenuous for Commerce to deny GTC a separate rate in the seventh administrative review based on a December 2012 meeting when Commerce granted GTC a separate rate in the fifth administrative review, which was also after the December 2012 meeting.  GTC further argues that the case for independence would seem to be stronger in the seventh review than the fifth review, considering that GIIG's ownership percentage was reduced and that certain performance reviews are no longer performed.  GTC's arguments ignore the evolution of Commerce's separate rate analysis since the fifth administrative review.  Commerce explained that, following litigation before the CIT and the Federal Circuit, "it is Commerce's practice to examine whether the government might be able to exercise, or have the potential to exercise, control of a company's general operations through *minority* government ownership

---

[143] *Id.*

47

BUSINESS PROPRIETARY INFORMATION DELETED

under certain factual scenarios."[144]  Thus, Commerce's differing conclusions between the fifth and seventh administrative reviews are not unexplained, and instead reflect the reasonable evolution of Commerce's analysis in response to court decisions.

GTC erroneously asserts that Commerce misconstrued GTC's relationship with its SOE shareholders.  First, GTC argues that Commerce's finding is undermined because GTC's board members do not hold positions in any government agency.  GTC's assertion misses the point.  Whether or not the board members work directly for GIIG or another government body does not change the fact that they were effectively elected by GIIG.  The factor at issue, autonomy in the selection of management, is implicated because GIIG elected the board that is responsible for the selection of management.  GTC argues that board members and management owe fiduciary duties to GTC, but government control does not require that officials act in favor of the government in breach of a fiduciary duty to a company, it only requires that the company not have the requisite independence from the government.  Here, an SOE exerted control over board selection and, by extension, the selection of management, which demonstrated a lack of independence from the government.

GTC focuses on a shareholder meeting in May 2015 where GIIG's preferred proposals were voted down, arguing that it demonstrates GIIG did not, in fact, have the ability to unilaterally impose its own agenda.  Commerce, however, considered the fact that GIIG is the only company with enough shares individually to convene an interim shareholders meeting.[145]  Commerce concluded that, even though GIIG's proposals initially failed, GIIG was able to

---

[144] *Id.* at 24 and 40 (citing *Advanced Tech III*).
[145] *Id.* at 28.

BUSINESS PROPRIETARY INFORMATION DELETED

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

convene an interim meeting only two months later where, representing the vast majority of votes present, GIIG passed the very proposals that failed previously.[146]

GTC emphasizes that GIIG was only able to enact its preferred proposals through the normal courses available to all shareholders.  Although GIIG did not violate the law or GTC's articles of association, no other shareholder has the requisite shares to individually call an interim meeting—only GIIG.[147]  Accordingly, although GTC argues that there is no instance of control by GIIG, Commerce concluded that GIIG's ability to force an interim meeting to re-vote on its favored proposals that did not pass was evidence of GIIG's control, and this control related to proposals directly relevant to the factors Commerce considers when evaluating *de facto* independence, *i.e.*, profit distribution and selection of management.[148]

GTC argues that the fact that in a subsequent meeting GIIG garnered sufficient votes through normal corporate procedures does not mean that GIIG controls the voting process.  The record suggests, however, that GIIG prevailed at the subsequent meeting because it [

], not because other shareholders who previously opposed GIIG's proposals changed their positions.[149]

GTC next argues that Commerce misconstrued the record because GIIG is not the only shareholder authorized to convene shareholder meetings—GTC's articles of association provide that shareholders holding ten percent individually or jointly can convene meetings, and the second- and third-largest shareholders owned 9.97 and 7.74 percent of shares, respectively.  This argument mischaracterizes Commerce's statement about GIIG's sole ability to convene meetings

---

[146] *Id.*
[147] *Id.*
[148] *Id.*
[149] *Id.* at 29 (citing GTC's Letter, "Supplemental Section A Questionnaire Response," dated May 25, 2016 (GTC's May 25, 2016 Supplemental Section A Questionnaire Response), at Exhibit A-7).

**BUSINESS PROPRIETARY INFORMATION DELETED**

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

and does not, in fact, contradict Commerce's findings.  Commerce correctly understood that

"GTC's {articles of association} allow{} '[


].'"[150]  Therefore, even though shareholders can

join together to convene meetings, this fact does not contradict Commerce's statements, as GTC

contends.  Instead, Commerce accurately concluded that GTC's status as the only individual

shareholder with enough shares to convene interim meetings provided additional evidence of the

potential for GIIG to control GTC's board.[151]

     GTC asserts that Commerce mistakenly found the second- and third-largest shareholders

to be SOEs.  GTC argues that these shareholders are not SOEs because they are the individual

fund shareholders, not the fund managers having custodial functions.  Commerce found that

these shareholders were SOEs because they were Chinese bank funds, and Commerce considers

Chinese financial institutions to be an arm of the Chinese government.[152]  Commerce did not

consider the SOE ownership together with GIIG's in its SOE ownership analysis because "the

record did not indicate that the funds exercised their shareholder rights{.}"[153]  GIIG's distinction

about fund shareholders versus fund managers does not disturb Commerce's finding that only

GIIG has the requisite shares to individually call a shareholders meeting.  Moreover, Commerce

only made the point about these shareholders being Chinese bank funds in response to GTC's

suggestion that they could join their shares together to meet the [              ] threshold.[154]

That these shareholders are individual fund shareholders and not fund managers with custodial

---

[150] *Id.* at 28 (quoting GTC's May 25, 2016 Supplemental Section A Questionnaire Response at Exhibit 1).
[151] *Id.* at 29.
[152] *Id.* at 30.
[153] *Id.*
[154] *Id.*

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

Case: 23-2163    Document: 21    Page: 264    Filed: 10/27/2023

Case 1:17-cv-00100-TCS    Document 110-1    Filed 09/24/21    Page 51 of 64
Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

functions only undermines GTC's argument that they would jointly convene a shareholders' meeting.

GTC next contests Commerce's reliance on the relationship between GTC's chairman and GIIG.  GTC argues that Commerce "disingenuously conflated instruction for proxy voting with state control in denying the separate rate because 'GTC's Chairperson does, in fact, communicate with and receives suggestions regarding nominations and profit distribution from a government entity.'"[155]  First, Commerce did not rely on this relationship alone as sufficient to deny GTC a separate rate.[156]  Second, Commerce is not required to show *overlapping* management to deny a separate rate.  Rather, Commerce considers a company's autonomy in the *selection* of management.[157]  That GTC's chairman's status as proxy does not constitute overlapping management therefore does not invalidate Commerce's decision, as GTC claims.

Finally, GTC asserts that Commerce failed to consider record evidence.  We disagree.  Commerce addressed the means through which it found that GIIG exerted control while considering GIIG's less-than-majority ownership.[158]

Regarding Guiyang SASAC's statement that it does not have authority to make decisions for GTC, Commerce considered the information that GIIG was wholly-owned by Guiyang SASAC and therefore constitutes an SOE, and that GIIG voted on the election of the board in place during the period of review, as well as on the appointment of management and profit distribution.[159]  Therefore, GIIG, an SOE, was involved in making decisions at GTC.

---

[155] *See* Respondents' Comments at 40.
[156] *Id.* at 29.
[157] *See Advanced Tech II*, 938 F. Supp. 2d at 1345.
[158] *See First Remand Redetermination* at 17-18.
[159] *Id.* at 26-27.

51

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

Regarding the statements GTC highlights from its annual report about minority shareholders expressing their opinions and claims and abiding by laws and regulations, Commerce never found that minority shareholders were silenced, or that GTC failed to abide by relevant laws.  Rather, Commerce found that these protections were ineffective at preventing GIIG's control.[160]

GTC's argument that the board's selection of general manager and deputy managers does not mean GIIG controls selection of management relies on GTC's argument that there is no basis to conclude that GIIG controls board selection.  As already discussed, Commerce explained its finding that GIIG was the dominant voter at the meeting electing the board in place during the period of review.[161]  Regarding profit distribution, as GTC states, a plan would be put to a meeting open to all shareholders, but in this case, GIIG called an interim meeting once its preferred proposals failed.[162]

GTC insists that Commerce relied on conjecture in denying GTC a separate rate. Commerce's separate rate analysis, however, is consistent with its practice, which relies on the reasonable conclusion that, "{c}onsistent with normal business practices, we would expect any controlling shareholder, including a government, to have the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company."[163]  This Court has stated that, "{i}n both its *de jure* and *de facto* determinations, Commerce may make reasonable inferences from the record evidence."[164] Therefore, we continue to find that we have appropriately considered the factor of autonomy in

---

[160] *Id.* at 18.
[161] *Id.*
[162] *Id.* at 28-29.
[163] *Id.* at 25 (citing *An Giang II*, 284 F. Supp. 3d at 1359).
[164] *See Jiasheng I*, 28 F. Supp. 3d at 1339.

management in considering whether GTC has independent control over export functions,

consistent with our separate rate practice.

**Comment 3:  The Denial of Aeolus's Separate Rate is Unlawful**

*Respondents' Comments*

- Commerce provides no support for its finding that ChinaChem controls Aeolus's board selection process.  Commerce conflates actions by the board with actions of the SOE shareholder.[165]  Commerce's focus on the lack of public shareholder involvement in nominating directors is misplaced because SOEs also did not nominate the board, but rather the board was nominated by the existing board of directors.  Commerce misstates the record with its calculation of the shareholder vote.  Moreover, an SOE shareholder voting alongside others to elect the board does not change the fact that the process was transparent and democratic – subject to myriad protections afforded by Aeolus' AoA, the Chinese Company Law, and Code for Listed Companies.  Thus, Commerce's incorrectly characterizes shareholder meetings as being dominated by an SOE, maintaining that the mere presence of other "shareholders representing 51 percent ownership cannot be so characterized."  The fact that non-independent directors may remain as long as they are re-elected cannot be equated with domination by any one shareholder.  Commerce overlooked that shareholders may nominate director candidates by meeting the requisite percentage of shares individually or collectively.[166]

- The Draft Results incorrectly discount the Rectification Report, which constitutes compelling evidence of cessation of intertwined operations between ChinaChem and Aeolus before the POR of the seventh administrative review.  The Draft Results mischaracterized the Rectification Report as a voluntary restraint promised by ChinaChem and an unenforceable promise by an SOE.  Commerce ignores the explanation in the Rectification Report that it is being entered into as a means of compliance with a decision rendered by the Henan Security Regulatory Commission (Henan SRC), as the Henan SRC is analogous to the Securities and Exchange Commission (SEC).  The Rectification Report evidence established that the steps taken to ensure that Aeolus has an independent accounting system are effective.  The Rectification Report cannot plausibly be read to prove government control.  While Commerce emphasized the Report's reference to ChinaChem as the "controlling shareholder," that reference only connotes that it is the largest shareholder which must act in accord with strict legal requirements, as opposed to being able to dominate Aeolus as it sees fit.  It is unreasonable for Commerce to discredit the fact that the Rectification Report formally demarcated a separation between Aeolus and ChinaChem before the POR based on the absence of any reviewable steps that the Henan SRC took to monitor and ensure compliance.  Commerce further misplaced reliance on website printouts as additional indicia of control, arguing that the website was primarily for advertisement purposes and does not demonstrate control in the manner considered by Commerce under its separate rate test.[167]

- The Draft Results also misconstrue record evidence concerning Aeolus's Chairman.  Specifically, there is no record support for Aeolus describing its Chairman as a representative

---

[165] *Id.* at 23.
[166] *See* Respondents' Comments at 48-52.
[167] *Id.* at 52-56.

**BUSINESS PROPRIETARY INFORMATION DELETED**

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

of China National Tire.  Also, government control is not evidenced merely because Aeolus's AoA grants its Chairman broad authorities, including [

].[168]

- Commerce failed to consider contrary evidence which ensures that all shareholders – including SOEs–abide by the standard procedures applicable to all investors, including extensive safeguards against control in its articles of association.  By declining to consider this evidence supporting Aeolus' entitlement to a separate rate in AR7, Commerce neglected its obligation to take into account whatever in the record fairly detracts from its weight.[169]

- The Draft Results thus rest only on speculative statements that ChinaChem could control Aeolus, whereas Aeolus has presented the *minimum quantum* of evidence necessary to shift the burden of proof to Commerce to affirmatively show *de facto* government control.  Commerce impermissibly found Aeolus had failed to rebut the presumption of government control based on potential government control.[170]

**Commerce's Position**:  Aeolus challenges Commerce's findings regarding Aeolus's board selection process, Commerce's interpretation of the Rectification Report and other evidence concerning Aeolus's relationship with its SOE shareholder, ChinaChem, and Commerce's findings regarding Aeolus's control over its export activities.  We disagree.

Aeolus asserts that Commerce provides no support for its finding that ChinaChem controls Aeolus's board selection process.  Aeolus argues that Commerce's focus on the lack of public shareholder involvement in nominating directors is misplaced because SOEs also did not nominate the board, but rather the board was nominated by the existing board of directors.  Commerce clarified that it had mistakenly conflated board nomination with selection, but Commerce concluded that an SOE effectively selected Aeolus's board because ChinaChem represented the vast majority of votes electing the board, whose members remained in place for the period of review.[171]  Therefore, contrary to Aeolus's assertion, Commerce explained its finding about how ChinaChem influenced the board selection process.

---

[168] *Id.* at 56-58.
[169] *Id.* at 58-59.
[170] *Id.* at 59-62.
[171] *See First Remand Redetermination* at 32-33.

54

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

Aeolus next contends that Commerce misstates the record with its calculation of the shareholder vote.  Aeolus asserts that the voting could have changed in the 19 days between the date of the vote and the date for which Aeolus provided shareholder information.  Aeolus points to no evidence of any change and, moreover, Commerce only relied on those specific calculations in establishing that ChinaChem was present at the vote in question.[172]  Aeolus has not asserted, and there is no record evidence to suggest, that ChinaChem's ownership percentage dropped or changed drastically during the period of review such that it would undermine Commerce's conclusion about ChinaChem's presence at the vote.  Therefore, we find that our conclusion about ChinaChem's participation in the vote remains supported by the information on the record, with no record evidence to contradict our finding.

Aeolus contests Commerce's characterization of shareholder meetings as being dominated by an SOE, maintaining that the mere presence of other "shareholders representing 51 percent ownership cannot be so characterized."[173]  Aeolus fails to rebut Commerce's characterization.  Other shareholders than ChinaChem were in attendance at meetings, but not all shareholders representing the 51 percent of shares not held by SOEs.  Instead, ChinaChem represented the vast majority of voting shares present at shareholder meetings.[174]

Aeolus next asserts that the fact non-independent directors may remain as long as they are re-elected cannot be equated with domination by any one shareholder.[175]  Commerce clarified its understanding that non-independent directors must be re-elected to continue serving, but that ChinaChem represented the vast majority of votes at the shareholder meetings re-electing them.  Therefore, Aeolus's argument does not contradict Commerce's finding that Aeolus's articles of

---

[172] *Id.* at 35.
[173] *See* Respondents' Comments at 51.
[174] *Id.*
[175] *Id.* at 17.

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

BUSINESS PROPRIETARY INFORMATION DELETED

association [

].[176]

Aeolus also asserts that Commerce overlooked that shareholders may nominate director candidates by meeting the requisite percentage of shares individually or collectively.  As an initial matter, Commerce is not relying on a finding that ChinaChem is the only shareholder able to nominate director candidates.  Notably, as Commerce clarified, Aeolus's board, not its shareholders, nominated the director candidates.[177]  Aeolus does not contest Commerce's finding that "no public shareholder has ever nominated a director to the board, despite any mechanisms that may be in place [                                                        ]."[178] Moreover, Commerce addressed this point in the *First Remand Redetermination*, explaining that, "because each board member was approved in ChinaChem-dominated shareholder votes, the fact that board members, not shareholders, nominate other potential board members does not undermine our finding that ChinaChem exercises control over the board selection process."[179]

Aeolus argues that Commerce misinterpreted the Rectification Report and other evidence concerning Aeolus's relationship with its SOE shareholder, ChinaChem.  However, Commerce interpreted the Rectification Report in context and concluded that the corrective actions outlined in the Rectification Report did not prevent ChinaChem's control of the board election process or establish Aeolus's independence from government control.[180]  Commerce acknowledged and considered the statements of the Rectification Report, and that it addressed certain connections between Aeolus and ChinaChem relevant to the separate rate inquiry.[181]  Commerce reasonably

---

[176] *See First Remand Redetermination* at 33.
[177] *Id.* at 33.
[178] *Id.* at 8.
[179] *Id.* at 32.
[180] *Id.* at 11.
[181] *Id.*

BUSINESS PROPRIETARY INFORMATION DELETED

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

concluded that, given the report's lack of any details about enforcement mechanisms or compliance, and its mention of ChinaChem as Aeolus's controlling party, it fails to rebut Commerce's findings.[182]  Therefore, Commerce appropriately considered the impact of the Rectification Report.

Aeolus next faults Commerce's reliance on website printouts as additional indicia of control, arguing that the website was primarily for advertisement purposes and does not demonstrate control in the manner considered by Commerce under its separate rate test. Commerce did not, however, take the website statements alone to demonstrate control.  Rather, Commerce considered these website printouts as additional evidence corroborating its findings. Notably, Commerce devoted its analysis in the *Remand Results* to examining ChinaChem's actual influence over Aeolus's board selection, the Rectification Report, and the role of Aeolus's chairman, demonstrating that Commerce did not rely on the website printouts to the extent that Aeolus claims.

Aeolus argues that Commerce misconstrues the relationship between China National Tire and Aeolus's chairman, Wang Feng.  Commerce specifically clarified its understanding of this relationship in the final remand, explaining that it is unclear from the record whether the China National Tire representative who attends shareholders meetings and Wang Feng are the same, but that even if they are not the same, Wang Feng is still a board member of China National Tire, a [          ] owned subsidiary of ChinaChem, and holds the position of [

].[183]  Therefore, contrary to Aeolus's argument, Commerce has been clear about Wang Feng's connection to both companies.

---

[182] *Id.* at 36-37.
[183] *Id.* at 35.

57

BUSINESS PROPRIETARY INFORMATION DELETED

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

Aeolus's emphasis on article 98(9) of its articles of association, providing that the Chairman "shall not harm interest of the company using their affiliation relationship" does not contradict Commerce's findings.  Commerce explained that the fiduciary relationship could influence the chairman's actions where it is in the interest of both companies.[184]  In other words, a decision need not be to Aeolus's detriment to be at the control of the Chinese government.  Finally, although Aeolus notes that Wang Feng's role as [

] was within the company, not the Chinese government, China National Tire is itself a [        ] owned subsidiary of ChinaChem.  Aeolus further contends that Commerce failed to consider contrary evidence, particularly that ChinaChem is a minority shareholder.  We disagree.  Commerce directly considered this information in explaining the ownership of Aeolus and how, despite owning a minority of shares, "{t}he board elected during the {period of review} [

]."[185]

Aeolus further argues that Commerce ignored safeguards against control in its articles of association.  However, none of the articles of association cited by Aeolus contradict the facts relied upon by Commerce for its finding.  These articles, therefore, do not fairly detract from the weight of Commerce's determination.

Aeolus maintains that Commerce impermissibly found Aeolus had failed to rebut the presumption of government control based on potential government control.  Aeolus further argues that Commerce did not establish that Aeolus was actually controlled during the period of review because state-owned entities only controlled 49.06 percent of Aeolus's shares rather than

---

[184] *Id.* at 36.
[185] *Id.* at 8-9.

58

Case: 23-2163    Document: 21    Page: 272    Filed: 10/27/2023

Case 1:17-cv-00100-TCS    Document 110-1    Filed 09/24/21    Page 59 of 64
Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

a majority and that Aeolus followed corporate formalities providing for appointment of
management through the board of directors rather than directly by shareholders.  Aeolus is
mistaken because Commerce appropriately considered the state-owned entity's ability to control
Aeolus's export decisions through appointment of board members who would select
management.

Commerce's separate rate analysis is consistent with its practice, which relies on the
reasonable conclusion that, "{c}onsistent with normal business practices, we would expect any
controlling shareholder, including a government, to have the ability to control, and an interest in
controlling, the operations of the company, including the selection of management and the
profitability of the company."[186]  The CIT has stated that, "{i}in both its *de jure* and *de facto*
determinations, Commerce may make reasonable inferences from the record evidence."[187]

As the CIT has observed, in majority ownership situations, the ability to exert control *is*
control, whether or not that ability is exercised.[188]  The Court observed that, because of
Commerce's practice of requiring additional indicia of control in minority ownership situations,
Commerce cannot rely solely on potentiality because "without more, 'potential control' suggests
the potential to influence management rather than the potential to actually control
management."[189]  Here, in addition to the evidence of 49.06 percent ownership by SOEs,
Commerce identified the mechanism by which shareholders could select management and
website printouts indicating government control.[190]  Therefore, Commerce has not relied on mere
potentiality, without more, and Commerce's finding is consistent with its past practice.

---

[186] *Id.* at 25 (citing *An Giang II* 284 F. Supp. 3d 1350, 1359 (CIT 2018)).
[187] *See Jiasheng I*, 28 F. Supp. 3d 1317, 1339 (CIT 2014).
[188] *See An Giang II* 284 F. Supp. 3d 1350, 1359 (CIT 2018).
[189] *Id.*, 284 F. Supp. 3d 1350, 1360 (CIT 2018).
[190] *See Final Results* IDM at 9-12.

59

Commerce's Policy Bulletin states, "the Department considers four factors *in evaluating* whether each respondent is subject to *de facto* government control *of its export functions*{.}" (emphasis added).  Thus, Commerce considers these factors themselves indicative of control over export functions.  Therefore, Commerce's analysis of whether Aeolus has autonomy from government control regarding the selection of its management is part of how Commerce determines whether Aeolus is subject to government control of its export functions.  Commerce's longstanding analysis of these factors recognizes the reality that control in these factors entails control over export functions.  Therefore, we disagree with Aeolus's arguments that Commerce did not make the required finding that Aeolus was subject to government control of its export functions because Commerce's analysis of Aeolus's autonomy in selecting management was itself an analysis of whether the government controls Aeolus's export functions.

## Comment 4:  New Separate Rate Analysis Contradicts Findings in Prior Segments

*Respondents' Comments*
- Commerce failed to acknowledge – let alone provide the requisite heightened justification for – its new separate rate analysis implemented in this administrative review that contradicted findings in prior segments, such as the fifth administrative review (AR5) where GTC was granted a separate rate despite significantly greater SOE ownership.
- Commerce myopically focuses on management selection, instead of examining the "totality of the circumstances."  Under the holistic approach, both respondents indisputably set their export prices without government approval and have independent authority to negotiate and sign contracts demonstrating their eligibility for a separate rate.  Commerce's new approach does not examine whether the government controls the companies' export activities, and instead focuses on management selection.[191]  By conceding that the respondents' export activities are conducted with complete independence from the Chinese government while denying their separate rates, Commerce has implemented a new separate rate policy.
- Commerce treated government ownership as dispositive, using a truncated analysis that relied upon SOE ownership percentages to deny separate rate status.  Decades ago, Commerce determined that ownership 'by all the people' in and of itself cannot be considered dispositive in establishing whether a company can receive a separate rate.[192]

---

[191] *See* Respondents' Comments at 64 (citing, *e.g.*, *Jiasheng I*, 28 F. Supp. 3d at 1339 n.160 (CIT 2014); and *Shandong Huanri*, 493 F. Supp. 2d at 1357 (CIT 2007)).
[192] *Id.* at 66 (citing *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results and Partial Termination of Antidumping Duty Administrative Review*, 62 FR 6173, 6174 (February 11, 1997)).

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

Case: 23-2163    Document: 21    Page: 274    Filed: 10/27/2023

Case 1:17-cv-00100-TCS    Document 110-1    Filed 09/24/21    Page 61 of 64
Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

- Commerce further based its separate rate denials on the mere "potential control" by the Chinese government, when it previously had required affirmative evidence of actual control. Commerce relied solely upon the government's potential to nominate a manager or a board member, deviating from its practice of requiring that the government either actually appoint management or be directly or indirectly involved in the management of the company.[193]

- Commerce has thus established a new separate rate analysis inconsistent with separate rate findings in the LTFV investigation and prior reviews and lacking reasonable explanation of the change in practice. Relevant precedent holds that Commerce only has discretion to change its policies so long as the agency's decisions are explained, yet Commerce failed to acknowledge implementing a changed policy, let alone provide the requisite adequate explanation for the change. Accordingly, because Commerce here provides no reasonable explanation for changing a practice that it has consistently followed, such a change is an unacceptable agency practice. Moreover, the U.S. Supreme Court requires that agencies show a more detailed justification when a new policy rests upon factual findings that contradict those which underlay its prior policy. Commerce's separate rate denials rest upon factual findings that contradict those made under *Sparklers* and *Silicon Carbide* – as evidenced by the fact that GTC was granted a separate rate in AR5, despite having significantly greater SOE ownership at that time.[194]

**Commerce's Position**: The respondents argue that Commerce's focus on one factor of its *de facto* control analysis is flawed because Commerce's practice is to evaluate the totality of the circumstances. GTC and Aeolus assert that, by not evaluating each factor, Commerce has departed from its separate rate analysis as established in *Sparklers* and *Silicon Carbide*, despite purporting to apply that analysis. However, we disagree because previous decisions of this Court and the Federal Circuit have upheld Commerce's methodology for application of the presumption of state control as applied here.

The respondents' arguments ignore the context in which Commerce stated that it "analyzes each exporting entity in an NME country under the test established in *Sparklers*, as further developed in *Silicon Carbide*."[195] After providing the separate rate factors, Commerce

---

[193] *Id.* (citing, *e.g.*, *Notice of Amended Final Results of Antidumping Duty Administrative Reviews: Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China*, 71 FR 10009 (February 28, 2006), and accompanying IDM at Comment 3; *An Giang I*, 203 F. Supp. 2d at 1292; and *Jiasheng II 2015*, 121 F. Supp. 3d at 1269).

[194] *Id.* at 67-69 (citing 587 F. Supp. 2d 1303 (CIT 2008); *SKF USA, Inc. v. United States*, 630 F. 3d 1365, 1373 (Fed. Cir. 2011); *WelCom Prods., Inc. v. United States*, 865 F. Supp. 2d 1340, 1344 (CIT 2012); and *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)).

[195] *See First Remand Redetermination* at 38.

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

explained that it continues to evaluate its practice with regard to the separate rates analysis in
light of the *Diamond Sawblades from China* antidumping proceeding, and Commerce's
determinations therein.[196]

Moreover, both Policy Bulletin 5.1 and Commerce's restatement of the factors in the
*First Remand Redetermination* provide that Commerce *typically* considers four factors in
evaluating whether each respondent is subject to *de facto* government control.[197]  Therefore,
contrary to the respondents' assertions, Commerce has not purported to follow one practice while
following another.  Rather, Commerce explained the evolution and state of its practice.

The respondents argue that, since *Silicon Carbide* in 1994, Commerce has granted
separate rates despite significant – and even 100 percent – ownership by SOEs.  The respondents
thus suggest that, by identifying the test established in *Sparklers* and further developed in *Silicon
Carbide*, Commerce was signaling a return to earlier practice in disregard of the developments in
*Diamond Sawblades*.  Such a claim, however, is contradicted by Commerce's express statements
in the *Final Results* and the *First Remand Redetermination*:  "{I}n recent proceedings, we
concluded that where a government entity holds a majority ownership share, . . . the majority
ownership holding in and of itself means that the government exercises, or has the potential to
exercise, control over the company's operations generally";[198] and "{F}ollowing these cases, in
evaluating whether a respondent has rebutted the presumption of government control, it is
Commerce's practice to examine whether the government might be able to exercise, or have the
potential to exercise, control of a company's general operations through *minority* government
ownership under certain factual scenarios."[199]

---

[196] *Id.* at 39 and n.192.
[197] *Id.* at 38; *see also* Policy Bulletin 5.1 at 2.
[198] *See Final Results* IDM at 7-8.
[199] *See First Remand Redetermination* at 24.

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

Case: 23-2163     Document: 21     Page: 276     Filed: 10/27/2023

Case 1:17-cv-00100-TCS     Document 110-1     Filed 09/24/21     Page 63 of 64
Barcode:4163794-01 A-570-912 REM - Remand - Slip Op. 21-60

The respondents argue that Commerce's application of the presumption of state control amounted to a "new separate rate methodology" that Commerce failed to disclose. Commerce's application of the factors for *de facto* control did not constitute a "new separate rate methodology" as GTC and Aeolus contend. Commerce followed its separate rate methodology as outlined in Policy Bulletin 05.1, the *Final Results*, and the *First Remand Redetermination*. Commerce explained that, following litigation before the CIT and the Federal Circuit, "it is Commerce's practice to examine whether the government might be able to exercise, or have the potential to exercise, control of a company's general operations through *minority* government ownership under certain factual scenarios."[200] Thus, as noted above, Commerce's differing conclusions between the fifth and seventh administrative reviews are not unexplained, and instead reflect the reasonable evolution of Commerce's analysis in response to court decisions. Commerce continued to follow its existing policy that "'all commercial entities in the country are presumed to export under the control of the state, and that no manufacturer would receive a separate antidumping duty rate unless it could demonstrate that it enjoyed both *de jure* and *de facto* independence from the central government."[201]

---

[200] *Id.* at 24 and 40 (citing *Advanced Tech III*).
[201] *See Diamond Sawblades*, 866 F.3d at 1310-11 (quoting *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997)).

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

## IV.    FINAL RESULTS OF REDETERMINATION

As a result of this remand redetermination, we have made no changes to the rate assigned

to Aeolus and GTC.

Dated:  September 24, 2021

9/24/2021

X _____

Signed by: CHRISTIAN MARSH

_____

Christian Marsh
Acting Assistant Secretary
  for Enforcement and Compliance

64

*Legal Authority:* 45 CFR 75.302, 75.308, 75.361, and 75.364; 15 U.S.C. 1525; 42 U.S.C. 282.

This information collection may be viewed at *www.reginfo.gov.* Follow the instructions to view the Department of Commerce collections currently under review by OMB.

Written comments and recommendations for the proposed information collection should be submitted within 30 days of the publication of this notice on the following website *www.reginfo.gov/ public/do/PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function and entering either the title of the collection or the OMB Control Number 0608–0069.

**Sheleen Dumas,**

*Department PRA Clearance Officer, Office of the Under Secretary for Economic Affairs, Commerce Department.*

[FR Doc. 2023–11725 Filed 6–1–23; 8:45 am]

**BILLING CODE 3510–06–P**

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

[B–9–2023]

### Foreign-Trade Zone (FTZ) 46; Authorization of Production Activity; Patheon Pharmaceuticals Inc.; (Pharmaceutical Products); Cincinnati, Ohio

On January 27, 2023, Patheon Pharmaceuticals Inc. submitted a notification of proposed production activity to the FTZ Board for its facilities within Subzone 46K, in Cincinnati, Ohio.

The notification was processed in accordance with the regulations of the FTZ Board (15 CFR part 400), including notice in the **Federal Register** inviting public comment (88 FR 7394, February 3, 2023). On May 30, 2023, the applicant was notified of the FTZ Board's decision that no further review of the activity is warranted at this time. The production activity described in the notification was authorized, subject to the FTZ Act and the FTZ Board's regulations, including section 400.14.

Dated: May 30, 2023.

**Elizabeth Whiteman,**

*Executive Secretary.*

[FR Doc. 2023–11779 Filed 6–1–23; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

[B–10–2023]

### Foreign-Trade Zone (FTZ) 148; Authorization of Production Activity; CoLinx, LLC; (Wheel Hub-Bearing Assemblies); Crossville, Tennessee

On January 27, 2023, CoLinx, LLC submitted a notification of proposed production activity to the FTZ Board for its facility within FTZ 148, in Crossville, Tennessee.

The notification was processed in accordance with the regulations of the FTZ Board (15 CFR part 400), including notice in the **Federal Register** inviting public comment (88 FR 7394, February 3, 2023). On May 30, 2023, the applicant was notified of the FTZ Board's decision that no further review of the activity is warranted at this time. The production activity described in the notification was authorized, subject to the FTZ Act and the FTZ Board's regulations, including section 400.14.

Dated: May 30, 2023.

**Elizabeth Whiteman,**

*Executive Secretary.*

[FR Doc. 2023–11778 Filed 6–1–23; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–912]

### Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Court Decision Not in Harmony With the Results of 2014–2015 Antidumping Administrative Review; Notice of Amended Final Results

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce

**SUMMARY:** On May 18, 2023, the U.S. Court of International Trade (CIT) issued its final judgment in *Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co., Ltd., et al.* v. *United States,* Consol. Court No. 17–00100, Slip Op. 23–79 (CIT 2023) (*Remand Order*), sustaining the U.S. Department of Commerce's (Commerce) second remand results pertaining to the administrative review of the antidumping duty (AD) order on certain new pneumatic off-the-road tires (OTR Tires) from the People's Republic of China (China) covering the period September 1, 2014, through August 31, 2015. Commerce is notifying the public

that the CIT's final judgment is not in harmony with Commerce's final results of the administrative review, and that Commerce is amending the final results with respect to the dumping margin assigned to mandatory respondent, Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Co. Ltd., and Xuzhou Hanbang Tyre Co., Ltd. (collectively, Xugong), as well as all other qualifying separate rate respondents that are plaintiffs in the action (*i.e.,* Qingdao Qihang Tyre Co., Ltd. (Qingdao Qihang), Qingdao Free Trade Zone Full-World International Trading Co., Ltd. (Full World), Trelleborg Wheel Systems (Xingtai) China, Co., Ltd. (Trelleborg), and Weihai Zhongwei Rubber Co., Ltd. (Zhongwei)).

**DATES:** Applicable May 28, 2023.

**FOR FURTHER INFORMATION CONTACT:** Brendan Quinn, Program Manager, AD/ CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–5848.

**SUPPLEMENTARY INFORMATION:**

### Background

On April 21, 2017, Commerce published its *Final Results* in the 2014– 2015 AD administrative review of OTR Tires from China.[1] After correcting ministerial errors contained in the *Final Results,* on June 14, 2017, Commerce published the *Amended Final Results,* and calculated a weighted-average dumping margin of 33.14 percent for Xugong, which was also used as the separate rate applicable to various respondents not individually examined in the administrative review, including Qingdao Qihang, Full World, Trelleborg, and Zhongwei.[2] Further, in the *Final Results* and *Amended Final Results,* Commerce determined that certain companies, including Guizhou Tyre Co Ltd. (GTC) and Guizhou Tyre Import and Export Co., Ltd. (GTCIE) (collectively, GTC/GTCIE) and Aeolus Tyre Co., Ltd., are part of the China-wide entity.[3]

Aeolus, Full World, GTC/GTCIE, Qingdao Qihang, Trelleborg, Xugong, and Zhongwei, appealed Commerce's *Final Results/Amended Final Results.*

---

[1] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014– 2015,* 82 FR 18733 (April 21, 2017) (*Final Results*), and accompanying Issues and Decision Memorandum.

[2] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2014–2015,* 82 FR 27224 (June 14, 2017) (*Amended Final Results*).

[3] *Id.*

The CIT remanded the *Final Results/ Amended Final Results* to Commerce to: (1) reconsider its separate rate determination as to GTC and Aeolus; (2) redetermine Xugong's weighted average dumping margin without making deductions for value-added tax (VAT); and (3) apply any relief that resulted from the recalculation of Xugong's individually-determined rate to Full World, Qingdao, Trelleborg, and Zhongwei.[4] In the First Remand Redetermination, issued in September 2019, Commerce: (1) recalculated export price (EP) and constructed export price (CEP) for Xugong without making deductions for Chinese VAT, resulting in a 16.78% weighted-average dumping margin for Xugong, which is also assigned to all other qualifying separate rate respondents that are plaintiffs in the action (*i.e.,* Full World, Qingdao Qihang, Trelleborg, and Zhongwei); and (2) reconsidered the record with respect to the decision to deny separate rate status to Aeolus and GTC/GTCIE in the *Final Results* and *Amended Final Results,* but continued to determine that both Aeolus and GTC failed to rebut the presumption of government control and remained ineligible for a separate rate.[5]

The CIT sustained, in part, Commerce's determination to recalculate EP and CEP for Xugong without making deductions for Chinese VAT, and the resulting redetermination of the weighted-average dumping margins for Xugong and for all other qualifying separate rate respondents, but remanded for a second time the decisions to continue to deny separate-rate status to Aeolus and GTC/GTCIE.[6] In its second remand redetermination, issued in September 2021, Commerce reconsidered the record evidence with respect to each prong of the enumerated *de facto* separate rate criteria in accordance with the *Guizhou Tyre II* opinion, and continued to find that both Aeolus and GTC/GTCIE failed to rebut at least one of the four *de facto* criteria and, thus, continued to be ineligible for a separate rate.[7] On May 18, 2023, the CIT sustained Commerce's final redetermination.[8]

**Timken Notice**

In its decision in *Timken*,[9] as clarified by *Diamond Sawblades,*[10] the Court of Appeals for the Federal Circuit held that, pursuant to section 516A(c) and (e) of the Tariff Act of 1930, as amended (the Act), Commerce must publish a notice of court decision that is not ''in harmony'' with a Commerce determination and must suspend liquidation of entries pending a ''conclusive'' court decision. The CIT's May 18, 2023, judgment constitutes a final decision of the CIT that is not in harmony with Commerce's *Final Results.* Thus, this notice is published in fulfillment of the publication requirements of *Timken.*

**Amended Final Results**

Because there is now a final court judgment, Commerce is amending its *Final Results* and *Amended Final Results* with respect to mandatory respondent Xugong and all other qualifying separate rate respondents that are plaintiffs in the action (*i.e.,* Full World, Qingdao Qihang, Trelleborg, and Zhongwei) as follows:

| Exporter | Weighted-average dumping margin (percent) |
|---|---|
| Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Company Ltd., or Xuzhou Hanbang Tyre Co., Ltd | 16.78 |
| Weihai Zhongwei Rubber Co., Ltd | 16.78 |
| Qingdao Qihang Tyre Co., Ltd | 16.78 |
| Qingdao Free Trade Zone Full-World International Trading Co., Ltd | 16.78 |
| Trelleborg Wheel Systems (Xingtai) China, Co. Ltd | 16.78 |

**Cash Deposit Requirements**

Because the AD order on OTR Tires from China was revoked,[11] Commerce will not issue cash deposit instructions as a result of this court decision.

**Liquidation of Suspended Entries**

In the event the CIT's ruling is not appealed, or, if appealed, upheld by a final and conclusive court decision, Commerce intends to instruct CBP to assess antidumping duties on unliquidated entries of subject merchandise exported by the companies listed above in accordance with 19 CFR 351.212(b). We will instruct CBP to assess antidumping duties on all appropriate entries covered by this review when the importer-specific *ad valorem* assessment rate is not zero or *de minimis.* Where an import-specific *ad valorem* assessment rate is zero or *de minimis*,[12] we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties.

**Notification to Interested Parties**

This notice is issued and published in accordance with sections 516A(c) and (e) and 777(i)(1) of the Act.

Dated: May 26, 2023.

Lisa W. Wang,
*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2023–11775 Filed 6–1–23; 8:45 am]

**BILLING CODE 3510–DS–P**

---

[4] *See Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co., Ltd., et al.* v. *United States,* 389 F. Supp. 3d 1350 (CIT 2019) (*Guizhou Tyre I*).

[5] *See Final Results of Redetermination Pursuant to Court Remand, Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co., Ltd., et al.* v. *United States,* Court No. 17–00100, Slip Op. 19–64 (CIT 2019), dated September 23, 2019 (*First Remand Redetermination*).

[6] *See Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co., Ltd., et al.* v. *United States,* 519 F. Supp. 3d 1248 (CIT 2021) (*Guizhou Tyre II*).

[7] *See Final Results of Redetermination Pursuant to Court Remand, Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co., Ltd., et al.* v. *United States,* Court No. 17–00100, Slip Op. 21–60 (CIT 2021), dated September 24, 2021 (*Second Remand Redetermination*).

[8] *See Remand Order.*

[9] *See Timken Co.* v. *United States,* 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).

[10] *See Diamond Sawblades Manufacturers Coalition* v. *United States,* 626 F.3d 1374 (Fed. Cir. 2010) (*Diamond Sawblades*).

[11] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Sunset Reviews and Revocation of Antidumping Duty and Countervailing Duty Orders,* 84 FR 20616 (May 10, 2019).

[12] *See* 19 CFR 351.106(c)(2).