2023-2163, 2023-2164

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

GUIZHOU TYRE CO., LTD., GUIZHOU TYRE IMPORT AND EXPORT CO.,
LTD., AEOLUS TYRE CO., LTD.,
*Plaintiffs-Appellants,*

QINGDAO FREE TRADE ZONE FULL-WORLD INTERNATIONAL
TRADING CO., LTD., XUZHOU XUGONG TYRES CO., LTD., TRELLEBORG
WHEEL SYSTEMS (XINGTAI) CO., LTD., QINGDAO QIHANG TYRE CO.,
LTD., WEIHAI ZHONGWEI RUBBER CO., LTD.,
*Plaintiffs,*
v.
UNITED STATES,
*Defendant-Appellee.*

Appeal from the United States Court of International Trade
in Case No. 17-CV-00100, Senior Judge Timothy C. Stanceu

**NONCONFIDENTIAL RESPONSE BRIEF OF DEFENDANT-APPELLEE**

|  | BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General |
|---|---|
|  | PATRICIA M. McCARTHY<br>Director |
|  | FRANKLIN E. WHITE, JR.<br>Assistant Director |
| Of Counsel:<br><br>ELIO GONZALEZ<br>Senior Counsel<br>U.S. Department of Commerce<br>Office of the Chief Counsel for<br>   Trade Enforcement and Compliance | EMMA E. BOND<br>Trial Attorney<br>Commercial Litigation Branch<br>U.S. Department of Justice<br>1100 L Street N.W. |<br>Washington, DC 20005<br>Tel: (202) 305-2034<br>Email: Emma.E.Bond@usdoj.gov |
| May 1, 2024 | *Attorneys for the United States* |

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ....................................................................v

STATEMENT OF RELATED CASES.................................................xi

INTRODUCTION ...............................................................................1

STATEMENT OF THE ISSUE ............................................................2

STATEMENT OF THE CASE ..............................................................2

STATEMENT OF FACTS ....................................................................3

I.     Background Regarding Antidumping Duty Proceedings
       Involving Imports From Nonmarket Economies ................................3

       A.     Antidumping Duty Administrative Reviews............................3

       B.     Presumption Of Government Control In Nonmarket
              Economy Proceedings ............................................................4

II.    Administrative Proceedings ................................................5

       A.     Commerce Initiates The Seventh Administrative Review
              Of The Antidumping Duty Order Covering Certain New
              Pneumatic Off-The-Road Tires From China ............................5

       B.     Commerce Preliminarily Determines That Guizhou
              Tyre And Aeolus Failed To Rebut The Presumption
              Of Government Control And Are Thus Subject
              To The China-Wide Rate.........................................................8

       C.     In The Final Results, Commerce Determines That
              Guizhou Tyre And Aeolus Did Not Rebut The
              Presumption Of Government Control ....................................10

       D.     Following Reconsideration On Remand, Commerce

Continues To Determine That Guizhou Tyre And
Aeolus Failed To Rebut The Presumption Of
Government Control ..............................................................11

    1.    First Remand Redetermination.....................................11

    2.    Second Remand Redetermination ...............................14

E.    Court Of International Trade Sustains Commerce's
Determination .......................................................................17

SUMMARY OF ARGUMENT ............................................................18

ARGUMENT.........................................................................................20

I.    Standard Of Review...................................................................20

II.    The Trial Court Correctly Sustained Commerce's
Nonmarket Economy Methodology And The Criteria For
Implementing It ........................................................................21

A.    This Court Has Long Approved Commerce's
Nonmarket Economy Methodology Assigning A
Single Rate To All Respondents Unable To Rebut The
Presumption Of Government Control.....................................22

B.    To Rebut The Presumption, Commerce Reasonably
Requires Exporters To Demonstrate Autonomy
Pursuant To All Four *De Facto* Criteria .................................26

    1.    The Requirement To Demonstrate Autonomy
For All Four *De Facto* Criteria Applies
Regardless Of The Level Of Government
Ownership ...................................................................29

2.      Aeolus And Guizhou Tyre Misunderstand Commerce's Recent Decisions Regarding Majority Ownership ...................................................... 32

3.      Appellants' Remaining Arguments Regarding Majority Ownership Are Unpersuasive ......................... 35

C.      Commerce's Methodology Reasonably Relates To "Export Activities" ................................................................. 39

III.      Substantial Evidence Supports Commerce's Findings That Aeolus And Guizhou Tyre Failed To Rebut The Presumption Of Government Control ................................................. 40

A.      Substantial Evidence Supports Commerce's Finding That Aeolus Failed To Demonstrate Autonomy In Selecting Management And Thus Failed To Rebut The Presumption Of Government Control ............................. 41

1.      The Record Supports Commerce's Finding ................. 41

2.      Aeolus's Arguments Are Unpersuasive ......................... 45

B.      Substantial Evidence Supports Commerce's Finding That Guizhou Tyre Failed To Demonstrate Autonomy In Selecting Management And Distributing Profits, And Thus Failed To Rebut The Presumption Of Government Control ................................................................. 49

1.      The Record Supports Commerce's Finding ................. 49

2.      Guizhou Tyre's Arguments Are Unpersuasive ............. 51

3.      Guizhou Tyre's Arguments Regarding The Fifth Administrative Review Are Unpersuasive ................... 54

CONCLUSION ................................................................................. 56

## CONFIDENTIAL INFORMATION OMITTED

The confidential version of this response brief contains certain confidential business proprietary information protected by the Administrative Protective Order in the underlying agency proceeding. Such confidential business proprietary information (BPI) consists of information contained in business proprietary documents provided by plaintiff-appellants, Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively, Guizhou Tyre), and Aeolus Tyre Co., Ltd., (Aeolus) to the Department of Commerce. During the underlying proceeding, Commerce accepted the BPI designation and accorded confidential treatment to the BPI.

Confidential information has been redacted from pages 7, 9, 10, 43, 44, 45, and 53 of the non-confidential version of this response brief. The confidential information omitted from these pages relates to shareholder votes, board membership, and management of Aeolus and Guizhou Tyre.

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,*
    960 F.2d 1020 (Fed. Cir. 1992) ............................................................24, 25

*Ad Hoc Shrimp Trade Action Committee v. United States,*
    802 F.3d 1339 (Fed. Cir. 2015) ..................................................................20

*Advanced Tech. & Materials Co. v. United States,*
    885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012) .....................................6, 33, 50

*Advanced Tech. & Materials Co. v. United States,*
    581 F. App'x 900 (Fed. Cir. 2014) ...........................................6, 16, 33, 38

*Advanced Tech. & Materials Co. v. United States,*
    938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013) ...........................16, 33, 36, 38

*Albemarle Corp. & Subsidiaries v. United States,*
    821 F.3d 1345 (Fed. Cir. 2016) ..................................................................54

*Am. Silicon Techs. v. United States,*
    261 F.3d 1371 (Fed. Cir. 2001) ..................................................................48

*An Giang Fisheries Import & Export Jt. Stock Co. v. United States,*
    284 F. Supp. 3d 1350 (Ct. Int'l Trade 2018) ........................................35, 37

*Atl. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ..................................................................21

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.,*
    419 U.S. 281 (1974)....................................................................................45

*Canadian Solar, Inc. v. United States,*
    918 F.3d 909 (Fed. Cir. 2019)....................................................................29

*Changzhou Wujin Fine Chem. Factory Co. v. United States,*
    701 F.3d 1367 (Fed. Cir. 2012) ..................................................................22

*China Manufacturers All., LLC v. United States,*
    1 F.4th 1028 (Fed. Cir. 2021)................................................................22, 23

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938)....................................................................20, 44, 53

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966)..............................................................................21

*Diamond Sawblades Manufacturers Coal. v. United States,*
    866 F.3d 1304 (Fed. Cir. 2017) ............................................................22, 24

*Downhole Pipe & Equip. v. United States,*
    776 F.3d 1369 (Fed. Cir. 2015) ....................................................41, 44, 49

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996)..................................................................27

*IDI Int'l Dev. & Inv. Corp. v. United States* (*IDI*),
    No. 20-00107, 2021 WL 3082807,
    (Ct. Int'l Trade July 6, 2021)................................................ 16, 17, 36, 40

*Inland Steel Indus., Inc. v. United States,*
    188 F.3d 1349 (Fed. Cir. 1999) ..........................................................41, 45

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,*
    28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ................................................38

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,*
    121 F. Supp. 3d 1263 (Ct. Int'l Trade) ..................................................32, 34

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States,*
    617 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) ...............................................25

*Koyo Seiko Co. v. United States,*
    36 F.3d 1565 (Fed. Cir. 1994).................................................................48

*Michaels Stores, Inc. v. United States,*
    766 F.3d 1388 (Fed. Cir. 2014) ............................................................22, 25

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).................................................................................29

*Nippon Steel v. United States*,
  337 F.3d 1373 (2003)..........................................................................20

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006)......................................................21, 53

*QVC Food, Co., LTD v. United States*,
  658 F.3d at 1318 (2011).......................................................................55

*Royal Brush Mfg., Inc. v. United States*,
  75 F.4th 1250 (Fed. Cir. 2023)......................................................26, 27

*SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*,
  580 U.S. 328 (2017).............................................................................24

*SeAH Steel VINA Corp. v. United States*,
  950 F.3d 833 (Fed. Cir. 2020)............................................................39

*Sigma Corp. v. United States*,
  117 F.3d 1401 (Fed. Cir. 1997)............................................22, 23, 25

*SKF USA Inc v. United States*,
  263 F.3d 1369 (Fed. Cir. 2001)..........................................................29

*Smith–Corona Group v. United States*,
  713 F.2d 1568 (Fed. Cir. 1983)..........................................................27

*Torrington Co. v. United States*,
  68 F.3d 1347 (Fed. Cir. 1995)............................................................23

*Transcom Inc. v. United States*,
  294 F.3d 1371 (Fed. Cir. 2002)..........................................................22

*Union Steel v. United States*,
  713 F.3d 1101 (Fed. Cir. 2013)..........................................................20

*United States v. Zenith Radio Corp.,*
      64 C.C.P.A. 130, 562 F.2d 1209 (1977) ....................................................27

*United States v. Zenith Radio Corp.,*
      437 U.S. 443 (1978)................................................................................27

*U.S. Steel Corp. v. United States,*
      621 F.3d 1351 (Fed. Cir. 2010) ...................................................................4

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
      435 U.S. 519 (1978)................................................................................27

*Yantai CMC Bearing Co. Ltd. v. United States,*
      203 F. Supp. 3d 1317 (2017)..............................................................16, 28

*Zenith Electronics Corp. v. United States,*
      988 F.2d 1573 (Fed. Cir. 1993) ..................................................................23

*Zhejiang Mach. Imp. & Exp. Corp. v. United States,*
      65 F.4th 1364 (Fed. Cir. 2023)...........................28, 29, 30, 33, 38, 47, 48, 54

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States,*
      350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ...........................16, 28, 35, 37

## FEDERAL STATUTES

19 U.S.C. § 1673...........................................................................................3

19 U.S.C. §§ 1675(a)(1)(B), (2)(A)...............................................................3, 30

19 U.S.C. § 1677(18)(B)(iv) ........................................................................4, 23

19 U.S.C. § 1677(35)(A)...................................................................................4

## FEDERAL REGULATIONS

19 C.F.R. § 351.107(d) ...............................................................................8, 22

19 C.F.R. § 351.401(f) ....................................................................................5

## ADMINISTRATIVE DETERMINATIONS

*1,1,1,2 Tetrafluoroethane (R-134a) from China*,
    82 Fed. Reg. 12,192 (Dep't of Commerce, Mar. 1, 2017) ..........................35

*53-Foot Domestic Dry Containers from China*,
    80 Fed. Reg. 21,203 (Dep't of Commerce, Apr. 17, 2015)...................17, 31

*Antidumping Duties; Countervailing Duties*,
    61 Fed. Reg. 7,308 (May 19, 1997).........................................................4, 22

*Antidumping Duties; Countervailing Duties*,
    62 Fed. Reg. 27,296 (Feb. 27, 1996) ............................................................4

*Carbon and Certain Alloy Steel Wire Rod from China* (*Wire Rod*),
    79 Fed. Reg. 53,169 (Dep't of Commerce Sept. 8, 2014)...........................34

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
    85 Fed. Reg. 23,756 (Dep't of Commerce, Apr. 29, 2020).............. 17, 34, 36

*Certain New Pneumatic Off-the-Road Tires From China: Final Results of
    Antidumping Duty Administrative Review; 2014-2015*,
    82 Fed. Reg. 18,733 (Dep't of Commerce Apr. 21, 2017)............................2

*Certain New Pneumatic Off-the-Road Tires from China*,
    82 Fed. Reg. 27,224 (Dep't of Commerce June 14, 2017)............................3

*Final Determination of Sales at Less than Fair Value: Silicon Carbide from
    China*,
    59 Fed. Reg. 22,585 (May 2, 1994)............................................. 8, 26, 28, 30

*Final Determination of Sales at Less Than Fair Value: Sparklers from
    China*,
    56 Fed. Reg. 20,588 (May 6, 1991).................................................. 8, 25, 26

*Heavy Forged Hand Tools from China*,
    71 Fed. Reg. 54,629 (Sept. 14, 2006) .........................................................38

*Off-the-Road Tires from China*,
    80 Fed. Reg. 20,197 (Dep't of Commerce Apr. 15, 2015)...........................54

*Truck and Bus Tires From China*,
    82 Fed. Reg. 8,599 (Dep't of Commerce, Jan. 27, 2017)............................55

## MISCELLANOUS AUTHORITIES

*Separate-Rates Practice and Application of Combination Rates in Antidumping
    Investigations Involving Non-Market Economy Countries* at 2
    (Apr. 5, 2005) (Policy Bulletin 05.1)...........................................................28

*Statement of Administrative Action (SAA)*, H.R. Doc. No. 103–826,
    (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040............................................22

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, defendant-appellee's counsel states that she is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title. The Court has designated the following as companion cases: *Guizhou Tyre Co., Ltd. v. United States,* Court No. 23-2165, and *China Manufacturers Alliance v. United States*, Court No. 23-2391. The Court has also designated the following as related to this appeal: *Jilin Forest Industry Jinqiao Flooring Group Co. v. United States*, Court No. 23-2245, and *Pirelli Tyre Co., Ltd. v. United States*, Court No. 23-2266.

# INTRODUCTION

This case involves an antidumping duty proceeding regarding imports from the People's Republic of China (China), a nonmarket economy, which does not operate on market principles of cost or pricing structures. Because the government of a nonmarket economy may control the export activities of its exporters or producers, the Department of Commerce (Commerce) presumes that such exporters or producers are subject to government control and assigns them a single dumping margin or rate, referred to in this proceeding as the China-wide rate. Exporters or producers may rebut the presumption—and obtain a separate rate—by demonstrating independence from government control.

In this case, Commerce determined that appellants Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively, Guizhou Tyre) and appellant Aeolus Tyre Co., Ltd., (Aeolus) failed to rebut the presumption of government control. Government-owned entities were the largest and controlling shareholders for both Guizhou Tyre and Aeolus during the period of review, and used their ownership interests to select board members—which, in turn, selected senior management. Under these circumstances, Commerce determined that Guizhou Tyre and Aeolus failed to establish autonomy from the government of China with respect to selection of management. Commerce also found that Guizhou Tyre failed to demonstrate autonomy with respect to distribution of

profits.  Accordingly, Commerce determined that both companies failed to rebut the presumption of government control, and assigned them the China-wide rate.

After two remands and careful consideration of the record, the Court of International Trade (trial court) sustained Commerce's determination that Guizhou Tyre and Aeolus did not rebut the presumption of government control, and were thus subject to the China-wide rate.  Because Commerce's determination is lawful and supported by substantial evidence, we respectfully request that the Court affirm the trial court's decision.

## STATEMENT OF THE ISSUE[1]

Whether Commerce's determination that Guizhou Tyre and Aeolus failed to rebut the presumption of government control is lawful and supported by substantial evidence.

## STATEMENT OF THE CASE

This appeal concerns Commerce's inclusion of Guizhou Tyre and Aeolus in the China-wide entity in the final results of the seventh administrative review of the antidumping duty order on certain off-the-road tires from China.  *See Certain New Pneumatic Off-the-Road Tires From China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733 (Dep't of Commerce

---

[1]  Pursuant to Federal Circuit Rule 28(b), we disagree with the statement of the issues, the case, and the facts in the appellants' brief, and thus include these sections in the response brief.

Apr. 21, 2017) (final results), Appx89-95, and accompanying Issues and Decision

Memorandum (IDM), Appx47-88.[2]  After multiple remands to Commerce for

further explanation, the trial court sustained Commerce's second remand

redetermination, which continued to include Aeolus and Guizhou Tyre in the

China-wide entity.  Appx1-46.  Guizhou Tyre and Aeolus filed this timely appeal.

## STATEMENT OF FACTS

I.    Background Regarding Antidumping Duty Proceedings Involving Imports
      From Nonmarket Economies

      A.    Antidumping Duty Administrative Reviews

      The antidumping statute is a remedial law authorizing Commerce to impose

duties on imports of foreign merchandise that are sold in the United States at less

than fair value, when a domestic industry is materially injured by such imports (or

threatened with such injury).  19 U.S.C. § 1673.  Once an antidumping duty order

is imposed, Commerce conducts administrative reviews to determine the amount of

any antidumping duty during the relevant period.  19 U.S.C. §§ 1675(a)(1)(B),

(2)(A).

---

[2]  Commerce later amended the final results to correct certain ministerial errors (which are not at issue in this litigation).  *Certain New Pneumatic Off-the-Road Tires from China*, 82 Fed. Reg. 27,224 (Dep't of Commerce June 14, 2017) (amended final results).

3

To determine the duty in an administrative review, Commerce calculates a "dumping margin" for each entry of merchandise subject to review. 19 U.S.C. § 1675(a)(2)(A)(ii). A dumping margin is the amount by which the "normal value" exceeds the United States export price or constructed export price for the merchandise. *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)). The "normal value" ordinarily means "the price at which the foreign like product is first sold . . . for consumption in the exporting country," in the ordinary course of trade. 19 U.S.C. § 1677b(a)(1)(B)(i).

B.     Presumption Of Government Control In Nonmarket Economy Proceedings

Special considerations apply when determining antidumping duty rates in proceedings involving imports from nonmarket economy countries. A nonmarket economy country is "any foreign country that {Commerce} determines does not operate on market principles of cost or pricing structures." 19 U.S.C. § 1677(18). In proceedings involving such countries, Commerce may impose "a single dumping margin applicable to all exporters and producers," 19 C.F.R. § 351.107(d), recognizing that "the government of {a nonmarket economy} country may control export activities," *see Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308 (Feb. 27, 1996) (proposed rule), adopted in *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (May 19, 1997) (preamble to final rule).

4

Thus, in proceedings involving nonmarket economy countries, Commerce "begins with a rebuttable presumption that all companies within the . . . country are subject to government control and, thus, should be assessed a single antidumping duty rate." Appx52-53. An exporter or producer may rebut the presumption by "affirmatively" demonstrating an absence of both *de facto* and *de jure* government control with respect to exports. Appx53, Appx3804.

II.    Administrative Proceedings

    A.    Commerce Initiates The Seventh Administrative Review Of The Antidumping Duty Order Covering Certain New Pneumatic Off-The-Road Tires From China

In November 2015, Commerce initiated an administrative review of the antidumping duty order covering certain new pneumatic off-the-road tires from China for the period from September 1, 2014, through August 31, 2015. Appx3795; Appx244-245. The review encompassed fifteen individually named companies, Appx244-245, Appx701, including Aeolus, Guizhou Tyre Co., Ltd. (GTC), and Guizhou Tyre Import and Export Corporation (GTCIE). Appx244-245, Appx701.[3] GTC and GTCIE are affiliated, with GTC owning 100 percent of GTCIE. Appx928-930, Appx59. Commerce collapsed the affiliated companies

---

[3] "GTC is the producer, and GTCIE is its affiliate in charge of export sales." Appx112 n.83; *see also* Appx810-812, Appx819-821.

GTC and GTCIE into a single entity, referred to collectively as Guizhou Tyre. Appx701; Appx3794 n.1.[4]

Resource constraints prevented Commerce from individually investigating all respondent companies, so Commerce determined to individually review the two entities responsible for the largest quantity of subject merchandise—one of which was Guizhou Tyre.  Appx701, Appx705-706, Appx3796.

In response to Commerce's questionnaires, Appx3796, Guizhou Tyre submitted records regarding its ownership and processes for nominating and voting for directors and appointing management.  *See, e.g.*, Appx1948-1949, Appx1954-1955 (Articles of Association).[5]  These records showed that a state-owned company Guiyang Industry Investment Group Co., Ltd. (GIIG) held an ownership stake in Guizhou Tyre—with GIIG owning 25.2 percent of GTC, which in turn owned 100 percent of GTCIE.  Appx928-930.  As a state-owned company, GIIG was supervised by the Guiyang State-Owned Assets Supervision and Administration Commission, Appx930; Appx812, a Chinese governmental entity, *Advanced Tech. & Materials Co. v. United States* (*Advanced Tech. 2012*), 885 F.

---

[4]  *See also* 19 C.F.R. § 351.401(f) (discussing Commerce's practices for treating affiliated companies as a single entity); Appx3794 (citations omitted).

[5]  Appx3796 (citing January 20, 2016, section A response, Appx810; May 25, 2016 Supp. Sec. A Questionnaire Resp, Appx1876; Aug. 8, 2016 Second Supp. Sec. A Questionnaire Resp, Appx2926; Sept. 13, 2016, Third Supp. Sec. A Questionnaire Resp., Appx3545).

Supp. 2d 1343, 1347 (Ct. Int'l Trade 2012) (discussing in detail the legal regime for state-owned assets).

Guizhou Tyre's responses also reflected the state-owned company GIIG's influence over GTC's board of directors.  For example, GIIG elected GTC's board of directors in 2012.  Appx3674; Appx3695, Appx3720-3721.  Although GIIG was unable to elect [number] preferred directors at a May 2015 shareholder meeting, Appx2669, Appx2674, GIIG successfully used its shares to elect the same [number] directors in a shareholder meeting two months later in July 2015, Appx2679-2681.  The board of directors, in turn, appoints GTC's senior management, Appx820-821, and "GTC selects GTCIE's management," Appx820.  At the July 2015 meeting, the state-owned company GIIG also used its votes to approve a preliminary profit distribution plan for GTC.  Appx2680.

Aeolus, meanwhile, was not selected as a mandatory respondent, but submitted a separate rate application attempting to rebut the presumption of government control.  *See, e.g.*, Appx258-274 (separate rate application); Appx767-771 (rebuttal factual information).  As part of its submission, Aeolus provided information regarding the percentage of ownership by state-owned entities, showing that four state-owned shareholders owned 49.06 percent of Aeolus, including state-owned entity China Chemical Rubber Co. Ltd. (ChinaChem Rubber) with a 42.58 percent share.  Appx262-263, Appx295-297; *see also*

7

Appx56.  According to a website submitted by the petitioner,[6] state-owned enterprise China National Chemical Corporation (ChinaChem) "control{led} Aeolus."  Appx730; *see also* Appx728-731.

B.    Commerce Preliminarily Determines That Guizhou Tyre And Aeolus Failed To Rebut The Presumption Of Government Control And Are Thus Subject To The China-Wide Rate

Commerce published the preliminary results on October 14, 2016. Appx3827-3830.  Commerce preliminarily determined that Guizhou Tyre and Aeolus were not eligible for a separate rate and, thus, were part of the China-wide entity.  Appx3829.  Because no party had requested review of the China-wide entity, the existing China-wide rate of 105.31 percent continued to apply.[7] Appx3829 (citation omitted).  Thus, Commerce preliminarily assigned Guizhou Tyre and Aeolus the China-wide antidumping duty rate of 105.31 percent. Appx3828-3829.

Commerce explained that respondents seeking a separate rate must affirmatively demonstrate the absence of "both" *de jure* and *de facto* government

---

[6] In this proceeding, the petitioner was the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC.  Appx3825 n.8.

[7] In this proceeding involving the government of China—a nonmarket economy—the China-wide rate is the presumptive single rate.  *See* Appx91 (discussing the "{China}-wide rate"); *see also* 19 C.F.R. § 351.107(d).

CONFIDENTIAL MATERIAL OMITTED

control over export activities.  Appx3804.[8]  Applying that standard, Commerce

preliminarily determined that Guizhou Tyre and Aeolus had failed to rebut the

presumption of *de facto* government control.[9]  Appx3809.

In a memorandum discussing Guizhou Tyre's eligibility for a separate rate,

Commerce explained that the Guiyang State-Owned Assets Supervision and

Administration Commission demonstrated "an ability to exercise *de facto* control"

over the companies GTC and GTCIE—which together comprised the single entity

Guizhou Tyre.  Appx3826.  The Guiyang State-Owned Assets Supervision and

Administration Commission owned "100 percent" of state-owned company GIIG,

which in turn owned "25.20 percent" of GTC, which owned "100 percent" of

GTCIE.  Appx3825.  Commerce highlighted the 2012 shareholder meeting, in

which the state-owned company GIIG elected GTC's board, with GIIG's shares

amounting to [number] percent of shares present at the meeting.  Appx3826.

---

[8]  *See* Appx53 (citing *Final Determination of Sales at Less Than Fair Value: Sparklers from China*, 56 Fed. Reg. 20,588, 20,589 (May 6, 1991) (*Sparklers*); *Final Determination of Sales at Less than Fair Value: Silicon Carbide from China*, 59 Fed. Reg. 22,585 (May 2, 1994) (*Silicon Carbide*)); *see also* Appx231-237 (Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries at 2 (Apr. 5, 2005) (Policy Bulletin 05.1)).

[9]  Commerce preliminarily determined that Aeolus and Guizhou Tyre had established *de jure* (but not *de facto*) independence from government control. Appx3807-3808; *see also* Appx53 (explaining that *de jure* control considers matters such as "legislative enactments" and "other formal measures" decentralizing control of companies).

CONFIDENTIAL MATERIAL OMITTED

Commerce explained that the directors elected in 2012 still comprised the [ratio    ] of board membership—*i.e.*, [number] out of [number] members—during the period of review.  Appx3826 (citing Appx3620-3623, Appx3674, Appx3695, Appx3720-3721); *see also* Appx113.

Commerce further explained that the state-owned company GIIG elected the remaining [number] of GTC's directors in a July 2015 shareholder meeting, in which GIIG's shares represented [number] percent of the shares present at the meeting. Appx3826.  Commerce preliminarily determined that the Guiyang State-Owned Assets Supervision and Administration Commission (through its ownership of GIIG) had "demonstrated an ability to exercise *de facto* control" over GTC and GTCIE, with the [ratio    ] of shares in shareholder meetings.  Appx3826.

With respect to Aeolus, Commerce preliminarily found that Aeolus failed to rebut the presumption of *de facto* government control.  Appx3825.  Commerce explained that Aeolus's top four shareholders were "all State-owned Assets Supervision and Administration Commission . . . entities," and accounted for 49.06 percent of Aeolus's ownership.  Appx3825 (citing Appx262-263).  Commerce also found that the website describing ChinaChem's control over Aeolus was current during the relevant period of review.  Appx3825.

C.    In The Final Results, Commerce Determines That Guizhou Tyre And
      Aeolus Did Not Rebut The Presumption Of Government Control

Commerce published the final results on April 21, 2017, determining that

Guizhou Tyre and Aeolus were not entitled to a separate rate.  Appx89-90; *see also*

Appx52-61 (Issue and Decision Memorandum (IDM) accompanying the final

results); Appx93-95 (amended final results).  Commerce continued to find that

Aeolus and Guizhou Tyre failed to rebut the presumption of *de facto* government

control.  Appx56-58 (Aeolus); Appx59-61 (Guizhou Tyre).

D.    Following Reconsideration On Remand, Commerce Continues To
      Determine That Guizhou Tyre And Aeolus Failed To Rebut The
      Presumption Of Government Control

Aeolus and Guizhou Tyre filed timely lawsuits in the Court of International

Trade, challenging Commerce's determination not to assign both companies a

separate rate.  The trial court twice remanded the separate rate issue to Commerce

for reconsideration.  *See* Appx15-16 (May 24, 2019 decision); Appx31 (May 14,

2021 decision).

1.    First Remand Redetermination

In the first decision, the Court granted Commerce's request for a voluntary

remand to reconsider Guizhou Tyre's eligibility for a separate rate, Appx10, and

ordered reconsideration of Aeolus's eligibility for a separate rate, Appx9.  On

remand, Commerce continued to find that Guizhou Tyre and Aeolus failed to rebut

the presumption of *de facto* government control.  Appx109-115, Appx117-126

(Guizhou Tyre); Appx101-109, Appx127-132 (Aeolus).

### Guizhou Tyre

With regard to Guizhou Tyre, Commerce requested a voluntary remand after

learning that a shareholder meeting was publicly noticed and open to all

shareholders.  Appx10.  After reconsideration on remand, Commerce continued to

find that Guizhou Tyre was not free from government control in the selection of its

management, and thus was "subject to *de facto* government control of its export

functions."  Appx112.  As Commerce explained, the state-owned company GIIG

was the largest and *de facto* controlling shareholder of GTC, Appx112, and

"controls the board selection process," Appx114, with the board selecting senior

management that "controls the day-to-day decisions regarding the company's

export activity," Appx115; *see also* Appx111-115.

Commerce rejected the argument that GTC's Articles of Association

provided safeguards against undue influence by large shareholders sufficient to

rebut the presumption of government control.  Appx114-115.  Instead, GTC's

Articles of Association did not prevent the state-owned company GIIG "from

engaging in behavior that interferes with the autonomy of GTC."  App114 (citation

omitted).  For example, the Articles of Association provided that "shareholders

with ten percent or more of voting shares" may convene an interim shareholders'

meeting.  Appx1948, Appx1959, Appx1966 (Articles 49 and 83 of GTC's Articles of Association) (referencing 10 percent of shares held individually or jointly); Appx113-114.  The state-owned company GIIG was "the only *individual* shareholder with more than ten percent of voting shares for the majority of the {period of review}."  Appx113-114.  Commerce found that the state-owned entity GIIG "was ultimately able to dominate GTC's decision-making process," "appoint its preferred members to {the} board," and control "profit distribution{}." Appx114, Appx61.

Commerce also explained that GTC's board chairperson, Ma Shichun, served as the proxy for state-owned entity GIIG.  Appx124; *see also* Appx114-115 (also discussing the proxy's connection with GTCIE).  This relationship showed that GTC's chairman "communicate{s} with and receives suggestions regarding nominations and profit distribution from a government entity," *i.e.*, GIIG—a government entity to which GTC's board chairman was "beholden" for his position.  Appx124 (explaining that "GIIG's shares determined" the chairman's selection to GTC's board).  In sum, in the first remand redetermination, Commerce continued to find that Guizhou Tyre failed to rebut the presumption of government control.

13

Aeolus

With regard to Aeolus, the trial court ordered Commerce to consider all record evidence on remand, including a rectification report not specifically discussed in Commerce's original determination. Appx9; *see also* Appx775-777 (rectification report). The rectification report addressed an "independence issue" associated with state-owned entity ChinaChem's ability to access Aeolus's financial information. Appx776 (capitalization altered). The rectification report also addressed the concern that ChinaChem played a role in "review{ing} and approv{ing}" Aeolus's investment and key projects (among other things). Appx776 (capitalization altered). According to the report, however, these independence issues had been rectified. Appx776-777 (listing the rectification status as "{c}ompleted").

On remand, Commerce found that considering the record as a whole, the rectification report did "not establish Aeolus's independence," but rather "an unenforceable promise" by a state-owned enterprise. Appx106. The rectification report contained "no details about any structural changes that would address the independence issues identified." Appx106. Instead, it relied "on the apparently voluntary restraint promised by ChinaChem." Appx106. Further, neither the rectification report nor other information relied on by Aeolus altered the fact that a

14

state-owned enterprise "effectively select{ed} {Aeolus's} board of directors."

Appx108.

Considering the rectification report alongside other record evidence,

Commerce continued to find "*de facto* government control over Aeolus," because

the state-owned entity shareholders approved Aeolus's board of directors and

management.  Appx109; *see also* Appx101-109, Appx127-132.

### 2.    Second Remand Redetermination

Upon review of Commerce's remand redetermination, the trial court ordered

a second remand for further reconsideration of Guizhou Tyre's and Aeolus's

eligibility for a separate rate.  Appx28-31.  The trial court held that Commerce

failed to address the issue of Guizhou Tyre's and Aeolus's control over pricing of

exported subject merchandise, and ordered reconsideration.  Appx31.

In the second remand redetermination, Commerce provided additional

explanation regarding its methodology and continued to find that Guizhou Tyre

and Aeolus failed to rebut the presumption of government control with respect to

export activities.  *See, e.g.*, Appx152-163.  Commerce explained that it typically

considers four factors relating to *de facto* control, including:

> (1) "whether the export prices are set by, or are subject to
> the approval of, a government agency,"
>
> (2) "whether the respondent has authority to negotiate
> and sign contracts and other agreements,"

(3) "whether the respondent has autonomy from the government in making decisions regarding the selection of management," and

(4) "whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses."

Appx152-153 (citations omitted); *see also* Appx53 (citations omitted).  Although the first factor explicitly references export prices, Commerce explained that *all four factors* reflect "whether a respondent has rebutted the presumption that the Chinese government exerts control over the export functions of a firm."  Appx160-161; Appx171-172.

Thus, in applying the four criteria, "Commerce's practice is to deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the factors{.}"  Appx153 (citing, *e.g.*, *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1320-21 (Ct. Int'l Trade 2018); *Yantai CMC Bearing Co. Ltd. v. United States*, 203 F. Supp. 3d 1317, 1326 (2017)).  The four factors are thus conjunctive. "{I}f an applicant fails to establish any one of the criteria, Commerce is not required to continue its analysis with respect to the remainder of the criteria." Appx153 (citations omitted).  "Crucially, a respondent must provide evidence to establish autonomy from government control with respect to all four factors in the *de facto* analysis in order to demonstrate that it operates free of government

control." Appx158; *see also id.* (citing *IDI Int'l Dev. & Inv. Corp. v. United States* (*IDI*), No. 20-00107, 2021 WL 3082807, at *7 (Ct. Int'l Trade July 6, 2021)).

Commerce also addressed the trial court's concern that prior cases sustaining Commerce's practice involved a state-owned entity with "majority ownership of the relevant respondent," whereas the state-owned-entity shareholders in this case had minority stakes in Aeolus and Guizhou Tyre. Appx153-154; Appx27-28. As Commerce explained on remand, however, there is no "threshold for government ownership in applying the relevant analytical framework" regarding the four *de facto* criteria. Appx154. Commerce cited "various other cases involving non-majority government-owned respondents" in which it applied the same conjunctive approach—*i.e.*, denying a separate rate after the respondent failed to "rebut the presumption of government control with respect to only one factor of the *de facto* criteria." Appx155 (citing *53-Foot Domestic Dry Containers from China*, 80 Fed. Reg. 21,203 (Dep't of Commerce, Apr. 17, 2015) (final determ. of sales at less than fair value), and accompanying IDM at cmt. 10; *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam* (*Fish Fillets*), 85 Fed. Reg. 23,756 (Dep't of Commerce, Apr. 29, 2020) (final results of antidumping administrative review

2017-2018), and accompanying IDM at Comment 6, *aff'd IDI*, No. 20-107, 2021 WL 3082807, at *12).[10]

    E.    <u>Court Of International Trade Sustains Commerce's Determination</u>

The trial court sustained Commerce's second remand redetermination. Appx36. With regard to Commerce's presumption of government control, the court held that "Commerce should be allowed broad discretion not only in applying its presumption but also in setting forth the criteria" to effectuate it. Appx41. Thus, the court sustained Commerce's use of its chosen criteria and procedures in implementing the presumption. Appx41.

The court also sustained Commerce's findings with regard to both Guizhou Tyre and Aeolus. As the court held, substantial evidence in the record supported the finding that "Aeolus had not demonstrated autonomy from the government in making decisions regarding the selection of management," and thus failed to rebut the presumption of government control. Appx43-44. Similarly, with regard to Guizhou Tyre, the record supported that the state-owned entity "GIIG had the ability to control the election of board members and influence the distribution of the company's profits." Appx44.

This appeal followed.

---

    [10]  The *Fish Fillets* IDM is available at
https://access.trade.gov/Resources/frn/summary/vietnam/2020-09089-1.pdf.

# SUMMARY OF ARGUMENT

The Court of International Trade correctly sustained Commerce's determination that Aeolus and Guizhou Tyre failed to rebut the presumption of government control. As the trial court explained, Commerce possesses authority to establish its nonmarket economy methodology and to fashion procedures and criteria to implement that methodology. Applying its methodology, Commerce reasonably required Aeolus and Guizhou Tyre to demonstrate autonomy pursuant to all four *de facto* criteria. Because each of the appellants failed to satisfy at least one criterion, they failed to rebut the presumption of government control.

Aeolus and Guizhou Tyre's challenges to Commerce's methodology are unpersuasive. Appellants are wrong in claiming that Commerce's conjunctive approach to the four *de facto* criteria departed from a prior practice limiting that approach to majority government-owned companies. Commerce has long required respondents to demonstrate autonomy with respect to all four *de facto* criteria. Recent decisions confirm that Commerce has applied this approach to respondents that are not majority owned by government entities.

Appellants' remaining challenges simply misunderstand Commerce's current methodology, in which majority government ownership *in and of itself* may demonstrate control, whereas additional indica of control are considered in other situations (including minority government ownership). Regardless of the degree of

19

government ownership, Commerce applies the conjunctive approach, requiring a respondent to demonstrate autonomy with respect to all four *de facto* criteria.

The trial court was also correct in holding that Commerce's determination is supported by substantial evidence. State-owned entities were the minority and controlling shareholders for both Aeolus and Guizhou Tyre, and Commerce reasonably found additional indicia of control (in addition to minority ownership) for both companies. Among other considerations, the state-owned entity ChinaChem dominated Aeolus's shareholder meetings and used its ownership share to select board members, which then selected senior management. With respect to Guizhou Tyre, GTC's board members were selected in shareholder votes dominated by state-owned company GIIG, and these board members possessed authority to appoint senior management and to propose profit distribution. Further, shareholder meetings in 2015 demonstrated that GIIG could effectively re-do prior shareholder votes to achieve GIIG's preferred result. These facts, plus other record evidence, support Commerce's findings that Aeolus and Guizhou Tyre failed to demonstrate autonomy in selection of management, and that Guizhou Tyre failed to demonstrate independence in profit distribution.

# **ARGUMENT**

I.    Standard Of Review

In reviewing the trial court's judgments, this Court reapplies "the statutory standard of review that the Court of International Trade applied in reviewing the administrative record." *Nippon Steel v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (citation omitted)  This Court will uphold Commerce's determination unless it is unsupported by substantial record evidence, or otherwise unlawful. *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  Although this amounts to repeating the trial court's work, this Court has declared that it "will not ignore the informed opinion of the {trial court}." *Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (citation and quotation marks omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted).  Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  A party disputing Commerce's determination as unsupported by substantial evidence thus "has chosen a course with a high barrier to reversal," *Nippon Steel Corp.*, 458

21

F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court will sustain

Commerce's determinations if they are reasonable and supported by the record as a

whole, even if some evidence detracts from them. *See Atl. Sugar, Ltd. v. United*

*States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

II.     The Trial Court Correctly Sustained Commerce's Nonmarket Economy
        Methodology And The Criteria For Implementing It

        The trial court correctly sustained Commerce's determination that Guizhou

Tyre and Aeolus did not rebut the presumption of *de facto* government control.

Appx40-44.  In challenging this determination, Aeolus and Guizhou Tyre dispute

Commerce's methodology for implementing the presumption—primarily arguing

that respondents with minority government ownership should not be required to

prove independence from government control with respect to all four *de facto*

criteria.  *See* Appellants Br. at 34-49.

        Commerce's methodology should be sustained.  As discussed below, this

Court has repeatedly affirmed Commerce's authority to apply a rebuttable

presumption of government control in antidumping duty proceedings involving a

nonmarket economy.  Commerce reasonably effectuated that presumption by

requiring respondents to rebut government control with respect to all four *de facto*

criteria.  Thus, failure to demonstrate autonomy with respect to just one *de facto*

factor is sufficient to deny a separate rate.  Aeolus and Guizhou Tyre's arguments to

the contrary are unpersuasive.

A.     This Court Has Long Approved Commerce's Nonmarket Economy
       Methodology Assigning A Single Rate To All Respondents Unable
       To Rebut The Presumption Of Government Control

This Court has "uniformly sustained" Commerce's nonmarket economy

methodology assigning a single antidumping duty rate to all respondents that are

unable to rebut the presumption of government control. *See China Manufacturers*

*All., LLC v. United States*, 1 F.4th 1028, 1036-37 (Fed. Cir. 2021) (citing *Michaels*

*Stores, Inc. v. United States*, 766 F.3d 1388, 1390-91 (Fed. Cir. 2014)); *see also*

*Diamond Sawblades Manufacturers Coal. v. United States*, 866 F.3d 1304, 1311

(Fed. Cir. 2017); *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701

F.3d 1367, 1370 (Fed. Cir. 2012); *Transcom Inc. v. United States*, 294 F.3d 1371,

1373 (Fed. Cir. 2002); *Sigma Corp. v. United States*, 117 F.3d 1401 (Fed. Cir.

1997).[11]

Indeed, Commerce "has broad authority to interpret the antidumping statute

and devise procedures to carry out the statutory mandate." *Sigma*, 117 F.3d at

1405-06 (citing *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir.

1995)). "The antidumping statute recognizes a close correlation between a

---

[11] By regulation, "'rates'" in nonmarket economy proceedings "may consist
of a single dumping margin applicable to all exporters and producers." 19 C.F.R.
§ 351.107(d). The term "rates" is used "as a single shorthand expression for the
various terms" in the statute. *See Antidumping Duties; Countervailing Duties*, 61
Fed. Reg. 7,308 (Feb. 27, 1996); *see also* Statement of Administrative Action
(SAA), H.R. Doc. No. 103–826, at 814 (1994), *reprinted in* 1994 U.S.C.C.A.N.
4040 (discussing rates).

nonmarket economy and government control of prices, output decisions, and the allocation of resources." *Id.* (citing 19 U.S.C. § 1677(18)(B)(iv), (v)).  It is "within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control." *Id.*

Moreover, "{t}he burden of production should belong to the party in possession of the necessary information." *Id.* (quoting *Zenith Electronics Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993)).  "{B}ecause exporters have the best access to information pertinent to the 'state control' issue, Commerce is justified in placing on them the burden of showing a lack of state control." *Id.* (citation omitted).  This Court has found it "clear" that "Commerce may, where the facts warrant, recognize a single {nonmarket economy}-wide entity to include all exporters that fail to rebut the presumption of government control." *China Manufacturers*, 1 F.4th at 1037.

Aeolus and Guizhou Tyre nonetheless claim that the presumption of state control "should vanish upon presentation of minimal contradictory evidence," at which point Commerce must "affirmatively establish . . . actual state control of {Guizhou Tyre} or Aeolus."  Appellants Br. at 30, 57-59.  This argument disregards "the core principle underlying the {nonmarket economy} presumption"—namely, the assumption that respondents "are part of the

24

{nonmarket economy} entity *until they prove otherwise.*"  *Diamond Sawblades,*

866 F.3d at 1313 (citing *Transcom*, 294 F.3d at 1381) (emphasis added).  Merely

submitting "minimal contradictory evidence," Appellants Br. at 30, does not prove

that a respondent is independent from government control, and thus does not

disturb the presumption.  *See Diamond Sawblades,* 866 F.3d at 1313 (citing

*Transcom*, 294 F.3d at 1381).  To the contrary, respondents subject to the

presumption "are assumed from the outset to be part of the {nonmarket economy}

entity."  *Id.* (citing *Transcom*, 294 F.3d at 1381).

Despite this clear authority, appellants rely on an abrogated patent case to

argue that the presumption "vanishes" upon the introduction of contrary evidence.

Appellants Br. at 49 (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960

F.2d 1020, 1037 (Fed. Cir. 1992), *abrogated by SCA Hygiene Products Aktiebolag

v. First Quality Baby Products, LLC*, 580 U.S. 328, 339 (2017)).  In *Aukerman*, the

Federal Circuit held that laches can be asserted to defeat a claim for damages

incurred within the 6-year period set out in the Patent Act.  960 F.2d at 1032.  In

*SCA Hygiene*, however, the Supreme Court held that "{l}aches cannot be

interposed as a defense against damages where infringement occurred within" the

six-year period.  580 U.S. at 346.  Thus, the *Aukerman* decision has been abrogated

and appellants' reliance on its reasoning should be rejected.

In any event, *Aukerman*'s discussion of "the presumption of laches" is far afield from the specialized administrative context in this case. *See Aukerman*, 960 F.2d at 1038. Unlike *Aukerman*, this case presents a challenge to the methodology used by Commerce's to implement the presumption of government control as part of its nonmarket economy methodology—a methodology that has long been sustained by this Court. *See, e.g.*, *Sigma*, 117 F.3d at 1405-06. Appellants have not provided any coherent reason for applying a rule from an abrogated patent case to govern Commerce's exercise of discretion in this context—and there is none. Accordingly, Commerce reasonably requires respondents to prove both *de jure* and *de facto* autonomy to rebut the presumption of government control. *See, e.g.*, Appx53, Appx152-153; *see also Michaels Stores*, 766 F.3d at 1392 (citing *Sparklers*, 56 Fed. Reg. at 20,589) (discussing the requirement to show both *de jure* and *de facto* independence).[12]

---

[12]  Despite citing *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, appellants did not exhaust their administrative remedies with respect to any challenge to the statutory basis for the presumption of government control. *See* Appellants Br. at 50 (citing *Jilin Forest*, 617 F. Supp. 3d 1343, 1354-68 (Ct. Int'l Trade 2023), *appeal filed*). Nor did appellants preserve any such argument before the trial court, resulting in waiver.

B.    To Rebut The Presumption, Commerce Reasonably Requires
      Exporters To Demonstrate Autonomy Pursuant To All Four *De Facto*
      Criteria

The trial court correctly sustained Commerce's methodology, including the

requirement for respondents to prove autonomy pursuant to all four *de facto*

criteria to rebut the presumption of government control.  Appx41; *see also*

Appx152-153 (citing, *e.g.*, *Sparklers*, 56 Fed. Reg. at  20589; *Silicon Carbide*, 59

Fed. Reg. at 22,586-22,587).

In addressing the reasonableness of Commerce's methodology in this regard,

the Court of International Trade highlighted "the breadth of {Commerce's}

discretion to craft its own antidumping duty procedures for exports from

{nonmarket economy} countries."  Appx41.  As the trial court explained,

"Commerce should be allowed broad discretion not only in applying its

presumption but also in setting forth the criteria by which it will effectuate it."

Appx41.  "In other words, the greater power to create an entire regulatory scheme

for {a nonmarket-economy-wide} entity . . . implies the lesser power to effectuate

it through criteria and procedures{.}"  Appx41.

The trial court's reasoning aligns with this Court's precedent.  *See* Appx41.

"Absent constitutional constraints or extremely compelling circumstances the

administrative agencies should be free . . . to pursue methods of inquiry capable of

permitting them to discharge their multitudinous duties."  *Royal Brush Mfg., Inc. v.*

*United States*, 75 F.4th 1250, 1261 (Fed. Cir. 2023) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978)).  Further, Commerce receives "tremendous deference" in making "complex economic and accounting decisions of a technical nature" as required to administer the antidumping and countervailing duty laws.  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citing, *e.g.*, *United States v. Zenith Radio Corp.*, 562 F.2d 1209, 1216 (1977), *aff'd*, 437 U.S. 443 (1978)).

Applying these rules, Commerce is entitled to "tremendous deference" in developing the criteria and methods of inquiry to implement its nonmarket economy methodology.  *See Fujitsu Gen.*, 88 F.3d at 1039 (citing, *e.g.*, *Smith–Corona Group v. United States*, 713 F.2d 1568, 1571, 1582 (Fed. Cir. 1983), *cert. denied*, 465 U.S. 1022 (1984)); *Royal Brush*, 75 F.4th at 1261.  Creating and implementing such criteria involves "decisions of a technical nature," for which Commerce possesses "far greater expertise than courts."  *See Fujitsu Gen.*, 88 F.3d at 1039.  Thus, Commerce is entitled to deference in requiring respondents to demonstrate autonomy with respect to all four *de facto* criteria to rebut the presumption of government control.

Commerce has reasonably explained its methodology.  Specifically, Commerce considers the following four factors when determining whether a respondent is free from *de facto* government control:

(1) whether the export prices are set by, or subject to the approval of, a government authority;

(2) whether the respondent has authority to negotiate and sign contracts and other agreements;

(3) whether the respondent has autonomy from the government in making decisions regarding the selection of its management; and

(4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

See Appx232; *Silicon Carbide from China*, 59 Fed. Reg. 22,585, 22,587 (Dep't of Commerce May 2, 1994) (final less-than-fair-value determ.).[13]  To rebut the presumption of government control, a respondent must demonstrate autonomy with respect to all four criteria.  Appx153-155.[14]  In other words, the four factors for assessing *de facto* government control are conjunctive, and failure to demonstrate autonomy with respect to only one factor is sufficient to defeat eligibility for a separate rate.[15]  *See* Appx135-136 (citing, *e.g.*, *Zhejiang Quzhou Lianzhou*

---

[13]  *See Zhejiang Mach. Imp. & Export Corp. v. United States*, 65 F.4th 1364, 1366 (Fed. Cir. 2023); *Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries* at 2 (Apr. 5, 2005) (Policy Bulletin 05.1), at Appx231-237.

[14]  *See also Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1325–26 (Ct. Int'l Trade 2017); *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1321 (Ct. Int'l Trade 2018).

[15]  As this Court summarized Commerce's practice, a respondent may demonstrate the absence of *de facto* government control by "demonstrat{ing} that it sets its prices independently, negotiates its own contracts, selects its management

*Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1313 (Ct. Int'l Trade 2018); *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1325-26 (Ct. Int'l Trade 2017)).

Appellants' challenges to Commerce's methodology are unpersuasive.

> 1. The Requirement To Demonstrate Autonomy For All Four *De Facto* Criteria Applies Regardless Of The Level Of Government Ownership

Aeolus and Guizhou Tyre claim that Commerce's conjunctive approach to the *de facto* criteria applies *only* to respondents with majority ownership by a state-owned entity (SOE). *See, e.g.*, Appellants Br. at 29.[16]  Appellants do not argue that Commerce lacks authority to apply such a standard, but instead maintain that it conflicts with Commerce's "traditional" methodology and with prior cases involving respondents that are majority owned by government entities. *Id.* at 35-49 (capitalization altered).  The relevant inquiry in addressing this argument is whether Commerce has provided a reasoned explanation for any departure from a prior practice. *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 917-18 (Fed. Cir. 2019) (citing, *e.g.*, *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State*

---

autonomously, *and* keeps its sales proceeds." *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 65 F.4th 1364, 1366 (Fed. Cir. 2023) (citation omitted) (emphasis added).

[16]  Aeolus and Guizhou Tyre refer to the conjunctive approach as a "truncated analysis." *See, e.g.*, Appellants Br. at 29.

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46-49 (1983)); *see also SKF USA Inc v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). Applying this standard, appellants fail to demonstrate that Commerce's conjunctive approach to the four *de facto* criteria departs from any past practice.

Indeed, in the *Silicon Carbide* decision—in which Commerce established the "four factor standard of analysis for *de facto* control"— Commerce found certain respondents ineligible for a separate rate based on "failure to substantiate just one of the factors." Appx155 (citing *Silicon Carbide from China*, 59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994)).[17] Two respondents in *Silicon Carbide* "failed to produce bank records necessary to prove their retention of proceeds from export sales." *Silicon Carbide from China*, 59 Fed. Reg. at 22,589. "Therefore, these respondents did not meet *an important criterion* for separate rates," and "failed to establish their eligibility for separate rates." *Id.* (emphasis added). Thus, Commerce's landmark *Silicon Carbide* decision applied the conjunctive approach as applied in this case. The *Silicon Carbide* decision, moreover, made no mention of the degree of government control for the two respondents that failed to rebut the presumption. Appx155.

---

[17] *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 65 F.4th 1364, 1366 (Fed. Cir. 2023) (describing Commerce's *de facto* methodology by citing *Silicon Carbide from China*, 59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994)).

Nor is appellants' claim of an unexplained departure supported by more recent cases. Commerce has also used the conjunctive approach in recent proceedings involving respondents that were *not* majority owned by state-owned entities. *See* Appx155 & n.63 (citations omitted).

For example, in *53-Foot Domestic Dry Containers from China* (*Containers*), 80 Fed. Reg. 21,203 (Dep't of Commerce, Apr. 17, 2015) (final determ. of sales at less than fair value), and accompanying IDM at cmt. 10, Commerce determined that a respondent with minority ownership by a state-owned entity failed to demonstrate autonomy in selection of management and, thus, failed to rebut the presumption of government control.

In *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam* (*Fish Fillets*), 85 Fed. Reg. 23,756 (Dep't of Commerce, Apr. 29, 2020) (final results of antidumping administrative review 2017-2018), and accompanying IDM at Comment 6, *aff'd IDI*, No. 20-107, 2021 WL 3082807, at *7), Commerce similarly determined that the respondent IDI failed to demonstrate autonomy in selection of management—and thus failed to rebut the presumption of government control— without any showing of majority government ownership.

These examples confirm that Commerce's approach in this case did not depart from prior practice. Aeolus and Guizhou Tyre's attempt to limit

Commerce's conjunctive approach to cases involving majority ownership is unpersuasive.

>    2.    Aeolus And Guizhou Tyre Misunderstand Commerce's Recent
>          Decisions Regarding Majority Ownership

Aeolus and Guizhou Tyre further maintain that Commerce departed from its practice of allowing a "truncated" (i.e., conjunctive) analysis only for majority SOE-owned respondents.  *See* Appellants Br. at 35-49.  These arguments, however, misunderstand Commerce's methodology.

Commerce has discussed majority ownership in recent decisions, but not for the reasons argued by Aeolus and Guizhou Tyre.  *See, e.g.*, Appx134-135; Appx154-155 (discussing prior agency and trial court cases).  Specifically, "Commerce has clarified its practice" to reflect that "'where a government entity holds a majority ownership share, either directly or indirectly, in the respondent exporter {or producer},' such majority ownership holding '*in and of itself*' precludes a finding of de facto autonomy."  Appx118 n.120 (quoting *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States* (*Jiasheng 2015*), 121 F. Supp. 3d 1263, 1266-1267 (Ct. Int'l Trade 2015)) (emphasis added).  In *Fish Fillets*, for example, Commerce explained that majority government ownership establishes "the potential for control . . . *based on ownership alone*{.}"  85 Fed. Reg. 23,756, and IDM at cmt. 6 (emphasis added).

33

Appellants concede that courts have sustained Commerce's updated methodology "for majority SOE-owned respondents"—adopting an analysis that "does not require finding actual government control over export activities, but instead only potential control over operations through management selection." Appellants Br. at 37; *see also id.* at 39 (citing *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 65 F.4th 1364, 1368 (Fed. Cir. 2023)). But appellants claim that the same is not true for minority SOE-owned companies. *See, e.g.*, Appellants Br. at 44, 46. Again, they misunderstand Commerce's practice.

As background, Commerce developed its updated methodology after litigation in an antidumping duty proceeding covering diamond sawblades from China. *See* Appx134-135, Appx154-155; *see also Advanced Tech. 2012*, 885 F. Supp. 2d 1343, *remand aff'd, Advanced Tech. & Materials Co. v. United States* (*Advanced Tech. 2013*), 938 F. Supp. 2d 1342, 1345 (Ct. Int'l Trade 2013), *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014)). In *Advanced Technology 2012*, the Court of International Trade, in remanding Commerce's determination to assign a separate rate, raised concerns regarding "governmental control" in the wake of a 2003 Chinese law governing state-owned enterprises—the Interim Regulations on Supervision and Management of State-owned Assets of Enterprises (SASAC law). *Advanced Tech. 2012*, 885 F. Supp. 2d at 1347-1351.

In addressing the trial court's concerns on remand, Commerce changed course and determined that the respondent in that proceeding did *not* rebut the presumption of state control. *Advanced Tech. 2013*, 938 F. Supp. 2d at 1345. Commerce "found that the SASAC law creates the potential for control," and thus, Commerce "further scrutinized the record evidence to see if it substantiates an absence of *de facto* control." *Id.* at 1346 (citation omitted). Commerce then determined that the majority SOE-owned respondent "did not choose its own management autonomously," and thus failed to rebut the presumption of government control. *Id.* at 1345 (citation omitted).

In later decisions, Commerce has explained that majority ownership "*in and of itself* means that the government exercises or has the potential to exercise control over the company's operations generally," such as "the selection of management."[18] Still, even when "the government does not hold a majority ownership," it "might nonetheless be able to exercise, or have the potential to exercise, control of a company's general operations under certain factual scenarios." *Fish Fillets*, 85 Fed. Reg. 23,756, IDM at cmt. 6; *see also* Appx155;

---

[18] *See, e.g.*, *Carbon and Certain Alloy Steel Wire Rod from China* (*Wire Rod*), 79 Fed. Reg. 53,169 (Dep't of Commerce Sept. 8, 2014) (preliminary determ.), and accompanying Prelim. Decision Mem. at 5–9 (emphasis added), *unchanged in* 79 Fed. Reg. 68,860 (Dep't of Commerce Nov. 19, 2014) (final less-than-fair-value determ.)) (emphasis added); *see also Jiasheng 2015*, 121 F. Supp. 3d at 1267 & n.21 (discussing Commerce's decision in *Wire Rod*).

Appx174. In such cases, Commerce continues to consider—as it did here—the "totality of the circumstances" and "additional indicia" of control to determine whether the respondent has rebutted the presumption of government control. Appx119-120, Appx124.

In summary, when a respondent is majority SOE-owned, the degree of government ownership *in and of itself* generally reflects that a government exercises, or has the potential to exercise, control over a company's operations. *See, e.g.*, *Zhejiang Quzhou*, 350 F. Supp. 3d at 1323; Appx119 n. 126 (quoting, *e.g.*, *1,1,1,2 Tetrafluoroethane (R-134a) from China*, 82 Fed. Reg. 12,192 (Dep't of Commerce, Mar. 1, 2017) (final less-than-fair-value determ.), and accompanying IDM at cmt. 1). In such cases, "potential for control exists based on ownership alone." *Fish Fillets*, 85 Fed. Reg. 23,756, IDM at cmt 6. In cases involving *minority* government ownership (or other factual scenarios), Commerce considers additional indicia of control—in addition to the degree of government ownership—in considering whether the government is "able to exercise, or have the potential to exercise, control of a company's general operations." Appx118-119; *see also* Appx119-120 (citing, *e.g.*, *Containers*, 80 Fed. Reg. 21,203, IDM at cmt. 10); *An Giang Fisheries Import & Export Jt. Stock Co. v. United States*, 284 F. Supp. 3d 1350, 1359 (Ct. Int'l Trade 2018)).

36

3.    Appellants' Remaining Arguments Regarding Majority
Ownership Are Unpersuasive

Although the percentage of government ownership of a respondent company may be relevant when applying Commerce's *de facto* criteria—because majority government ownership *alone* may demonstrate government control—appellants go too far in attempting to limit the presumption of government control with respect to minority SOE-owned respondents.  *See* Appellants Br. at 46-47.

For example, appellants are wrong in claiming that the conjunctive *de facto* test does not apply to companies with minority government ownership.  *See* Appellants Br. at 46-47.  To the contrary, even in cases not involving majority government ownership, Commerce continues to apply the conjunctive approach to the four *de facto* criteria—in which failure to satisfy one criterion prevents a respondent from rebutting the presumption.  *See* Section II.B.1.  Indeed, Commerce has determined that respondents fail to rebut the presumption of control by failing to prove autonomy with respect to one of the four *de facto* criteria. *Compare Containers*, 80 Fed. Reg. 21,203, and IDM at cmt. 10 (minority SOE-owned respondent), *with Advanced Tech. 2013*, 938 F. Supp. 2d at 1345 (majority SOE-owned respondent).[19]

---

[19]  In *Fish Fillets*, likewise, Commerce found that the respondent IDI failed to demonstrate autonomy in selection of management and thus failed to rebut the presumption of government control—without any showing of majority government

Appellants further cite the decision in *An Giang* to claim that minority SOE-owned respondents are entitled to a separate rate absent a showing of "actual" government control over export activities. *See* Appellants Br. at 45-46 (citing *An Giang*, 284 F. Supp. 3d at 1359-60). In *An Giang*, however, the trial court sustained Commerce's determination denying a separate rate when "there existed the *potential* for actual control by the minority government shareholder during the {period of review}." *An Giang*, 284 F. Supp. 3d at 1364 (emphasis added). Thus, *An Giang* does not support appellants' argument.

The analysis in *IDI*—a case not involving majority government ownership—is instructive regarding potential versus actual government control pursuant to Commerce's *de facto* criteria. *IDI*, 2021 WL 3082807, at *7-12. In *IDI*, the court explained that an exporter fails to demonstrate its independence from *de facto* government control when it is "*potentially* controlled by the government—in the sense that the government has the '*ability* to exercise actual control (even without exercising it)." *Id.* (citing, *e.g.*, *An Giang*, 284 F. Supp. 3d at 1359; *Zhejiang*, 350

---

ownership. 85 Fed. Reg. 23,756, and IDM at cmt. 6. The "Vietnamese government exercised control over {the respondent} through the presence of Mr. X and fellow Communist Party members on the company boards who followed his lead." *IDI*, No. 20-00107, 2021 WL 3082807, at *12 (Ct. Int'l. Trade July 6, 2021). This prevented IDI from demonstrating autonomy from the government in selection of management, requiring application of the China-wide rate. *Id.*; *see also Fish Fillets*, 85 Fed. Reg. 23,756, and IDM at cmt. 6.

F. Supp. 3d at 1318). "A puppet master is no less in control when the strings are slack." *Id.*; *see also* Appx156-157 (discussing control).

Appellants' remaining claims regarding "actual" control are unpersuasive because they rely on cases that predate Commerce's updated practice. *See* Appellants Br. at 36-37, 59-60 (citing, *e.g.*, *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F. Supp. 3d 1317, 1350 (Ct. Int'l Trade 2014) (*Jiasheng 2014*); *Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,269 (Sept. 14, 2006) (final results), IDM Comment 3). For example, appellants cite *Jiasheng 2014*, but fail to acknowledge that Commerce updated its approach in a remand decision, which was later sustained in *Jiasheng 2015.* In *Jiasheng 2015*, the trial court recognized the development in Commerce's methodology, stating that "Commerce has clarified its practice" in assessing "*de facto* independence from government control." 121 F. Supp. 3d at 1267 (citation omitted). "This revised practice . . . was sustained by this Court and subsequently affirmed by the Court of Appeals." *Id.* (citing *Advanced Tech. 2013*, 938 F. Supp. 2d at 1345, *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014)); *see also Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 65 F.4th 1364, 1368 (Fed. Cir. 2023) (sustaining Commerce's application

of its updated methodology).  Thus, Commerce's explanation for departing from

the approach discussed in *Jiasheng 2014*  has been explained and sustained.[20]

> C.     Commerce's Methodology Reasonably Relates To "Export Activities"

Finally, Aeolus and Guizhou Tyre are also wrong in claiming that

Commerce departed from its focus on government control over a respondent's

export activities.  *See, e.g.*, Appellants Br. at 36, 77-82.  Commerce clearly

explained that all four *de facto* criteria relate to the question of government control

over a respondent's export activities.  *See, e.g.*, Appx152-154.

The trial court correctly sustained this reasoning.  Appx41.  As the Court of

International Trade explained, it was not "unreasonable for Commerce to infer

control of 'export functions,'" based on facts showing government control over the

selection of company management and, thus, "business activity in general."

Appx41.  Such business activity "includes activity related to the exportation of

merchandise."  Appx41.  Commerce's explanation was consistent with its overall

discretion in implementing the presumption of government control, and with its

"discretion to draw reasonable inferences from record evidence."  Appx41 (citing,

---

[20]  Commerce's 2006 decision in *Heavy Forged Hand Tools* also predated
Commerce's updated methodology.  *See* Appellants Br. at 37 (citing *Heavy Forged
Hand Tools from China*, 71 Fed. Reg. 54,269 (Sept. 14, 2006) (final results), and
accompanying IDM Comment 3).  Further, the language cited by appellants
appears in the discussion of *de jure* criteria, and thus does not implicate the *de
facto* analysis at issue in this case.

*e.g.*, *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 845 (Fed. Cir. 2020); *China Mfrs. All.*, 1 F.4th at 1039).

In sum, consistent with longstanding practice, Commerce's *de facto* analysis requires a showing of autonomy with respect to all four criteria, such that failure to satisfy one factor prevents a respondent from rebutting the presumption of government control. *See* Section II.B.1. Further, Commerce engages in fact-finding pursuant to the four *de facto* criteria, all of which relate to a respondent's export activities. *See, e.g.*, *IDI*, 2021 WL 3082807 at *2-4; Appx160-161.

Commerce reasonably applied its nonmarket economy methodology in this case, by making factual findings regarding government control over selection of management and distribution of profits. *See* Appx56-58 (Aeolus), Appx59-61 (Guizhou Tyre). Commerce did not confine its analysis to the degree of government ownership, but also addressed additional indicia of control, including (1) specific votes by government-owned shareholders Appx192, Appx128 n.160 (Aeolus); Appx3826 (Guizhou Tyre); (2) the governing Articles of Association, *see, e.g.*, Appx193-194 (Aeolus); Appx113-114, Appx187-188 (Guizhou Tyre); and (3) other connections and relationships between government-owned entities and company management, Appx104, Appx108, Appx195 (Aeolus); Appx114-115 (Guizhou Tyre). Because Aeolus and Guizhou Tyre each failed to prove autonomy

with respect to at least one *de facto* factor, Commerce reasonably determined that they failed to rebut the presumption of government control.[21]

III.    Substantial Evidence Supports Commerce's Findings That Aeolus And Guizhou Tyre Failed To Rebut The Presumption Of Government Control

Applying Commerce's nonmarket economy methodology, substantial evidence supports Commerce's findings that (1) Aeolus failed to rebut the presumption of control with respect to selection of management, and (2) Guizhou Tyre failed to establish autonomy with respect to selection of management and disposition of profits. In challenging these findings, Aeolus and Guizhou Tyre ask the Court to reweigh the evidence—contrary to the deferential substantial evidence standard of review. *See Downhole Pipe & Equip. v. United States*, 776 F.3d 1369, 1376 (Fed. Cir. 2015); *Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1359 (Fed. Cir. 1999).

---

[21] In any event, even accepting appellants' incorrect claim that Commerce was required to weigh all four *de facto* factors together (rather than applying the conjunctive approach), Commerce's determination should be sustained. On remand Commerce provided "explicit finding{s} on each of the four prongs of the standard analysis with respect to *de facto* government control." *See* Appx141-142 (acting pursuant to the trial court's remand instructions).

CONFIDENTIAL MATERIAL OMITTED

A.    Substantial Evidence Supports Commerce's Finding That Aeolus
Failed To Demonstrate Autonomy In Selecting Management And
Thus Failed To Rebut The Presumption Of Government Control

1.    The Record Supports Commerce's Finding

Substantial evidence supports Commerce's finding that Aeolus failed to

rebut the presumption of government control with respect to selecting its

management.  Commerce acted in accordance with its practice by considering

Aeolus's minority government ownership and additional indicia of control when

assessing this issue.  *See, e.g.*, Appx41, Appx56-58, Appx102-104, Appx192-195.

As the trial court explained, "Commerce identified record evidence that

ChinaChem was, by far, the dominant shareholder casting votes for the election of

members of Aeolus's board of directors."  Appx41.  ChinaChem was "Aeolus's

largest and controlling shareholder," with a 42.58 percent share.  Appx56 (citations

omitted), Appx99 (citing, *e.g.*, Appx262-263, Appx295-297), Appx102.  Other

state-owned entities held a further 6.48 percent share, totaling 49.06 percent

ownership by state-owned entities.  Appx99, Appx102; Appx3825.

Using its controlling ownership interest, moreover, ChinaChem dominated

the vote at the election of Aeolus's board during the period of review, as its voted

shares were [          ratio          ] higher than all other shares present at that

meeting.  Appx128 n.160, Appx130 n.172; Appx103-104 & n.38 (citing Appx681,

Appx684-687); Appx295-297.  Thus, the state-owned entity ChinaChem

43

CONFIDENTIAL MATERIAL OMITTED

"represented the vast majority of votes electing the board, whose members remained in place for the period of review."  Appx192 (citing Appx127-128).  Aeolus's Articles of Association, in turn, gave board members the authority to appoint the general manager and deputy general managers.  Appx57 (citing Articles 107, 108, 147, Appx654-655, Appx663); Appx103; Appx197.  Thus, "the Chinese government," through a state-owned entity, exerted "control over Aeolus's management selection process, through control of its board member selection process."  Appx102; *see also* Appx635, Appx642-644, Appx653-663 (Articles of Association).[22]

Specific facts about Aeolus's board composition further support Commerce's finding.  During the period of review, Aeolus shared multiple board members with another company, China National Tire, that is 100 percent owned by the state-owned entity ChinaChem.  Appx104 (citing Appx2904-2905).  One of China National Tire's and Aeolus's shared board members was also Aeolus's chairman, who has [    role    ], including the ability to make [ role

---

[22]  Aeolus's Articles of Association also grant shareholders the ability to elect board members, Appx56-57 (citing, *e.g.*, Appx635, Appx641-645, Appx647, Appx650-653), Appx127-128, and "give shareholders authority over decisions on the operations of the company," Appx57 (citing Appx642, Appx654).  The board members may act as the general manager or managers of the company and appoint or remove senior management.  Appx57 (citing, *e.g.*, Appx653, Appx655).

CONFIDENTIAL MATERIAL OMITTED

role                    ] under Aeolus's Articles of Association. Appx104.

The number of "independent" directors versus "non-independent" directors on the board also supported the finding regarding government control.  Appx103-104, Appx193-194; *see also* Appx658-659 (Articles 125 and 127 defining independent directors).  Aeolus's Articles of Association state that the board of directors shall be composed of [number] directors," only [ ratio ] of which must be "independent."  Appx103.  The terms for "independent" directors are [adjective] to [length of time] terms, while the "non-independent director candidates may remain in their position in perpetuity," if re-elected.  Appx103, Appx128; *see also* Appx662 (defining nomination committee).[23]  The record showed that "no public shareholder ha{d} ever nominated a director to the board."  Appx103; Appx194.

Finally, Commerce's finding is supported by a contemporaneous website printout showing that "Aeolus is under the direct control" of China Chem Rubber, a state-owned enterprise.  Appx57 (citing Appx728-734), Appx195.  Commerce reasonably found that this printout "support{s} the presumption of {Chinese} government control over Aeolus."  Appx57.

---

[23]  Aeolus contends that the nomination committee and related procedures create a "constrained legal process" that "does not constitute domination by any one shareholder," Appellants Br. at 72-73, but Commerce reasonably considered these factors among the constellation of record evidence relating to Aeolus's failure to demonstrate independence in its selection of management.

Collectively, this evidence is sufficient for a reasonable mind to conclude that Aeolus failed to rebut the presumption of government control with respect to selection of management.  *See Downhole Pipe*, 776 F.3d at 1374 (defining substantial evidence as evidence that a reasonable mind might accept as adequate to support a conclusion) (citations omitted).  Nothing more is required for Commerce's determination to be supported by substantial evidence.  *See Downhole Pipe*, 776 F.3d at 1374 (quoting *Consol. Edison*, 305 U.S. at 229).

### 2.    Aeolus's Arguments Are Unpersuasive

Aeolus challenges Commerce's weighing of the evidence, but fails to demonstrate error pursuant to the deferential substantial evidence standard.  Appellants Br. at 68-77.  The substantial  evidence standard of review "does not allow {the Court} to substitute {its} judgment for that of Commerce . . . nor does it allow the parties to retry factual issues . . . de novo."  *Inland Steel*, 188 F.3d at 1359 (citations omitted)

Aeolus contends, for example, that "the 2014 board election does not evidence state control."  Appellants Br. at 68-73 (capitalization altered).  Aeolus argues that Commerce mistakenly stated that Aeolus "allows its majority shareholders to control the selection of its board of directors," when state-owned entities had only a minority (not majority) share.  Appellants Br. at 68-69.  But Commerce's path can reasonably be discerned.  *See Bowman Transp., Inc. v.*

46

*Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974). Although the 49.06

percent owned by state-owned entities was not a majority share, Commerce

explained that ChinaChem (a state-owned entity) "represented the vast majority of

votes electing the board, whose members remained in place for the period of

review." Appx192; Appx681, Appx684-687. Thus, even though more than 50

percent of shares were owned by "non-SOE shareholders," Appellants Br. at 71-

72, Commerce reasonably considered the fact that state-owned entities represented

a majority of the shares present and voting at the relevant shareholder meetings.

Appx192; Appx681, Appx684-687; *see also* Appx295-297.

Aeolus next highlights the "legal requirements" to ensure that the board

"shall be elected democratically," and contends that "neither ChinaChem nor any

shareholder" nominated board members. Appellants Br. at 69-70. Both arguments

fall flat in light of ChinaChem's majority presence when electing board members

at the relevant shareholder meeting. Appx192; Appx681, Appx684-687 (showing

the number of shares voted); Appx295-297 (showing the number of shares held by

ChinaChem).

As the trial court explained, "{t}hat a publicly-held company is governed by

transparent and democratic procedures . . . does not suffice to demonstrate

autonomy from government control of decisions on the selection of management

where, as here, *a government entity was the dominant shareholder* in the election

47

of board members." Appx43 (emphasis added).  Moreover, "Commerce did not rely upon a finding that Aeolus's governance procedures were other than transparent and democratic, or that non-government shareholders were barred from participating in those procedures, including procedures for nominating board members." Appx43.  Instead, as the trial court correctly explained, Commerce's conclusions "reflected record data on shareholder voting, which supported a finding that a government-owned shareholder had the ability to control board membership through its predominance in the voting process, and the finding that the board controlled the selection of senior management." Appx43.

Aeolus challenges the finding that ChinaChem dominated the election of board members, arguing that the number of shares held by ChinaChem could have changed in the 19 days between the date of the vote and the date when Aeolus provided shareholder information.  Appellants Br. at 71.  As Commerce explained, however, Aeolus pointed to "no evidence of any change" within those 19 days. Appx193.  In nonmarket economy proceedings, "the burden lies with {the respondent} to develop a full record and affirmatively rebut the presumption." *Zhejiang Mach. Import & Export Corp.*, 65 F.4th at 1371 (citations omitted). Aeolus has failed to meet its burden.[24]

---

[24] In light of this burden, the appellants are also wrong in demanding that Commerce should request additional "information regarding price" from

Aeolus's remaining arguments attempt to flip both the presumption of government control and the deferential standard of substantial evidence review. Appellants Br. at 73-77. Aeolus argues, for example, that multiple non-SOE shareholders "could" have banded together to nominate non-independent directors, *id.* at 73, and that the rectification report does not show "actual" government control, *id.* at 74-75. Aeolus also disputes the weight that should be given to the website referencing ChinaChem's control over Aeolus, and the fact of Aeolus's chairman serving as a board member of China National Tire. *Id.* at 76-77.

Not only are these arguments unpersuasive, but they reflect the wrong standard. The relevant question is whether a reasonable mind could conclude that Aeolus failed to rebut the presumption of government control with respect to selection of its management. *See Zhejiang Mach. Import & Export Corp.*, 65 F.4th at 1371-1372 (applying the substantial evidence standard). Even if Aeolus's arguments were supported by some evidence in the record, the Court must "uphold Commerce's determination if it is supported by substantial evidence and is otherwise in accordance with the law." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1381 (Fed. Cir. 2001); *see also Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) ("To survive judicial scrutiny, an agency's

---

respondents to overcome gaps in the record. Appellants Br. at 81. Again, it is *respondent's* burden to develop the record to rebut the presumption of government control. *Zhejiang Mach. Import & Export Corp.*, 65 F.4th at 1371.

49

construction need not be the *only* reasonable interpretation or even the *most* reasonable interpretation.").

Applying the correct standard, none of Aeolus's arguments disturb the sound basis for Commerce's finding that Aeolus failed to rebut the presumption of government control. The record contains substantial evidence of government control, including (1) 49.06 ownership by state-owned entities, (2) ChinaChem's majority role in electing board members at the relevant shareholder meeting, and (3) Aeolus's board chairman serving as a representative of a state-owned entity— among other relevant facts. *See* Section III.A.1. Accordingly, substantial evidence supports Commerce's finding that Aeolus failed to rebut the presumption of government control. Although appellants "invite this court to reweigh this evidence, this court may not do so." *Downhole Pipe*, 776 F.3d at 1376 (citations omitted)

B.    Substantial Evidence Supports Commerce's Finding That Guizhou Tyre Failed To Demonstrate Autonomy In Selecting Management And Distributing Profits, And Thus Failed To Rebut The Presumption Of Government Control

1.    The Record Supports Commerce's Finding

Substantial evidence likewise supports Commerce's findings that Guizhou Tyre failed to rebut the presumption of government control with respect to selection of management and distribution of profits.

50

The state-owned company GIIG was the largest and controlling shareholder of GTC, which in turn held a 100 percent ownership interest in GTCIE, both of which collectively comprise the single entity Guizhou Tyre.  Appx112, Appx59.  Not only did GIIG hold a minority ownership stake, but GIIG used its ownership interests to "effectively select{} GTC's board."  Appx44 (citing, *e.g.*, Appx184).  Further, the record contains additional indicia—facts in addition to GIIG's minority ownership—demonstrating GIIG's control over selection of management.  Specifically, GIIG controlled relevant decisions at shareholder meetings in 2012 and 2015, which resulted in the approval of the board members that remained on the board during the period of review.  Appx112-113, Appx122-124.  The board, in turn, selected senior management that "control{led} the day-to-day decisions regarding the company's export activity," Appx115; Appx147; *see also* Appx111-115.

As to distribution of profits, moreover, GTC's Articles of Association state that the board of directors "shall put forward {an} annual profit distribution proposal{.}"  Appx114.  GIIG controlled the shareholder vote in July 2015, when a preliminary profit distribution plan was approved.  Appx2680; Appx186-187.  As the trial court observed, "GIIG's preferred proposals on profit distribution and selection of managers failed at a shareholder meeting in May 2015," but then

"GIIG called another meeting, held in July 2015, at which GIIG's preferred proposals were adopted." Appx44 (citations omitted).

The relationship between the board chairman and the state-owned entity GIIG also supports Commerce's findings. Specifically, GTC's board chairman served as the proxy for state-owned entity GIIG. Appx114-115 (discussing the chairman's connection with GTCIE); *see also* Appx124. Thus, GTC's chairman received GIIG's "suggestions regarding nominations and profit distribution"—at the same time that he was "beholden" to GIIG for his position on the board. Appx124.[25]

In sum, as the trial court correctly explained, record evidence supports Commerce's findings "that GIIG had the ability to control the election of board members and influence the distribution of the company's profits." Appx44. Thus, Commerce reasonably determined that Guizhou Tyre failed to rebut the presumption of government control.

2.    Guizhou Tyre's Arguments Are Unpersuasive

Guizhou Tyre's challenges to Commerce's factual finding are unpersuasive. Appellants Br. at 61-68. Importantly, Guizhou Tyre does not dispute that GIIG comprised the majority of votes in the shareholder meetings in 2012 and July 2015,

---

[25] *See Advanced Tech. 2012*, 885 F. Supp. 2d at 1359 (discussing whether managers are "beholden to the board that controls their pay, in particular to the chairman of the board as the de facto company head" under Chinese law).

CONFIDENTIAL MATERIAL OMITTED

in which the board members were approved.  *See*, *e.g.*, Appx44; Appx112-113

(2012 meeting); Appx123-124 (the 2015 meeting); Appx3826; Appellants Br. at 67

(acknowledging "GIIG's success in July 2015").  Nor does Guizhou Tyre contest

that these board members select GTC's managers, Appellants Br. at 64, and make

proposals regarding profit distribution, *see* Appx114.  These undisputed facts alone

provide sufficient support to sustain Commerce's findings.

Guizhou Tyre nonetheless claims that the state-owned entity GIIG's role in

the 2012 and 2015 shareholder meetings do "not evidence government control."

Appellants Br. at 61-68 (capitalization altered).  With regard to the 2012 meeting,

Guizhou Tyre argues that GIIG had no "direct" role in the nomination process, that

other shareholders could have participated in the 2012 meeting, and that the 2012

meeting predated the period of review.  Appellants Br. at 62-64.  But these

arguments are unavailing given that GIIG's votes dominated the results of the 2012

meeting—including the approval of board members that remained on the board

during the period of review.  *See*, *e.g.*, Appx183-185.  Indeed, [number] board

members approved in 2012 were still in place during the period of review.

Appx3826 (citations omitted); *see also* Appx113; Appx121-122.

With regard to the July 2015 shareholder meeting, Guizhou Tyre contends

that the prior May 2015 meeting "disproves GIIG control during the {period of

review}," because GIIG's preferred candidates "were not elected" at the May 2015

meeting.  Appellants Br. at 65 (citations and emphasis omitted).  As Commerce

explained, however, the state-owned company GIIG was the only shareholder with

"the requisite number of shares to convene a shareholders meeting."  Appx114

(citing Appx932-933); Appx123.  Thus, only two months after the unsuccessful

votes in the May 2015 meeting, GIIG scheduled an interim shareholder meeting for

July 2015.  Appx122-124.  At the July 2015 meeting, GIIG used its own votes to

approve its preferred board candidates and preliminary profit distribution plan.

Appx3826; Appx122-124.  GIIG's ability to override the May 2015 vote therefore

supports, rather than undermines, Commerce's findings.

     Guizhou Tyre also contends that it complied with all legal requirements and

that the Articles of Association ensured the board's independence.  Appellants Br.

at 63-66.  But Commerce found that GTC's Articles of Association did not prevent

GIIG "from engaging in behavior that interferes with the autonomy of GTC."

App114.  Even when complying with the governing law and Articles of

Association, GIIG was able to use its controlling ownership to "dominate GTC's

decision-making process," "appoint its preferred members to {the} board," and

"control profit distribution."  Appx61; *see also* Appx114.[26]  Moreover, as the trial

court held, "Commerce did not base its determination on the company's

---

[26] Guizhou Tyre's reference to its attestations and the legal requirements associated with the Company Law are not dispositive with respect to the factual questions before Commerce.  *See* Appellants Br. at 52-56.

noncompliance with the articles of association or applicable Chinese law." Appx44. Rather, "Commerce based its denial of separate rate status on what it determined to be GTC's failure to demonstrate independence in the selection of management and the distribution of profits," which was "based on findings, supported by record evidence, that GIIG had the ability to control the election of board members and influence the distribution of the company's profits." Appx44.

Ultimately, the Court must sustain Commerce's findings so long as they are supported by evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 229. By disputing the evidence in support of Commerce's findings, Guizhou Tyre has "chosen a course with a high barrier to reversal." *Nippon Steel*, 458 F.3d at 1352 (citation omitted). Under similar circumstances, this Court sustained Commerce's "determination of de facto government control" in *Zhejiang Mach. Import & Export Corp.*, 65 F.4th at 1372. As in *Zhejiang Machinery*, the trial court "properly affirmed Commerce's remand determination denying {Guizhou Tyre} a separate rate due to de facto government control." *See id.*

### 3.    Guizhou Tyre's Arguments Regarding The Fifth Administrative Review Are Unpersuasive

Finally, Guizhou Tyre argues that Commerce's denial of a separate rate in this proceeding was arbitrary because Commerce previously granted it a separate rate in the fifth administrative review. Appellants Br. at 82-85 (citing *Off-the-Road*

*Tires from China*, 80 Fed. Reg. 20,197 (Dep't of Commerce Apr. 15, 2015) (final results of the fifth admin. review). But each "administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1357 (Fed. Cir. 2016) (quoting *Qingdao Sea–Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)).

Commerce was not required to make the same findings in this administrative review as it did in a prior administrative review based on a different record and a different period of review. *See id.* Indeed, the period of review for the fifth administrative review—from September 1, 2012, through August 31, 2013—predated the 2015 shareholder meetings demonstrating that GIIG could "effectively hold re-votes on {its} favored proposals until such a time where such proposals would prevail, which they did in the July 2015 re-vote." Appx123-124; *see also* Appx122-124.

Nor does the fact that Guizhou Tyre's "SOE ownership declined" between the fifth and seventh administrative reviews mandate a different result. *See* Appellants Br. at 82. Again, "the burden of creating an adequate record lies with interested parties and not with Commerce." *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (citation omitted) (cleaned up). The record in this case presents detailed analysis and argument regarding entitlement to a separate rate

during the period of review based on multiple indicia of government control—not based solely on the degree of government ownership.  *See generally* Section III.B.1.

In any event, to the extent Guizhou Tyre contends that other reviews are relevant, Commerce explained that the differing outcome in the fifth administrative review reflected the reasonable evolution of Commerce's analysis based on court decisions.  Appx185-186.  In a more recent proceeding, Commerce found—as in this case—that Guizhou Tyre failed to rebut the presumption of government control.  *Truck and Bus Tires From China*, 82 Fed. Reg. 8,599 (Dep't of Commerce, Jan. 27, 2017) (final less-than-fair-value determ.).[27]

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the judgment of the trial court.

---

[27]  This decision is before the Court in *Guizhou Tyre Import & Export Co. v. United States*, Fed. Cir. No. 23-2165.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

/s/ Emma E. Bond
OF COUNSEL:                                EMMA E. BOND
                                           Trial Counsel
ELIO GONZALEZ                              U.S. Department of Justice
Senior Counsel                             Civil Division
Office of the Chief Counsel                Commercial Litigation Branch
  for Trade Enforcement and Compliance    P.O. Box 480, Ben Franklin Station
U.S. Department of Commerce                Washington, DC 20044
                                           202-305-2034
                                           Emma.E.Bond@usdoj.gov

May 1, 2024                                *Attorneys for Defendant-Appellee,*
                                           *United States*

58

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(B), the undersigned certifies that this brief contains no more than 12,408 words, excluding the parts of the brief exempted by this rule.  The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman, 14-point font, proportionally spaced typeface.

<u>/s/ Emma E. Bond </u>
EMMA E. BOND