**2023-2163, 2023-2164**

In The

# United States Court of Appeals
# for the Federal Circuit

GUIZHOU TYRE CO., LTD., GUIZHOU TYRE
IMPORT AND EXPORT CO., LTD., AEOLUS TYRE CO., LTD.,

Plaintiffs-Appellants,

QINGDAO FREE TRADE ZONE FULL-WORLD INTERNATIONAL
TRADING CO., LTD., XUZHOU XUGONG TYRES CO., LTD., TRELLEBORG
WHEEL SYSTEMS (XINGTAI) CO., LTD., QINGDAO QIHANG TYRE CO.,
LTD., WEIHAI ZHONGWEI RUBBER CO., LTD.,

Plaintiffs,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of International Trade in
Case No. 17-cv-00100, Senior Judge Timothy C. Stanceu

## REPLY BRIEF FOR PLAINTIFF-APPELLANTS GUIZHOU TYRE CO., LTD., GUIZHOU TYRE IMPORT AND EXPORT CO., LTD., AND AEOLUS TYRE CO., LTD.

Ned H. Marshak*
Jordan C. Kahn
Dharmendra N. Choudhary

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

*599 Lexington Ave., 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel to Plaintiff-Appellants*
*Guizhou Tyre Co., Ltd., Guizhou Tyre*
*Import and Export Co., Ltd., and*
*Aeolus Tyre Co., Ltd.*

Dated:  June 20, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number**     23-2163 (consolidated with 23-2164)

**Short Case Caption**     Guizhou Tyre Co., Ltd. v. US

**Filing Party/Entity**     Guizhou Tyre Co., Ltd., Guizhou Tyre Import and Export Co., Ltd., Aeolus Tyre Co., Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/20/2024

Signature:     /s/ Jordan C. Kahn

Name:     Jordan C. Kahn

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Guizhou Tyre Co., Ltd. | | |
| Guizhou Tyre Import and Export Co., Ltd. | | |
| Aeolus Tyre Co., Ltd. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Brandon M. Petelin | Elaine F. Wang | Andrew T. Schutz |
| Mark E. Pardo | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)    ☐ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................1

I.    THE GOVERNMENT MISAPPLIES THE PRESUMPTION OF GOVERNMENT CONTROL IGNORING THE FACT THAT SUCH PRESUMPTION "BURSTS LIKE A BUBBLE" ...............................3

II.    RESPONDENTS REBUTTED THE PRESUMPTION OF STATE CONTROL ........................................................................................8

III.    COMMERCE'S SEPARATE RATE DENIALS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE .............................14

    A.    GTC's Separate Rate Denial Is Unsupported ...........................15

    B.    Aeolus's Separate Rate Denial Is Unsupported........................18

IV.    COMMERCE IMPROPERLY USED THE SEPARATE RATE ANALYSIS FOR MAJORITY SOE-OWNED RESPONDENTS.....21

V.    COMMERCE ARBITRARILY REVERSED ITSELF ......................25

CONCLUSION ....................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
284 F.Supp.3d 1350 (CIT 2018)............................................................21, 22, 24

*Aukerman Co. v. R.L. Chaides Constr. Co.*,
960 F.2d 1020 (Fed. Cir. 1992) ...................................................*passim*

*China Mfgrs. Alliance, LLC v. United States*,
639 F.Supp.3d 1260 (CIT 2023).......................................................21, 25

*Diamond Sawblades Mgrs. Coal. v. United States*,
866 F.3d 1304 (Fed. Cir. 2017) .......................................................21, 30

*Dongtai Peak Honey Indus. Co. v. United States*,
777 F.3d 1343 (Fed. Cir. 2015) ...............................................................5

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)................................................................................28

*Gallant Ocean (Thailand) Co. v. United States*,
602 F.3d 1319 (Fed. Cir. 2010) .............................................................20

*GTC v. United States*,
389 F.Supp.3d 1302 (CIT 2019).............................................................17

*Guizhou v. United States*,
641 F.Supp.3d 1386 (CIT 2023).............................................................18

*Hyundai Elecs. Indus. Co. v. United States*,
899 F.2d 1204 (Fed. Cir. 1990) .............................................................27

*I.D.I. Int'l Dev. & Inv. Corp. v. United States*,
2021 WL 3082807 (CIT July 6, 2021) ...................................................23

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
28 F.Supp.3d 1317 (CIT 2014)...............................................................24

*Jilin Forest Indus. Jinqiao Flooring Grp. v. United States*,
617 F.Supp.3d 1343 (CIT 2023)..........................................................7, 8

*Lucent Tech., Inc. v. United States*,
   580 F.3d 1301 (Fed. Cir. 2009) ........................................................23

*Papierfabrik Aug. Koehler AG v. United States*,
   36 CIT 1632 (2012) ...........................................................................8

*Sigma Corp. v. United States*,
   117 F.3d 1401 (Fed. Cir. 1997) ...........................................5, 6, 13, 14

*SKF USA, Inc. v. United States*,
   630 F.3d 1365 (Fed. Cir. 2011) ......................................................26

*WelCom Prods., Inc. v. United States*,
   865 F.Supp.2d 1340 (CIT 2012) .....................................................27

*Yantai CMC Bearing Co. v. United States*,
   203 F.Supp.3d 1317 (CIT 2017) .....................................................21

*Zhejiang Mach. Imp & Exp. Corp. v. United States*,
   64 F.4th 1364 (Fed. Cir. 2023) ................................................*passim*

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*,
   350 F.Supp.3d 1308 (CIT 2018) ...............................................21, 22

**Rules**

Federal Rules of Evidence Rule 301 ......................................................3, 7

**Statutes**

19 U.S.C. § 1677 ...................................................................................20

**Administrative Decisions**

*Circular Welded Carbon Quality Steel Line Pipe from China*,
   74 Fed. Reg. 14,514 (Mar. 31, 2009) (final determination) ..............28

*Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,629
   (Sept. 14, 2006) (final results) ...............................................14, 16, 28

*Hot-Rolled Carbon Steel from China*, 66 Fed. Reg. 49,632
   (Sept. 28, 2001) (final determination) ...............................................28

*Off-The-Road Tires from China*, 80 Fed. Reg. 20,197 (Apr. 15, 2015)
(final results) ...................................................................................25, 26

*Oil Country Tubular Goods from China*, 75 Fed. Reg. 20,335
(Apr. 19, 2010) (final determination) ...................................................28

*Pea Protein from China*, 89 Fed. Reg. 10,038 (Feb. 13, 2024)
(preliminary determination) .................................................................29

*Silicon Carbide from China*, 59 Fed. Reg. 22,585 (May 2, 1994)
(final determination) ......................................................................14, 16

*Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474
(Sept. 9, 2016) (final results) ...............................................................29

*Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992
(Dec. 26, 2012) (final determination)...................................................28

**INTRODUCTION**

In its Opening Brief, Plaintiffs-Appellants Guizhou Tyre Co., Ltd. ("GTC") and Guizhou Tyre Import and Export Co., Ltd. ("GTCIE") (collectively, "Guizhou"),[1] and Aeolus Tyre Co., Ltd. ("Aeolus") (Guizhou and Aeolus are collectively, "Respondents") demonstrated that the U.S. Department of Commerce ("Commerce" or "Department") unlawfully denied separate rate status for GTC and Aeolus in the seventh administrative review ("AR7") of the antidumping duty ("ADD") order on new pneumatic off-the-road-tires ("OTR") from the People's Republic of China ("China" or "PRC"). Respondents' Corrected Opening Brief (Feb. 20, 2024), ECF 35-36 ("Opening Br."). Commerce improperly:

- employed the separate rate analysis for respondents that are majority-owned by state owned enterprises ("SOE"), notwithstanding that Guizhou and Aeolus are only 25.2% and 49.06% SOE-owned, respectively. *Id.* at 35-49;

- found that the presumption of state control, long recognized by this Court, had not been rebutted notwithstanding extensive record evidence that Guizhou and Aeolus were independent from the Chinese government. *Id.* at 49-60;

- did not rely on substantial evidence necessary to deny separate rates for either GTC or Aeolus. *Id.* at 61-81; and

- contradicted its conclusion in the preceding fifth administrative review ("AR5") of the ADD order on OTR from China, in which

---

[1]     GTC produced the subject merchandise exported to the United States by its wholly-owned affiliate GTCIE, and both participated in the administrative proceeding resulting in GTC's separate rate denial.

GTC was granted a separate rate despite having 33.84% SOE-ownership. *Id*. at 57-60.

These demonstrations are not undermined by the Response Brief filed by

Defendant-Appellee United States ("Government"). Response Brief (May 1, 2024),

ECF 39-40 ("Gov. Br."). As set forth in turn below:

1. the Government misapplied the presumption by requiring that GTC and Aeolus conclusively demonstrate an absence of potential government control when—per the required application of rebuttable presumptions—only a minimum quantum of contrary evidence need be proffered;

2. GTC and Aeolus rebutted the presumption with substantial evidence demonstrating an absence of state control, including that the government entity owning the SOE proclaimed that it did not control GTC, financial statements so attesting, the SOE being unable to pass resolutions at GTC's May 2015 meeting, a report memorializing a cessation of intertwined operations between the SOE and Aeolus before the period of review ("POR"), and statements of non-control supported by substantial documentation and legal protections;

3. Commerce's rationale for denying separate rate status was not supported by substantial evidence, as SOEs voting to elect board members do not reasonably establish that Respondents' export activities were actually controlled by the Chinese government – Commerce's rationale effectively was based solely on the fact that Respondents have sizable SOE ownership;

4. Commerce improperly employed the separate rate analysis used to determine whether majority SOE-owned respondents should be granted separate rate status, when this analysis does not extend to respondents with minority SOE-ownership; and

5. Commerce arbitrarily reversed its separate rate practice, as evidenced by its prior grant of a separate rate for GTC when it had significantly greater SOE-ownership than it had in this POR.

## I.   THE GOVERNMENT MISAPPLIES THE PRESUMPTION OF GOVERNMENT CONTROL IGNORING THE FACT THAT SUCH PRESUMPTION "BURSTS LIKE A BUBBLE"

The Government properly identifies the overarching issue in this case, whether "Commerce's determination that Guizhou Tyre and Aeolus failed to rebut the presumption of government control is lawful and supported by substantial evidence." Gov. Br. at 2. The Government further correctly explains that "this Court has repeatedly sustained Commerce's authority to apply a rebuttable presumption of government control in {ADD} proceedings involving a non-market economy." Gov. Br. at 22. The Government, however, ignores the manner in which this Court, decades ago, reasoned how presumptions operate under the Federal Rules of Evidence ("FRE"):

> Rule 301 embodies what is known as a **bursting bubble theory** of presumptions. Under this theory, a presumption is not merely rebuttable but **completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact**. . . . {T}he evidence must be sufficient to put the existence of a presumed fact into genuine dispute. **The presumption compels the production of this minimum quantum of evidence from the party against whom it operates, nothing more**.

*Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992) (emphases added) (citations omitted).

The Government miscasts the presumption of state control as a burden on respondents to completely disprove potential government control. It claims that "Appellants have not provided any coherent reason for applying a rule from an

- 3 -

abrogated patent case to govern Commerce's exercise of discretion in this

context—and there is none." Gov. Br. at 26. Yet the Government's discussion of

laches and the Patent Act, *id.* at 25, do not affect this Court's clear discussion as to

how presumptions operate as a general legal matter. Contrary to the Government's

claim, authority for applying the *Aukerman* standard is found in the legal definition

of the term "presumption":

> Presumption is a legal inference that must be made in light of
> certain facts. . . . ; **a party challenging it can overcome the
> presumption by providing the appropriate burden of proof**.
>
> **Most presumptions are rebuttable, meaning that they are rejected
> if** proven to be false or at least **thrown into sufficient
> doubt with evidence**.

Wex Legal Dictionary, LEGAL INFORMATION INSTITUTE, available at:

https://www.law.cornell.edu/wex/presumption (emphases added).

This Court's recent precedent cited extensively by the Government, Gov. Br.

at 28-33, 47-47, 54, confirms that the *Aukerman* standard and legal definition of

the presumption of government control apply in this case: "the burden lies with

{the respondent} to develop a full record and **affirmatively rebut the

presumption**." *Zhejiang Mach. Imp & Exp. Corp. v. United States*, 64 F.4th 1364,

1371 (Fed. Cir. 2023) ("*ZMC*") (emphasis added). This Court likewise reasoned

that: "under the law for non-market economy countries, all **respondents are

*presumed* to be subject to governmental control unless they meet the burden**

**of proving otherwise**." *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1354 (Fed. Cir. 2015) (emphasis modified).

These statements are entirely consistent with *Aukerman*: "respondents are *presumed* to be subject to governmental control unless they" "affirmatively rebut the presumption" by providing "evidence . . . sufficient to put the existence" government control "into genuine dispute." *Id*. (emphasis in original); *ZMC*, 64 F.4th at 1371; *Aukerman*, 960 F.2d at 1037.

The Government misplaces reliance on this Court's first case adjudicating Commerce's presumption of government control. Gov. Br. at 23-25. In *Sigma Corp. v. United States*, this Court affirmed "Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy and to place the burden on the exporters to demonstrate an absence of central government control." 117 F.3d 1401, 1405 (Fed. Cir. 1997). This statement does not require that respondents conclusively establish an absence of government control. First, *Sigma* affirmed Commerce's separate rate denial because the "evidentiary showing was **insufficient to overcome the presumption**." *Id*. at 1407 (emphasis added). Moreover, the facts of *Sigma* confirm that the respondent in that case failed to satisfy the threshold, minimal evidentiary requirement:

> Commerce noted that {exporter} **Guangdong "provided almost no evidence on the record** establishing that it negotiated prices or sales with its customers, or that it was actually responsible for its profits or losses." . . . . **Guangdong provided only a certification** from its

- 5 -

parent corporation attesting that Guangdong acted independently . . . . Commerce concluded that such a certification, "standing alone **without any supporting documentation** does not establish the absence of *de facto* control."

Commerce noted that Guangdong had submitted copies of its 1986 and 1988 business licenses in an effort to demonstrate its independence. . . . As Commerce concluded, however, the 1988 business license does not "establish clear independence from the parent corporation," as it "describes the scope of Guangdong's business activities without identifying the government's role in those activities," and fails to prove the absence of *de facto* government control with respect to export sales and pricing decisions.

**It was proper for Commerce to require . . . more** to establish Guangdong's independence of the central government. . . . In view of the presumption that an exporter in a nonmarket economy country is part of the national corporation and Commerce's reasonable conclusion that {importer} D & L's **evidentiary showing was insufficient to overcome that presumption,** we affirm . . . . .

*Id.* at 1406-07 (emphases added). Given that the scant evidence proffered in *Sigma* was "insufficient to overcome the presumption," *Sigma* does not stand for the proposition that respondents are only entitled to separate rates if they conclusively establish "an absence of central government control." *Id*. at 1405.

In this appeal, Respondents ask this Court to reconcile the *Aukerman* rebuttable presumption and substantial evidence standards. Before this Court assesses whether Commerce's findings that GTC and Aeolus failed to rebut the presumption are supported by substantial evidence, it needs to decide whether the presumed state control was "**thrown into sufficient doubt**." Wex Legal Dictionary (emphasis added). To overcome the presumption, Guizhou and Aeolus needed only

to submit **evidence sufficient to support a finding of the nonexistence of the presumed fact**—*i.e.*, that they were not controlled by the Chinese government. *Aukerman*, 960 F.2d at 1037 (emphasis added).

In deciding these issues, this Court should adopt the U.S. Court of International Trade ("CIT") rationale in *Jilin Forest Indus. Jinqiao Flooring Grp. v. United States*, 617 F.Supp.3d 1343 (CIT 2023), *appealed as* Fed. Cir. Case No. 23-2245. The CIT in *Jilin Forest* found that "Commerce has failed to provide a lawful justification for its use of the NME presumption." *Id*. at 1369. In reaching this conclusion, the CIT expressed concern as to "the crux of Commerce's argument, *i.e.*, that somehow, apart from other executive agencies, it has special powers that free it from the constraints placed upon other agencies that must identify a statutory or regulatory source of their actions." *Id*. at 1367. The CIT in *Jilin Forest* also emphasized recent judicial precedent undermining the presumption: "Recent cases also suggest that the wind is blowing against wide-ranging claims for deference." *Id*.

*Jilin Forest* establishes that, at minimum, Commerce lacks discretion to implement the rebuttal presumption of state control in a manner contrary to that proscribed by FRE 301.[2] Commerce does not have "special powers that free it from

---

[2]    The Government correctly notes that Respondents have not advanced the statutory challenge accepted by the CIT in *Jilin Forest*. Gov. Br. at 26 n.12. Yet *Jilin Forest* supports Respondents' longstanding claim that Commerce unlawfully

the constraints placed upon other agencies" with respect to rebuttal presumptions. *Id*. While Commerce's discretion may be further curtailed in the event that *Chevron* is revisited, Opening Br. at 50 n.5, Commerce currently cannot disregard the *Aukerman* standard; that is, as with all legal rebuttal presumptions, the presumption of state control bursts like a bubble upon the introduction of sufficient contrary evidence.

## II. RESPONDENTS REBUTTED THE PRESUMPTION OF STATE CONTROL

GTC submitted information far surpassing the requisite "minimum quantum of evidence" establishing its independence from the Chinese government. *Aukerman*, 960 F.2d at1037. Guizhou provided a formal clarification of GTC's relationship with Guiyang Industry Investment (Group) Co., Ltd. ("GIIC" or "GIIG"), which owns 25.2% of Guizhou and is under the supervision of the Guiyang State-owned Assets Supervision and Administration Commission ("SASAC"). Guizhou Supplemental Section A Questionnaire Response (May 25, 2016) ("SAQR"), at 6, Appx1888, Exhibit 10, Appx2763-2770 ("Guiyang SASAC Clarification"). The Guiyang SASAC "**confirmed that it does not have the**

---

misconstrued the presumption. Moreover, should this Court invalidate the presumption, Commerce would have acted unlawfully in AR7 and such an "intervening judicial decision" would be an "exception" to the exhaustion requirement. *Papierfabrik Aug. Koehler AG v. United States,* 36 CIT 1632, 1635 (2012).

**authority to make decisions for GTC**. . . . **Guiyang SASAC, which has an interest in {GTC}, does not have the right to make a decision on appointment or dismissal of board directors or management of {GTC}**." *Id*. at 2, Exhibit 1 (emphases added), Appx1888, Appx2769. Similarly, GTC's 2015 Annual Report provided:

> The Company . . . **completely separates from the controlling shareholder {GIIC} in personnel, assets and finance**, etc., with independent organization and independent business. **The controlling shareholder strictly abides by the provisions of laws** and regulations and exercise shareholders' rights pursuant to laws.

*Id*. at 3, Exhibit 3 at 16, Appx2205.

Guizhou also detailed how the SOE's proposals were rejected at the 2014 Annual General Meeting ("May 2015 Meeting"). At that time, proposals to appoint two directors and preliminarily distribute profits advanced by GIIC failed. Guizhou Second SAQR (Aug. 8, 2016) ("2SAQR") at 9 (emphasis added), Exhibit 7C, Appx2941, Appx3446-3490. This occurrence, regardless of what subsequently transpired, rebuts the presumption that GTC is controlled by the Chinese government through its SOE shareholder.

Aeolus likewise provided sufficient evidence that it was independent from the SOEs that collectively own 49.06% of Aeolus's shares. *See* Aeolus Sperate Rate Application (Dec. 11, 2015) ("SRA"), at 13, Appx263. In particular, the Rectification Report executed by the SOE China National Chemical Corporation

- 9 -

("ChinaChem") that owns 42.58% of Aeolus's shares, *id*., provides that:

"**ChinaChem fully respects the independence** of a listed company **and has never inquired about financial information** of the Company (Aeolus)." Aeolus Rebuttal Factual Information (Jan. 8, 2016) ("Aeolus RFI"), Exhibit 1A (emphases added), Appx777. As documented in the Rectification Report, ChinaChem further agreed to "**strictly comply with the provisions of the *Company Law, Code of Corporate Governance for Listed Companies* and other relevant law and regulations, and will respect the independence . . . and will not interfere with . . . {Aeolus's} financial and accounting activities**." *Id*. (emphasis added). Aeolus also provided sample documents to show that investments, key projects, and tender processes were reviewed and approved by the internal management of Aeolus— not ChinaChem—during and after the AR7 POR. *Id.* Exhibit 2, Appx782-787.

Further support for the independence of GTC and Aeolus was provided in multiple responses attesting to their independence, each of which were certified as "accurate and complete" and accompanied by supporting documentation, where applicable. SRA, Appx277; Guizhou Section A Questionnaire Response (Jan. 20, 2016) ("AQR"), Appx805-806; SAQR, Appx1878-1879, Aeolus Supplemental Separate Rate Application (Aug. 2, 2016) ("SSRA"), Appx2900; 2SAQR, Appx2928-2929; 3SAQR, Appx3547-3548. These certified statements include Guizhou attesting to the facts that:

- its "**prices are not subject to review or guidance from any governmental organization**";

- neither GTC "nor any manager of the Company is expected to achieve foreign exchange targets set by any governmental authority";

- "The export price less the cost of goods sold and applicable sales expenses results in export profits. The Company can dispose these profits as it needs for its business operations";

- As a public company, the board of directors of GTC is selected by its shareholders at a shareholders' meeting, and its senior management are selected by its board of directors;

- As the single shareholder of GTCIE, GTC selects GTCIE's management; and

- Neither GTC nor GTCIE is required to notify any governmental authorities as to who are their managers.

AQR at 10-11 (emphasis added), Exhibit A-5, Appx819-820, App921-924.

Aeolus likewise attested to the facts that:

- it "independently operates its business and its intermediate and ultimate shareholders cannot direct or dictate the company's operations or business decisions. Aeolus's export prices are set independent of government influence and without the participation or approval of any government authority.";

- its "contracts and other agreements are negotiated and concluded without oversight by or consultation with any government authority or SASAC entity.";

- it "has independent authority to select its board of directors and/or board of supervisors and its management. **Neither government entities nor SASAC have the authority to appoint the board** of directors and/or board of supervisors of Aeolus.";

- its "board of directors during the POR was elected at Aeolus's shareholders' meeting pursuant to the relevant procedures . . . and in conformity with the AoA of Aeolus.**" Aeolus's senior management is thereby selected by its board members.**;

- it "retains the proceeds of its sales and makes independent decisions regarding the disposition of profits or financing of losses."; and

- during the POR it did not make any disbursements to government accounts other than for tax or government-provided goods or services.

SRA at 13-15 (emphasis added), 19-21, Exhibits 13-14, Appx263-265, Appx269-271, Appx681-700.

Respondents also provided substantial evidence that, as publicly listed companies, there existed significant legal restrictions on all shareholders—including GIIC and ChinaChem—to ensure that they abide by the procedures applicable to all investors. *See* AQR Exhibit A-3A: PRC Company Law, Appx842-891; SAQR Exhibit 9: PRC Code of Corporate Governance for Listed Companies ("PRC Code"), Appx2745-2762; SAQR Exhibit 1: GTC Articles of Association ("AoA"), Appx1896-1900; SRA Exhibit 11: Aeolus AoA, Appx581-675. Such "evidence show{s} that the only way in which GIIC may participate in GTC's decision-making" and "Aeolus' shareholders may participate in Aeolus' decision-making is through normal courses available to all shareholders." Guizhou Case Brief at 20 (Dec. 14, 2016), Appx3886; Aeolus Case Brief (Dec. 14, 2016), at 17, Appx3852. These ample legal requirements and safeguards include:

- GTC/Aeolus AoA 40 with PRC Company Law Articles 3 and 99 provide **strict election procedures**, through which board members were elected democratically and transparently by shareholders, and chairmen were elected by the board;

- PRC Code Articles 20–21 **limit controlling shareholders**, prohibiting SOE-owned shareholders from either circumventing the shareholders' meetings or the board of directors in selecting management or interfering with the companies or other shareholders;

- GTC AoA 83 limits GIIC from nominating more than one third of GTC's directors; in fact, the 6th Board was nominated in 2012 by the previous board—without GIIC/Guiyang SASAC involvement;

- GTC/Aeolus AoA 57, 83, and 88 provide for strict voting procedures, allowing **cumulative voting** to prevent SOE-owned shareholders from controlling GTC elections and **internet voting** to maximize participation;

- Aeolus AoA 119, 147, 149, and 151 provide strict election procedures for senior management, through which Aeolus's management was selected by board members—not by shareholders or any governmental entity; and

- GTC AoA 124, 130, 132, and 134 provide strict election procedures for senior management, through which board members selected GTC's management.

PRC Company Law, Appx843-857; PRC Code, Appx2750; GTC AoA, Appx1956-1978; Guizhou Case Brief at 21-25, Appx3887-3891; SRA Exhibits 8A–B, 11, Appx317-332, Appx363, Appx643-664; SRA Exhibit 11, Appx642-664.

The presumption of GTC and Aeolus being state-controlled "**completely vanish{ed}**" because Respondents submitted "evidence sufficient to support a finding of the nonexistence of the presumed fact." *Aukerman*, 960 F.2d at 1037 (emphases added). By contrast, the respondent in this Court's seminal *Sigma* case

"provided almost no evidence"—"only a certification" and "business licenses in an effort to demonstrate its independence." 117 F.3d at 1406. In light of the plethora of evidence supporting GTC's independence, the presumption burst. Such ordinary operation of presumption law does not "flip . . . the presumption of government control and the deferential standard of review" as the Government argues. Gov. Br. at 49. Rather, Commerce unlawfully denied Respondents' separate rate because the presumption, in fact, was rebutted.

## III. COMMERCE'S SEPARATE RATE DENIALS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

With Guizhou and Aeolus providing evidence bursting the presumption, the issue on appeal narrows to whether Commerce's separate rate denials are supported by substantial evidence—*i.e.*, without considering the presumption. Critically, Commerce's longstanding separate rate analysis upon which Commerce purportedly relied in AR7 evaluates "government control over . . . **export activities**" and requires evidence of "**actual control**" instead of mere "potential control." Opening Br. at 25-26; U.S. Department of Commerce Memorandum (Aug. 26, 2016) ("Separate Rate Memo"), at 2 (emphasis added), Appx1434; *Silicon Carbide from China*, 59 Fed. Reg. 22,585, 22,587 (May 2, 1994) (final determination); *Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,629 (Sept. 14, 2006) (final results), Issues and Decision Memorandum ("IDM") Comment 3 (emphases added).

### A.     GTC's Separate Rate Denial Is Unsupported

The scant evidence relied upon by Commerce does not reasonably support the conclusion that GTC's export activities were actually controlled by the Chinese government. Commerce first heralds GTC's 2012 Meeting: "GIIG's votes dominated the results of the 2012 meeting—including the approval of board members that remained on the board during the {POR}." Gov. Br. at 53 (citing Final Redetermination (Sept. 24, 2021) ("2nd Remand"), at 45-47, Appx183-185). These facts cannot reasonably support Commerce's finding that the Chinese government controlled GTC, let alone its export activities, because:

- GIIG, the SOE that owns 25.2% of Guizhou, was not involved in nominating director candidates. 2SAQR at 9, Appx2941;

- the elected GTC board members "do not have any position in GIIG or SASAC or any other government agency." Guizhou Case Brief at 20, Appx3886; and

- the 2012 Meeting election complied with all legal requirements proscribed by GTC's AoA, the PRC Company Law, and PRC Code— including protections against domination by any one shareholder. AQR Exhibit A-3A, Appx842-891; SAQR Exhibit 9, Appx2745-2762; SAQR Exhibit 1, Appx1896-1900.

Commerce thereby lacked a basis to deny GTC's separate rate based on GIIG having, years before the POR, democratically and transparently through a legally constrained process voted to elect GTC directors—none of whom GIIG nominated.

The Government asserts that "GIIG was the only shareholder with 'the requisite number of shares to convene a shareholders meeting.'" Gov. Br. at 16

(emphasis in original). This claim is factually inaccurate; other smaller entities are able to together convene shareholder meetings. AQR Exhibit A-8, Appx933; GTC SAQR Exhibit 1 Art. 43, Appx1957-1958. This fact refutes Commerce's reliance on GTC's AoA to deny GTC's separate rate. *See* Gov. Br at 12-13; 2nd Remand at 18-20, Appx113-115. These AoA ensure "that the only way in which GIIC may participate in GTC's decision making is through the normal courses available to all shareholders. There is **absolutely no record evidence of any instance of 'control' over the operations or export activities** of GTC." 2SAQR at 10, Appx2942 (emphasis added).

The gravamen of Commerce's state control finding was that: "At the July 2015 meeting, GIIG used its own votes to approve its preferred board candidates and preliminary profit distribution plan." Gov. Br. at 54. According to Commerce, such actions were "relevant to the factors Commerce considers when evaluating *de facto* independence, *i.e.*, profit distribution and selection of management." *Id*. at 34; 2nd Remand at 49, Appx187. However, this separate rate denial lynchpin is devoid of a nexus between GIIG's voting and the SOE having "actual control" over GTC's "export activities"—long recognized linchpins of the separate rate analysis. Opening Br. at 35-37; Commerce Memorandum (Oct. 5, 2016) ("Separate Rate Memo"), at 1 (emphasis added), Appx3824; *Silicon Carbide from China*, 59 Fed. Reg. at 22,587; *Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,269,

IDM Comment 3.

Moreover, Commerce's conclusion is rebutted by the critical fact that, two months earlier: "GIIG's preferred proposals on profit distribution and selection of managers failed at a shareholder meeting in May 2015." Gov. Br. at 51 (quoting *GTC v. United States*, 641 F.Supp.3d 1371, 1385 (CIT 2023) ("*GTC III*"), Appx44). That the SOE was unable to pass its preferred proposals constitutes **substantial evidence that Guizhou is not ultimately beholden to GIIG**. That these proposals subsequently were passed does not establish actual government control over GTC's export activities, the essential prerequisite for separate rate denial. The 2015 GTC meetings demonstrate that GIIC participated transparently and democratically through normal procedures, subject to legal restrictions. As such, Commerce improperly misconstrues the ordinary operations of a company that is 25.2% owned by an SOE as a basis to deny GTC's separate rate.

The Government heralds the CIT finding that "Commerce did not base its determination on the company's noncompliance with the {AoA} or applicable Chinese law." Gov. Br. at 54-55 (quoting *GTC III*, 641 F.Supp.3d at 1385, Appx44). This finding does not support Commerce's decision. As an initial matter, Commerce in fact rested its original separate rate denial on the discredited finding that the July 2015 Meeting was not open to all shareholders. *GTC v. United States*, 389 F.Supp.3d 1302, 1359-61 (CIT 2019), Appx8-10; IDM (Apr. 12, 2017), at 60,

Appx63; Final Redetermination (Sept. 23, 2019) ("1st Remand"), at 14-15,

Appx109-110. Commerce thereafter continued denying GTC's separate rate,

undeterred by the fact that all relevant meetings were "publicly announced and

open to all shareholders." 1st Remand at 15, Appx110.

Moreover, Guizhou's separate rate eligibility does not hinge on GIIG having

done "anything improper, inimical to the company's interests, or in derogation of a

fiduciary duty." *GTC*, 641 F.Supp.3d 1886, 1396 (CIT 2023). With Guizhou

having rebutted the presumption, Section II, *supra*, Commerce could only deny

GCT's separate rate by relying on substantial evidence supporting its finding of

actual government control over export activities. The ordinary operations of a

company with a one-quarter SOE ownership does not suffice, and only resulted in

denial because Commerce improperly extended the separate rate analysis for

majority SOE-ownership to GTC, as shown in Section IV below.

### B.   Aeolus's Separate Rate Denial Is Unsupported

The Government argues that Commerce properly denied Aeolus's separate

rate based on: "(1) 49.06 ownership by state-owned entities, (2) ChinaChem

majority role in electing board members at the relevant shareholder meeting, and

(3) Aeolus's board chairman serving as a representative of a state-owned entity."

Gov. Br. at 50. Yet upon examination of the Department's rationale, it is clear that

Commerce essentially based the denial on the first factor alone, that it then

rounded up to equate with majority ownership; the second and third points are corollaries of having a sizeable SOE shareholder and do not evidence government control of Aeolus, let alone its export activities. Indeed, the Government concedes that Commerce misplaced reliance on the fact that Aeolus's "AoA allows its **majority shareholders** to control the selection of its board . . . ." 2nd Remand at 6, Appx144 (emphasis added). In fact, Aeolus is not majority SOE-owned. The Government claims that nonetheless "Commerce's path can be reasonably discerned." Gov. Br. at 46. Aeolus submits that Commerce's path is an administrative effort to conflate minority with majority SOE-ownership, to avoid the necessary rigorous evidentiary evaluation.

Commerce unreasonably found that "ChinaChem . . . controls Aeolus' Board selection process." 1st Remand at 7 (emphasis added), Appx102. ChinaChem played no role in nominating Aeolus Board members, as all "board member candidates were nominated by the existing board." SSRA at 1 (emphasis added), Appx2903. The Government emphasizes that "no public shareholder . . . ever nominated a director," Gov. Br. at 45 (quoting 1st Remand at 8, Appx103), while ignoring the fact that no SOE shareholders were involved in this process. Moreover, the ChinaChem vote heralded by Commerce—besides undisputably being transparent and democratic through a constrained legal process—is not grounded in evidence, in light of a 19-day gap in the record. Opening Br. at 71-73.

The Government improperly faults Aeolus for this omission. In fact, Aeolus did "develop the record to rebut the presumption," Section II, *supra*, and Commerce is required by law to provide notice of deficient responses and "an opportunity to remedy." 19 U.S.C. § 1677m(d). The requisite notice and opportunity to remedy was not accorded to Aeolus.

That Aeolus's board chairman served as a representative of a SOE likewise does not reasonably evidence state control. The record confirms he acted in accordance with Aeolus AoA Art. 113 by "attending the meeting . . . , reading the proposals from other directors and voting on the proposals"—he "did not play any other roles" for the SOE. SSRA at 2-3, Appx2904-2905; SRA Exhibit 11, Appx655-656. Moreover, Aeolus AoA Article 98(9) provides that the Chairman "**shall not harm interest of the company using their affiliation relationship**." SRA Exhibit 11 (emphasis added), Appx653. By disregarding these record facts to deny Aeolus's separate rate, Commerce improperly failed to consider "evidence that fairly detracts from the substantiality of the evidence." *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010).

Commerce likewise improperly sought to justify its denial on a contorted reading of the Rectification Report. *See* 1st Remand at 11-13, 36, Appx106-108, Appx131. Aeolus demonstrated that the Rectification Report could not be construed as a basis for finding state control, and the Government declined to

support those erroneous Commerce findings. *Compare* Opening Br. at 74-75 *with* Gov. Br. at 49. The Rectification Report, by evidencing a cessation of intertwined operations between ChinaChem and Aeolus **before the AR7 POR**, instead constitutes substantial evidence disproving state control. Aeolus RFI Exhibit 1A, Appx777.

## IV.  COMMERCE IMPROPERLY USED THE SEPARATE RATE ANALYSIS FOR MAJORITY SOE-OWNED RESPONDENTS

The Government relies heavily on precedent affirming Commerce's summary separate rate denial for majority SOE-owned respondents, in which Commerce is not required to establish a direct nexus to actual control over export activities. Gov. Br. at 16, 22-38, 47-48, 54; *Diamond Sawblades Mgrs. Coal. v. United States*, 866 F.3d 1304, 1307 (Fed. Cir. 2017) ("*DSMC*"); *China Mfgrs. Alliance, LLC v. United States*, 639 F.Supp.3d 1260, 1264 (CIT 2023); *ZMC*, 65 F.4th at 1368; *Yantai CMC Bearing Co. v. United States*, 203 F.Supp.3d 1317, 1317-26 (CIT 2017); *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F.Supp.3d 1308 (CIT 2018). The CIT in the majority SOE-ownership context recognizes that:

- **"a majority government shareholder will not be able to rebut the presumption of government control because** . . . notwithstanding a lack of evidence of actual control, **the majority shareholder is constantly in possession of the ability to exercise actual control**." *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F.Supp.3d 1350, 1357 (CIT 2018) ("*An Giang II*") (emphases added); and, relatedly

- 21 -

- **the *Aukerman* standard is "unhelpful"** to such respondents attempting to establish separate rate eligibility. *Zhejiang Quzhou*, 350 F.Supp.3d at 1323 (emphasis added).

These CIT decisions found that majority SOE-owned respondents cannot rebut the presumption of state control.

By contrast, the CIT recognizes that minority SOE-owned respondents such as Guizhou can rebut the presumption, as their separate rate denial must be supported by "more indicia of control" beyond 'potential control.'" *An Giang II*, 284 F.Supp.3d at 1361; Opening Br. at 29-33. Commerce failed to heed this distinction, denying separate rates upon "considering whether the government 'is able to exercise, or have **the potential to exercise**, control of a company's general operations." Gov. Br. at 36 (emphasis added) (citing Remand at 23-24, Appx118-119). Commerce purports to have "analyzed additional indicia of control," but its evidentiary bases:

- for GTC, relies on actions at the July 2015 meeting, without considering actions at the May 2015 Meeting; and

- for Aeolus, relies on the board election at the 2014 Meeting, while disregarding the Rectification Report.

Section III, *supra*.

Reviewing courts have affirmed Commerce's rationale that the normal operation of respondents with majority SOE shareholders is sufficient to deny separate rates without evidence that the SOE actually controls export activities.

Opening Br. at 37-40. Evidence of potential control is an appropriate basis to deny separate rates for majority SOE-owned respondents. Opening Br. at 37-40.[3] However, evidence of actual control is necessary to deny separate rates for minority SOE-owned respondents. Commerce thereby impermissibly concluded, without substantial evidence, that SOEs controlled Respondents' export activities: "It is well established that speculation does not constitute 'substantial evidence.'" *Lucent Tech., Inc. v. United States*, 580 F.3d 1301, 1328 (Fed. Cir. 2009).

Moreover, Commerce improperly conflated general operations with export activities that have been the longstanding focus of Commerce's analysis, which Commerce purportedly employed in AR7. U.S. Department of Commerce Policy No. 05.1 (Apr. 5, 2005), Appx231; Separate Rate Memo at 1, Appx3824.

The Government next claims that each *de facto* criterion can be evaluated in isolation, and that a separate rate for a minority-owned SOE can be denied if merely one of the four factors is not satisfied. Gov. Br. at 16-17. Commerce correctly concedes that "there is **no evidence that the SOE owners directly**

---

[3]    The Government heralds the lone CIT decision that potential control is sufficient to deny a separate rate for minority SOE-owned respondents, viewing each *de facto* factor in isolation. Gov. Br. at 16-17, 36-40 (citing *I.D.I. Int'l Dev. & Inv. Corp. v. United States*, 2021 WL 3082807, *7 (CIT July 6, 2021)). Respondents submit that *I.D.I.*—beyond being not binding on this Court—is inconsistent with multiple CIT decisions requiring distinct analyses for majority- and minority SOE-owned respondents, as well as Commerce's traditional holistic separate rate methodology. *See* Opening Br. at 40-49.

exercised their control on the respondents' export activities" and "**no explicit**

**evidence that the Chinese government 'actually did control' export pricing**."

2nd Remand at 3-4, 19 (emphases added), Appx141-142, Appx157. Yet this Court

has only recognized that separate rates for **majority SOE-owned respondents**

may be denied based on the SOE having "the power to select managers and keep

the profit distribution—factors that Commerce has considered in establishing the

presumption of de facto control." *ZMC*, 65 F.4th at 1372.

This Court should decline to extend *ZMC*; rather, all factors should remain

relevant in evaluating the separate rate eligibility in the minority SOE-ownership

context. Commerce's separate rate analysis historically "**consider{s} the totality**

**of circumstances**." *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28

F.Supp.3d 1317, 1339 n.160 (CIT 2014) (emphasis added). The truncated analysis

used to deny Respondents' separate rates, in which each factor is evaluated in

isolation and those favoring eligibility are ignored, is anathema to "considering the

totality of the circumstances." *Id*. This truncated approach may be appropriate for

majority SOE-ownership because "the majority shareholder is constantly in

possession of the ability to exercise actual control." *An Giang II*, 284 F.Supp.3d at

1357. However, there is no basis to extend this myopic analysis to respondents

which are minority SOE-owned, for which all factors should remain relevant under

the traditionally holistic inquiry.

In short, Commerce improperly transposed the standard for majority ownership to deny Respondents' separate rates. Guizhou and Aeolus ask this Court to accept the CIT-recognized critical distinction between majority and minority SOE-owned respondents. The truncated analysis through which Commerce denies separate rates based on potential control over operations by considering each factor in isolation—thereby creating an irrebuttable presumption of state control—should be confined to the majority SOE-ownership context. The ordinary rebuttable presumption, with its applicable *Aukerman* standard, as well as the nexus to actual control over export activities through holistic consideration, should remain applicable to the minority-owned SOE Respondents. Respondents are not asking "the Court to reweigh the evidence" as the Government insists, Gov. Br. at 42, but instead request that this Court compel Commerce to employ the correct evidentiary and analytical separate rate framework in the first instance.

## V.    COMMERCE ARBITRARILY REVERSED ITSELF

Commerce granted GTC's separate rate in the fifth administrative review ("AR5") of the ADD order on OTR from China in April 2015, in the middle of the AR7 POR. *OTR from China*, 80 Fed. Reg. 20,197, 20,198-99 (Apr. 15, 2015) (final results). That OTR AR5 proceeding is being appealed by Double Coin Holdings Ltd., a majority SOE-owned respondent denied a separate rate, as a companion to this AR7 appeal. *China Mfgrs. Alliance, LLC v. United States*, 639 F.Supp.3d

1260, 1264 (CIT 2023), *appealed as* Fed. Cir. Case No. 23-2391. Between AR5,

when GTC was granted a separate rate, and AR7 when its separate rate application

was denied, GTC's SOE ownership decreased from 33.84% to 25.2% and

Guiyang's SASAC ceased conducting GTC performance reviews. Guizhou RFI at

2, 6, Exhibit 1, Appx1740, 1744-1753; *AR5 Final Results*, 80 Fed. Reg. at 20,198-

99. In AR7, Guizhou also provided additional substantial evidence of its

independence that was not submitted in AR5—including the Guiyang SASAC

Clarification and 2015 Annual Report. Section II.A, *supra*.

    The Government endeavors to defend this nearly contemporaneous

Commerce 180-degree about-face as "reflect{ing} the reasonable evolution of

Commerce's analysis based on court decisions." Gov. Br. at 57 (citing 2nd

Remand at 47-48, Appx185-186). This argument should be rejected. First,

extensive judicial precedent confirms the propriety of demarcating separate rate

analyses depending on whether the respondent is majority or minority SOE-

owned—a distinction which Commerce properly applied in AR5, evidenced by the

different outcomes for GTC and Double Coin. Second, simply stating that a

practice has evolved based on inapposite precedent does not constitute the requisite

"adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d

1365, 1373 (Fed. Cir. 2011).

    Finally, Commerce cannot reasonably find that a respondent demonstrating

less SOE ownership and oversight than when it was granted a separate rate in the past magically becomes ineligible for such status—in the absence of intervening judicial precedent or a formal change in agency practice effectuated after notice and opportunity for comment. Commerce cannot reasonably move the goal posts by granting a separate rate in one proceeding, and shortly thereafter denying a separate rate when the record in the second proceeding contains substantial evidence of significantly less SOE ownership and control than in the first proceeding. This contemporaneous reversal constitutes arbitrary agency action resulting from "a clear error in judgment." *Hyundai Elecs. Indus. Co. v. United States*, 899 F.2d 1204, 1209 (Fed. Cir. 1990).

Judicial precedent involving majority SOE-owned respondents does not support Commerce jettisoning its multi-factor analysis into actual control over export activities for respondents who are minority SOE-owned. Accordingly, because "the Department provides no reasonable explanation for changing a practice that it has consistently followed, **such a change in an unacceptable agency practice**." *WelCom Prods., Inc. v. United States,* 865 F.Supp.2d 1340, 1344 (CIT 2012). (emphasis added). Indeed, Commerce was required to provide "a **more detailed justification**" for denying GTC's separate rate, because "its **new policy rests upon factual findings that contradict those which underlay its prior policy**." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)

(emphases added). Commerce inexplicably and unreasonably summarily denied GTC's separate rate through findings that contradicted the longstanding approach followed since *Silicon Carbide* three decades ago—which had been properly applied to GTC in AR5.

## CONCLUSION

Commerce implemented a radically different separate rate analysis in AR7 than it had in the past. Until its recent change of practice with respect to majority-owned SOEs, Commerce applied the *Silicon Carbide* analysis by granting separate rates to respondents having significant—even 100 percent—SOE ownership:

- *Hot-Rolled Carbon Steel from China*, 66 Fed. Reg. 49,632 (Sept. 28, 2001), IDM Comment 1 (granting separate rates despite government ownership);

- *Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,269 (Sept. 14, 2006), IDM Comment 3 ("information submitted by the Petitioner **addresses only potential control by SASAC** . . . , **rather than any actual control** of the PRC government over the numerous individual export decisions . . . during the POR.") (emphasis added);

- *Circular Welded Carbon Quality Steel Line Pipe from China*, 74 Fed. Reg. 14,514 (Mar. 31, 2009), IDM Comment II (separate rate granted to subsidiary of company directly owned by SASAC);

- *Oil Country Tubular Goods from China*, 75 Fed. Reg. 20,335, 20,338-40 (Apr. 19, 2010) (well-known SOE granted separate rate);

- *Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992 (Dec. 26, 2012), IDM Comment 6 ("**the Department has previously found an absence of *de jure* government control for companies with various forms of state ownership**") (emphasis added); and

- *Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474 (Sept. 9, 2016), IDM Comment 1 ("examin{ing} whether the holding of a minority stake of a producing entity which is a subsidiary of the exporter, by a local SASAC entity, amounts to *de facto* government control . . . . {B}ased on the totality of the circumstances, we find that there is an absence of government control.").

This Court has affirmed Commerce's change of practice to automatically deny separate rates for majority SOE-owned respondents through an irrebuttable presumption. This approval reflects the fact the government actually controls a corporate entity in which it has majority ownership. Opening Br. at 37-40. That truncated analysis, however, should not be extended to minority SOE-owned respondents such as GTC, since minority ownership does not constitute control. *Id*. at 40-44. Where minority SOE-ownership exists, the normal rebuttable presumption, *Aukerman* standard, nexus to actual control over export activities, and holistic consideration of all factors should remain intact. *Id*. at 37-44. Otherwise, there will be no limits on Commerce's authority to deny separate rates; indeed, Commerce is poised to find an exporter part of the China-wide entity despite it having no SOE ownership whatsoever. *See Pea Protein from China*, 89 Fed. Reg. 10,038 (Feb. 13, 2024) (preliminary determination), Decision Memorandum at 9-10.

Respondents respectfully request that this Court clarify that its recent holdings in *ZMC*, *DSMC*, and AR5 are limited to records in which there exists

majority SOE-ownership. This Court should further clarify that Commerce does not have *carte blanche* to deny separate rates by applying a test contrary to longstanding agency practice.

Based on the foregoing and as set forth in Respondents' Opening Brief, Guizhou and Aeolus respectfully request that the CIT's judgment be reversed and remanded for further consideration consistent with this Court's opinion.

Respectfully submitted,

*/s/ Jordan C. Kahn*
Ned H. Marshak*
Jordan C. Kahn
Dharmendra N. Choudhary

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW Suite 650
Washington, DC 20005
 (202) 783-6881

*599 Lexington Ave., 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel to Plaintiffs-Appellants Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.*

Dated: June 20, 2024

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type-volume limitations of Federal Rule

of Appellate Procedure 32(a)(7)(B) because it contains less than 14,000 words.

This brief contains 6,794 words, excluding the parts exempted by Federal Rule of

Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.     This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of

Appellate Procedure 32(a)(6) because it has been prepared in a proportionally

spaced typeface using Microsoft Office Word in Times New Roman 14-point font.


Dated: June 20, 2024                                    */s/ Jordan C. Kahn*
                                                        Jordan C. Kahn